UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

POWER INVESTMENTS, LLC, )
Plaintiff, )
vs. ) Case No. 4:21-cv-01022
CARDINALS PREFERRED, LLC, )
Defendant. )

**MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff Power Investments, LLC ("**Power**") submits this Memorandum in Support of its Motion for Temporary Restraining Order (and thereafter a preliminary injunction) pursuant to Rule 65 of the Federal Rules of Civil Procedure.

## I. INTRODUCTION AND BACKGROUND

Power and Cardinals are co-owners, or Unitholders, of Ashley Energy LLC ("**Ashley**") whose relationship is governed by the *Ashley Energy LLC Amended and Restated Limited Liability Company Agreement* (the "**Agreement**"). *See* Agreement, Exhibit 1.[1] Cardinals, also known under the Agreement as the "Preferred Unitholder," purchased 999,222 Preferred Units of the Company in exchange for an investment of $999,222.00 on August 8, 2017. *Id.* Power is the sole owner of the Company's Class A Common Units and owns 850,988 such units. *Id.* at Schedule I.

This dispute stems from Cardinals' attempt to circumvent its clear obligations under the Agreement related to consummating Power's valid exercise of a call option on August 9, 2021, whereby Power agreed to purchase all of Cardinals' Preferred Units in exchange for an amount set

[1] All references to exhibits referenced herein are to exhibits attached to Power's Verified Complaint.

forth in the Agreement (the "**Call**"). Section 10.5(b) of the Agreement provides: "At any time on or following August 9, 2021, a majority of Class A Common Units shall have the right to purchase a portion or all of the Preferred Units pursuant to this Section 10.5(b)." *Id.*, § 10.5. Section 10.5(b) further provides that the Call shall be consummated at the price described in Section 10.5(a), which is the greater of two calculations:

> The price for Preferred Units sold to the LLC in accordance with this Section 10.5(a) shall be equal to the greater of (x) the sum of (1) the Preferred Unitholder's Unreturned Capital and (2) the Preferred Unitholder's Unpaid Return, in each case as of the date of such redemption or (y) the price of the Preferred Units calculated in accordance with the following formula:
>
> E * 11 – D – WC – O
>
> E = trailing twelve month EBITDA, as determined by LLC's auditors, measured from the month ending prior to redemption;
> D = all secured debt outstanding at the time of redemption;
> WC = adjusted working capital, as determined by the LLC's auditors;
> O = other material, on-balance sheet LLC obligations, measured for the month ending prior to redemption

On August 9, 2021, Power delivered notice of its intent to exercise the Call (the "**Call Notice**"). *See* Call Notice, Exhibit 2. The Call Notice included both calculations set forth in Section 10.5 and calculated a purchase price of $1,610,971.77 using the first calculation, because it was the greater of the two. *See* Ex. 2. This amount represents a total return of $611,749.77 over the life of its 4-year investment, or 61%, on Cardinals original $999,220.00 investment. Compl., ¶ 36.

Section 10.5(b) further provides that the Call must be consummated within the timing specified by Section 10.5(a) governing the corresponding Put, which provides that the Put shall be consummated within six months after the delivery of notice of exercise: "The Put shall be consummated within six (6) months after the delivery of notice that the Preferred Unitholder has

exercised the Put (such date of consummation, the 'Put Closing')". Ex. 1, § 10.5(a)(ii). Accordingly, the Call must be consummated within six months after the delivery of notice that Power has exercised the Call. *Id.* In the Call Notice, Power indicated its intent to consummate the transaction immediately. Ex. 2.

In addition to agreeing to give Power the option to purchase the Preferred Units, Cardinals also agreed to cooperate so as to ensure the purposes of the Agreement are achieved: "The Parties agree to execute and deliver all documents, provide all information and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement." Ex. 1, § 15.12. Cardinals further agreed that specific performance and injunctive relief would be available as potential remedies for breach of any provision of the Agreement: "The Parties agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that the LLC and each Unitholder may in its sole discretion apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive relief (without posting a bond or other security) in order to enforce or prevent any violation of the provisions of this Agreement." *Id.*, § 15.3.

Upon receiving the Call Notice, a Cardinals' representative admitted by email that the Agreement requires consummation and closing of the Call purchase within six months of Power's notice. Compl., ¶ 49; Ex. 5, pp. 1-3. The same Cardinals' representative acknowledged that, consistent with the plain language of the Agreement, the price mechanics for the Call Option are the same as for the Put Option under the Agreement, and that the Board of the Company, including Cardinals, had unanimously approved the form and methodology of the calculation of the price set forth in the Call exercise. Compl., ¶¶ 49-50; Exs. 5-6.

Notwithstanding these admissions/acknowledgements, Cardinals informed Power that it is

unwilling to comply with its obligations under the Agreement to consummate and close the Call. On an August 12, 2021 phone call, Cardinals' representatives informed Mason Miller, Power's representative, of its unwillingness to comply with the Agreement—despite also admitting to Mr. Miller that Section 10.5 of the Agreement is "very clear" in providing Power with the Call Option it exercised. Compl., ¶ 38. On that phone call, the Cardinals' representatives even asked Power to retract its exercise of the Call (which Power declined to do). *Id.* Cardinals also refused to permit Power to consummate the call and refused to provide payment/wire instructions and stated that Cardinals had no intention of selling the Preferred Shares for the price called for in Section 10.5 of the Agreement. *Id.*

Further, after receiving Power's notice, Cardinals began taking steps to prevent the consummation and closing of the Call, including attempting to convert its Preferred Units—all of which Cardinals was already obligated to sell to Power by virtue of the Call exercise. Section 4.1(a) provides a mechanism by which the Preferred Unitholder may convert Preferred Units it owns into Class A Common Units. *Id.* § 4.1(a). Shortly after 7:00 p.m. Central on Sunday, August 15, 2021—six days after receiving the Call Notice—Cardinals faxed Mr. Miller, both as owner of Power and board member of Ashley, a letter purporting to provide notice that Cardinals is converting all of its Preferred Units into Class A Common Units pursuant to Section 4.1(a). Compl., ¶ 42; Ex. 3. Cardinals' letter claims that its purported conversion "moot[s]" Power's Call. *Id.*

Section 4.2(a) of the Agreement provides that the effective time of conversion of Preferred Units under Section 4.1(a) is "[t]he close of business on the date of receipt by the LLC of such notice [of conversion]." *Id.* § 4.2(a). Thus, notwithstanding the fact that Cardinals' purported conversion attempts to convert all of the very shares Cardinals is contractually obligated to sell to

Power, the earliest Cardinals' attempted conversion could even become effective is the close of business on Monday, August 16, 2021—after the filing of this action—and only under a scenario where the Company has received such notice of conversion. *Id.*

Cardinals' August 15, 2021 letter further purported to reject Power's exercise of its Call Option, despite admitting that Cardinals had received Power's August 9, 2021 notice of its Call exercise. Further, after receiving Power's notice, Cardinals has threatened to take additional steps to frustrate and/or prevent the consummation and closing of the Call pursuant to the Agreement. Specifically, in a separate August 12, 2021 phone call, a Cardinals' representative communicated to Mr. Miller that Cardinals believed it has the power to delay the closing of Power's Call at least six months, and to take steps to significantly increase the Call's purchase price by forcing cash distributions to the Company, and prematurely settling an as-yet-unlitigated and unliquidated subrogation claim by the Company against the Metropolitan St. Louis Sewer District and forcing those proceeds to be distributed as well. Compl., ¶ 48.

Beyond Cardinals' wholesale refusal to comply with its obligations to consummate and close the Call and its attempt to subvert Power's Call through an improper conversion, Cardinals' taking the additional threatened steps would render impossible the consummation and closing of Power's Call pursuant to the Agreement because it would delay the start of the closing process (which involves a number of events that must happen in sequence over a period of months) and would improperly burden Power with a higher purchase price that it is not obligated to pay.

## ARGUMENT

### II. LEGAL STANDARD

The Eighth Circuit follows a four-factor balancing test for determining whether to grant a motion for preliminary injunction, which examines: (1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between

this harm and the injury that granting the injunction will inflict on the other party; and (4) the public interest. *Safety-Kleen Sys., Inc. v. Hennkens*, 301 F.3d 931, 935 (8th Cir. 2002). The same factors govern a request for a temporary restraining order.

"No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction." *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994). It is a balancing test where the Court can consider all four factors, but the movant need only establish one such factor: the threat of irreparable harm. *Id.* Additionally, the movant need not prove a greater than fifty percent likelihood of prevailing on the merits of its claims; rather, showing a "fair chance of prevailing" is enough. *Tillman v. City of St. Louis*, 2021 WL 1080686, at *2 (E.D. Mo. Mar. 18, 2021).

## III. ALL FACTORS WEIGH IN FAVOR OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### A. Power Has a Substantial Likelihood of Success on the Merits of Its Claims.

#### 1. Power Investments validly exercise its call option.

Section 10.5's Call Option is a binding option contract. Unlike a standard offer, an option contract is an offer that cannot be revoked before acceptance. Missouri law makes this concept clear: "An option coupled with consideration is a continuing and irrevocable offer to sell that the seller cannot withdraw during a stated period. . . . The option vests the buyer with a power of acceptance." *In re Estate of Schulze*, 105 S.W.3d 548, 550 (Mo. App. 2003). An option gives the optionee the power to purchase the property in question at a stipulated price whether or not the owner wishes to sell. *Id.* "Once the buyer accepts the offer in the prescribed manner, the option is considered exercised so as to create a binding bilateral contract. . . . The bilateral contract is specifically enforceable." *Id.*

Tellingly, the Delaware Chancery Court has addressed the issue of option contracts in the

precise context of corporate/LLC share purchases, as here. In *Walsh v. White House Post Productions, LLC*, the Chancery Court held that call options in the corporate buyout/share purchase context are binding option contracts that the offeree cannot revoke, whose acceptance is solely within the power of the optionee, and that become binding bilateral contracts upon the optionee's acceptance. 2020 WL 1492543, *5-6 (Del. Ch. Ct. Mar. 25, 2020). The court explained: "An option contract has two elements: the underlying offer concerning the sale or purchase of the property and the collateral promise to hold that offer open. The option holder, or offeree, holds the power of acceptance as to the underlying offer." *Id.* at *5. The court stated that call options are a type of option contract that give investors or the company the right to buy the interests of other investors. *Id.* The court continued, explaining: "The offeree has unfettered discretion to either accept the offer or not. . . . An offeree that accepts the offer is said to 'exercise' the option. . . . [O]nce the option is exercised and the offer accepted . . . , the underlying agreement becomes a valid and enforceable bilateral contract . . . . The notice of acceptance binds the acceptor (option holder) irrevocably." *Id.* at *6 (internal quotation marks omitted).

The Chancery Court thus left no doubt that call options in the corporate buyout context are option contracts subject to black-letter common law governing such contracts. Such call options ensure that the parties honor and execute the pre-negotiated buyout terms they agreed to in executing the corporate/LLC agreement in the event the optionee exercises the call. *Id.* Notably, multiple Delaware decisions have made clear that disputes or disagreements over the purchase price for an exercised corporate buyout call option, or how that purchase price is arrived at, are ***not*** grounds for allowing the offeror (here Cardinals) to withdraw from the binding option contract. In *Walsh*, the defendants were dissatisfied with the increasingly high purchase price being generated by multiple successive appraisals of the company and self-servingly contended they had

the right to withdraw from the option and the price-fixing process. 2020 WL 1492543, at *1. The court rejected this position, holding that the call option became a binding bilateral contract upon the optionee plaintiffs' acceptance, from which the defendants could not withdraw. *Id.* at *5-6.

In so holding, the Chancery Court approvingly cited another Delaware decision, *In re Ryckman Creek Resources, LLC*, 2018 WL 4178692 (D. Del. Bnkr. Aug. 29, 2018). The LLC agreement call option in *Ryckman Creek* gave the majority member the right to buy out the minority member's interests upon exercising the option and providing notice of same. *Id.* at *2. Like the call option here, the option in *Ryckman Creek* had a price-fixing mechanism requiring the majority member to pay the greater of two numbers, one of which was a contractually established minimum or floor. *Id.* In response to the minority member's suit to enforce the contractual minimum number, the majority member tried to withdraw from the option on the ground that there was no enforceable agreement and the call option exercise notice was just an offer, not an acceptance of an open offer. *Id.* at *9. The court rejected this position, reasoning that the call option was the offer, the call option notice of exercise was the acceptance initiating the valuation process, and the offeror (majority member) was not permitted to withdraw from the option contract once exercised by the optionee. *Id.* The court explained that the "heart" of the call option is "the process for determining the price" of the interest to be bought, and the parties agreed to that process when they executed the LLC agreement. *Id.* "That the [minority member] responded to the Call Option Notice with a different view of what the valuation should be is not the defining factor here." *Id.*

The Section 10.5 Call Option constitutes a continuing and irrevocable offer by Cardinals to Power that Cardinals could not legally withdraw. It was solely Power's right to determine whether to exercise the Call, and when it exercised the Call it accepted the Option. Once Power

accepted the offer in the manner specified in the Call Option, the Option was exercised so as to create a binding bilateral contract that is specifically enforceable by Power against Cardinals. *Schulze*, 105 S.W.3d at 550. Power's notice of exercise of the Call Option bound the parties irrevocably to proceed with the Call and fulfill bilateral obligations. *Walsh*, 2020 WL 1492543, at *6. The Preferred Units are, therefore, the subject of a binding contract, whereby Cardinals has no option except to comply with the Agreement and consummate the transaction contemplated therein. Cardinals has no ability to convert those shares because they are under contract to be sold pursuant to the Agreement.

**2. Cardinals' attempted conversion is contrary to the Agreement and Missouri law.**

"Missouri law implies a covenant of good faith and fair dealing in every contract." *Farmers' Elec. Co-op., Inc. v. Missouri Dept. of Corr.*, 977 S.W.2d 266, 271 (Mo. banc 1998). A party breaches the covenant of good faith if it exercises a judgment conferred by the agreement's express terms in a manner that "evades the spirit of the transaction or denies the other party the expected benefit of the contract." *Envtl. Prot., Inspection, & Consulting, Inc. v. City of Kansas City*, 37 S.W.3d 360, 366 (Mo. App. 2000). The covenant of good faith and fair dealing also includes an "obligation imposed by law to prevent opportunistic behavior, that is, the exploitation of changing economic conditions to ensure gains in excess of those reasonably expected at the time of contracting." *City of St. Joseph v. Lake Contrary Sewer Dist.*, 251 S.W.3d 362, 370 (Mo. App. 2008). The implied covenant of good faith is necessary to prevent unenforceable, illusory contracts that lack mutuality of obligations. *See Home Shopping Club, Inc. v. Roberts Broad. Co.*, 989 S.W.2d 174, 179 (Mo. App. E.D. 1998) (citing *Martin v. Prier Brass Mfg. Co.,* 710 S.W.2d 466, 473 (Mo. App. W.D. 1986)).

Missouri courts interpret a limited liability company's operating agreement according to

the ordinary rules of contract law. *McGuire v. Lindsay*, 496 S.W.3d 599, 607 (Mo. App. E.D. 2016). "The cardinal principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent." *Dunn Indus. Group, Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. banc 2003). Accordingly, when interpreting an operating agreement, courts apply the plain and ordinary meaning of the words in the agreement and consider the document as a whole. *McGuire*, 496 S.W.3d at 607. Additionally, each term, clause, and provision should be construed to avoid an interpretation that renders other parts of the agreement meaningless, nonfunctional or nonsensical. *Id.; Storey v. RGIS Inventory Specialists, LLC*, 466 S.W.3d 650, 655 (Mo. App. E.D. 2015) ("Interpretations that render provisions meaningless should be avoided."). Where the terms of the agreement are clear, courts must apply the agreement as written and not supply additional terms. *McGuire*, 496 S.W.3d at 607.

Here, Cardinals' attempted conversion of its Preferred Units to Class A Common Units in an attempt to "moot" Power's Call Option is both an express breach of the Agreement and a breach of the duty of good faith and fair dealing. Since receiving Power's Call Option notice, Cardinals has taken no actions to close Power's purchase of the Preferred Units as required by Section 10.5. Instead, nearly a week after receiving Power's notice, Cardinals informed Power that it intends to "convert all of the Preferred Units held by the Preferred Holder into Class A Common Unit" pursuant to 4.1(a), which Cardinals claims moots Power's Call Option. Ex. 3. **First**, Cardinals is obligated by the Agreement to (i) close the Call transaction within 6 months; and (ii) "execute and deliver all documents, provide all information and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement." Compl., ¶ 31; Ex. 1, § 15.12. One purpose of the Agreement was to give Power Call Option rights (and Cardinals corresponding Put rights). Cardinals' intent to frustrate or "moot" that purpose is a clear breach

of the Agreement. **Second**, to permit Cardinals to moot a Call using a conversion right—a week after it has occurred—would render section 10.5 completely meaningless. In other words, under Cardinals' interpretation of the Agreement, where it can moot rights after the fact, Power's Call Option could be subverted by Cardinals at any point rendering Section 10.5 nonfunctional and meaningless. This interpretation of the Agreement is nonsensical and contrary to basic tenets of contract interpretation. *See*, *e.g.*, *McGuire*, 496 S.W.3d at 607. **Third**, Cardinals' attempt to convert its Preferred Units into common units for the sole purpose of subverting Power's Call rights is a textbook example of a breach of the implied obligation of good faith and fair dealing by evading the spirit of what was agreed upon. Indeed, Cardinals' failure to act in good faith is demonstrated by its communications with Power in the days following Power's Call Option notification. While admitting that the Agreement is "very clear" in providing Power the Call Option it exercised, Cardinals has (1) refused to allow Power to consummate the Call Option; (2) refused to provide necessary payment and wiring instructions; and (3) communicated that it will take steps to significantly increase the Calls' purchase price. This opportunistic behavior is in violation of the covenant of good faith and fair dealing.

**B. Power Will Suffer Immediate and Irreparable Harm Absent an Injunction.**

Cardinals attempt to "moot" the consummation and exercise of Power's Call will cause irreparable harm absent an injunction barring Cardinals from attempting to convert its Preferred Units into common units. If Cardinals is permitted to convert its shares, the Call rights for which the parties bargained for will be lost. *See Saint Laurie Ltd. v. Yves Saint Laurent America, Inc.*, 13-CV-6857 (DAB), 2015 WL 12991205, at *5 (S.D.N.Y. Mar. 27, 2015) ("Assuming a breach is proven, "[w]hen specific performance is contemplated by the contract, courts tend to find that irreparable harm would be suffered unless specific performance is granted." (citing *Wells Fargo*

*Bank v. Bank of Am.*, No. 11 Civ. 4062, 2013 WL 372149, at *8 (S.D.N.Y. Jan. 31, 2013) (citing *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 2009))).

Moreover, if the conversion is not barred, the Preferred Units will be converted into a majority of common units, and Power Investments could thereafter be deprived of its spot on the board. In the Agreement, Power and Cardinals negotiated a governance structure pursuant to which the Ashley would be governed by a Board made up of three Managers, designated as follows: (i) one Manager designated by the holder of the majority of the Class A Units ("Manager 1"); (ii) one Manager designated by the holder of the majority of the Preferred Units ("Manager 2"); and one Manager designated by the majority of the Class A Units and Preferred Units voting as a single class on an unconverted basis ("Manager 3"). Prior to Cardinals' purported conversion of the Preferred Units, Power Investments is entitled to designate Manager 1 as the holder of the majority of the Class A Units, while Cardinals has the authority to designate Manager 2 as the holder of the majority of the Preferred Units and Manager 3 as the holder of the majority of the Class A Units and Preferred Units voting together as single class. The operating agreement further provides that a Manager can be removed upon written request of the Member entitled to designate such Manager. This structure affords Power, as the sole holder of Class A Units, but the minority holder of the ownership interests of Ashley as a whole, a board seat and a right to participate in the governance of the Ashley. Conversion of the Preferred Units by Cardinals in contravention to the terms of the operating agreement would allow Cardinals to wrongfully remove the Power's Manager 1 designee and replace Manager 1 with its own designee. If this occurs, Power Investments would be wrongly stripped of its right to participate in the governance of the Ashley, which would also constitute irreparable harm.

### C. Preliminary Injunctive Relief Will Not Cause Substantial Harm to Defendant, and Any Harm to Defendant Is Outweighed by the Harm to Power in the Absence of an Injunction

The balance of harms also weighs in favor of granting a temporary restraining order and preliminary injunction. As discussed above, without injunctive relief, Power will be prevented from purchasing the Preferred Units as permitted by Section 10.5. By contrast, Cardinals can claim no harm because the requested injunction simply requires it comply with the terms of the Agreement, and it expressly agreed that an injunction could be entered to prevent its breach of the Agreement. *McCann v. Barton*, 4:08-CV-00574-GAF, 2009 WL 900741, at *23 (W.D. Mo. Apr. 1, 2009), *aff'd sub nom. Mayer Hoffman McCann, P.C. v. Barton*, 614 F.3d 893 (8th Cir. 2010) (finding that defendants did not suffer harm when they signed agreements "knowingly and voluntarily," and then breached those agreements "knowingly and voluntarily."). In fact, Cardinals will benefit from being enjoined from violating the agreement. Indeed, injunctive relief will permit closing of a transaction in which Cardinals will realize more than a $600,000 return (61%) on its investment.

### D. Preliminarily Enjoining Defendant Will Serve the Public Interest

The public interest also favors entry of a temporary restraining order and preliminary injunction. Power has a legitimate interest in protecting its rights under the Agreement. The public interest is furthered by preserving the enforceability of contractual relationships. *Ronnoco Coffee LLC v. Peoples*, 4:20-CV-1401 RLW, 2020 WL 6875754, at *8 (E.D. Mo. Nov. 23, 2020) (quoting *H&R Block Tax Servs., LLC v. Cardenas*, 2020 WL 1031033, at *4 (W.D. Mo. Mar. 3, 2020)). An entry of a temporary restraining order and preliminary injunction will promote the public interest, including promoting freedom of contract and the enforcement of contracts.

## IV. THE COURT SHOULD NOT REQUIRE A BOND

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The amount of the bond lies within the sound discretion of the trial court and can be overturned on appeal only upon a finding that the trial court abused its discretion. *Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016). Based on various circumstances, including public interest factors at stake, or the defendant's failure to show damages that would result from a wrongful issuance of an injunction, the court may elect to waive the bond requirement. *Id.*

Here, where the parties have contractually agreed to waive the requirement of a bond, the Court should honor the parties' bargain and impose a zero bond upon granting injunctive relief. The parties expressly agreed that remedies including specific performance and/or injunctive relief would be available in response to a party's breach "***without posting a bond or other security***." Ex. 1, § 15.3 (emphasis added). Enforcing the terms of the parties' agreement serves important public policy purposes, including honoring the parties' settled expectations and the consideration they paid in bargaining for a no-bond requirement. *See PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1145 (8th Cir. 2007) (holding trial court "did not abuse its discretion by concluding its grant of a preliminary injunction promoted the public interest by protecting freedom to contract through enforcement of contractual rights and obligations").

Additionally, Cardinals cannot show that it will incur any damages because of a purportedly wrongful injunction granted against it. If Cardinals were to prevail in this case, the fact that Cardinals was prevented by injunction from carrying out the subversive steps it has been planning and/or attempting in opposition to Power's stock under the Call Option would have no

negative impact on Cardinals, and the parties would simply be returned to the status quo before Power's exercise of the Call.

Accordingly, upon granting the injunctive relief Power seeks herein, the Court should waive the normal requirement of a bond and impose a zero bond.

**CONCLUSION**

Plaintiff Power Investments, LLC, respectfully requests this Court issue a temporary restraining order and preliminary injunction and has filed a proposed order concurrently herewith.

Dated: August 16, 2021

ARMSTRONG TEASDALE LLP

By: */s/ Christopher R. LaRose*

Christopher R. LaRose #59612MO
Daniel R. O'Brien #69258MO
Armstrong Teasdale LLP
7700 Forsyth Blvd., Suite 1800
St. Louis, Missouri 63105
Telephone: 314.621.5070
Fax: 314.621.5065
clarose@atllp.com
dobrien@atllp.com

ATTORNEYS FOR PLAINTIFF POWER INVESTMENTS, LLC

**CERTIFICATE OF SERVICE**

I hereby certify that on the 16th day of August 2021, the foregoing was filed electronically with the Clerk of Court and served via email to:

Jose A. Castillo, Jr.
Reed Smith LLP
22nd Floor
New York, NY 10022
jcastillo@reedsmith.com

/s/ *Christopher R. LaRose* _