**From:**                             Gelinas, Charles A.
**Sent:**                             Monday, August 7, 2017 1:50 PM
**To:**                                vdupont@arenaco.com; Mason Millerdfa
**Cc:**                                tim.hauck@dentons.com
**Subject:**                      APP - Preferred Investment Documentation
**Attachments:**           Ashley Energy LLC-  LLC Operating
                                           Agreement(104316822_3).docx

Victor and Mason, here are the remaining open points to be discussed regarding the preferred share purchase arrangement.  Can you provide responses to each of the below questions in sufficient enough detail that we can finalize our turn of the attached operating agreement?  Thank you!

1. Please confirm the name of the Arena entity that will be making the $1mil investment.

2. Please confirm the equity ownership split of the LLC.

3. Especially if Arena will be owning less than a majority of the equity of the LLC. Please advise whether Arena has negotiated for any pro rata/preemptive rights (which is the right for Arena to buy into any future financing round to preserve their equity percentage).

4. Please confirm whether Arena has negotiated for any anti-dilution protection, such that if the LLC raised additional equity financing at a lower valuation in the future, Arena's conversion price (for conversion of its the Preferred Units into Class A Common Units) would be decreased.

5. Please confirm that the parties have reviewed Sections 5.1(a), 5.1(b) and 5.1(c) of the operating agreement and agree that this accurately reflects the business deal.

6. Please confirm the size of the board and the names of the individuals who will be board members.

7. Please confirm the names and titles of the officers of the LLC (eg. President, CEO, Secretary, Treasurer, etc.).

8. On the protective provisions, please advise on the dollar threshold for debt securities where the LLC must receive approval from the Preferred Units.

9. Please confirm whether the drag along and tag along provisions reflect the business understanding.

10. Please confirm that the put/call option provisions reflect the business understanding.

11. Please confirm whether the LLC will remain a Missouri LLC or whether parties have agreed to merge entity into a DE LLC. We are not Missouri lawyers, so the draft LLC agreement is based on DE law, which is more established.

12. Please confirm the number of authorized Class A Common Units, Class B Common Units and Preferred Units. Recall that the Class B Common Units will be the units set aside for any incentive equity grants that might be made to service providers. This pool of units should be set

EXHIBIT 11

aside now so that the pool is factored into the capitalization of the LLC now and any future Class B Common Unit grants do not dilute the Preferred Units.

[DENTONS DRAFT 07/28/17]

**ASHLEY ENERGY, LLC**

**AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**

THE UNITS REPRESENTED BY THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION.  SUCH UNITS MAY ONLY BE ACQUIRED FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO DISTRIBUTION OR RESALE, AND MAY NOT BE SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER THE SECURITIES ACT AND APPLICABLE STATE OR OTHER SECURITIES LAWS OR AN OPINION OF COUNSEL SATISFACTORY TO THE LLC TO THE EFFECT THAT AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE UNDER THE SECURITIES ACT AND SUCH STATE OR OTHER SECURITIES LAWS.

CERTAIN OF THE UNITS DESCRIBED IN THIS AGREEMENT ARE SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFERABILITY AND SALE AND TO REPURCHASE OPTIONS SET FORTH IN THIS AGREEMENT AND/OR ANY OTHER AGREEMENTS (INCLUDING EQUITY INCENTIVE AGREEMENTS) BETWEEN THE LLC AND THE INITIAL HOLDERS OF SUCH UNITS.

# TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS** ....................................................................................................... 1

ARTICLE II ORGANIZATIONAL MATTERS .......................................................................... 9

2.1    Formation of LLC ..................................................................................................... 9

2.2    Limited Liability Company Agreement ..................................................................... 9

2.3    Name ......................................................................................................................... 9

2.4    Purpose .................................................................................................................... 10

2.5    Principal Office; Registered Office ......................................................................... 10

2.6    Term ........................................................................................................................ 10

2.7    No State-Law Partnership; Tax Treatment as a Partnership ................................... 10

ARTICLE III CAPITAL CONTRIBUTIONS ............................................................................ 10

3.1    Units ........................................................................................................................ 10

3.2    Class B Common Units ........................................................................................... 11

3.3    No Withdrawal ........................................................................................................ 12

3.4    Loans From Unitholders .......................................................................................... 12

3.5    Distributions In-Kind ............................................................................................... 12

ARTICLE IV CONVERSION OF PREFERRED UNITS ......................................................... 12

4.1    Conversion Ratio ..................................................................................................... 12

4.2    Mechanics of Conversion ........................................................................................ 12

4.3    Conversion of the Preferred Units ........................................................................... 13

4.4    Adjustment for Unit Splits and Combinations ........................................................ 13

4.5    Adjustment for Merger or Reorganization, etc ....................................................... 13

ARTICLE V DISTRIBUTIONS AND ALLOCATIONS ......................................................... 14

5.1    Distributions............................................................................................................. 14

5.2    Indemnification and Reimbursement for Payments on Behalf of a Unitholder .............. 15

5.3    Tax Distributions...................................................................................................... 15

5.4    Limitations on Distributions ................................................................................... 16

5.5    Allocations of Profits and Losses ............................................................................ 16

5.6    Regulatory Allocations ............................................................................................ 16

5.7    Special Allocations Relating to Entity-Level Taxes; Withholding ......................... 17

5.8    Allocation for Income Tax Purposes ....................................................................... 18

ARTICLE VI MANAGEMENT .................................................................................................. 18

6.1    Management by the Board of Managers ................................................................... 18

6.2    Composition and Selection of the Board of Managers ............................................ 19

i

| | 6.3 | Board Meetings and Actions by Written Consent | 20 |
|---|---|---|---|
| | 6.4 | Officers | 21 |
| | 6.5 | Protective Provisions | 21 |
| | 6.6 | Limitation of Liability | 22 |
| | 6.7 | Indemnification | 23 |
| ARTICLE VII | | RIGHTS AND OBLIGATIONS OF UNITHOLDERS | 24 |
| | 7.1 | Limitation of Liability | 24 |
| | 7.2 | Lack of Authority | 24 |
| | 7.3 | No Right of Partition | 24 |
| | 7.4 | Manner of Voting by Members | 24 |
| ARTICLE VIII | | BOOKS, RECORDS AND REPORTS | 25 |
| | 8.1 | Records and Accounting | 25 |
| | 8.2 | Fiscal Year | 25 |
| | 8.3 | Transmission of Communications | 25 |
| | 8.4 | Financial Statements and Other Information | 25 |
| ARTICLE IX | | TAX MATTERS | 25 |
| | 9.1 | Preparation of Tax Returns | 25 |
| | 9.2 | Tax Elections | 25 |
| | 9.3 | Tax Matters Partner | 26 |
| ARTICLE X | | TRANSFER OF LLC INTERESTS | 27 |
| | 10.1 | Transfers by Unitholders | 27 |
| | 10.2 | Approved Sale; Drag Along Obligations | 27 |
| | 10.3 | Right of First Refusal on Sales by Other Common Holders | 28 |
| | 10.4 | Tag-Along Rights | 29 |
| | 10.5 | Put/Call Option | 29 |
| | 10.6 | Void Transfers | 30 |
| | 10.7 | Effect of Assignment | 30 |
| | 10.8 | Additional Restrictions on Transfer | 30 |
| | 10.9 | Prospective Transferees | 31 |
| | 10.10 | Legend | 31 |
| | 10.11 | Transfer Fees and Expenses | 31 |
| ARTICLE XI | | ADMISSION OF MEMBERS | 31 |
| | 11.1 | Substituted Members | 31 |
| | 11.2 | Additional Members | 31 |

104316822\V-3

ARTICLE XII WITHDRAWAL AND RESIGNATION OF UNITHOLDERS ..................................... 32

    12.1    Withdrawal and Resignation of Unitholders .................................................. 32

ARTICLE XIII DISSOLUTION AND LIQUIDATION ............................................................. 32

    13.1    Dissolution ................................................................................................ 32

    13.2    Liquidation and Termination ...................................................................... 32

    13.3    Cancellation of Certificate ......................................................................... 33

    13.4    Reasonable Time for Winding Up ............................................................... 33

    13.5    Return of Capital ....................................................................................... 33

ARTICLE XIV VALUATION ....................................................................................... 33

    14.1    Valuation of Non-Cash Assets .................................................................... 33

    14.2    Valuation Methodology for Securities .......................................................... 33

ARTICLE XV GENERAL PROVISIONS ......................................................................... 34

    15.1    Amendments ............................................................................................. 34

    15.2    Title to LLC Assets ................................................................................... 34

    15.3    Remedies ................................................................................................. 34

    15.4    Successors and Assigns .............................................................................. 34

    15.5    Severability .............................................................................................. 34

    15.6    Counterparts ............................................................................................. 35

    15.7    Descriptive Headings; Interpretation .......................................................... 35

    15.8    Applicable Law ........................................................................................ 35

    15.9    Addresses and Notices ............................................................................... 35

    15.10    Creditors ................................................................................................ 35

    15.11    Waiver ................................................................................................... 35

    15.12    Further Action ......................................................................................... 36

    15.13    Entire Agreement .................................................................................... 36

    15.14    Delivery ................................................................................................. 36

    15.15    Aggregation of Units ............................................................................... 36

104316822\V-3

# ASHLEY ENERGY, LLC
## AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

This AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement"), dated as of _____, 2017, is adopted by, executed and agreed to, by and among ASHLEY, ENERGY LLC, a Delaware limited liability company [1] (the "LLC"), the Members, and those other Persons who hereafter are admitted as Substituted Members and Additional Members of the LLC pursuant to this Agreement.  Capital terms used but not otherwise defined herein shall have the meanings ascribed thereto in Article I.

## RECITALS

WHEREAS, the LLC was formed as a Delaware limited liability company by the filing of the Articles of Organization on November 23, 2016, with the Office of the Secretary of State of Delaware pursuant to and in accordance with the Limited Liability Company Act of the State of Delaware, as amended from time to time (the "LLC Act"); and

WHEREAS, the Members and the LLC desire by the execution and delivery of this Agreement, to provide for the operation and management of the business and affairs of the LLC and set forth the terms and conditions of the respective rights, powers, preferences, limitations and responsibilities of its Members.

## AGREEMENT

In consideration of the mutual promises and covenants set forth below and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties agree as follows:

## ARTICLE I

## DEFINITIONS

"Additional Member" means a Person admitted to the LLC as a Member pursuant to Section 11.2.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year or other period, after giving effect to the following adjustments:

(a)     credit such Capital Account by any amounts which such Member is obligated to restore pursuant to this Agreement (including any note obligations) or is deemed to be obligated to restore pursuant to the penultimate sentence of each of Regulations Sections 1.704-2(i)(5) and 1.704-2(g); and

(b)     debit such Capital Account by the items described in Regulations Section 1.704-1(b)(2)(ii)(*d*)*(4)*, *(5)* and *(6)*.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

---

[1] Parties to consider merging existing Missouri LLC into Delaware LLC since DE LLC law is more established.

"Affiliate" means with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such particular Person, where "control" (including, with correlative meanings, the terms "controlling", "controlled by", and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise.

"Assignee" means a Person to whom Units have been Transferred in accordance with the terms of this Agreement and any other agreements contemplated by this Agreement, but who has not become a Member pursuant to Article XI.

"Assumed Tax Rate" means forty-five percent (45%) (or such other percentage as may be determined by the Board from time to time to estimate the aggregate effective income tax rate of the Members) for each Member's allocable share of the LLC's taxable income.

"Available Class B Common Units" means the difference between the number of Class B Common Units authorized in Section 3.1(b), as the same may be increased in accordance with Section 6.2(c)(iv), and the sum of (i) the aggregate number of Class B Common Units issued and outstanding and (ii) the aggregate number of any Class B Common Units reserved for issuance for outstanding options and other convertible securities.

"Base Rate" means, on any date, a variable rate per annum equal to the rate of interest most recently published by The Wall Street Journal as the "prime rate" at large U.S. money center banks.

"Base Value" means the amount determined by the Board from time to time in accordance with Section 3.2(b), which amount shall not be less than the fair market value of the LLC as determined by the Board.

"Board" means the Board of Managers established pursuant to Section 6.1(a).

"Business" has the meaning set forth in Section 2.4.

"Capital Account" means the account maintained by the LLC for each Member.  If any Unit or interest in the LLC is transferred pursuant to the terms hereof, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Unit or interest in the LLC.  It is intended that the Capital Accounts of all Unitholders or holders of an interest in the LLC shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions hereof relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

"Capital Contribution" means any cash, cash equivalents or the Fair Market Value of other property which a Unitholder contributes or is deemed to have contributed to the LLC with respect to any Unit.

"Cause" has the meaning set forth in Section 6.1(b).

"Certificate" means the LLC's Certificate of Formation as filed with the Secretary of State of Delaware.

"Class A Common Cumulative Principal Amount" means $[    ].

"Class A Common Original Issue Price" means $[    ] per Class A Common Unit.

2

104316822\V-3

"<u>Class A Common Return</u>" means an amount equal to a 12% per annum, monthly compounding, cumulative return on the Class A Common Original Issue Price (subject to appropriate adjustment for Unit splits, combinations and other similar recapitalizations with respect to the Class A Common Units) on any Class A Common Unit as of such date.  For the avoidance of doubt, Tax Distributions made pursuant to <u>Section 5.3</u> shall not reduce the Class A Common Return.

"<u>Class A Common Unit</u>" means a Unit having the rights and obligations specified with respect to Class A Common Units in this Agreement.

"<u>Class A Common Unit Funded Balance</u>" means the sum of the Class A Common Cumulative Principal Amount and any accrued but unpaid Class A Common Return thereon.

"<u>Class A Unitholder</u>" means Power Investments, LLC, the holder of all Class A Common Units.

"<u>Class B Common Unit</u>" means a Unit having the rights and obligations specified with respect to Class B Common Units in this Agreement.

"<u>Code</u>" means the United States Internal Revenue Code of 1986, as amended.  Such term shall, in the Board's good faith discretion, be deemed to include any future amendments to the Code and any corresponding provisions of succeeding Code provisions (whether or not such amendments and corresponding provisions are mandatory or discretionary).

"<u>Common Unit</u>" means any Class A Common Unit or Class B Common Unit.

"<u>Common Unitholder</u>" means a holder of a Common Unit.

"<u>Convertible Securities</u>" shall mean any evidences of indebtedness, shares or other securities directly or indirectly convertible into or exchangeable for Common Units, but excluding Options.

"<u>Credit Facilities</u>" means (i) that certain senior secured, first lien term loan agreement by and between the LLC and _____, dated as of the date hereof and (ii) that certain senior secured, second lien credit facility by and between the LLC and ____ dated as of the date hereof.

"<u>Delaware Law</u>" means the Limited Liability Company Act of the State of Delaware, as it may be amended from time to time, and any successor thereto.

"<u>Depreciation</u>" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to assets for such Fiscal Year, except that if the Gross Asset Value of the assets differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; <u>provided</u>, <u>however</u>, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board.

"<u>Distributable Cash</u>" means cash or other property of the LLC which the Board determines in good faith is available for Distribution to the Members after deducting any amounts which the Board determines are required to (i) maintain sufficient working capital ((ii) pay any liabilities, expenses and other cash outlays of the LLC then payable, including without limitation any charitable gifts, contributions or investments permitted by <u>Section 6.1(a)</u> and/or (iii) maintain sufficient reserves for

3

liabilities, contingencies, expenses, investment in growth and other anticipated cash outlays or needs of the LLC; provided, that following a Sale of the LLC or in connection with a Liquidation under Article XIII, working capital for purposes of clause (i) above shall be the minimum working capital necessary in order to complete an orderly wind-down of the LLC in connection therewith), and reserves for purposes of clause (iii) above shall not include investments in growth or other cash outlays not related to existing liabilities, contingencies and expenses..

"Distribution" means each distribution made by the LLC to a Unitholder (in such Unitholder's capacity as such), whether in cash, property or securities of the LLC and whether by liquidating distribution, redemption, repurchase or otherwise; provided, however, that none of the following shall be a Distribution:  (a) any redemption or repurchase by the LLC of any Units or other securities of the LLC (including Units or other securities issued in exchange for Units), (b) any recapitalization or exchange of securities of the LLC, and (c) any subdivision (by Unit split or otherwise) or any combination (by reverse Unit split or otherwise) of any outstanding Units.

"Equity Incentive Agreement" means any applicable agreement that governs the terms of grant and/or repurchase of any Units or Equity Securities in accordance with the Equity Incentive Plan.

"Equity Incentive Plan" means an equity incentive plan of the LLC adopted by the Board.

"Fair Market Value" means, with respect to any asset or equity interest, its fair market value determined according to Article XIV.

"Family Group" means, with respect to a Member who is a natural person, such Member's spouse and descendants (whether natural, adopted, or by marriage or step relationship, including former relationships) and any trust, family limited partnership, limited liability company, corporation or other entity solely for the benefit of the Member and/or the Member's spouse and/or descendants.

"Governmental Entity" means any entity, republic, authority, association or organization exercising legitimate executive, legislative, judicial, regulatory or administrative functions of government.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any asset contributed by a Member to the LLC shall be the gross fair market value of such asset, as determined in accordance with this Agreement;

(b)     The Gross Asset Values of all LLC Property shall be adjusted to equal the respective gross fair market values of such property, as determined by the Board, as of the following times:  (i) the acquisition of an additional Units by any new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) the distribution by the LLC to a Member of more than a de minimis amount of LLC Property as consideration for Units; (iii) the liquidation of the LLC within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g) and (iv) the issuance of Units to any Person as compensation for services provided to or on behalf of the LLC; provided, however, that adjustments pursuant to clauses (i), (ii) and (iv) above shall be made only if the Board reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the LLC;

4

(c)  The Gross Asset Value of any LLC Property distributed to any Member shall be adjusted to equal the gross fair market value of such property on the date of distribution as determined by the distributee and the Board; and

(d)  The Gross Asset Values of LLC assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Section 734(b) or Section 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this subsection (d) to the extent the Board determines that an adjustment pursuant to subsection (b) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subsection (d).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraph (a), (b), or (d) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Initial Closing" shall mean the first closing of the sale of Preferred Units by the LLC.

"Initial Preferred Unit Offering" means the offer of up to 1,000,000 Preferred Units for $1.00 per Unit pursuant to the Preferred Unit Investment Agreement.

"IRS" means the Internal Revenue Service.

"LLC Property" means any and all property, real or personal, tangible or intangible, owned of record or beneficially by the LLC.

"Management Members" means any employee, officer, director, Manager, consultant or other service provider of or to the LLC or any of its Subsidiaries who (i) acquires Units pursuant to an Equity Incentive Agreement and (ii) is admitted as a Substituted Member or Additional Member on or after the date of this Agreement.

"Manager" has the meaning set forth in Section 6.1(a).

"Member" means each Person listed on the Schedule of Unitholders attached to this Agreement and any Person admitted to the LLC as a Substituted Member or Additional Member but only for so long as such Person is shown on the LLC's books and records as the owner of one or more Units.

"Officers" means each individual designated as an officer of the LLC to whom authority and duties have been delegated pursuant to Section 6.4, subject to any resolution of the Board appointing such individual as an officer or relating to such appointment.

"Option" shall mean rights, options or warrants to subscribe for, purchase or otherwise acquire Class B Common Units or Convertible Securities.

"Partially Adjusted Capital Account" means with respect to any Member for any Fiscal Year, the Capital Account of such Member at the beginning of such Fiscal Year, increased by all Capital Contributions by such Member during such Fiscal Year and all special allocations of income and gain to such Member pursuant to the last paragraph of Section 5.5 and Section 5.6 with respect to such Fiscal Year, and decreased by all Distributions during such Fiscal Year and all special allocations of losses and

5

deductions to such Member pursuant to the last paragraph of <u>Section 5.5</u> and <u>Section 5.6</u>, but before giving effect to any allocation of Profits or Losses for such Fiscal Year pursuant to <u>Sections 5.5(a)</u> and <u>5.5(b)</u>.

"<u>Parties</u>" means the parties to this Agreement (including any Person who becomes a party subsequent to the date of this Agreement).

"<u>Permitted Transferee</u>" means (i) with respect to any Member who is a natural person, a member of such Member's Family Group or (ii) with respect to any Member which is an entity, any beneficial holder of such entity as of immediately prior to the applicable Transfer.

"<u>Person</u>" means an individual, corporation, partnership, limited liability company, trust, unincorporated organization, joint venture, association or other entity or a Governmental Entity.

"<u>Preferred Cumulative Principal Amount</u>" means $1,000,000.

"<u>Preferred Original Issue Date</u>" shall mean the date on which the first Preferred Unit was issued.

"<u>Preferred Original Issue Price</u>" means $1.00 per Preferred Unit.

"<u>Preferred Return</u>" means an amount equal to a 12% per annum, monthly compounding, cumulative return on the Preferred Original Issue Price (subject to appropriate adjustment for Unit splits, combinations and other similar recapitalizations with respect to the Preferred Units) on any Preferred Unit as of such date.  For the avoidance of doubt, Tax Distributions made pursuant to <u>Section 5.3</u> shall not reduce the Preferred Return.

"<u>Preferred Unit</u>" means a Unit having the rights and obligations specified with respect to Preferred Units in this Agreement.

"<u>Preferred Unit Funded Balance</u>" means the sum of the Preferred Cumulative Principal Amount and any accrued but unpaid Preferred Accruing Distribution thereon.

"<u>Preferred Unit Investment Agreement</u>" means that certain investment agreement by and between the LLC and [Arena Investors, LP] dated as of the date thereof.

"<u>Preferred Unitholder</u>" means [Arena Investors, LP], the holder of all Preferred Units.

"<u>Profits</u>" and "<u>Losses</u>" means, for each period taken into account under <u>Article V</u>, an amount equal to the LLC's taxable income or taxable loss for such period, determined in accordance with federal income tax principles, with the following adjustments:

(a)      There shall be added to such taxable income or taxable loss an amount equal to any income received by the LLC during such period which is wholly exempt from federal income tax (e.g., interest income which is exempt from federal income tax under section 103 of the Code);

(b)      Any expenditures of the LLC described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses, shall be subtracted from such taxable income or loss;

6

(c)      In the event the Gross Asset Value of any LLC asset is adjusted pursuant to the terms of this Agreement, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(d)      Gain or loss resulting from any disposition of LLC Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the LLC property disposed of, notwithstanding that the adjusted tax basis of such LLC property differs from its Gross Asset Value;

(e)      In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period;

(f)      To the extent an adjustment to the adjusted tax basis of any LLC asset pursuant to Section 734(b) or Section 743(b) of the Code is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) of the Regulations to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Units, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

(g)      Any items that are specially allocated pursuant to Section 5.5(c) and Section 5.6 shall not be taken into account in computing Profits and Losses.

"Regulations" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

"Return" shall mean the Preferred Return together with the Class A Common Return.

"Revised Partnership Audit Procedures" means the provisions of Subchapter C of Subtitle A, Chapter 63 of the Code, as amended by the Bipartisan Budget Act of 2015, P.L. 114-74 (together with any subsequent amendments thereto, Treasury Regulations promulgated thereunder, and published administrative interpretations thereof).

"Safe Harbor Election" has the meaning set forth in Section 3.2(a).

"Safe Harbor Regulations" means the finally promulgated successor rules to proposed Regulations Section 1.83-3(l) and IRS Notice 2005-43.

"Sale of the LLC" means either (i) a transaction or series of transactions (including by way of merger, consolidation, recapitalization, reorganization or sale of securities) the result of which is that the Unitholders and their Affiliates immediately prior to such transaction(s) are, after giving effect to such transaction(s) no longer, in the aggregate, the "beneficial owners" (as such term is defined in Rule 13d-3 and Rule 13d-5 promulgated under the Securities Exchange Act), directly or indirectly through one or more intermediaries, of more than 50% of the voting power of the outstanding voting securities of the LLC or (ii) the sale, transfer, conveyance or other disposition, in one transaction or a series of related transactions, of all or substantially all of the assets of the LLC or its Subsidiaries, taken as a whole to an independent third party.

"Schedule of Unitholders" means the register of the Unitholders of the LLC that is maintained by the LLC, and the Schedule of Unitholders as of the date hereof is attached to this Agreement.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, and applicable rules and regulations promulgated thereunder, and any successor to such statute, rules or regulations.  Any reference in this Agreement to a specific section, rule or regulation of the Securities Act shall be deemed to include any corresponding provisions of future law.

"Securities Exchange Act" means the Securities Exchange Act of 1934, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations.  Any reference in this Agreement to a specific section, rule or regulation of the Securities Exchange Act shall be deemed to include any corresponding provisions of future law.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of Managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof.  For purposes of this Agreement, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other entity gains or losses or shall be or control any managing member or general partner of such limited liability company, partnership, association or other business entity.  For purposes of this Agreement, references to a "Subsidiary" of any Person shall be given effect only at such times that such Person has one or more Subsidiaries, and, unless otherwise indicated, the term "Subsidiary" refers to a Subsidiary of the LLC.

"Substituted Member" means a Person that is admitted as a Member to the LLC pursuant to Section 11.1.

"Target Capital Account" means, with respect to any Member and any Fiscal Year, an amount (which may be either a positive or a deficit balance) equal to (A) the amount that would be received by such Member if all LLC assets were sold for cash equal to their Gross Asset Value, all LLC liabilities were satisfied to the extent required by their terms (limited with respect to each non-recourse liability to the Gross Asset Value of the asset(s) securing such liability), and the net assets of the LLC were distributed in full to the Members as required pursuant to Section 5.1, all as of the last day of such Fiscal Year, minus (B) the sum of (1) the Member's share of partnership minimum gain determined pursuant to Regulations Section 1.704-2(g), and (2) the Member's share of the partner non-recourse debt minimum gain determined in accordance with Regulations Section 1.704-2(i)(5), in each case computed immediately prior to the hypothetical sale described above.

"Tax" or "Taxes" means any federal, state, county, local or foreign income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, capital stock, social security, unemployment, disability, payroll, license, employee or other withholding, or other tax, of any kind whatsoever, including any interest, penalties (civil or criminal) or additions to tax or additional amounts in respect of the foregoing.

8

"Tax Distributions" has the meaning set forth in Section 5.3(a).

"Taxable Year" means the LLC's accounting period for federal income tax purposes.

"Transfer" means any sale, transfer, assignment, pledge, mortgage, exchange, hypothecation, grant of a security interest or other direct or indirect disposition or encumbrance of an interest (whether with or without consideration, whether voluntarily or involuntarily or by operation of law) or the acts thereof.  The terms "Transferee," "Transferred," and other forms of the word "Transfer" shall have correlative meanings.

"Unit" means a Unit of a Member or an Assignee in the LLC representing a fractional part of interests in Distributions of the LLC held by all Members and Assignees and shall include Preferred Units, Class A Common Units and Class B Common Units; provided, however, that any class or group of Units issued shall have the relative rights, powers and duties set forth in this Agreement.

"Unitholder" means any owner of one or more Units as reflected on the LLC's books and records, which includes each Member.

"Unpaid Return" as to the Preferred Unitholder or a Class A Common Unitholder as of any date means an amount equal to (A) such Unitholder's Return, less (B) any previous Distributions to such Unitholder pursuant to Section 5.1(a)(i) as of such date.

"Unreturned Capital" as to the Preferred Unitholder on any date means (A) the total amount of the Preferred Unitholder's Capital Contributions attributable to the Preferred Units held by the Preferred Unitholder (which, for the avoidance of doubt, if there are no additional Capital Contributions with respect to the Preferred Units following the Preferred Original Issue Date, shall be an amount equal to the Preferred Original Issue Price for each Preferred Unit) reduced by (B) all previous Distributions with respect to Preferred Units held by the Preferred Unitholder pursuant to Section 5.1, and/or Section 13.2 as of such date.

## ARTICLE II

## ORGANIZATIONAL MATTERS

**2.1      Formation of LLC**.  The LLC was formed on November 23, 2016 pursuant to the provisions of the Delaware Law.

**2.2      Limited Liability Company Agreement**.  The Members execute this Agreement for the purpose of establishing the affairs of the LLC and the conduct of its business in accordance with the provisions of the Delaware Law.  The Members agree that during the term of the LLC set forth in Section 2.6 the rights and obligations of the Unitholders with respect to the LLC will be determined in accordance with the terms and conditions of this Agreement and the Delaware Law.  In the event of a conflict between the terms of this Agreement and the Delaware Law, the terms of this Agreement will prevail, govern and control, except where the Delaware Law provides that such terms of the Delaware Law cannot be waived or overridden by a limited liability company agreement or operating agreement.

**2.3      Name**.  The name of the LLC is "**ASHLEY ENERGY, LLC**".  The Board in its sole discretion may change the name of the LLC at any time and from time to time.  Notification of any such change shall be given to all Unitholders.  The LLC's business may be conducted under its name and/or any other name or names deemed advisable by the Board.

9

**2.4**     **Purpose**.  The purpose and business of the LLC shall be to engage in any lawful act or activity or business as shall be determined by the Board.

**2.5**     **Principal Office; Registered Office**.  The principal office of the LLC shall be located at such place as the Board may from time to time designate, and all business and activities of the LLC shall be deemed to have occurred at its principal office.  The LLC may maintain offices at such other place or places as the Board deems advisable.  The address of the registered office of the LLC in the State of Delaware shall be, and the registered agent for service of process on the LLC in the State of Delaware at such registered office shall be [          ].

**2.6**     **Term**.  The term of the LLC shall continue in existence until termination and dissolution thereof in accordance with the provisions of Article XIII.

**2.7**     **No State-Law Partnership; Tax Treatment as a Partnership**.

(a)     The Unitholders intend that the LLC not be a partnership (including, but not limited to, a limited partnership) or joint venture, that no Unitholder be a partner or joint venturer of any other Unitholder by virtue of this Agreement for any purposes other than tax purposes, and that neither this Agreement nor any other document entered into by the LLC or any Unitholder relating to the subject matter of this Agreement shall be construed to suggest otherwise.

(b)     The Members intend for the LLC to treated as a partnership for U.S. federal and applicable state and local income tax purposes and, except as otherwise expressly contemplated in the Agreement, agree not to take any action or position, or to make any election, for U.S. federal, state or local income tax purposes, in a tax return or otherwise, inconsistent with the classification of the LLC as a partnership for such purposes.

**ARTICLE III**

**CAPITAL CONTRIBUTIONS**

**3.1**     **Units**.

(a)     **Units**.  All Units issued pursuant to this Agreement shall be uncertificated; provided, however, that the Board, in its sole discretion, may approve a specimen form of certificate and issue to some or all Unitholders such certificates specifying the number and type of Units held by each such Unitholder.  The total number of Units of all classes of Units which the LLC shall have the authority to issue is (i) [1,250,000] Common Units and (ii) [1,000,000] Preferred Units.  There shall be two classes of Common Units: Class A Common Units and Class B Common Units.  The LLC shall have the authority to issue [125,000] Class A Common Units and [125,000] Class B Common Units.  Except with respect to Section 6.2(b)(ii), Section 6.5, Section 10.2(a), all Preferred Units shall be non-voting units.  The ownership by a Unitholder of Preferred Units or Common Units shall entitle such Unitholder to Distributions as set forth in Article V.

(b)     **Issuance of Additional Units and Interests**.  Subject to Section 3.1(a), and in addition to the Initial Preferred Unit Offering and any Preferred Units issued pursuant to Section 3.1(d), the Board shall have the right to cause the LLC to issue (i) additional Units or other interests in the LLC (including creating other classes or series thereof having different rights), (ii) obligations, evidences of indebtedness or other securities or interests convertible or exchangeable into Units or other interests in the LLC and (iii) Class B Common Units, warrants, options or other rights to purchase or otherwise acquire Class B Common Units in the LLC (collectively, "Equity Securities"); provided, however, that the LLC shall not

10

issue Units to any Person unless such Person is already a party hereto or, in connection with such issuance, shall have executed a counterpart, or other instrument pursuant to which such Person agrees to become a party, to this Agreement.  In such event, the Board shall amend the <u>Schedule of Unitholders</u> to reflect such additional issuances and dilution and to make any such other amendments to this Agreement as it deems reasonably necessary or desirable to reflect such additional issuances (including, but not limited to, amending this Agreement to increase the authorized number of Units of any class or creating a new class of Units and to add the terms of such new class including economic and governance rights which may be different from the Preferred Units, Class A Common Units or Class B Common Units or any other outstanding securities).  The Capital Contributions made by the Members shall be recorded in the records of the Company.  Absent manifest error, the ownership interests recorded on the <u>Schedule of Unitholders</u> shall be the conclusive record of the Units that have been issued and are outstanding.  As of the date hereof, there are [     ] Class B Common Units reserved for issuance pursuant to Equity Incentive Agreements in accordance with <u>Section 3.2</u>; the LLC may issue Class B Common Units or Equity Securities convertible into Class B Common Units to the extent that there are Available Class B Common Units.   The number of Available Class B Common Units may be increased in accordance with <u>Section 6.2(c)(iv)</u>.  In the event that any of the Class B Common Units are forfeited pursuant to the operation of any vesting, forfeiture or repurchase provisions of the applicable Equity Incentive Agreement, then such forfeited or repurchased Units shall be added back to the Available Class B Common Units and may be re-issued in accordance with.

**3.2    <u>Class B Common Units</u>**.

(a)     Each Class B Common Unit is hereby designated as a "profits interest" under Revenue Procedures 93-27 and 2001-43 (or under the Safe Harbor Regulations for any Class B Common Unit granted after the Safe Harbor Regulations become effective), and the Board agrees to account for such Class B Common Unit in accordance with such designation.  Notwithstanding the foregoing, the Board shall cause the LLC to make an election to value any Class B Common Unit granted after the effective date of the Safe Harbor Regulations at liquidation value (the "<u>Safe Harbor Election</u>") as the same may permitted pursuant to or in accordance with Safe Harbor Regulations.  The Board shall cause the LLC to make any allocations of items of income, gain, deduction, loss or credit (including forfeiture allocations and elections as to allocation periods) necessary or appropriate to effectuate and maintain the Safe Harbor Election.  Immediately prior to the issuance of each Class B Common Unit, the Capital Accounts of the Members shall be adjusted and all LLC property shall revalued in accordance with Regulations Section 1.704-1(b)(2)(iv)(f).  The Class B Common Units shall be non-voting Units.

(b)     The Board shall have the sole power and discretion to approve the issuance of Class B Common Units to Management Members or Persons who are eligible to be Management Members upon the issuance of Class B Common Units and such Person's execution and delivery of the Equity Incentive Agreement applicable thereto and a counterpart to this Agreement.  Such Equity Incentive Agreement may contain vesting, forfeiture, repurchase rights and other provisions applicable to the Class B Common Units issuable thereunder, as well as the Base Value of such Units as contemplated by <u>Section 3.2(c)</u>.  The Board shall have sole and complete power and discretion to approve which Management Members shall be offered Class B Common Units, the number of Class B Common Units to be offered, the Base Value for such Class B Common Units (in consultation with the Board and/or a third-party appraiser) and issued to each such Management Member and the purchase price therefor, if any, all of which decisions shall be made in good faith.

(c)     No holder of Class B Common Units, in his or her capacity as such, shall have the right to obtain a copy of the list of Members or Schedule of Unitholders hereto (except for a redacted version thereof showing the name just of such Unitholder).  The Company may provide a summary of the relevant provisions of this Agreement or a redacted version hereof in lieu of the full Agreement to any such holder.

**3.3**     **No Withdrawal**.  No Person shall be entitled to withdraw any part of such Person's Capital Contributions or to receive any Distribution from the LLC, except as expressly provided herein.

**3.4**     **Loans From Unitholders**.  Loans by Unitholders to the LLC shall not be considered Capital Contributions.  If any Unitholder shall loan funds to the LLC in excess of the amounts, if any, required under this Agreement to be contributed by such Unitholder to the capital of the LLC, the making of such loans shall not result in any increase in the amount of the Capital Contribution of such Unitholder. The amount of any such loans shall be a debt of the LLC to such Unitholder and shall be payable or collectible in accordance with the terms and conditions upon which such loans are made.  No Member may loan money to the LLC unless such loan is approved by the Board, and holders of a majority of the Preferred Units are given the opportunity to loan funds, at the same interest rate and otherwise generally on the same terms, as such lending Member.

**3.5**     **Distributions In-Kind**.  To the extent that the LLC makes a Distribution of property in-kind to the Unitholders, the LLC shall be treated as making a Distribution equal to the Fair Market Value of such property for purposes of Section 5.1.

**ARTICLE IV**

**CONVERSION OF PREFERRED UNITS**

**4.1**     **Conversion Right**.

(a)     Preferred Units shall be convertible at any time or from time to time by a holder of such Preferred Units giving written notice to the LLC of the exercise of conversion rights contemplated by this Article IV (the "Conversion Rights"), without the payment of additional consideration by any holder thereof, into such number of fully paid and non-assessable Class A Common Units as is determined by dividing the Original Issue Price by the Conversion Price (as defined below) in effect at the time of conversion, and shall automatically so convert as provided in Section 5.1(b)(i).  The "Original Issue Price" shall be equal to $1.00.  The "Conversion Price" shall initially be equal to $1.00 and shall be subject to adjustments as provided in this Article IV.

(b)     Termination of Conversion Rights.  In the event of a liquidation, dissolution or winding up of the LLC, the Conversion Rights shall terminate at the close of business on the last full day preceding the date fixed for the payment of any such amounts distributable on such event to the Preferred Unitholder.

**4.2**     **Mechanics of Conversion**.

(a)     Conversion.  The close of business on the date of receipt by the LLC of such notice shall be the time of conversion (the "Conversion Time").  The LLC shall, as soon as practicable after the Conversion Time issue and deliver to such holder of Preferred Units, or to his, her or its nominees, a notice of issuance of Class A Common Units in accordance with the provisions hereof.

(b)     Effect of Conversion.  All Preferred Units which shall have been surrendered for conversion as herein provided shall no longer be deemed to be outstanding and all rights with respect to such Units shall immediately cease and terminate at the Conversion Time, except only the right of the holders thereof to receive Class A Common Units in exchange therefor.

12

**4.3**     <u>Conversion of the Preferred Units</u>.

(a)     Notwithstanding any other provision of this Agreement to the contrary, each Preferred Unit is convertible, at the option of the holder thereof, at any time, and without the payment of additional consideration by the holder thereof, into such number of Class A Common Units as is determined as described in <u>Section 4.3(b)</u> below.

(b)     If none of the Preferred Units had yet converted to Class A Common Units, and all of the Preferred Units were converted to Class A Common Units, then the Preferred Units shall at all times convert into eighty percent (80%) of the Common Units outstanding (treating for this purpose as outstanding all Class B Common Units issuable upon exercise of Options at such time or upon conversion or exchange of Convertible Securities).  Accordingly, at any time when Preferred Units are to be converted, the Preferred Units being converted shall convert into percentage of Common Units determined in accordance with the following formula:

> Preferred Unit Funded Balance $\div$ (Preferred Unit Funded Balance + Class A Common Unit Funded Balance)

**4.4**     <u>Adjustment for Unit Splits and Combinations</u>.  If the LLC shall at any time or from time to time after the Preferred Original Issue Date effect a subdivision of the outstanding Common Units, the Conversion Price in effect immediately before that subdivision shall be proportionately decreased so that the number of Common Units issuable on conversion shall be increased in proportion to such increase in the aggregate number of Common Units outstanding.  If the LLC shall at any time or from time to time after the Preferred Original Issue Date combine the outstanding Common Units, the Conversion Price in effect immediately before the combination shall be proportionately increased so that the number of Common Units issuable on conversion shall be decreased in proportion to such decrease in the aggregate number of Common Units outstanding.  Any adjustment under this <u>Section 4.4</u> shall become effective at the close of business on the date the subdivision or combination becomes effective.

**4.5**     <u>Adjustment for Merger or Reorganization, etc</u>.  If there shall occur any reorganization, recapitalization, reclassification, consolidation or merger involving the LLC in which the Common Units (but not the Preferred Units) are converted into or exchanged for securities, cash or other property (other than a transaction covered by <u>Section 4.3</u>), then, following any such reorganization, recapitalization, reclassification, consolidation or merger, each Preferred Unit shall thereafter be convertible in lieu of the Common Unit into which it was convertible prior to such event into the kind and amount of securities, cash or other property which a holder of the number of Common Units of the LLC issuable upon conversion of one Preferred Unit immediately prior to such reorganization, recapitalization, reclassification, consolidation or merger would have been entitled to receive pursuant to such transaction; and, in such case, appropriate adjustment (as reasonably determined in good faith by the Board) shall be made in the application of the provisions in this <u>Article IV</u> with respect to the rights and interests thereafter of the Preferred Unitholder, to the end that the provisions set forth in this <u>Article IV</u> (including provisions with respect to changes in and other adjustments of the Conversion Price) shall thereafter be applicable, as nearly as reasonably may be, in relation to any securities or other property thereafter deliverable upon the conversion of the Preferred Units.

**ARTICLE V**

**DISTRIBUTIONS AND ALLOCATIONS**

    **5.1**    **Distributions**[2].  The Board (i) may at any time or from time to time, in its good faith discretion (but shall not be obligated to), make Distributions, or (ii) shall make Distributions upon a Sale of the LLC or in connection with a liquidation under Article XIII, in each case, to the holders of Units as follows:

    (a)    Distributions shall be made in the following order of priority:

    (i)    First, to the Preferred Unitholder and the Class A Unitholder to the extent of and in proportion to such Unitholders' respective Unpaid Return amounts, on a pro rata *pari passu* basis;

    (ii)    [Second, to the Preferred Unitholder to the extent of and in proportion to the Preferred Unitholder's Unreturned Capital amount until the aggregate amount of the Preferred Unitholder's Unreturned Capital equals zero]; and

    (iii)    Thereafter, to the holders of the Units, ratably among such holders based upon the number of Units held by each such holder immediately prior to such Distribution.

    (b)    Following a Sale of the LLC or in connection with a liquidation under Article XIII, Distributions shall be made out of Distributable Cash in the following order of priority:

    (i)    First, to the Preferred Unitholder, to the extent of and in proportion to the Preferred Unitholder's respective Unreturned Capital amounts until the aggregate amount of the Preferred Unitholder's Unreturned Capital equals zero; provided, that in the event that the amount distributable in respect of such Preferred Units on an as-converted basis pursuant to Section 5.1(b)(ii) below would be greater than the amount distributable pursuant to this Section 5.1(b)(i), such Preferred Units shall automatically be deemed to have converted into Class A Units in accordance with Article III (without having to so actually convert) and Distributions in respect thereof shall be made in accordance with Section 5.1(b)(ii); and

    (ii)    Thereafter, to the holders of the Common Units, ratably among such holders based upon the number of Common Units held by each such holder immediately prior to such Distribution (including any Common Units deemed to have been issued upon a deemed conversion of Preferred Units as contemplated by Section 5.1(b)(i)); provided, that no distributions shall be made with respect to any Class B Common Unit until the aggregate amount of distributions made to all other Members after the grant of such Class B Common Unit equals the Base Value assigned to such Class B Common Unit (any amounts limited by this proviso shall be distributed to other Unit holders ratably among such holders based upon the number of Units held by each such holder immediately prior to such Distribution).

    (c)    Notwithstanding the foregoing Sections 5.1(a) and 5.1(b), with respect to any unvested Class B Common Unit, the portion of any Distribution that would otherwise be made with respect to such Class B Common Units, other than Tax Distributions under Section 5.3, shall be held in reserve by the LLC (the "Reserve Amount") (but shall be treated as distributed for purposes of this Section 5.1 and Section 5.3) until such unvested Class B Common Unit either (i) vests, in which case the Reserve Amount

_____

[2] To be discussed with Arena.

attributable to such Class B Common Unit shall be distributed to the holder of such Class B Common Unit, or (ii) is forfeited or repurchased pursuant to the terms and conditions of any written agreement pursuant to which such Class B Common Units were issued, in which case the Reserve Amount attributable to such Class B Common Unit shall be distributed among the holders of the outstanding Preferred Units and, if applicable, Class A Common Units and vested Class B Common Units pursuant to Section 5.1(a) or Section 5.1(b), as applicable (but subject to the holdback terms of this sentence with respect to any unvested Class B Common Units).

**5.2**     **Indemnification and Reimbursement for Payments on Behalf of a Unitholder**.  If the LLC is required by law to make any payment to a Governmental Entity that is specifically attributable to a Unitholder or a Unitholder's status as such (including, but not limited to, federal withholding taxes, state income and personal property taxes, and state unincorporated business taxes), then such Unitholder shall, upon request by the Board, indemnify the LLC for and contribute to the LLC, the entire amount paid by the LLC (including interest, penalties and related expenses).  The Board may offset Distributions to which a Person is otherwise entitled under this Agreement against such Person's obligation to indemnify the LLC under this Section 5.2.  A Unitholder's obligation to indemnify and make contributions to the LLC under this Section 5.2 shall survive the termination, dissolution, liquidation and winding up of the LLC and, for purposes of this Section 5.2, the LLC shall be treated as continuing in existence.  The LLC may pursue and enforce all rights and remedies it may have against each Unitholder under this Section 5.2, including instituting a lawsuit to collect such indemnification and contribution with interest calculated at a rate equal to the Base Rate (but not in excess of the highest rate per annum permitted by law).

**5.3**     **Tax Distributions**.

(a)     Independent of Section 5.1 or any other provision of this Agreement, the LLC shall distribute to each Member out of Distributable Cash an amount determined under Section 5.3(b) in order to enable the Members to pay federal, state and local income taxes arising from their ownership of Units during a Taxable Year, provided, however, in no event shall the LLC make Tax Distributions if the cumulative taxable losses allocated to a Member over the life of the LLC at any given time exceed the cumulative taxable income of the LLC allocated to such Member for such period Tax Distributions made under this Section 5.3 (each, a "Tax Distribution") shall not be treated as advances against any Distributions distributable pursuant to Section 5.1 and/or Section 13.2.  The Board shall use reasonable best efforts to ensure that there will be sufficient Distributable Cash to make reasonably anticipated Tax Distributions.  In the event that any Member is allocated income of $50,000 or more in the aggregate in respect of which such Member has not received Tax Distributions by the date (as extended) that tax returns therefor with respect to such income are due, such Member may transfer some or all of his Units without the Board approval otherwise required under Section 10.1(a), but otherwise subject to Article X , so long as such Tax Distributions have not been made.

(b)     The amount of the Tax Distribution distributable to each Member pursuant to Section 5.3(a) with respect to any Fiscal Year of the LLC shall be equal to the product of (i) the excess of (A) the taxable income allocated to such Member (excluding allocations made under Section 704(c) of the Code principles) by the LLC for such Fiscal Year, over (B) the cumulative net losses, if any, theretofore allocated to such Member from the LLC from the date hereof through the end of such Fiscal Year and not previously applied for purposes of this Section 5.3(b), and (ii) the Assumed Tax Rate.

(c)     Any and all Tax Distributions shall be paid with respect to any Fiscal Year of the LLC on a quarterly basis with a view to enabling the Members to pay their respective estimated income tax liabilities (based on the Board's good faith estimate of the taxable income of the LLC for the current

Fiscal Year and the amount of Tax Advance to which each Member is entitled pursuant to Section 5.3(b)), with any additional distribution (based on the actual taxable income of the LLC for such Fiscal Year) to be paid no later than March 10 following such Fiscal Year.

5.4    **Limitations on Distributions**.  Notwithstanding anything to the contrary contained herein, the Members hereby acknowledge and agree that the LLC's ability to make any Distributions and/or Tax Distribution may be subject to the satisfaction of certain covenants and approvals pursuant to such commercially-reasonable loans with third parties and/or associated security agreements or mortgages to which the LLC may become a party or by which its assets may be bound and that Distributions may be prohibited by such loan and/or security agreements.

5.5    **Allocations of Profits and Losses**.  Except as otherwise required by Section 704(b) of the Code and Sections 5.6 and 5.7 hereof, Profits and Losses of the LLC for any Fiscal Year shall be allocated as follows:

(a)    Profits.  Profits, and each item of LLC income, gain, loss or deduction entering into the computation thereof, shall be allocated to the Members proportionally based on the amount of any difference between their respective Target Capital Accounts and Partially Adjusted Capital Accounts for such Fiscal Year, so as to reduce the amount of such difference.  No portion of the Profits for any Fiscal Year shall be allocated to a Member whose Partially Adjusted Capital Account is greater than or equal to his Target Capital Account for such Fiscal Year.

(b)    Losses.  Losses, and each item of LLC income, gain, loss or deduction entering into the computation thereof, for each Fiscal Year shall be allocated to the Members so as to reduce, proportionally based on the amount of any difference between their respective Partially Adjusted Capital Accounts and Target Capital Accounts for such Fiscal Year, so as to reduce the amount of such difference. No portion of the Losses for any Fiscal Year shall be allocated to a Member whose Target Capital Account is less than or equal to his Partially Adjusted Capital Account for such Fiscal Year.

(c)    Loss Limitation.  Losses allocated to any Member pursuant to Section 5.5(b) shall not exceed the maximum amount of Losses that can be allocated to such Member without causing such Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year.  In the event that some but not all of the Members would have an Adjusted Capital Account Deficit as a consequence of an allocation of Losses pursuant to Section 5.5(b), the limitations set forth herein shall be applied on a Member-by-Member basis and Losses not allocable to any Member as a result of such limitation shall be allocated to the other Members in accordance with the positive balances in such Members' Capital Accounts so as to allocate the maximum permissible Losses to each Member under Regulations Section 1.704-1 (b)(2)(ii)(*d*).

Notwithstanding the foregoing, the Board may make such allocations as it deems reasonably necessary to give economic effect to the provisions of this Agreement, taking into account facts and circumstances as the Board deems reasonably necessary for this purpose.

5.6    **Regulatory Allocations**.

(a)    Minimum Gain and Member Minimum Gain Chargebacks.  Notwithstanding any other provision of this Article V, items of LLC income and gain shall be allocated so as to comply with the minimum gain chargeback requirements of Regulations Sections 1.704-2(f) and 1.704-2(i)(4).

(b)    Qualified Income Offset.  If a Member unexpectedly receives any adjustments, allocations      or      distributions      described      in      Regulations      Section      1.704-1(b)(2)(ii)(d)(4),

16

1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) which results in or increases such Member's Adjusted Capital Account Deficit, items of LLC income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible; provided, however, that an allocation pursuant to this Section 5.6(b) shall be made if and only to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article V have been tentatively made as if this Section 5.6(b) were not in this Agreement.

(c)    Non-recourse Deductions.    Non-recourse deductions (as defined in Regulations Section 1.704-2(b)(1)) for any Taxable Year or other period shall be allocated to the Members in accordance with Regulations Section 1.704-2(b) and (e) or, alternatively, Regulations Section 1.704-1(b)(3).  The amount of non-recourse deductions and excess non-recourse liabilities shall be determined in accordance with Regulations Section 1.704-2(c).

(d)    Partner Non-recourse Deductions.    Any partner non-recourse deductions (as defined in Regulations Section 1.704-2(i)(1)) for any Taxable Year or other period shall be specially allocated to the Members who bear the economic risk of loss with respect to the partner non-recourse debt to which such partner non-recourse deductions are attributable in accordance with Regulations Section 1.704-2(i).  The amount of partner non-recourse deductions shall be determined in accordance with Regulations Section 1.704-2(i)(2).

(e)    Effect of Regulatory Allocations.    The allocations described in Section 5.5(c) and Section 5.6(a), (b), (c) and (d) above (the "Regulatory Allocations") are intended to comply with certain requirements of Regulations Sections 1.704-1(b) and 1.704-2 and as such may not be consistent with the manner in which the Members intend to allocate items of income, gain, loss, deduction and expense or make distributions.  Accordingly, notwithstanding other provisions of this Section 5.6 and Section 5.5(c), but subject to the requirements of the Regulations, items of income, gain, loss, deduction and expense in subsequent Taxable Years shall be allocated among the Members in such a way as to reverse as quickly as possible the effect of the Regulatory Allocations and thereby cause the respective Capital Accounts of the Members to be in the amounts they would have been if Profits and Losses (and such other items of income, gain, deduction and loss) had been allocated without reference to the Regulatory Allocations.

**5.7**    **Special Allocations Relating to Entity-Level Taxes; Withholding**.

(a)    Special Allocations Relating to Entity-Level Taxes.    Notwithstanding anything to the contrary herein, in the event that and to the extent that any state, local or other income tax imposed on the LLC as an entity is reduced by reason of the holding of an interest by any Member, no part of the expense of the LLC for such tax shall be allocated to such Member.  In addition, if the LLC is obligated under applicable law to pay any amount to a governmental agency because of a Member's status as a member of the LLC for federal or state withholding or other taxes, such amount shall reduce the distributions which would otherwise be made to such Member pursuant to this Article V.

(b)    Withholding.  The LLC shall comply with the tax withholding provisions of federal, state and local law and shall remit amounts withheld to, and file required forms with, the applicable jurisdictions.  To the extent the LLC is required to withhold and pay over any amounts to any tax authority with respect to distributions or allocations to any Member, the amount withheld shall be treated as a distribution in the amount of the withholding to that Member for all purposes under this Agreement. In the event of any claimed over-withholding of taxes, the Member shall be limited to a refund claim against the applicable jurisdiction.  To the extent that at any time such withheld amounts exceed the distributions that such Member would have received but for such withholding, the LLC may, at the Board's option, (i) require the Member to reimburse the LLC for such amount upon request by the Board,

17

or (ii) reduce any subsequent distributions to the Member by such amount.   Each Member agrees to furnish the LLC with any representations and forms as shall reasonably be requested by the Board to assist it in determining the extent of, and in fulfilling, the LLC's withholding tax obligations.

      **5.8**    **Allocation for Income Tax Purposes**.   <u>Allocation in General</u>.   Except as otherwise provided in <u>Section 5.8(b)</u>, for each Fiscal Year, items of LLC income, gain, loss, deduction and expense shall be allocated, for federal, state and local income tax purposes, among the Members in the same manner as the Profits (and the items thereof) or Losses (and the items thereof) of which such items are components are allocated pursuant to <u>Section 5.5</u>.

      (b)    <u>Section 704(c) Items</u>.   In accordance with Section 704(c) of the Code and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the LLC shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the LLC for federal income tax purposes and its initial Gross Asset Value.   If the Gross Asset Value of a LLC asset is adjusted pursuant to clause (b) of the definition of Gross Asset Value, subsequent allocations of income, gain, loss, and deduction with respect to such asset for tax purposes shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Section 704(c) of the Code and the Regulations thereunder.   Any elections or other decisions relating to such allocations shall be made by the Board in any manner that reasonably reflects the purpose and intention of this Agreement.

      (c)    <u>Allocations Solely for Tax Purposes</u>.   Allocations pursuant to this <u>Section 5.8</u> are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits and Losses or other items or distributions pursuant to any provision of this Agreement.

## ARTICLE VI

## MANAGEMENT

      **6.1**    **Management by the Board of Managers**.   Except for situations in which the approval of the Members or any specific Member is expressly required by the terms of this Agreement or by non-waivable provisions of applicable law, (i) the Board shall conduct, direct and exercise full control over all activities of the LLC, including the issuance of Equity Securities and the voting and sale of and the exercise of other rights with respect to, the equity securities of the LLC's Subsidiaries and any other Person in which the LLC directly or indirectly holds an equity interest, (ii) all management powers over the business and affairs of the LLC shall be exclusively vested in the Board and (iii) the Board shall have the power to bind or take any action on behalf of the LLC or to exercise in its good faith discretion any rights and powers (including the rights and powers to take certain actions, give or withhold certain consents or approvals, or make certain determinations, opinions, judgments, or other decisions) granted to the LLC under this Agreement, or any other agreement, instrument, or other document to which the LLC is a party, or by virtue of its holding the equity interests of any Subsidiary thereof or any other Person. No Member shall have the authority to bind the LLC in any way, to do any act that would be (or that could be construed as) binding on the LLC, or to make any expenditures on behalf of the LLC, unless such specific authority has been expressly granted to and not revoked from such Member by the Board. No Manager (acting in his or her capacity as such) shall have any authority to bind the LLC with respect to any matter except pursuant to a resolution expressly authorizing such action which resolution is duly adopted by the Board by the affirmative vote required for such matter pursuant to this Agreement.   Each Member acknowledges and agrees that no Manager shall, as a result of being a Manager (as such), be bound to devote all of his or her business time to the affairs of the LLC, and that he and his Affiliates or

she and her Affiliates do and will continue to engage for their own account and for the accounts of others in other business ventures.

**6.2**       **Composition and Selection of the Board of Managers**

(a)       <u>Number</u>.  The authorized number of Managers on the Board shall initially be three (3) Managers and may be increased or decreased only with the consent of the Preferred Unitholder.

(b)       <u>Composition</u>.  The following individuals shall be the members of the Board of Managers (the "<u>Managers</u>"):

(i)       Two (2) Managers designated by the holders of a majority of the Class A Common Units ("the <u>Common Managers</u>"), who shall initially be _____ and _____;

(ii)       [One (1) Manager designated by the holders of a majority of the Preferred Units (the "<u>Preferred Manager</u>"), who shall initially be _____.][3]

(c)       <u>Committees; Sub Boards</u>.  The Board shall have the power and right, but not the obligation, to create and disband committees of the Board and to determine the duties, responsibilities, powers and composition thereof.  If any Subsidiary has a board of managers or board of directors (each, a "<u>Sub Board</u>"), such Sub Board will have the same composition as the Board.

(d)       <u>Term</u>.  Managers shall serve until their earlier resignations, deaths or removals or the elections of their successors in accordance with the terms of this Agreement.

(e)       <u>Removal and Resignation</u>.  The removal from the Board, a Sub Board or a committee (with or without cause) of any Manager shall only be at the written request of the parties entitled to designate such Manager pursuant to <u>Section 6.2(b)</u>.  A Manager may resign as such by delivering his or her written notice of resignation to the LLC at the LLC's principal office addressed to the Board.  Such resignation shall take effect upon receipt of such notice or at a later time specified in the notice, at the option of the LLC, and the acceptance of such notice shall not be necessary to make it effective.

(f)       <u>Vacancies</u>.  In the event that any representative designated pursuant to <u>Section 6.2(b)</u> for any reason ceases to serve as a member of the Board, a Sub Board or a committee during his term of office, the resulting vacancy on the Board, the Sub Board or such committee shall be filled in the manner specified in <u>Section 6.2(b)</u>.  Each representative so chosen shall hold office until a successor is designated in the manner specified in <u>Section 6.2(b)</u> or until his or her earlier death, resignation or removal as herein provided.

(g)       <u>Expense Reimbursement; Directors' and Officers' Insurance</u>.  The LLC shall reimburse all reasonable out-of-pocket costs and expenses incurred by each Manager in the course of his or her service, including in connection with attending regular and special meetings of the Board, any Sub Board and any committee thereof, upon presentation of appropriate documentation.  The LLC shall maintain directors' and officers' liability insurance for the LLC and its Subsidiaries that is reasonably acceptable to the Board.

(h)       <u>Compensation of Managers</u>.  Each Manager who is not employed by, or an officer of the LLC, may receive such compensation for serving in such capacity as may be determined from time to time by a majority of the Managers (excluding the Manager who may receive such compensation).

---

[3] To be discussed with Arena; term sheet provides that Arena only gets one board seat.

104316822\V-3

(i)     <u>Access to Records</u>.  Each Manager will have equal access to Board meetings, information distributed to the Board, minutes or information distributed to committees of the Board, and LLC books and records.  The Preferred Unitholder will have access to minutes from meetings of the Board, quarterly financial statements and annual financial statements (which shall be audited, if available).

**6.3**     **Board Meetings and Actions by Written Consent**

(a)     <u>Voting</u>.  Each Manager shall have one (1) vote on all actions permitted or required by the Delaware Law, the Articles or this Agreement to be taken by the Board or any committee on which such Manager serves.  A majority of the total number of the authorized Managers fixed by, or in the manner provided in, this Agreement must be present in order to constitute a quorum for the transaction of business of the Board (provided that a quorum must at <u>all</u> <u>times</u> include the Preferred Manager with respect to all actions under <u>Section 6.5</u> herein), and except as otherwise provided in this Agreement, the act of Managers possessing a majority of the votes held by the Managers present at a meeting of the Board at which a quorum is present shall be the act of the Board.  A Manager who is present at a meeting of the Board at which action on any matter is taken shall be presumed to have assented to the action unless the Manager votes against such action or delivers his or her written dissent to the LLC promptly after the adjournment of the meeting.  Such right to dissent shall not apply to a Manager who voted in favor of such action.  On any matter that is to be voted on by Managers, the Managers may vote in person or by proxy, and such proxy may be granted in writing, by means of electronic transmission or as otherwise permitted by law.

(b)     <u>Meetings, Generally</u>.  At all meetings of the Board, business shall be transacted in such order as shall from time to time be determined by the Board.  Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting was not called or convened in accordance with this Agreement.

(c)     <u>Regular Meetings</u>.  Regular meetings of the Board shall be held at such times and places as shall be designated from time to time by the Board.  Notice of such regular meetings shall not be required.

(d)     <u>Special Meetings</u>.  Special meetings of the Board may be called by any Manager on at least 48 hours' notice to each Manager.  Such notice need not state the purpose or purposes of, nor the business to be transacted at, such meeting.  The Board shall use its best efforts to hold each meeting at a date and time convenient to all Managers (or members of such committee) entitled to vote thereat.

(e)     <u>Action by Written Consent or Telephone Conference</u>.  Any action permitted or required by the New York Law, the Articles or this Agreement to be taken at a meeting of the Board or any committee of the Board may be taken without a meeting if a consent in writing (which may be in counterparts) to the adoption of a resolution authorizing the action is signed by Managers possessing not less than the minimum number of votes of the Managers (or members of such committee) that would be necessary to authorize or take such action at a meeting of the Board (or such committee) at which all Managers (or members of such committee) entitled to vote thereon were present and voted, as the case may be.  The consent and resolution by the members of the Board or committee shall be filed with the minutes of the Board or committee, as applicable.  Subject to the requirements of the New York Law, the Articles or this Agreement for notice of meetings, the Managers or members of any committee of the Board may participate in and hold a meeting of the Board or any such committee, as the case may be, by means of a conference telephone or similar communications equipment allowing all persons participating in the meeting can hear each other. Participation by such means shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of

objecting to the transaction of any business on the ground that the meeting was not called or convened in accordance with this Agreement.

**6.4**    **Officers**

(a)    <u>Designation and Appointment</u>.  The Board may (but need not), from time to time, designate and appoint one or more persons as an Officer of the LLC.  No Officer need be a resident of the State of Delaware, a Member or a Manager.  Any Officers so designated shall have such authority and perform such duties as the Board may, from time to time, delegate to them.  Any such delegation may be revoked at any time by the Board in its sole discretion.  The Board may assign titles to particular Officers. Unless the Board otherwise decides, if the title is one commonly used for officers of a business corporation formed under the New York Business Corporation Law, the assignment of such title shall constitute the delegation to such Officer of the authority and duties that are normally associated with that office, and any specific delegation of authority and duties made to such Officer by the Board.  Each Officer shall hold office until such Officer's successor shall be duly designated or until such Officer's death, resignation or removal as provided in this Agreement.  Any number of offices may be held by the same individual.  The salaries or other compensation, if any, of the Officers and agents of the LLC shall be fixed from time to time by the Board, subject to <u>Section 6.4(c)</u> and <u>7.5</u>.  The initial Officers of the LLC and shall be as follows:

<mark>[TO BE INSERTED]</mark>

(b)    <u>Resignation; Removal</u>.  Any Officer (subject to any contract rights available to the LLC, if applicable) may resign at any time.  Such resignation shall be made in writing and shall take effect at the time specified in the notice, or if no time be specified, at the time of its receipt by the Board.  The acceptance of a resignation shall not be necessary to make it effective.  Any Officer may be removed, either with or without cause, by the Board; <u>provided</u>, <u>however</u>, that such removal shall be without prejudice to the contract rights, if any, of the individual so removed.  Designation of an Officer shall not of itself create contract rights.  Any vacancy occurring in any office of the LLC may be filled by the Board.

**6.5**    **Protective Provisions**.  For so long any Preferred Units remain outstanding, neither the LLC nor any of its Subsidiaries shall, and no Officer or Manager of the LLC or any of its Subsidiaries shall cause the LLC or any of its Subsidiaries to, without the prior consent of the Preferred Unitholder:

(a)    liquidate, dissolve or wind-up the affairs of the LLC, or effect any Sale of the LLC;

(b)    amend, alter, or repeal any provision of the Articles or this Agreement;

(c)    create or authorize the creation of or issue any other security convertible into or exercisable for any equity security, having rights, preferences or privileges senior to or on parity with the Preferred Units, or increase the authorized number of shares of Common Units or Preferred Units;

(d)    purchase or redeem or pay any dividend on any equity prior to the Preferred Units, other than Class B Common Units repurchased from former employees or consultants in connection with the cessation of their employment/services, at the lower of fair market value or cost;

(e)      create or authorize the creation of any debt security, other than equipment leases that do not exceed, individually or in the aggregate, $[   ]$^4$, unless such debt security has received the prior approval of the Board of Managers, including the approval of the Preferred Manager;

(f)      increase or decrease the size of the Board of Managers;

(g)      make any loan or advance to, or own any stock or other securities of, any subsidiary or other entity unless it is wholly owned by the LLC;

(h)      make any loan or advance to any individual or entity, including any employee or Manager of the LLC or any subsidiary, except advances and similar expenditures in the ordinary course of business or under the terms of an equity incentive plan approved by the Board of Managers;

(i)      guarantee, directly or indirectly any indebtedness except for the Credit Facilities and trade accounts of the LLC arising in the ordinary course of business;

(j)      increase the number of shares authorized for issuance to officers, Managers, employees, consultants and advisors pursuant to equity incentive plans or arrangements; or

(k)      create, or hold equity in, any subsidiary that is not wholly owned by the Company, or sell, transfer or otherwise dispose of any capital stock of any direct or indirect subsidiary of the LLC, or permit any direct or indirect subsidiary to sell, lease, transfer, exclusively license or otherwise dispose of all or substantially all of the assets of such subsidiary.

**6.6      <u>Limitation of Liability</u>.**

(a)      Except as otherwise may be provided in this Agreement or in any agreement entered into by such Person and the LLC or any of the LLC's Subsidiaries, to the maximum extent permitted by law, no present or former Manager or any of such Manager's Affiliates, heirs, successors, assigns, agents or representatives shall be liable to the LLC or any of its Subsidiaries or to any Unitholder for any act or omission performed or omitted by such Person in his or her capacity as a Manager of the LLC or in a similar capacity with respect to any Subsidiaries of the LLC or otherwise taken in good faith; <u>provided</u>, <u>however</u>, that, except as otherwise may be provided in this Agreement, such limitation of liability shall not apply to the extent the act or omission was attributable to such Person's gross negligence, bad faith, willful misconduct, knowing violation of law or breach of this Agreement as determined by a final, non-appealable judgment of a court of competent jurisdiction.  Each Manager shall be entitled to rely upon the advice of legal counsel, independent public accountants and other experts, including financial advisors, and any act of or failure to act by such Manager in good faith reliance on such advice shall in no event subject such Manager or any of their respective Affiliates, heirs, successors, assigns, agents or representatives to liability to the LLC or any of its Subsidiaries or any Unitholder.

(b)      Notwithstanding anything to the contrary contained in this Agreement, to the maximum extent permitted by law, whenever in this Agreement or any other agreement contemplated herein or otherwise, the Board are permitted or required to take any action or to make a decision in its "sole discretion" or "discretion" or that the Board deems "necessary," "necessary or appropriate," "necessary or desirable" or "necessary, appropriate or advisable," or under a grant of similar authority or latitude, the Board shall, to the fullest extent permitted by applicable law, make such decision in its sole discretion (regardless of whether there is a reference to "sole discretion" or "discretion"), shall be entitled to consider such interests and factors as it desires (including the interests of a Unitholder with which a

---

$^4$ Parties to agree on appropriate dollar amount.

Director may be affiliated), and shall have no duty or obligation (fiduciary or otherwise) to give any consideration to any interest of or factors affecting the LLC, its Subsidiaries or the Unitholders, and shall not be subject to any other or different standards imposed by this Agreement, any other agreement contemplated by this Agreement, under the Delaware Law or under any other applicable law or in equity, provided, however, that, the foregoing is not intended to eliminate the implied duty of good faith.

(c)     Whenever in this Agreement a Manager is permitted or required to take any action or to make a decision in his or her "good faith" or under another express standard, such Manager shall act under such express standard and, to the extent permitted by applicable law, shall not be subject to any other or different standards imposed by this Agreement or any other agreement and, notwithstanding anything to the contrary in this Agreement, so long as such Manager believes that the action taken or the decision made is in the best interests of the LLC, the resolution, action or terms so made, taken or provided by such Manager shall not constitute a breach of this Agreement or any other agreement contemplated herein or impose liability upon such Manager or any of their respective Affiliates, heirs, successors, assigns, agents or representatives.  Without limiting the foregoing, the obligation to act in "good faith" shall mean and include, without limitation, the obligation to disclose to the Board and the Board any proposed interests or transactions that actually or potentially conflict with the interests of the LLC.

### 6.7    <u>Indemnification</u>.

(a)     The LLC hereby agrees to indemnify and hold harmless any Person (each an "<u>Indemnified Person</u>") to the fullest extent permitted under the Delaware Law, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the LLC to provide broader indemnification rights than the LLC is providing immediately prior to such amendment), against all expenses, liabilities and losses (including reasonable attorney fees, judgments, fines, excise taxes or penalties) reasonably incurred or suffered by such Person (or one or more of such Person's Affiliates) by reason of the fact that such Person is or was a Unitholder or Member or is or was serving as a Manager or Officer of the LLC or is or was serving at the request of the LLC as a Manager, director or officer of another corporation, partnership, joint venture, limited liability company, trust or other enterprise, including the LLC and its Subsidiaries; <u>provided</u>, <u>however</u>, that no Indemnified Person shall be indemnified for any expenses, liabilities and losses suffered that are attributable to such Indemnified Person's or its Affiliates' gross negligence, willful misconduct or knowing violation of law as determined by a final, non-appealable judgment of a court of competent jurisdiction or for any present or future breaches of any representations, warranties or covenants by such Indemnified Person or its Affiliates, employees, agents or representatives contained herein or in any other agreement with the LLC or any of its Subsidiaries.  Expenses, including reasonable attorneys' fees and expenses, incurred by any such Indemnified Person in defending a proceeding shall be paid by the LLC in advance of the final disposition of such proceeding, including any appeal therefrom, upon receipt of an undertaking by or on behalf of such Indemnified Person to repay such amount if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified by the LLC.

(b)     The LLC, at the direction of the Board, may indemnify and advance expenses to an employee or agent of the LLC or any of its Subsidiaries to the same extent and subject to the same conditions under which it is obligated to indemnify and advance expenses to an Indemnified Person under <u>Section 6.7(a)</u>.

(c)     The LLC may maintain insurance, at its expense, to protect any Indemnified Person (or employee or agent) against any expense, liability or loss described in <u>Sections 6.7(a)</u> and <u>6.7(b)</u> above

whether or not the LLC would have the power to indemnify such Indemnified Person (or employee or agent) against such expense, liability or loss under the provisions of this <u>Section 6.7</u>.

(d)     Notwithstanding anything contained in this Agreement to the contrary (including in this <u>Section 6.7</u>), any indemnity by the LLC relating to the matters covered in this <u>Section 6.7</u> shall be provided out of and to the extent of LLC assets only, and no Unitholder (unless such Unitholder otherwise agrees in writing or is found in a final, non-appealable decision by a court of competent jurisdiction to have personal liability on account thereof) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity obligation of the LLC.

(e)     If this <u>Section 6.7</u> or any portion of it shall be invalidated on any ground by any court of competent jurisdiction, then the LLC shall nevertheless indemnify and hold harmless each Indemnified Person pursuant to this <u>Section 6.7</u> to the fullest extent permitted by any applicable portion of this <u>Section 6.7</u> that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE VII

## RIGHTS AND OBLIGATIONS OF UNITHOLDERS

**7.1     <u>Limitation of Liability</u>**.  Except as otherwise provided by the Delaware Law, the debts, obligations and liabilities of the LLC, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the LLC, and no Unitholder or Member shall be obligated personally for any such debt, obligation or liability of the LLC solely by reason of being a Unitholder or acting as a Member or Manager of the LLC.  Except as otherwise provided in this Agreement, a Unitholder's liability (in its capacity as such) for LLC liabilities and losses shall be such Unitholder's share of the LLC's assets; <u>provided</u>, <u>however</u>, that a Unitholder shall be required to return to the LLC any Distribution made to it in clear and manifest accounting or similar error.

**7.2     <u>Lack of Authority</u>**.  No Unitholder or Member in his, her or its capacity as such has the authority or power to act for or on behalf of the LLC in any manner, to do any act that would be (or could be construed as) binding on the LLC or to make any expenditures on behalf of the LLC.  The Unitholders and Members consent to the exercise by the Board of the powers conferred on it by law and this Agreement.

**7.3     <u>No Right of Partition</u>**.  No Unitholder or Member shall have the right to seek or obtain partition by court decree or operation of law of any LLC property, or the right to own or use particular or individual assets of the LLC.

**7.4     <u>Manner of Voting by Members</u>**.  Except as otherwise provided in Section 6.5 and in any other provision of this Agreement, with respect to any matter expressly made subject to the vote or consent of the Members by this Agreement or the Delaware Law, the Class A Unitholders shall act through meetings and written consents as described in this <u>Section 7.4</u> (including to elect the Directors pursuant to <u>Section 6.2</u>), voting together as a single class.  Except as expressly provided in this Agreement, holders of Class B Common Units and Preferred Units shall not have any voting rights with respect to such Units.  The Class A Unitholders may take action at a meeting called by the a majority of the Board (which, for the avoidance of doubt, shall include the Preferred Manager with respect to such action described under 6.5(e)) on at least 72 hours' prior written notice to the other Members entitled to vote thereat, which notice shall state the purpose or purposes for which such meeting is being called.  The actions taken by the Class A Unitholders entitled to vote or consent at any meeting (as opposed to by written consent), however called and noticed, shall be as valid as though taken at a meeting duly held

24

after regular call and notice if (but not until), either before, at or after the meeting, the Class A Unitholders entitled to vote or consent as to whom it was improperly held sign a written waiver of notice or a consent to the holding of such meeting or an approval of the minutes thereof.  The actions by the Class A Unitholders entitled to vote or consent may be taken by vote of the Class A Unitholders entitled to vote or consent at a meeting or by written consent (without a meeting and without a vote) so long as such consent is signed by the Class A Unitholders having not less than the minimum number of Units that would be necessary to authorize or take such action at a meeting at which all Class A Unitholders entitled to vote thereon were present and voted.  Prompt notice of the action so taken without a meeting shall be given to those Class A Unitholders entitled to vote or consent who have not consented in writing.  Any action taken pursuant to such written consent of the Class A Unitholders shall have the same force and effect as if taken by the Members at a meeting thereof.

## ARTICLE VIII

## BOOKS, RECORDS AND REPORTS

**8.1**    **Records and Accounting**.  The LLC shall keep, or cause to be kept, customary books and records with respect to the LLC's business.  All matters concerning (i) the determination of the relative amount of contributions by and distributions to the Unitholders pursuant to Articles III and V, (ii) the calculations regarding conversion of the Preferred Units pursuant to Article IV, and (iii) accounting procedures and determinations shall be determined by the Board, whose determination shall be final and conclusive as to all of the Unitholders absent manifest error.

**8.2**    **Fiscal Year**.  The fiscal year (the "Fiscal Year") of the LLC shall constitute the 12-month period ending on December 31 of each calendar year, or such other annual accounting period as may be established by the Board.

**8.3**    **Transmission of Communications**.  Each Person that owns or controls Units on behalf of, or for the benefit of, another Person or Persons shall be responsible for conveying any report, notice or other communication received from the Board to such other Person or Persons.

**8.4**    **Financial Statements and Other Information**.  The LLC shall deliver to the Preferred Unitholder the following quarterly and annual financial statements: a statement of income (unaudited) and cash flow of the LLC for the immediately preceding quarter or Fiscal Year, and for the Fiscal Year to date in the case of the second and third quarters; and a balance sheet of the LLC and its Subsidiaries as of the end of such quarter or Fiscal Year, as applicable.  Such financial statements need not be audited unless otherwise determined by the Board.[5]

## ARTICLE IX
## TAX MATTERS

**9.1**    **Preparation of Tax Returns**.  The LLC shall arrange for the preparation and timely filing of all tax returns required to be filed by the LLC and/or its Subsidiaries and shall pay or cause to be paid all Taxes required to be paid by the LLC and its Subsidiaries.

**9.2**    **Tax Elections**.  Subject to Section 2.7(b), the Board shall have the authority to make any and all tax elections for federal, state and local tax purposes and shall determine in good faith whether or not to make any available election.

---

[5] Arena to confirm.

**9.3** **Tax Matters Partner**.

(a)     For tax periods not subject to the provisions of the Revised Partnership Audit Procedures, the Board or such other eligible Member or eligible Person as may be designated by the Board shall act as the LLC's "tax matters partner" for U.S. federal income tax purposes under Section 6231(a)(7) of the Code and as the LLC's "partnership representative" for any tax period subject to the provisions of Section 6223 of the Code, as amended by the Revised Partnership Audit Procedures (the tax matters partner and partnership representative, collectively, the "Tax Matters Person"), and in any similar capacity under state or local law.  The Tax Matters Person shall have the power and authority to perform in such capacity those duties as may be required to be performed by a "tax matters partner" or "partnership representative," as the case may be, under the Code.  The Tax Matters Person shall advise and consult with the Board from time to time regarding the status of tax related elections, investigations, proceedings and negotiations with governmental authorities, and shall not take any action, other than a purely ministerial action, in its capacity as such without the approval of the Board .  Notwithstanding the foregoing, the following actions shall be subject to the approval of the Board:  (i) commencing any judicial action or appealing any adverse determination of a judicial tribunal, in each case regarding taxes of the LLC, (ii) entering into any settlement agreement with any taxing authority regarding taxes of the LLC, and (iii) agreeing to any extension of any statute of limitations for making assessments regarding taxes of the LLC.

(b)     Notwithstanding anything to the contrary contained herein, for taxable years subject to the provisions of the Revised Partnership Audit Procedures, the Tax Matters Person shall be the "partnership representative" of the LLC within the meaning of Section 6223 of the Code.  If the Board determine in good faith that the LLC will not make the election under Section 6226 of the Code with respect to any taxable year of the LLC, then the LLC shall make any payments of assessed amounts under Section 6221(a) of the Code to the Internal Revenue Service (the "IRS") and shall allocate any such assessment among the current or former Members of the LLC for the "reviewed year" to which the assessment relates in a manner that reflects the current or former Member's respective interests in the LLC for the reviewed year based on each such current or former Member's share of such assessment as would have occurred if the LLC had amended the tax returns for such reviewed year and each such current or former Member incurred the assessment directly (using the tax rates applicable to the LLC under Section 6225 of the Code).  In addition, if the LLC does not make the election under Section 6226 of the Code, then, to the extent that the LLC is assessed amounts under Section 6221(a) of the Code, each current or former Member to which this assessment relates shall pay to the LLC such current or former Member's share of the assessed amounts, as determined pursuant to the preceding sentence, including such current or former Member's share of any accrued interest and penalties assessed against the LLC relating to such current or former Member's share of the assessment, upon thirty (30) days written notice from the Tax Matters Person requesting the payment.  All Code sections referred to in this Section 9.3(b) are as promulgated under the Revised Partnership Audit Provisions.

(c)     If the LLC becomes the subject of any audit, assessment or other examination relating to taxes by any tax authority or any judicial or administrative proceedings relating to taxes (a "Tax Audit"), the LLC shall reimburse the Members for reasonable out-of-pocket fees and expenses incurred to the extent their participation is requested by the Board in connection with such Tax Audit.  In addition, the Tax Matters Person shall give prompt notice to the Board of any and all notices it receives from the IRS concerning the LLC, whether in its capacity as "partnership representative" or "tax matters partner" (other than any notices that have previously been provided by the IRS to such Member directly), including any notice of audit, any notice of action with respect to a revenue agent's report, any notice of a thirty (30) day appeal letter and any notice of a deficiency in tax concerning the LLC's federal income tax return. The Tax Matters Person shall furnish the Board periodically with status reports regarding any negotiations between the IRS and the LLC.

26

## ARTICLE X
## TRANSFER OF LLC INTERESTS

**10.1    Transfers by Unitholders**.

(a)    No Unitholder shall Transfer any interest in any Units except in compliance with this Article X (which, for the avoidance of doubt, shall include a Transfer to a Permitted Transferee).  Except pursuant to:  (i) Section 10.2 as a result of an Approved Sale or Section 10.4 as an Electing Member, (ii) the terms and conditions of an Equity Incentive Agreement, (iii) a Transfer to a Permitted Transferee on terms and conditions approved by the Board (not to be unreasonably withheld) or by devise in the event of death of an individual Member or (iv) pursuant to Section 5.3(a), no Unitholder (the "Prohibited Unitholders") shall Transfer, or offer or agree to Transfer, all or any part of any interest of such Prohibited Unitholder's Units without the prior consent of the Board (not to be unreasonably withheld).

(b)    Except in connection with an Approved Sale or a Transfer to the LLC or a Member, each Transferee of Units shall, as a condition prior to such Transfer, execute and deliver to the LLC a counterpart, or other instrument pursuant to which such Transferee agrees to become a party, to this Agreement and bound by the provisions of this Agreement.

**10.2    Approved Sale; Drag Along Obligations**.

(a)    If (i) the holders of more than fifty percent (50%) of the outstanding Preferred Units and the Class A Common Units collectively, voting together as a single class on an as converted basis, and (ii) the Board (together, the "Approving Party") approve a Sale of the LLC, which for purposes of clarification shall include a sale, transfer, conveyance, merger or other disposition of the equity interests of the LLC (as so approved, each an "Approved Sale"), then each Unitholder shall vote for, consent to and raise no objections against such Approved Sale.  If the Approved Sale is structured as a (x) merger or consolidation, each Unitholder shall waive any dissenters rights, appraisal rights or similar rights in connection with such merger or consolidation or (y) sale of Units, each holder of Units shall agree to sell all of his, her or its Units and rights to acquire Units on such other terms and conditions approved by the Approving Party, provided that a Unitholder shall not be required to make representations other than on a several (and not joint), pro rata basis (except as to such Unitholder's Own Units), or which such Unitholder knows to be false, provided that such Unitholder shall inform the Board of such false representations, including the manner in which such representations are false.  Subject to the provisions of this Section 10.2, each Unitholder shall take all actions in connection with the consummation of the Approved Sale as requested by the Approving Party including, but not limited to, becoming party to a purchase and sale agreement or merger agreement related to the Approved Sale.

(b)    The obligations of the Unitholders under this Section 10.2 with respect to an Approved Sale are subject to the satisfaction of the condition that the net consideration to be received by the Unitholders in connection with such Approved Sale shall be allocated among the Unitholders in accordance with Section 5.1.  Each Unitholder shall take all actions in connection with the distribution of the aggregate consideration from the sale or exchange by the Unitholders of Units held by the Unitholders (whether by sale, merger, recapitalization, reorganization, consolidation, combination or otherwise) as may be requested by the Approving Party.

(c)    In no manner shall this Section 10.2 be construed to grant to any Member or Unitholder any dissenters rights or appraisal rights or give any Member or Unitholder any right to vote in any transaction structured as a merger or consolidation (it being understood that the Members have expressly waived rights under the Delaware Law and have granted to the Approving Party the sole right to approve

27

or consent to a merger or consolidation of the LLC without approval or consent of the Members or Unitholders or any class or group thereof).

(d)     Notwithstanding the foregoing, a Unitholder shall not be required to comply with this Section 10.2 in connection with an Approved Sale, unless liability shall be limited to such Unitholder's applicable share (determined based on the respective proceeds payable to each Unitholder in connection with such Approved Sale in accordance with Section 5.1) of a negotiated aggregate indemnification amount that applies equally to all Unitholders but that in no event exceeds the amount of consideration otherwise payable to such Unitholder in connection with such Approved Sale, except with respect to claims related to actual fraud by such Unitholder, the liability for which need not be limited as to such Unitholder.

**10.3     <u>Right of First Refusal on Sales by Other Common Holders</u>**

(a)     If at any time a Common Unitholder, other than the Preferred Unitholder who holds Units that were received upon conversion of Preferred Units, (a "<u>Transferring Common Member</u>"), proposes to Transfer any of its Common Units (the "<u>ROFR Units</u>") in a transaction or series of related transactions to a Person other than a Transfer to a Permitted Transferee, such Transferring Common Member shall give written notice of such proposal to the LLC and the Preferred Unitholder.  Such notice shall include (i) a description of proposed transaction including, without limitation, the number of Common Units to be sold, (ii) the consideration (which shall be cash), (iii) the proposed Transferee and (iv) material terms and conditions upon which the proposed Transfer is to be made (a "<u>ROFR Notice</u>").

(b)     The LLC shall have a right of first refusal to purchase the ROFR Units on the same terms and conditions as specified in the ROFR Notice, exercisable by delivering a notice to the Transferring Common Member(s) in writing within thirty (30) days after delivery of the ROFR Notice (such thirty day period, the "<u>LLC ROFR Exercise Period</u>").  The LLC shall effect its purchase of some or all of the ROFR Units by promptly delivering to the Transferring Common Member(s) the consideration therefor and the Transferring Common Member(s) shall deliver such documentation as reasonably requested by the LLC in connection therewith (which, for the avoidance of doubt, shall contain customary representations and warranties regarding delivery of good title to the transferred ROFR Units, free and clear of any encumbrances, and such Transferring Common Member's authority to enter into such transaction and the documents related thereto).

(c)     After the expiration of the LLC ROFR Exercise Period, the LLC shall deliver a notice to the Preferred Unitholder (the "<u>Preferred ROFR Notice</u>") stating the number of ROFR Units not purchased by the LLC (the "<u>Remaining ROFR Units</u>").  The Preferred Unitholder may purchase Remaining ROFR Units by delivering a notice to the Transferring Common Member(s) in writing within thirty (30) days after delivery of the Preferred ROFR Notice (the "<u>Preferred ROFR Notice Period</u>").  The Preferred Unitholder shall have the right to purchase up to that number of Remaining ROFR Units as shall be equal to the product obtained by multiplying (X) the total number of Remaining ROFR Units by (Y) a fraction, the numerator of which is the total number of Preferred Units owned by the Preferred Unitholder on the date of the Preferred ROFR Notice and the denominator of which is the total number of Preferred Units outstanding on the date of the Preferred ROFR Notice.  The Preferred Unitholder shall effect its purchase of the Remaining ROFR Units by promptly delivering to the Transferring Common Member(s) the consideration therefor and the Transferring Common Member(s) shall deliver such documentation reasonably requested by the Preferred Unitholder in connection therewith (which, for the avoidance of doubt, shall contain customary representations and warranties regarding delivery of good title to the ROFR Units, free and clear of any encumbrances, and such Transferring Common Member's authority to enter into such transaction and the documents related thereto).

104316822\V-3

**10.4**   **Tag-Along Rights.**

(a)      Following the expiration of a Preferred ROFR Notice Period in which less than all of the Remaining ROFR Units are purchased, upon identifying prospective Transferee(s) upon terms no more favorable to the prospective Transferee(s) than those offered to the LLC and the Preferred Unitholder pursuant to Section 10.3 (and if they are more favorable, such Units must be reoffered pursuant to Section 10.3), the Transferring Common Member(s) shall deliver a written notice (the "Sale Notice") to the LLC and to the Preferred Unitholder, specifying in reasonable detail the identity of the prospective Transferee(s), the number of Units to be Transferred and the terms and conditions of the Transfer (including the price per Unit offered by the prospective Transferee).  The Preferred Unitholder may elect to participate in the contemplated Transfer by delivering written notice to the Transferring Common Member(s) within 20 days after delivery of the Sale Notice.  The Transferring Common Member(s) and the Preferred Unitholder shall be entitled to sell in the contemplated Transfer, on the same terms (other than price), a number of Units equal to the product of (i) the quotient determined by dividing the number of Preferred Units and Common Units owned by such Person by the aggregate number of Preferred Units and Common Units owned by the Transferring Common Member and Preferred Unitholder and (ii) the number of Preferred Units or Common Units to be sold in the contemplated Transfer.  The Preferred Unitholder may elect to sell in any Transfer contemplated under this Section 10.4 a lesser number of Units than the Preferred Unitholder is entitled to sell, in which case the Transferring Common Member(s) shall have the right to sell an additional number of Units in such Transfer equal to the number that the Preferred Unitholder has elected not to sell.  If the Preferred Unitholder has not elected to participate in the contemplated Transfer (through notice to such effect or expiration of the 20-day period after delivery of the Sale Notice), then the Transferring Common Member(s) may Transfer the Units specified in the Sale Notice at a price and on terms no more favorable to the Transferee(s) thereof than specified in the Sale Notice and the ROFR Notice during the 180-day period immediately following the date of the delivery of the Sale Notice.  Any Transferring Common Member's Units not Transferred within such 180-day period shall be subject to the provisions of this Section 10.4 upon subsequent Transfer.

(b)      For purposes of this Section 10.4, all Preferred Units and Common Units will be interchangeable, such that Preferred Units and Common Units may be transferred by the Preferred Unitholder, regardless of the class of Unit specified in a Sale Notice.  Each Transferring Common Member(s) shall use commercially reasonable efforts to obtain the agreement of the prospective Transferee(s) to the participation of the Preferred Unitholder, and no Transferring Common Member(s) shall Transfer any of its Units to any prospective Transferee if such prospective Transferee(s) declines to allow the participation of the Preferred Unitholder to the extent required by this Section 10.4.  Each Member Transferring Units pursuant to this Section 10.4 shall pay its portion (determined based on an "inverse waterfall" methodology (i.e., the expenses would first be allocated to the latest tranche of the waterfall contained in Section 5.1 that is eligible to receive proceeds from such Approved Sale, and if there are insufficient funds that would otherwise be distributed pursuant to such tranche, expenses would then be allocated to the prior tranche of the waterfall contained in Section 5.1, and so on)) of the expenses incurred by the Transferring Common Member in connection with such Transfer.

**10.5**   **Put/Call Option.**

(a)      Put Option:

(i)      At any time on or following _____, 2021, the Preferred Unitholder shall have the right to cause the LLC to redeem [a portion or] all of the Preferred Units pursuant to this Section 10.5(a) (the "Put").  The price for Preferred Units sold to the LLC in accordance with this Section 10.5(a) shall be in accordance with the following formula:

$$E * 11 - D - WC - O$$

E = trailing twelve month EBITDA, as determined by LLC's auditors, measured from the month ending prior to redemption;

D = all secured debt outstanding at the time of redemption;

WC = adjusted working capital, as determined by the LLC's auditors;

O = other material, on-balance sheet LLC obligations, measured for the month ending prior to redemption

(ii)     The Put shall be consummated within six (6) months after the delivery of notice that the Preferred Unitholder has exercised the Put (such date of consummation, the "Put Closing"). If the Put Closing does not take place in accordance with Section 10.5(a) or to the extent that the LLC may not, as of the Put Closing legally redeem the Preferred Units, such redemption will take place as soon as legally permitted.

(b)     Call Option. At any time on or following ___, 2021, a majority of Class A Common Units shall have the right to purchase [a portion or] all of the Preferred Units pursuant to this Section 10.5(b) (the "Call"). The Call shall be consummated within the same time period and at the same price described in Section 10.5(a) above.

10.6     **Void Transfers**. Any Transfer by any Unitholder of any Units or other interest in the LLC in contravention of this Agreement (including, but not limited to, the failure of the Transferee to execute a counterpart in accordance with Section 10.1(b), if applicable) shall be void ab initio and ineffectual and shall not bind or be recognized by the LLC or any other party. No such purported Transferee shall have any right to any Distributions from the LLC, or any other rights, including, but not limited to, inspection rights, associated with the LLC.

10.7     **Effect of Assignment**.

(a)     Any Member who shall assign any Units or other interest in the LLC shall cease to be a Member of the LLC with respect to such Units or other interest and shall no longer have any rights or privileges of a Member with respect to such Units or other interest.

(b)     Any Person who acquires in any manner whatsoever any Units or other interest in the LLC, irrespective of whether such Person has accepted and adopted in writing the terms and provisions of this Agreement, shall be deemed by the acceptance of the benefits of the acquisition thereof to have agreed to be subject to and bound by all of the terms and conditions of this Agreement that any predecessor in such Units or other interest in the LLC of such Person was subject to or by which such predecessor was bound.

10.8     **Additional Restrictions on Transfer**. In connection with the Transfer of any Units, the Unitholder will deliver to the LLC (x) a written notice describing in reasonable detail the Transfer or proposed Transfer, and (y) to the extent required by the LLC, an opinion of counsel that (to the LLC's reasonable satisfaction) is knowledgeable in securities law matters, or other documentation acceptable to the LLC, to the effect that such Transfer of Units may be effected without registration of such Units under the Securities Act. In addition, if the holder of such Units delivers to the LLC an opinion of counsel, or other documentation acceptable to the LLC to the effect that no subsequent Transfer of such Units shall

require registration under the Securities Act, the LLC shall promptly deliver to such holder new certificates for such Units that do not bear the Securities Act legend set forth in Section 10.9.

**10.9**    **Prospective Transferees**.  Subject to the terms of this Agreement, the LLC agrees to cooperate, as may reasonably be requested, in order to provide any information and access to any information to any prospective Transferee that would be permitted hereunder in connection with a proposed Transfer, subject to receipt of a confidentiality agreement in form and substance satisfactory to the Board.

**10.10**    **Legend**.  In the event that certificates representing the Units are issued, such certificates will bear the following legend:

> "THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR APPLICABLE STATE SECURITIES LAWS ("STATE ACTS") AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR TRANSFERRED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR STATE ACTS OR AN EXEMPTION FROM REGISTRATION THEREUNDER.  THE TRANSFER OF THE UNITS REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE CONDITIONS SPECIFIED IN A LIMITED LIABILITY COMPANY AGREEMENT, AS AMENDED AND MODIFIED FROM TIME TO TIME, GOVERNING THE ISSUER AND BY AND AMONG CERTAIN INVESTORS.  A COPY OF SUCH CONDITIONS SHALL BE FURNISHED BY ASHLEY ENERGY, LLC TO THE HOLDER HEREOF UPON WRITTEN REQUEST AND WITHOUT CHARGE."

**10.11**    **Transfer Fees and Expenses**.  Unless the purchaser or transferee of any Units or other interest in the LLC is the LLC, the transferor of such Units or other interest in the LLC shall be obligated to reimburse the LLC for all reasonable expenses (including attorneys' fees and expenses) of any Transfer or proposed Transfer, whether or not consummated.

## ARTICLE XI

## ADMISSION OF MEMBERS

**11.1**    **Substituted Members**.  In connection with the Transfer of Units of a Unitholder permitted under the terms of this Agreement, and the other agreements contemplated by this Agreement, the Transferee shall become a Substituted Member on the effective date of such Transfer, and such admission shall be shown on the books and records of the LLC.

**11.2**    **Additional Members**.  A Person may be admitted to the LLC as an Additional Member only with the approval of the Board and only upon furnishing to the Board (a) a letter of acceptance, in form satisfactory to the Board, of all the terms and conditions of this Agreement, and (b) such other documents or instruments as may be necessary or appropriate to effect such Person's admission as a Member.  Such admission shall become effective on the date on which the Board determines that such conditions have been satisfied and when any such admission is shown on the books and records of the LLC.

31

## ARTICLE XII

### WITHDRAWAL AND RESIGNATION OF UNITHOLDERS

**12.1    Withdrawal and Resignation of Unitholders**.  No Unitholder shall have the power or right to withdraw or otherwise resign from the LLC prior to the dissolution and winding up of the LLC pursuant to Article XIII without the prior written consent of the Board (which consent may be withheld by the Board, in its good faith discretion), except as otherwise expressly permitted by this Agreement or any of the other agreements contemplated by this Agreement.  Upon a Transfer of all of a Unitholder's Units in a Transfer permitted by this Agreement, subject to the provisions of Section 10.5, such Unitholder shall cease to be a Unitholder.  Notwithstanding that payment on account of a withdrawal may be made after the effective time of such withdrawal, any completely withdrawing Unitholder will not be considered a Unitholder for any purpose after the effective time of such complete withdrawal and, in the case of a partial withdrawal, such Unitholder's Capital Contribution (and corresponding voting and other rights) shall be reduced for all other purposes hereunder upon the effective time of such partial withdrawal.

## ARTICLE XIII

### DISSOLUTION AND LIQUIDATION

**13.1    Dissolution**.  The LLC shall not be dissolved by the admission of Additional Members or Substituted Members.  The LLC shall dissolve, and its affairs shall be wound up upon the first to occur of the following:

(a)      at any time as determined by the Board, with the consent of the Board; or

(b)      the entry of a decree of administrative dissolution under the Delaware Law.

Except as otherwise set forth in this Article XIII, the LLC is intended to have perpetual existence.  An Event of Withdrawal shall not cause a dissolution of the LLC and the LLC shall continue in existence subject to the terms and conditions of this Agreement.

**13.2    Liquidation and Termination**.  On the dissolution of the LLC, the Board shall act as liquidator or may appoint one or more representatives, Members or other Persons as liquidator(s).  The liquidators shall proceed diligently to wind up the affairs of the LLC and make final distributions as provided herein and in the Delaware Law.  The costs of liquidation shall be borne as an LLC expense. Until final distribution, the liquidators shall continue to operate the LLC properties with all of the power and authority of the Board.  The steps to be accomplished by the liquidators are as follows:

(a)      the liquidators shall pay, satisfy or discharge from LLC funds all of the debts, liabilities and obligations of the LLC (including, but not limited to, all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including, but not limited to, the establishment of a cash fund for contingent liabilities in such amount and for such term as the liquidators may reasonably determine);

(b)      as promptly as practicable after dissolution, the liquidators shall (i) determine the Fair Market Value (the "Liquidation FMV") of the LLC's remaining assets (the "Liquidation Assets") in accordance with Article XIII of this Agreement, (ii) determine the amounts to be distributed to each Unitholder in accordance with Section 5.1, and (iii) deliver to each Unitholder a statement (the "Liquidation Statement") setting forth the Liquidation FMV and the amounts and recipients of such

Distributions which such Liquidation Statement shall be final and binding on all Unitholders, absent manifest clerical error; and

(c)     the liquidators shall promptly distribute the LLC's Liquidation Assets to the holders of Units in accordance with Section 5.1.  To the extent that equity securities of the LLC are distributed to any Unitholders in connection with the liquidation, such Unitholders agree to enter into a securityholders agreement with the LLC and each other Unitholder which contains restrictions on the Transfer of such equity securities and other provisions (including with respect to the governance and control of the LLC) in form and substance similar to the provisions and restrictions set forth in this Agreement (including, but not limited to, in Article VI and Article X).  The distribution of cash and/or property to a Unitholder in accordance with the provisions of this Section 13.2 constitutes a complete return to the Unitholder of his, her or its Capital Contributions and a complete distribution to the Unitholder of his, her or its interest in the LLC and all the LLC's property and constitutes a compromise to which all Unitholders have consented.  To the extent that a Unitholder returns funds to the LLC, it has no claim against any other Unitholder for those funds.

**13.3     Cancellation of Certificate**.   On completion of the distribution of LLC assets as provided in this Article XIII, the LLC shall terminate (and the LLC shall not be terminated prior to such time), and the Board (or such other Person or Persons as the Delaware Law may require or permit) shall file certificate of cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to this Agreement that are or should be canceled and take such other actions as may be necessary to terminate the LLC.   The LLC shall be deemed to continue in existence for all purposes of this Agreement until it is terminated pursuant to this Section 13.3.

**13.4     Reasonable Time for Winding Up**.  A reasonable time shall be allowed for the orderly winding up of the business and affairs of the LLC and the liquidation of its assets pursuant to Section 13.2 in order to minimize any losses otherwise attendant upon such winding up.

**13.5     Return of Capital**.  The liquidators shall not be personally liable for the Unreturned Capital or any other return of Capital Contributions or any portion thereof to the Unitholders (it being understood that any such return shall be made solely from LLC assets).

## ARTICLE XIV

## VALUATION

**14.1     Valuation of Non-Cash Assets**.  The Fair Market Value of all non-cash assets shall mean the fair value for such assets as between a willing buyer and a willing seller in an arm's-length transaction occurring on the date of valuation as determined by the Board or its designees in its or their good faith.

**14.2     Valuation Methodology for Securities**.  In determining Fair Market Value of any securities, the Board shall make such determination on the basis of an orderly sale to a willing, unaffiliated buyer in an arm's-length transaction, taking into account whether the issuer is a privately held company or a public company.

## ARTICLE XV

## GENERAL PROVISIONS

**15.1     Amendments**.  Subject to the right of the Board to amend this Agreement as expressly provided in this Agreement, this Agreement may only be amended, modified, or waived with the written consent of the holder(s) of 75% of the Preferred Units and 75% of the Class A Common Units, voting as separate classes; provided, that no provision of this Agreement may be amended or waived to (i) impair the limited liability of a Unitholder or increase the liabilities or responsibilities of, or (except for dilution resulting from the issuance of additional Units or the admission of additional Members as otherwise permitted under this Agreement) diminish the rights or protections of, any Unitholder (in his, her or its capacity as a Unitholder or Member) under this Agreement, in each case in a manner different than other Unitholders or Members holding the same class of Units, without the consent of each such affected Member or Unitholder, as applicable, (ii) increase the Capital Contribution required to be made by any Unitholder with respect to such Unitholder's Units, without the consent of each adversely affected Unitholder, (iii) alter the economic interest of any Unitholder in income, gains or losses, or amend or modify any portion of Article V, in each case in a manner different from other Unitholders holding the same class of Units without the consent of each Unitholder adversely affected by such amendment or modification (except in connection with the issuance of additional Units or the admission of additional Members as otherwise permitted under this Agreement), or (iv) change any voting, consent or approval threshold or requirement specified in this Agreement without the prior approval of the Board or the Members, as the case may be, constituting at least such voting, consent or approval threshold or otherwise satisfying such requirement.

**15.2     Title to LLC Assets**.  LLC assets shall be deemed to be owned by the LLC as an entity, and no Unitholder, individually or collectively, shall have any ownership interest in such LLC assets or any portion thereof.  Legal title to any or all LLC assets may be held in the name of the LLC, the Board or one or more nominees, as the Board may determine.  The Board declares and warrants that any LLC assets for which legal title is held in its name or the name of any nominee shall be held in trust by the Board or such nominee for the use and benefit of the LLC in accordance with the provisions of this Agreement.  All LLC assets shall be recorded as the property of the LLC on its books and records, irrespective of the name in which legal title to such LLC assets is held.

**15.3     Remedies**.  Each Unitholder shall have all rights and remedies set forth in this Agreement and all rights and remedies which such Person has been granted at any time under any other agreement or contract and all of the rights which such Person has under any law.  The Parties agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that the LLC and each Unitholder may in its sole discretion apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive relief (without posting a bond or other security) in order to enforce or prevent any violation of the provisions of this Agreement.

**15.4     Successors and Assigns**.  All covenants and agreements contained in this Agreement shall bind and inure to the benefit of the Parties and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns, whether so expressed or not.

**15.5     Severability**.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement will be reformed,

104316822\V-3

construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

**15.6**    **Counterparts**.  This Agreement may be executed simultaneously in two or more separate counterparts, anyone of which need not contain the signatures of more than one Party, but each of which will be an original and all of which together shall constitute one and the same agreement binding on all the Parties.

**15.7**    **Descriptive Headings; Interpretation**.  The descriptive headings of this Agreement are inserted for convenience of reference only and do not constitute a substantive part of this Agreement. Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.  The use of the word "including" in this Agreement shall be by way of example rather than by limitation.  Reference to any agreement, document or instrument means such agreement, document or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and if applicable hereof.  Wherever required by the context, references to a Fiscal Year shall refer to a portion thereof.  The use of the words "or," "either" and "any" shall not be exclusive. The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.  Wherever a conflict exists between this Agreement and any other agreement, this Agreement shall control but solely to the extent of such conflict, unless the other agreement is executed subsequent to this Agreement by Persons who are capable of amending or waiving the applicable provision of this Agreement.

**15.8**    **Applicable Law**.  This Agreement and any dispute hereunder shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.  Any dispute relating to this Agreement shall be heard in the state or federal courts of Delaware, and the Parties agree to jurisdiction and venue therein.

**15.9**    **Addresses and Notices**.  All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given or made when (a) delivered personally to the recipient, (b) telecopied to the recipient (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if telecopied before 5:00 p.m.  New York, New York time on a business day, and otherwise on the next business day, or (c) one business day after being sent to the recipient by reputable overnight courier service (charges prepaid).  Such notices, demands and other communications shall be sent to the address for such recipient set forth in the LLC's books and records, or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party.

**15.10**    **Creditors**.  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the LLC or any of its Affiliates, and no creditor who makes a loan to the LLC or any of its Affiliates may have or acquire (except pursuant to the terms of a separate agreement executed by the LLC in favor of such creditor) at any time as a result of making the loan any direct or indirect interest in LLC Distributions, capital or property other than as a secured creditor.

**15.11**    **Waiver**.  No failure by any Party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a

breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

**15.12   Further Action**.  The Parties agree to execute and deliver all documents, provide all information and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement.

**15.13   Entire Agreement**.  This Agreement, those documents expressly referred to herein and other documents of even date herewith embody the complete agreement and understanding among the Parties and supersede and preempt the Prior Agreement and any other prior understandings, agreements or representations by or among the Parties, written or oral, which may have related to the subject matter hereof in any way.

**15.14   Delivery**.  This Agreement, and any amendments to this Agreement to the extent signed and delivered by means of a facsimile machine or other electronic transmission (including e-mail of a .pdf, .tiff, JPEG or similar document), shall be treated in all manner and respects as an original agreement or amendment and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any Party, each other Party shall re-execute original forms thereof and deliver them to all other Parties.  No Party shall raise the use of a facsimile machine or other electronic transmission to deliver a signature or the fact that any signature was transmitted or communicated through the use of a facsimile machine or other electronic transmission as a defense to the formation or enforceability of a contract and each such Party forever waives any such defense.

**15.15   Aggregation of Units**.  All Units held or acquired by any Member and its Permitted Transferees shall be aggregated together for the purpose of determining the availability of any rights under this Agreement and such affiliated Members may apportion such rights as among themselves in any manner they deem appropriate.

*[Signature page follows]*

36

IN WITNESS WHEREOF, the undersigned have executed or caused to be executed on their behalf this Limited Liability Company Agreement as of the date first written above.

**THE LLC**:

**ASHLEY ENERGY, LLC**

By:      _____
Name:
Title:

**CLASS A UNITHOLDER:**

**POWER INVESTMENTS, LLC**

By:      _____
Name:
Title:

**PREFERRED UNITHOLDER:**

**[ARENA INVESTORS LP]**

By:      _____
Name:
Title:

*[Signature Page to the Limited Liability Company Agreement of Ashley Energy, LLC - (Company)]*

## SCHEDULE OF UNITHOLDERS OF ASHLEY ENERGY, LLC

(as of [•], 2017)

| Member | Class A Common Units | Class B Common Units | Preferred Units |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| Totals |  |  |  |

104316822\V-3