# ARENA INVESTORS, LP

## INVESTMENT MEMORANDUM

To:             DZ

From:        VRD, DD

Date:         August 9, 2017

Re:           $7.5 million credit facility and $1.0 million equity investment to Power Investments, LLC

**Introduction**

In December 2016 Arena Investors, LP ("Arena" or "Lender") executed a term sheet with Power Investments, LLC[1] ("PI," the "Borrower") to provide a senior secured, first lien ($5.99 million) (the "First Lien Facility"), second lien ($1.49 million) (the "Second Lien Facility" and, together with the First Lien Facility, the "Facilities") and preferred equity investment ($1.0 million) (the "Pref" and, together with the Facilities, the "Investment") to (1) fund PI's acquisition of the Ashley Power Plant ("APP") from Trigen-St. Louis Energy Corporation (the "Seller"), a subsidiary of Veolia North America (itself a subsidiary of Veolia Environnement S.A. (ENXTPA:VIE)[2]), (2) fund certain CAPEX required for APP to increase operating margins and (3) provide operating reserves.

In 2012 Seller entered into an agreement with the City of St. Louis to provide steam heat to the core business district, and that contract gave the City of St. Louis the right to purchase the Ashley Power Plant according to a specified formula described in more detail below.  In 2015 local St. Louis businessman Mike Becker formed SLEC, LLC and the City of St. Louis assigned that purchase option to SLEC, LLC.  As a result of an introduction made through mutual business associates, in 2016 Borrower entered into an agreement with SLEC to acquire that option to purchase the Ashley Power Plant through its operating subsidiary, Ashley Energy, and in exchange SLEC will receive an equity position in Ashley Energy.  Ashley Energy subsequent entered into an Asset Purchase Agreement with Veolia North America for the purchase of the Ashley Plant with a closing currently scheduled for July 31, 2017.

The total purchase price for the power plant and option is $6.540 million.  Closing costs are estimated to be $370,000 (an estimate for Arena's legal expenses, title insurance, third party consultants, transfer taxes, etc.) and advisory costs relating to the financing of $385,400.  The remaining proceeds ($1,193,579) will provide working capital and funds for CAPEX described below.  Concurrent with the closing, the City of St. Louis (rated Baa1/A+/A- by Moody's, S&P, and Fitch, respectively) has agreed to enter into a new 20-year service agreement with Ashley Energy providing for:  (a) substantially higher pricing for steam[3]; (b) guarantees of up to $250,000 per year of debt service; and (c) additional surcharges to assure Ashley Energy meets certain EBITDA targets.  The acquisition is scheduled to close on August 9, 2017.

---

[1] Sourced through Michael Planit, a broker/merchant banker introduced to Arena through Joe Ingrassia of Capstone Business Funding. Capstone is Arena's servicing partner on a specialty factoring transaction.
[2] As of 1/25/2016, US$18.4bn in EV; US$8.7bn in MV; US$24.6bn in LTM 6/30/2016 revenue.
[3] The new Service Agreement pricing is 13.75% higher than that paid to Seller pursuant to the 2012 Service Agreement.

EXHIBIT 16

The Ashley Power Plant is a natural gas-fired cogeneration plant pursuant to which steam and electricity are simultaneously generated. The electricity is sold into the wholesale power grid, and the steam is distributed to buildings via the district energy system/steam loop that runs underneath the downtown St. Louis central business district.  Since 1904 the core business district of the City of St. Louis has been heated by steam produced by the Ashley Power Plant, which today is the exclusive and sole provider of steam heat to 75 buildings in downtown St. Louis, including Busch Stadium (St. Louis Cardinals), the Four Seasons, Marriott and Westin Hotels, the Federal Reserve and Federal Courthouse, the Scottrade Center (St. Louis Blues) and the City of St. Louis itself (and all of the associated government buildings).  A list of APP's customers with annual average steam volume purchased is attached as Exhibit 1.

Today, the Ashley Power Plant controls a monopoly with respect to heat in the central business corridor; if it were to cease operations, none of the buildings and stadiums on the steam loop would have any source for alternative heat (beyond entirely refitting each building for a boiler system, a process both capital intensive and energy efficiency inefficient), as there is no other plant or viable provider connected to the steam loop. Such a retrofit would require not only purchasing and installing individual boiler systems in each building, but would also require installing stacks and venting for the new boilers, moving the existing MEP systems within each building, relocating tenants during the installation, and then reconstructing the building in an attempt to maximize heating efficiency. In St. Louis, the cost of purchasing the boilers alone would exceed $13.1 million and, according to a 2008 study conducted by Richard Damecor[4], the actual space heating and domestic hot water boiler equipment only makes up about 25 percent of the total install cost.  Put differently, based on that study, for the St. Louis business district to shift from the Ashley Plant would require a capital investment of in excess of $50 million (i.e. $13.1 million/25%). The Ashley plant produces 466,000 pounds per hour of steam through 22 miles of underground pipes, has electrical generation capacity of 28MW, and sells approximately 70,000 MW/hour into the wholesale power grid.

Originally built in 1904 by the predecessor to Ameren Missouri Electric, the plant was originally configured as a coal-fired power plant.  In 1972 it was converted to an oil-fired plant, and in 1996 it was overhauled and developed as a natural gas-fired facility.  In 1992, Thermal North America, Inc. acquired the Ashley Power Plant, and in 1998 it invested an additional $13.5 million to install new combustion turbines and back-pressure steam turbines.  In 2007, the Seller purchased the plant from Thermal North America for approximately $14.5 million cash, representing a forward EBITDA multiple of nearly 9.5x.

Because the purchase price for the proposed transaction has been determined by a contractual formula contained in the 2012 Service Agreement between the City of St. Louis and Veolia instead of an arms-length negotiation, Power Investments will purchase the Ashley Power Plant at a multiple of approximately 0.6x revenue and 6.3x EBITDA on a pro forma basis[5].  Recent acquisitions of similar district energy power plants in Omaha and Cleveland have taken place at valuations of 5x revenue and 13x EBITDA, and 3.5x revenue and 11.5x EBITDA, respectively.

After completing the acquisition, Power Investments intends to maintain all of the current employees (approximately 12) except for the general manager, who will be replaced by Mr. Dan Dennis. Mr. Dennis has over a decade of personal experience operating the Ashley plant, having served as the general manager of the Ashley Power Plant from 1997-2005.  He then served as the VP of Operations for Thermal Energy Corporation, operating a 60MW CHP plant and the largest district energy chilled water system in the country until 2010, when Veolia

---

[4] Richard Damecour is a registered professional engineer in the Province of Ontario and has an MBA from the University of Alberta. He has over 27 years experience in the energy industry, including 12 years in oil and gas. For the past 15 years, he has helped to develop at least 25 new district energy systems successfully brought into service in North America and the Middle East. Richard is currently the elected vice-chair of the Canadian District Energy Association and a former marketing chair of the International District Energy Association.

[5] i.e. pro forma for Management's base case first year projections using the new 20-year service agreement with the City of St. Louis, which first year assumes no increase in customers or volume and only re-rates pricing congruent with the new contract.

North America hired Mr. Dennis to serve as VP and General Manager of the Ashley Power Plant and the Kansas City district energy system until 2013.

In addition, Ashley Energy will be managed by Messrs. Steve Hutchinson and Mason Miller (neither of which are current employees), discussed in detail below who, at close, will collectively have funded approximately $[941,756].

PI is seeking capital to fund the acquisition. Net of servicing and monitoring costs, Arena expects the facility to generate the following metrics (shown on a blended basis; more detailed, tranche-level summaries presented in the Transaction section below):

| Arena funded through closing[6] | ITV[7] through close | ITC through close | Contractual term (Facilities) | Unlevered IRR net to Arena[8] | Unlevered ROIC net to Arena[8] | Arena WAL[8] |
|---|---|---|---|---|---|---|
| $8.49/($7.49 Facilities; $1.00 Pref) million | [80.9%] | 90.9% | 36 months | 18.3% | 1.57x | 2.7 years |

## Company

<u>Overview and history</u>

District energy systems are a highly efficient way to heat and cool many buildings in a given locale from a central plant.  They use a network of underground pipes to pump steam, hot water, and/or chilled water to multiple buildings in an area such as a downtown district, college or hospital campus, airport, or military base.  Providing heating and cooling from a central plant requires less fuel and displaces the need to install separate space heating and cooling and hot water systems in each building. In most instances, district energy systems are connected to combined heat and power (CHP) plants.  Also known as cogeneration plants, CHP plants generate electric power in addition to heating and cooling, and can achieve energy efficiencies above 80 percent.  (This is far more efficient than a conventional power-only plant, which exhausts two-thirds of the energy content of its fuel as heat into oceans, rivers, and/or the atmosphere). About 6.5% of commercial buildings in the U.S. are heated with district heating.  Mature steam systems in U.S. cities like Philadelphia, Indianapolis, Boston or Denver serve between 200 and 400 customer buildings, to as many as 1,800+ customer buildings served by Con Edison Steam Business Unit in Manhattan, the largest district steam system in the world. Larger and established district heating systems such as those in Hartford, Minneapolis, and Omaha generally serve between 65 and 150 customer buildings. In most cases, the urban district energy system typically serves over 50% of the Class A commercial office space in the central business district and in many cases, market share exceeds 85%.

Cogeneration, in its most basic form, is the simultaneous production of two forms of energy (usually electric and thermal). The following diagrams illustrate how cogeneration/CHP plants work, at a very basic level:

---

[6] Includes $1.35mm funded in cash

[7] Assumes low end of DAI "conservative" valuation of ~$10.5 million.

[8] Assumes that the PI's cumulative investment at close is $941,756; the Facilities remain outstanding through maturity; and APP is sold at maturity (month 36) for a net recovery of ~$13.3 million, or a discount to Management's "base case"-implied valuation.



The following diagram illustrates the relative efficiency (from a cost and fuel perspective) of using cogeneration versus typical boiler/power plant combinations:



The Ashley plant was built in 1904 by the predecessor to Ameren Missouri Electric in order to provide electricity to the World's Fair.  Situated on the Mississippi River in downtown St. Louis, the six-story plant is primarily composed of two natural gas fired combustion turbines producing 5 MW of power each, dual 2 MW back pressure steam turbines, a 20 MW General Electric condensing turbine, two ERI heat recovery steam generators (HRSG) that take gas turbine exhaust and produce steam for the 20 MW condensing steam turbine generator or for use on the district steam system, and three package boilers operating at 80,000 lb/hr each. The plant is directly attached to

4

approximately 22 miles of steam piping owned by the City of St. Louis, and is connected to the electric grid through a substation owned by APP several blocks away that has a 13.8 kV to 138 kV transformer for transmitting power to the grid.

In 1992 Thermal North America, Inc. purchased the Ashley plant from Ameren at an unknown price and entered into a 20-year steam service agreement with the City of St. Louis, pursuant to which the City leased the steam loop/distribution network to Thermal and designated Thermal as the exclusive party authorized to sell steam to the City's district energy customers.   Thermal subsequently converted it to a natural gas-fired cogeneration plant, investing approximately $13.5 million in 1998 for the turbines and related equipment.

In 2007 Veolia purchased the Ashley plant from Thermal North America for approximately $14.5 million.  At the time of the purchase, the 1992 Service Agreement with the City of St. Louis was still in effect.  In 2012 (the year through which the 1992 Service Agreement was effective), Veolia entered into a new Service Agreement with the City of St. Louis through its municipal corporation in charge of the steam system, referred to herein as "SWMDC,"[9] establishing new rates for the sale of steam and providing the City of St. Louis an assignable purchase option for the plant.  The purchase price for the plant is contractually defined to be equal to the net book value of the assets less accumulated depreciation and all liabilities, including non-cash liabilities.

In 2015 the City of St. Louis elected not to continue negotiations with Veolia for a new service agreement (reflecting the City's distaste for dealing with a massive, foreign utility conglomerate and the inefficiencies inherent therein), and instead gave notice of its intent to exercise and assign the purchase option to a third party, SLEC, LLC, an entity formed by Mike Becker for the sole purpose of acquiring the option to purchase the Ashley Power Plant.  Power Investments, through its subsidiary Ashley Energy, LLC, has agreed to acquire that purchase option from SLEC, subject to obtaining financing, and the total sum for the purchase of the power plant and option is $6.290 million, of which Veolia would receive approximately $5.701 million.  Concurrent with the closing of the purchase of the power plant by Ashley Energy, the City of St. Louis has agreed to enter into a new 20-year Service Agreement with Ashley Energy, the terms of which are discussed in further detail below.

All of the existing employees except for Veolia's general manager will be retained by Power Investments.  In addition, all of the existing systems and software for the operation of the plant, including all vendor contracts, material/fuel supply agreements and governmental and environmental permits will be assigned to Borrower by Seller at closing.  The plant operates using two software systems: a Continuous Emission Monitoring System (CEMS) and a Plant Control System (SCADA) known as Wonderware.  Both systems are already in operation and licenses for continued use of both will be assigned at closing.

Approximately 20 months of due diligence has been conducted, both by the City of St. Louis and Power Investments.  Because the City of St. Louis was asked to provide financial guarantees to assure repayment of financing to be obtained by Power Investments, it retained Burns & McDonald, a national engineering firm with specialized experience in district energy systems, to review the condition and value of the plant and equipment, to analyze and opine on the validity and reasonability of Power Investments' projected financials, and to examine and validate the proposed CAPEX projects outlined by Power Investments (discussed below).

---

[9] For the purposes of this memorandum, the City of St. Louis and its municipal corporation, SWMDC (Solid Waste Management and Development Corporation), are used interchangeably. SWMDC is technically one of the major commissions of the City, as it is governed by employees of the city and does not prepare its own financial statements. The City appoints a majority of the SWMDC's board of directors, which consists of representatives of the president of the Board of Public Service, deputy mayor/chief of staff, and the director of the Street Department.

With respect to the physical condition of the plant, equipment and related components, Burns & McDonald concluded that the plant was in good operating condition, noting that the major components had been overhauled in 2012.  A copy of Burns & McDonald's due diligence report dated November 2015 is attached as Exhibit 2.[10]  As it concerns Power Investments' projected financials and CAPEX projects, Burns & McDonald issued a second report in August 2016 concluding that the projections were reasonable and reliable based on historical information provided by Seller, actual plant operating data, forecasted commodity prices, proposed upgrade projects, and projections of future conditions.  A copy of Burns & McDonald's August 2016 report is attached as Exhibit 3, and the specific details of the projected financials and proposed CAPEX projects are discussed in detail below.[11]

Independently, Power Investments retained outside legal counsel, Miller Wells, PLLC, to conduct due diligence typical with an asset purchase of this size and scope.  Pursuant to that engagement, specific data and document requests were submitted to Veolia, and a data room populated with the information provided by Veolia was established and reviewed.  That information includes, without limitation, data concerning all of the assets to be transferred (real property, equipment, inventory, etc.), all material sales contracts (for both steam and electricity), vendor contracts, commodity supply and transportation agreements, environmental and other necessary permits and consents, including relevant FERC certifications and authorizations, employment and employee records, and historical financial statements.  The information contained in the data room is extremely voluminous, but can be viewed by clicking on the following link:  https://www.dropbox.com/sh/uwvwasyb8jg8tua/AABTuiM_y-b66mnbU0JvzR2la?dl=0.  Based on the due diligence review, Power Investments' legal counsel negotiated an asset purchase agreement with Seller, a copy of which is also in the data room and forms the basis for the acquisition.


Business operations and historical financials

APP generates revenue from three primary sources.  First, as noted above, APP sells steam heat on a per pound basis to end-use customers in the St. Louis central business district.  Pricing is determined by a formula similar to a utility tariff, such that APP's cost to produce the steam is passed through to the end customer and marked up on a percentage basis, thus immunizing APP from economic risk associated with changes in commodity pricing (primarily natural gas).[12]  The pricing formula is determined by reference to the service agreement with the City of St. Louis, and as noted previously, a new service agreement with 13.75% higher pricing rates as compared to the 2012 Service Agreement will be executed concurrent with the closing of the purchase.  The new rates were negotiated in advance by Dan Dennis, and Burns & McDonnell has confirmed revenue generated at the new rates are correctly reflected in the pro forma financial statements above.

Second, APP sells electric power it produces on the wholesale electric power grid known as the Midcontinent Independent System Operator ("MISO").  MISO is a forward market that simultaneously clears energy and operating reserves on a co-optimized basis for each hour of the next operating day. APP generates electricity to sell on the MISO market by economically dispatching the gas turbines and associated units when sufficient system steam load exists on the system that use all of the steam and when power prices exceeded the cost of production (which itself is a function of natural gas pricing).  The cost of natural gas is passed through to end-use steam

---

[10] Burns & McDonald's November 2015 due diligence report also includes a review of certain financial projections that are no longer valid due to changes in steam and electricity pricing, but are included for the sake of providing the full report.

[11] Subsequent to the Burns & McDonnell's August 2016 report, Power Investments has updated the projected financials to account for: (a) seasonality fluctuations in the business and cash flow assuming a January 31, 2017 closing; (b) the actual electric capacity sales agreement Seller has executed for 2017 which is being assigned to Borrower at closing; and (c) actual current commodity pricing.  Such updates have not materially altered the projected financials.

[12] The impact of changes in natural gas pricing are discussed in more detail below.

customers regardless of whether the natural gas is used to produce solely steam or steam and electricity in a co-generation cycle.

Market participants may sell generation into the MISO market based on real-time bids into the market. APP has entered into an energy management agreement with EDF Trading North America, pursuant to which EDF acts as APP's agent and power marketer with MISO to calculate and administer the bidding process. The aforementioned agreement with EDF has been assumed by Borrower.

Third, APP sells its excess electric generating capacity annually. The Ashley plant has an approximate generation capacity of 28MW (essentially a measurement of the total electricity the plant could produce if the turbines were run all of the time), but it does not generate that much electricity in any given year because the turbines are only dispatched when economically justified by the steam load on the district system. The excess capacity – in essence a right to produce a certain amount of electricity – is sold on a forward basis either bilaterally, to a contract counterparty at a negotiated price, or at auction. Historically, APP has sold its excess capacity on a bilateral basis, and has retained EDF to market that capacity pursuant to the aforementioned contract.

Below are the summary historical financial results obtained from Seller for the operation of the Ashley Power Plant since 2011 and the period ending May 30, 2017:

| SUMMARY P&L | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Revenues | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017-YTD | | YTD 2016 |
| Steam | 7,503,829 | 6,818,591 | 8,976,056 | 12,549,791 | 7,480,285 | 6,739,199 | 2,181,029 | | 2,181,083 |
| Electricity | 1,568,719 | 1,217,036 | 649,310 | 575,109 | 272,270 | 789,172 | 155,099 | | 79,362 |
| Supplemental Services | 30,383 | 3,068 | 22,566 | 36,849 | 6,194 | - | - | | - |
| **Total Revenue** | 9,102,931 | 8,038,695 | 9,647,932 | 13,161,749 | 7,758,749 | 7,528,372 | 2,336,129 | | 2,260,445 |
| | | | | | | | | | |
| Variable Expenses | | | | | | | | | |
| Natural Gas | (5,151,168) | (3,297,208) | (4,618,652) | (7,819,140) | (3,071,627) | (2,553,784) | (722,304) | | (655,707) |
| Oil | (7,846) | (5,625) | (4,164) | (4,508) | (7,329) | (4,133) | (203) | | - |
| Consumables | (481,365) | (376,348) | (376,348) | (551,934) | (152,430) | (190,888) | (67,761) | | (62,812) |
| Grid Electricity | - | - | - | - | (263,629) | (245,811) | (39,738) | | (46,761) |
| Supplemental Service Expenses | - | - | - | - | - | (367,990) | (261,353) | | - |
| Fixed Expenses | | | | | | | | | |
| O&M | (2,297,677) | (2,161,213) | (1,803,340) | (1,903,906) | (3,312,426) | (2,966,431) | (591,987) | | (500,780) |
| G&A | (580,104) | (497,158) | (765,588) | (606,044) | (471,066) | (354,695) | (224,746) | | (74,253) |
| Insurance | (132,011) | (124,763) | (142,752) | (173,760) | (142,078) | (168,401) | (5,936) | | (32,565) |
| Rent | (355,722) | (147,654) | (166,494) | (152,966) | (16,177) | (169,906) | (25,000) | | (30,872) |
| **Total Expense** | (9,005,894) | (6,609,968) | (7,877,338) | (11,212,257) | (7,436,762) | (7,022,039) | (1,939,028) | | (1,403,750) |
| | | | | | | | | | |
| **EBITDA - Maint. CAPEX** | 97,037 | 1,428,728 | 1,770,594 | 1,949,492 | 321,987 | 506,333 | 397,101 | | 856,697 |
| | | | | | | | | | |
| Commodity related margin | 1,863,451 | 3,139,410 | 3,976,892 | 4,174,209 | 4,248,899 | 4,533,755 | 1,506,122 | | 1,495,165 |
| Commodity related % margin | 20.5% | 39.1% | 41.3% | 31.8% | 54.8% | 60.2% | 64.5% | | 66.1% |
| EBITDA - Maint. CAPEX margin | 1.1% | 17.8% | 18.4% | 14.8% | 4.1% | 6.7% | 17.0% | | 37.9% |

A few trends bear highlighting: first, the decline in revenue from 2015 to present is the result of a number of factors. First, in 2015, both back pressure steam turbines were taken out of service for maintenance, and only since November 2016 have the turbines begun to be returned to operation. Maintenance was delayed by Seller because it had received notice that the City of St. Louis was going to exercise and assign the purchase option, and therefore Seller did not want to deploy capital for an asset being sold. In-service use of the back pressure steam turbines contributes approximately $2.4 million of additional revenue and $800,000 of EBITDA. The net impact of both back-pressure steam turbines being out of service reduced the plant's ability to process the same volumes it had in prior years. Second, after Mr. Dennis left in 2013, Seller obtained and relied upon erroneous gas turbine maintenance estimates, the effect of which caused APP to dispatch the turbines for electricity generation far less. Paired with the

absence of the back pressure steam turbines, electricity generation was further curtailed (note that not only did electricity revenue grow for the two months ending May 2017 vs. the same period in 2016 from $259.6k to $270.8k, but the gross spread on that electricity ((electricity revenue – grid electricity costs)/electricity revenue) grew on both a relative *and absolute* basis from 2015 (3.2%) through 2016 (68.9%) and YTD May 2017 (63.1%). Third, while the cost of natural gas (and therefore revenues derived) declined materially in 2015, the relative *and absolute* margin APP earned on commodities processed (i.e. natural gas, oil, consumables, and grid electricity) expanded materially versus 2014, a trend which has continued into 2017 (i.e. through May, the last full month for which MMBtu consumed data is available).  APP's relative gross margin on commodities processed continued to expand (i.e. from 55% in 2015, 60% in 2016, and 58% YTD 2017 (which is similar to the 63% margin generated May YTD 2016).

According to Management and corroborated by DAI and Dentons' review of historical contracts and the go-forward service agreement, this fluctuation in gross margin primarily reflects the fundamental nature of the plant's sales contracts (i.e. customers buying steam) and purchase contracts and secondarily reflects Veolia-specific operational decisions.  As such, isolating the pure impact of natural gas in the historical results is an at-best imprecise exercise.

That said, Management and DAI generally believe that the plant will operate more profitably in a lower or declining natural gas pricing environment, which the historical data directionally supports.

1. The first reason for this can be attributed to the structure of APP's steam sales and supply contracts.

Sales contracts (which govern the steam bill which, in turn, governs APP's steam revenue), for the most part[13], are generally comprised of the sum of two components: (1) "fuel" and (2) "service":

(1) Fuel revenue = mlbs * [4.79*(current gas price / 2.25691) * k], where k > a multiplier > 1 which varies depending on the nature of the customer (large, small), time of year, and volume purchased
(2) Service revenue = mlbs * [(($9.48 * 25%) + ($9.48 * 75% * (CPI / 152.9))-$5]; much like the fuel component, the multipliers (e.g. the $9.48) and the discount (e.g. the $5) for the service revenue are often a function of season (higher during winter months), nature of the customer (federal vs. commercial).

In addition to these charges, under the new service contract, customers will pay monthly volume-based "customer charges" and connection charges.

Purchase contracts (e.g. APP "variable expenses"), for the most part, allow the company to purchase in the spot market at Henry Hub + or – a spread (usually plus $0.005 during "peak months" i.e. January through March) and minus $0.01 throughout the balance of the year.

As such, in a falling natural gas price environment, the service and customer/connection charges will comprise a higher percentage of the steam bill (and correspondingly the price of purchasing natural gas) as prices decline (and hence a higher gross margin on that gas purchased), and a lower percentage as prices rise.

A rising natural gas pricing environment will typically accompany higher steam demand (and hence volume). While relative margins may contract, absolute gross margin generated should remain the same, holding constant efficiency and volumes.

Nonetheless, based on prior experience, Management has historically (e.g. pre-Veolia acquisition) entered into forward natural gas hedge contracts during peak volume months (i.e. winter) to cushion customers from the risk

---

[13] It is worth emphasizing that while the above construct characterizes most of the plant's contracts, some have slightly different multiples and spreads which correspondingly may vary for the same customer depending on the volume consumed by that customer.

of upward natural gas price volatility. Without hedging, if prices were to suddenly rise during the plant's peak demand period with regards to both its customers and its own power needs, customers could see upward volatility in their own heating bills. Accordingly, during the winter months of both 2014-2015 and 2015-2016, Veolia entered into forward-looking fixed pricing agreements with CenterPoint, the party from whom Ashley purchases its natural gas. Specifically, in September and October 2014, Ashley locked in pricing for 175,000 MMbtu of gas at a price of $4.12-$4.63 per Mmbtu for December through March. Similarly, in in September and October 2015, Ashley locked in pricing for 155,000 Mmbtu of gas at a price of $2.96-$3.39 per Mmbtu for December through March. Veolia did not engage in any hedging strategies this winter due to the pending sale of the plant to Borrower.

Borrower intends to employ a similar gas price hedging plan developed by Mr. Dennis for use at the Houston co-generation facility he previously managed (and which was recently sold to Brookfield for approximately $130 million). Specifically, Ashley intends to lock pricing for 2/3rds of its projected winter gas usage for steam production with CenterPoint on a rolling 24 month basis, such that 24 months prior to the month in question for which pricing locks are sought, Ashley will enter into a contract locking pricing on 1/18th of that partial usage. As a result, by the time Ashley is 6 months from the winter month in question, it will have firm pricing established for that 2/3rd portion, at an average trailing 2 year basis. The costs, if any, of hedging, will be passed through to customers as a part of their heating bill.

2. The second reason for this can be attributed to the structure of APP's power generating revenues.

Power dispatch (e.g. electricity), whether sold through MISO or to customers bilaterally, is a function of price and volume. According to Management and DAI, the markets for power dispatch are daily settled (i.e. the electricity pricing APP receives is settled daily, which near-matches the spot pricing APP pays for its natural gas). APP sells electricity only when it can earn a sufficient spread on it. The higher natural gas pricing becomes, the greater the absolute spread dollars earned on a given unit of sale. Which is to say that, as natural gas prices increase, holding volume constant, power revenues and absolute margins should increase (and relative margins should remain the same/similar).



The issue is, as natural gas prices (and hence the cost to buy electricity from the marginal natural gas-fired producer) rise, historically, marginal demand has declined, as electricity consumers begin substituting away from natural gas-powered electricity and into coal-powered electricity, therefore diminishing the windows for dispatch. Prior to early 2015, the dollars per megawatthour for natural gas-powered electricity were in excess of the same for central Appalachian thermal coal (according to the EIA, see chart below). By mid-2015, the same metric for natural gas went to "parity" with coal; by late 2016, henry hub dollars per megawatthour fluctuated between parity and levels slightly in excess of or below that for CA thermal coal.

In DAI's opinion, the diminished dispatch opportunities in a higher natural gas pricing environment will typically outweigh the higher absolute dollars of margin, therefore leading to relatively lower EBITDA in a higher pricing environment. This outlook, however, hinges on the efficiency with which a given plant can dispatch. The more efficient dispatch (coal plants tend to be less efficient than natural gas plants), the lower the dollars per megawatthour (and hence the cost to end consumer) can be. If APP can continue to drive the gains in efficiency observed over the past two years (see table below), the greater growth we might expect in absolute and relative

gross margins from electricity production.  Because power dispatch has historically represented a minority of APP's revenue (15% in 2012 and at most 10% more recently) and due to the near-contemporaneous settlement of buying input/selling power, DAI further proffered that the incremental costs to hedging input pricing for this side of APP's business would fail to outweigh the benefits.  To that end, DAI also concluded that it is difficult to isolate the pure impact of weather on financial performance (hence drawing into question the value of weather hedges/derivatives) (for instance, a warmer-than average winter likely leads to less steam consumption/volume, but also likely leads to lower natural gas pricing, which in turn would lead to expanded margins and more electricity output).

Correspondingly, the gross profitability of each MMBtu of commodities consumed expanded materially versus 2014, though it remains difficult to distinguish precisely the degree to which that can be attributed solely to falling natural gas prices versus expanding plant operational efficiency. Lastly, APP's operating efficiency (defined as total steam and electricity BTUs produced as a function of fuel consumed (the primary fuel being natural gas); the higher the ratio the more profitably the plant operates, all equal) drifted upwards from 2011 through 2015, with 2015 marginally improving on 2014 and 2016 improving on 2015.  The decline in EBITDA year-over-year much more reflected[14] a spike in the aforementioned maintenance CAPEX, which is built into the "O&M" line item.

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017-YTD |
|---|---|---|---|---|---|---|---|
| _Natural gas pricing (paid by APP)_ | | | | | | | |
| 31-Jan | 4.636 | 2.761 | 3.491 | 7.956 | 3.584 | | |
| 28-Feb | 4.385 | 2.571 | 3.396 | 10.836 | 4.018 | | |
| 31-Mar | 3.962 | 2.216 | 3.801 | 9.362 | 3.492 | | |
| 30-Apr | 4.284 | 1.953 | 4.171 | 4.594 | 2.606 | | |
| 31-May | 4.327 | 2.443 | 4.061 | 4.582 | 2.834 | | |
| 30-Jun | 4.592 | 2.417 | 3.88 | 4.574 | 2.757 | | |
| 31-Jul | 4.445 | 2.929 | 3.67 | 4.067 | 2.829 | | |
| 31-Aug | 4.099 | 2.858 | 3.842 | 3.879 | 2.768 | | |
| 30-Sep | 3.973 | 2.831 | 3.636 | 3.903 | 2.648 | | |
| 31-Oct | 3.602 | 3.352 | 3.698 | 3.757 | 2.323 | | |
| 30-Nov | 3.219 | 3.542 | 3.629 | 4.324 | 2.078 | | |
| 31-Dec | 3.212 | 3.407 | 4.479 | 3.705 | 2.3411 | | |
| MMBtu-weighted avg. | 4.072 | 2.807 | 3.477 | 5.646 | 2.139 | | |
| | | | | | | | |
| _MMBtus consumed (e.g. by APP, NOT customers) - nat gas + fuel + electricity_ | | | | | | | |
| 31-Jan | 252,249 | 181,170 | 220,798 | 208,306 | 171,292 | 138,933 | 147,518 |
| 28-Feb | 192,395 | 185,656 | 168,219 | 177,978 | 161,914 | 112,898 | 93,917 |
| 31-Mar | 172,654 | 138,531 | 147,958 | 157,773 | 110,005 | 105,881 | 116,044 |
| 30-Apr | 90,608 | 133,547 | 102,539 | 105,824 | 56,950 | 79,099 | 70,635 |
| 31-May | 80,806 | 119,163 | 72,308 | 75,376 | 46,433 | 54,099 | 46,979 |
| 30-Jun | 66,232 | 102,749 | 49,567 | 56,290 | 45,000 | 49,488 | 0 |
| 31-Jul | 88,713 | 108,260 | 57,061 | 49,533 | 50,516 | 60,253 | 0 |
| 31-Aug | 79,917 | 92,215 | 58,823 | 56,565 | 48,306 | 68,230 | 0 |
| 30-Sep | 60,061 | 66,734 | 51,621 | 48,087 | 49,656 | 53,699 | 0 |
| 31-Oct | 89,525 | 75,180 | 82,943 | 70,167 | 68,695 | 53,684 | 0 |
| 30-Nov | 132,861 | 127,180 | 137,905 | 141,346 | 102,632 | 95,987 | 0 |
| 31-Dec | 152,331 | 157,462 | 183,669 | 161,606 | 121,967 | 153,699 | 0 |
| | 1,458,352 | 1,487,847 | 1,333,412 | 1,308,850 | 1,033,367 | 1,025,950 | 475,094 |
| Gross margin produced per MMBtu consumed - annual | $1.28 | $2.11 | $2.98 | $3.19 | $4.11 | $4.28 | |
| Gross margin produced per MMBtu consumed - YTD May | | | | | | $4.56 | $4.65 |

---

[14] Versus commodity driven gross margin compression

| *Operating efficiency (MMTBtus sold/MMTBUs consumed)* | | | | | | | |
|---|---|---|---|---|---|---|---|
| 31-Jan | 65.21% | 67.40% | 64.73% | 68.22% | 65.16% | 70.54% | 65.93% |
| 28-Feb | 64.63% | 63.39% | 68.33% | 67.59% | 68.22% | 73.63% | 65.20% |
| 31-Mar | 62.41% | 57.86% | 68.99% | 64.92% | 69.46% | 67.37% | 64.34% |
| 30-Apr | 57.66% | 54.71% | 64.33% | 61.64% | 66.55% | 65.11% | 68.06% |
| 31-May | 51.08% | 50.54% | 56.27% | 62.07% | 70.65% | 66.08% | 76.37% |
| 30-Jun | 54.69% | 50.54% | 58.41% | 60.36% | 67.05% | 66.67% | |
| 31-Jul | 54.21% | 51.85% | 60.03% | 63.71% | 63.12% | 63.00% | |
| 31-Aug | 57.52% | 50.83% | 60.00% | 58.64% | 62.30% | 59.69% | |
| 30-Sep | 62.39% | 55.63% | 60.14% | 61.77% | 63.33% | 67.47% | |
| 31-Oct | 61.09% | 65.65% | 62.71% | 61.44% | 61.88% | 68.93% | |
| 30-Nov | 62.56% | 66.36% | 65.94% | 62.45% | 62.16% | 62.27% | |
| 31-Dec | 67.76% | 66.56% | 66.24% | 62.46% | 67.09% | 65.66% | |
| Weighted avg. | 61.70% | 59.77% | 64.56% | 64.03% | 65.96% | 66.92% | 66.80% |

Below is the historical balance sheet obtained from Seller with respect to the Ashley Power Plant since 2012 and for the period ending April 30, 2017:

| ASSETS | April 2017 | March 2017 | February 2017 | January 2017 | 2016 | 2015 | 2014 | 2013 | 2012 |
|---|---|---|---|---|---|---|---|---|---|
| CURRENT ASSETS: | | | | | | | | | |
| Cash | $ - | $ - | $ - | $ - | $ - | $ 1 | $ 120 | $ 69 | $ 259 |
| Accounts Receivable (less allowance for doubtful accounts) | 938,537 | 1,333,364 | 1,877,178 | 2,206,492 | 1,525,540 | 894,898 | 1,587,951 | 2,065,271 | 1,540,477 |
| Inventories | 133,467 | 133,729 | 133,523 | 133,844 | 134,177 | 136,664 | 146,998 | 139,172 | 134,186 |
| Prepaid expenses and other current assets | 56,541 | 79,857 | 71,976 | 128,989 | 135,978 | 133,380 | 78,066 | 106,257 | 71,466 |
| Total current assets | 1,128,545 | 1,546,890 | 2,082,677 | 2,469,325 | 1,795,695 | 1,164,944 | 1,813,135 | 2,310,769 | 1,746,388 |
| PROPERTY, PLANT, AND EQUIPMENT - Net | 9,619,609 | 9,659,495 | 9,530,582 | 9,235,989 | 9,278,026 | 9,243,252 | 9,647,439 | 9,605,017 | 9,986,725 |
| GOODWILL | - | - | - | - | - | - | - | - | - |
| OTHER ASSETS | 150,270 | 150,270 | 150,270 | 150,270 | 150,270 | 150,270 | 150,270 | 150,270 | 150,270 |
| TOTAL | $ 10,898,423 | $ 11,356,654 | $ 11,763,528 | $ 11,855,584 | $ 11,223,991 | $ 10,558,465 | $ 11,610,843 | $ 12,066,055 | $ 11,883,382 |
| LIABILITIES AND STOCKHOLDER'S EQUITY | | | | | | | | | |
| CURRENT LIABILITIES: | | | | | | | | | |
| Accrued fuel and consumables | 577,894 | 452,194 | 882,942 | 1,392,296 | 891,968 | 628,537 | 1,368,149 | 1,271,691 | 628,793 |
| Accrued expenses and other current liabilities | 562,119 | 793,280 | 1,105,830 | 682,310 | 610,811 | 693,048 | 623,300 | 707,023 | 1,058,067 |
| Total current liabilities | 1,140,013 | 1,245,474 | 1,988,772 | 2,074,606 | 1,502,778 | 1,321,585 | 1,991,449 | 1,978,714 | 1,686,860 |
| DUE TO AFFILIATES | 10,561,853 | 10,901,449 | 10,845,554 | 10,742,245 | 10,976,578 | 9,924,109 | 9,739,828 | 10,062,778 | 10,095,334 |
| OTHER LIABILITIES | 4,057,254 | 4,050,111 | 3,961,828 | 3,954,239 | 3,949,185 | 3,704,668 | 3,528,152 | 3,230,292 | 3,141,450 |
| Total liabilities | 15,859,120 | 16,197,033 | 16,796,154 | 16,771,090 | 16,428,542 | 14,950,362 | 15,259,430 | 15,271,784 | 14,893,645 |
| Total stockholder's equity | (4,960,697) | (4,840,379) | (5,032,626) | (4,915,506) | (5,204,551) | (4,391,897) | (3,648,586) | (3,205,728) | (3,010,263) |
| TOTAL | $ 10,898,423 | $ 11,356,654 | $ 11,763,528 | $ 11,855,584 | $ 11,223,991 | $ 10,558,465 | $ 11,610,843 | $ 12,066,055 | $ 11,883,382 |
| Calculated Purchase Price Per Section 2X c) of Service Agreement | $ 5,701,156 | $ 6,061,070 | $ 5,812,928 | $ 5,826,739 | $ 5,772,027 | $ 5,532,213 | $ 6,091,242 | $ 6,857,050 | $ 7,055,072 |

Burns & McDonnell's visual inspection of the Ashley plant confirmed that the combustion turbines were completely overhauled in 2012, and as noted above, the back pressure steam turbines were rebuilt and begun to be placed back into operation in only November 2016.  Physical inspection of the steam turbine by Burns & McDonnell confirmed that capital expenditures have been made to assure that it has been maintained properly and is in good working order.

Seller incurred additional CAPEX charges of approximately $384,000 in 2016 related to upgrades performed on the #4 Boiler Economizer, the 13.8 KV Transformer, the #5 LPFW Pump, roof renovations, a distribution meter upgrade and work to connect new service for additional steam sales to the Four Seasons hotel.

Projected financials and CAPEX initiatives

Below are the Management projected financial results for Ashley Energy after acquisition of the Ashley Power Plant, followed by a summary of the assumptions reflected in the result of operations related to changes to be implemented upon closing:

| REVENUES | Esc | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|
| CAPACITY - Steam Sales | 2% | $ 772,270 | $ 787,716 | $ 803,470 | $ 819,539 | $ 835,930 |
| CAPACITY - Power Sales | 5% | 547,267 | $ 702,400 | $ 874,000 | $ 917,800 | $ 963,600 |
| Powerbus improvements | | | $ 100,000 | | | |
| Inlet Cooling project | | | $ 30,000 | | | |
| | | | | | | |
| COMMODITY - Steam Service Sales | 2% | $ 2,850,396 | $ 2,907,404 | $ 2,965,552 | $ 3,024,863 | $ 3,085,360 |
| Rate increases from new contract | | $ 350,000 | $ 357,000 | $ 364,140 | $ 371,423 | $ 378,851 |
| Rate increases from new contract - year 2 | | | $ 350,000 | $ 357,000 | $ 364,140 | $ 371,423 |
| Rate increases from new contract - year 3 | | | | $ 100,000 | $ 102,000 | $ 104,040 |
| 2nd half metering revenues | | $ 200,000 | $ 204,000 | $ 208,080 | $ 212,242 | $ 216,486 |
| Metering revenues - year 2 | | | $ 200,000 | $ 204,000 | $ 208,080 | $ 212,242 |
| | | | | | | |
| COMMODITY - Steam Fuel Sales | 2% | $ 2,964,641 | $ 3,023,934 | $ 3,084,412 | $ 3,146,101 | $ 3,209,023 |
| COMMODITY - Power Sales | 2% | $ 2,374,259 | $ 2,421,744 | $ 2,470,179 | $ 2,519,583 | $ 2,569,974 |
| Inlet cooling project | | | $ 130,000 | $ 132,600 | $ 135,252 | $ 137,957 |
| MISCELLANEOUS | 2% | $ 38,375 | $ 39,143 | $ 39,925 | $ 40,724 | $ 41,538 |
| | | | | | | |
| TOTAL REVENUE | | $10,097,208 | $11,253,340 | $11,603,359 | $11,861,746 | $12,126,425 |

| | Year | Forecast 1 | Forecast 2 | Forecast 3 | Forecast 4 | Forecast 5 |
|---|---|---|---|---|---|---|
| COST OF REVENUES | | | | | | |
| FUEL EXPENSE | | $ 4,212,972 | $ 4,297,231 | $ 4,383,176 | $ 4,470,840 | $ 4,560,256 |
| CONSUMABLES | | $ 627,987 | $ 649,547 | $ 601,338 | $ 613,364 | $ 625,632 |
| Rebalancing Improvement | | | $ (60,000) | | | |
| | | | | | | |
| VARIABLE COST OF REVENUES | | $ 4,840,959 | $ 4,886,778 | $ 4,984,514 | $ 5,084,204 | $ 5,185,888 |
| | | | | | | |
| GROSS MARGIN | | $ 5,256,249 | $ 6,366,562 | $ 6,618,845 | $ 6,777,542 | $ 6,940,537 |
| | | | | | | |
| PERSONNEL | | $ 1,977,750 | $ 2,017,305 | $ 2,057,651 | $ 2,098,804 | $ 2,140,780 |
| PLANT & DISTRIBUTION | | $ 957,000 | $ 976,140 | $ 995,663 | $ 1,015,576 | $ 1,035,888 |
| GENERAL & ADMINISTRATIVE | | $ 1,016,900 | $ 1,037,238 | $ 1,057,983 | $ 1,079,142 | $ 1,100,725 |
| ANNUAL ROUTINE CAPITAL | | $ 300,000 | $ 306,000 | $ 312,120 | $ 318,362 | $ 324,730 |
| PACE ASSESSMENT | | $ - | $ 77,674 | $ 155,347 | $ 155,347 | $ 155,347 |
| | | | | | | |
| TOTAL FIXED OPERATING EXPENSES | | $ 4,251,650 | $ 4,414,357 | $ 4,578,764 | $ 4,667,232 | $ 4,757,470 |
| | | | | | | |
| GROSS EXPENSES | | $ 9,092,609 | $ 9,301,135 | $ 9,563,277 | $ 9,751,436 | $ 9,943,358 |
| | | | | | | |
| EBITDA | | $ 1,004,599 | $ 1,952,205 | $ 2,040,081 | $ 2,110,310 | $ 2,183,067 |

15

---

[15] Note that "annual routine capital" and "plant and distribution" includes maintenance CAPEX.

A number of structural and other changes account for the projected improved performance, each of which are discussed in turn below and have been independently reviewed and validated by Burns & McDonnell at the request of the City of St. Louis.[16]

Higher Steam Sales Rates (commencing year 1):  The City of St. Louis and Borrower will enter into a new Service Agreement with a twenty-year term. The new Service Agreement has a 13.75% higher rate schedule for the steam sales pricing that escalates over the term of the agreement.  The enhanced pricing and higher steam rates that will produce improved incremental commodity sales revenue resulting in approximately $800,000 per year of additional profit ($350,000 in first twelve months; an incremental $350,000 in the second twelve months; and an incremental $100,000 in the third twelve months, which collectively reflects each customer's historic consumption levels subsequently adjusted for the new contract's pricing). DAI (discussed below) perceived these improvements as readily achievable given the nature of the new contract with the City.

System and Consumable Rebalancing:  Seller is currently purchasing City water to cool plant equipment such as the air compressors, intercoolers, and other systems with the warm City water dumped into the sewer. Buyer will install a small fin fan cooler and cool the equipment through a closed loop cooling system. The estimated savings resulting from reduced water purchase cost and sewer cost is $60,000 per year.  Total cost: $250,000.  Management's base case assumes all of this spend is incurred in year 1 with incremental cost savings benefit commencing year 2. DAI's base case gives full credit to this assumption.

Improved Capacity Sales (commencing year 2, post May 2017, when the legacy capacity sale contract expires): Based on historical data provided by Burns & McDonnell, the value of market capacity is expected to escalate considerably over the next 4 years to $2.25 per kW-month from counterparty sales in the wholesale MISO market, resulting in a bump to run-rate incremental revenues of approximately $144,000.  The increased pricing is the direct result of regulatory changes permitting producers located in MISO Zone 5, where APP is located, to sell their capacity in the much higher priced MISO Zone 4.  In 2016, auction pricing in Zone 4 was $150/MW-day and pricing in Zone 5 was $3.48/MW-day.  As a result of such disparity, Zone 5 producers are now permitted to sell in Zone 4. In DAI's base case, no such improvement is assumed.

Prior to the execution of the Asset Purchase Agreement, Veolia, instead of entering into a bilateral contract for the sale of excess capacity from June 2017-May 2018 (as the plant has always done every year since it began selling electric capacity through MISO), elected to sell the capacity at auction with a reserve price of only $1.50/MW-day – a very deep discount to the market price (practically speaking, the "reserve price" represents the lowest price on offer in the capacity auction). The true market price has been at least 50 times greater, having sold last year for $74/MW-day (according to EDF, the Plant's legacy and go-forward MISO market manager who purchase capacity by way of bilateral contract from the Plant and others).  Veolia is believed to have entered into the one-off arrangement in an effort to discourage the Buyer from purchasing the Ashley Plant.  The amount of cash reserves contemplated at closing are designed to mitigate the prospective impact of Veolia's actions.

Economic Dispatch of Gas Turbines: Burns & McDonnell's review of historical operating data determined that the Seller is relying on outdated logarithmic formulas to determine when to dispatch the gas turbines, HRSGs, and back pressure steam turbines to generate electricity for sale.  Using correct economic assumptions, the units would be dispatched when sufficient system steam load exists on the system that use all of the steam and when the power prices exceeded the cost of production. Based on information provided, only $185,000 of net EBITDA currently being generated by Veolia due to misinterpretations of the net production cost of operating the gas turbines. Burns & McDonnell has reviewed the assumptions, calculations, energy pricing data, and results of the incremental

_____

[16] The projected financials utilize a 20-year average weather history in calculating the projected commodity sales volume.

revenue calculations as described in the previous section of its report and estimated that up to $650,000 in additional EBITDA can be generated.[17]  Despite this, in Management's base case, no benefits from the gas turbines are assumed.

Upgraded Meter Installations and Recapture of Lost Steam Sales (commencing year 2):  Veolia's system has annual steam loss between 35 and 40 percent, considerably above the average in the district heating industry of approximately 30 percent for a steam loop of this size and age. The line loss is attributable to unmetered and incorrectly metered steam flows to customers, heat loss from the pipes to the ground, and leaks in the lines themselves.  Line loss can be reduced with metering audits and replacements, improving EBITDA by up to $400,000 per year once completed.  APP intends to implement the project in stages across 2017 and 2018. Total cost: $375,000. Management's base case assumes $200,000 of this spend is incurred in year 1 (with the balance in year 2) with $200,000 of incremental revenue benefit commencing year 2. DAI's base case assumes only $100,000 of incremental revenue benefit commencing in year 2 and an additional $100,000 in year 3, despite the full spend in year 1.

Inlet Chilling Improvements to Gas Turbine Generators (year 2):  Incremental commodity revenues are expected to be generated by installing chillers and cooling the inlet air year round during the on peak hours.  Inlet chilling essentially compresses the ambient air going to the gas turbine generator, allowing more air and fuel to enter the engine which in turn produces more power output. Reducing the inlet cooling air temperature to 45 Fahrenheit is estimated to generate $130,000 in additional incremental EBITDA commencing in 2018.  Total cost: $280,000. Management's base case assumes all of this spend is incurred in year 1 with incremental revenue benefit commencing year 2.  DAI's base case assumes only $65,000 of incremental revenue benefit commencing year 3, despite the full spend in year 1.

Gas Turbine Inlet Air Chilling Capacity Improvements (year 2): Incremental capacity sales will also be generated by installing the new chiller and implementing inlet air chilling into the existing evaporative cooling system. Upgrading the inlet air cooling system will reduce inlet air temperatures into the two gas turbines in the summer from 77 F° (current) to 45 F° (new). An estimated 1.2 MW are expected to be realized yielding $30,000 in additional EBITDA generated from capacity sales in 2018. Management's base case assumes all of this spend is incurred in year 1 with incremental revenue benefit commencing year 2.  DAI's base case assumes only $15,000 of incremental revenue benefit commencing year 3, despite the full spend in year 1.

Power Bus Improvements to Saleable Power Capacity and Improvement to Water Handling and Cooling Systems (year 2): Incremental capacity sales and revenues are assumed to be generated by upgrading the existing 13.8 kV switchgear, and incremental capacity sales will be improved by installing a new chiller and implementing inlet air chilling into the existing evaporative cooling system, with a net increase of approximately $100,000 per year of profit.  Total cost: $90,000.  Management's base case assumes all of this spend is incurred in year 1 with incremental revenue benefit commencing year 2.  DAI's base case assumes only $50,000 of incremental revenue benefit commencing year 3, despite the full spend in year 1.

Connection to Four Seasons: Connecting the district energy system to the Four Seasons Hotel for additional service related to laundry processing is anticipated to generate approximately $170,000 of additional revenue and $111,000 of additional EBITDA per year.   The hotel has entered into an amendment with Seller consistent with such projections. Total cost: $350,000.  Management's base case assumes no impact.

---

[17] Burns & McDonnell refers to "incremental margin" and "net margin" interchangeably to mean the additional net gross profit margin improvement generated by the referenced CAPEX projects, with fixed costs held constant, the effect of which is to translate directly to improvements to EBITDA on a dollar equal basis.

Upon maturity of the Facility, Borrower intends to refinance, in part, utilizing PACE financing, a tax incentive financing program that provides financing for environmentally-friendly CAPEX projects with third-party bonds secured and repaid by the project's property tax assessments over time.  SLEC has entered into a preliminary term sheet approving unsecured PACE refinancing of $1,605,400, with estimated annual principal and interest of $153,809, to be repaid by a property tax assessment of $155,347 annually.   The Borrower presently has PACE financing offers, presented as Exhibit [5].

As a vast majority of the CAPEX in Management's base case is expected during the first year, the following table shows expected cash balances using DAI's first year assumptions (which effectively reflects none of the management improvements described above).  It assumes the interest rate structure described in the "Transaction" section below, that the Plant is initially acquired with $250,000 cash on balance sheet (excludes the cash reserves from the uses of proceeds), and that a minimum of $20,000 in excess cash is required at all times.  It also assumes all capex occurs as scheduled.  The analysis shows that excess cash troughs at $244k and, within the projection period, rebuilds to $653k.  Assuming no capex spend but further haircutting the first year projected EBITDA to $500,000, excess cash troughs at ~$117k and, within the projection period, rebuilds to $1,168k.  Assuming the same downside case and Management's CAPEX spend, excess cash troughs at $117k and, within the projection period, rebuilds to $348k.

*DAI assumptions, mgmt. capex*

| Month 1-12 Projected Monthly P&L/Cash Flow | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Total |
| TOTAL REVENUE | 393,288 | 375,758 | 349,637 | 463,179 | 749,173 | 1,236,792 | 1,659,113 | 1,448,114 | 1,279,413 | 907,401 | 599,027 | 436,313 | 9,897,208 |
| | | | | | | | | | | | | | |
| TOTAL VARIABLE COST OF REVENUES | 255,150 | 254,697 | 248,278 | 291,763 | 370,496 | 569,861 | 700,084 | 615,195 | 574,918 | 401,026 | 303,711 | 255,780 | 4,840,959 |
| | | | | | | | | | | | | | |
| GROSS MARGIN | 138,138 | 121,061 | 101,359 | 171,416 | 378,677 | 666,931 | 959,029 | 832,919 | 704,495 | 506,375 | 295,316 | 180,533 | 5,056,249 |
| | | | | | | | | | | | | | |
| TOTAL FIXED OPERATING EXPENSES | 354,304 | 354,304 | 354,304 | 354,304 | 354,304 | 354,304 | 354,304 | 354,304 | 354,304 | 354,304 | 354,304 | 354,304 | 4,251,650 |
| | | | | | | | | | | | | | |
| GROSS EXPENSES | 609,454 | 609,001 | 602,582 | 646,067 | 724,800 | 924,165 | 1,054,388 | 969,500 | 929,223 | 755,330 | 658,015 | 610,084 | 9,092,609 |
| | | | | | | | | | | | | | |
| EBITDA | | | | | | | | | | | | | |
| OPERATING EBITDA | (216,166) | (233,243) | (252,945) | (182,888) | 24,373 | 312,627 | 604,725 | 478,614 | 350,190 | 152,071 | (58,988) | (173,771) | 804,599 |
| EBITDA ENHANCEMENT PAYMENT/(REDUCTION) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL EBITDA | (216,166) | (233,243) | (252,945) | (182,888) | 24,373 | 312,627 | 604,725 | 478,614 | 350,190 | 152,071 | (58,988) | (173,771) | 804,599 |
| | | | | | | | | | | | | | |
| INTEREST EXPENSE | 63,211 | 63,464 | 63,719 | 63,975 | 64,231 | 64,489 | 64,748 | 65,009 | 65,270 | 65,533 | 65,797 | 66,062 | 775,509 |
| | | | | | | | | | | | | | |
| OPERATING CASH FLOW | (279,377) | (296,708) | (316,664) | (246,863) | (39,858) | 248,138 | 539,977 | 413,606 | 284,920 | 86,538 | (124,785) | (239,833) | 29,090 |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| OP. CASH | (279,377) | (576,085) | (892,749) | (1,139,612) | ######### | (931,333) | (391,356) | 22,250 | 284,920 | 371,458 | 246,673 | 6,840 | 29,090 |
| | | | | | | | | | | | | | |
| PLANNED CAPEX | | | | | | | | | | | | | |
| Re-metering Project | | | | | | | 100,000 | | 100,000 | | | | 200,000 |
| Inlet Air Cooling | | | | | | | 140,000 | | 140,000 | | | | 280,000 |
| Power Bus Improvements | | | | | | | 45,000 | | 45,000 | | | | 90,000 |
| System Consumable Rebalancing | | | | | | | 125,000 | 125,000 | | | | | 250,000 |
| Total planned CAPEX | 0 | 0 | 0 | 0 | 0 | 0 | 410,000 | 125,000 | 285,000 | 0 | 0 | 0 | 820,000 |
| Beginning total cash | $1,193,579 | 1,164,202 | 867,495 | 550,831 | 303,968 | 264,109 | 512,247 | 642,224 | 930,829 | 930,749 | 1,017,287 | 892,502 | 1,193,579 |
| Plus/(minus) - receivables collected | $250,000 | | | | | | | | | | | | |
| Plus/(minus) OP. CF minus PLANNED CAPEX | (279,377) | (296,708) | (316,664) | (246,863) | (39,858) | 248,138 | 129,977 | 288,606 | (80) | 86,538 | (124,785) | (239,833) | (790,910) |
| Plus/(minus) Periodic reserve draw down | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending total cash | 1,164,202 | 867,495 | 550,831 | 303,968 | 264,109 | 512,247 | 642,224 | 930,829 | 930,749 | 1,017,287 | 892,502 | 652,669 | 652,669 |
| Excess cash for debt repayment | | 847,495 | 530,831 | 283,968 | 244,109 | 492,247 | 622,224 | 910,829 | 910,749 | 997,287 | 872,502 | 632,669 | 632,669 |

*Down case (no capex improvement)*

| Month 1-12 Projected Monthly P&L/Cash Flow | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Total |
| TOTAL REVENUE | 393,288 | 375,758 | 349,637 | 463,179 | 749,173 | 1,236,792 | 1,659,113 | 1,448,114 | 1,279,413 | 907,401 | 599,027 | 436,313 | 9,897,208 |
| TOTAL VARIABLE COST OF REVENUES | 255,150 | 254,697 | 248,278 | 291,763 | 370,496 | 569,861 | 700,084 | 615,195 | 574,918 | 401,026 | 303,711 | 255,780 | 4,840,959 |
| GROSS MARGIN | 138,138 | 121,061 | 101,359 | 171,416 | 378,677 | 666,931 | 959,029 | 832,919 | 704,495 | 506,375 | 295,316 | 180,533 | 5,056,249 |
| TOTAL FIXED OPERATING EXPENSES | 354,304 | 354,304 | 354,304 | 354,304 | 354,304 | 354,304 | 354,304 | 354,304 | 354,304 | 354,304 | 354,304 | 354,304 | 4,251,650 |
| GROSS EXPENSES | 609,454 | 609,001 | 602,582 | 646,067 | 724,800 | 924,165 | 1,054,388 | 969,500 | 929,223 | 755,330 | 658,015 | 610,084 | 9,092,609 |
| **EBITDA** | | | | | | | | | | | | | |
| OPERATING EBITDA | (216,166) | (233,243) | (252,945) | (182,888) | 24,373 | 312,627 | 604,725 | 478,614 | 350,190 | 152,071 | (58,988) | (173,771) | 804,599 |
| EBITDA ENHANCEMENT PAYMENT/(REDUCTION) | (25,383) | (25,383) | (25,383) | (25,383) | (25,383) | (25,383) | (25,383) | (25,383) | (25,383) | (25,383) | (25,383) | (25,383) | (304,599) |
| TOTAL EBITDA | (241,549) | (258,626) | (278,328) | (208,271) | (1,010) | 287,244 | 579,342 | 453,231 | 324,807 | 126,688 | (84,371) | (199,154) | 500,000 |
| INTEREST EXPENSE | 63,211 | 63,464 | 63,719 | 63,975 | 64,231 | 64,489 | 64,748 | 65,009 | 65,270 | 65,533 | 65,797 | 66,062 | 775,509 |
| OPERATING CASH FLOW | (304,761) | (322,091) | (342,047) | (272,246) | (65,242) | 222,754 | 514,593 | 388,222 | 259,537 | 61,154 | (150,168) | (265,216) | (275,509) |
| OP. CASH | (304,761) | (626,851) | (968,899) | (1,241,145) | (1,306,386) | (1,083,632) | (569,038) | (180,816) | 259,537 | 320,691 | 170,523 | (94,693) | (275,509) |
| PLANNED CAPEX | | | | | | | | | | | | | |
| Re-metering Project | | | | | | | | | | | | | 0 |
| Inlet Air Cooling | | | | | | | | | | | | | 0 |
| Power Bus Improvements | | | | | | | | | | | | | 0 |
| System Consumable Rebalancing | | | | | | | | | | | | | 0 |
| Total planned CAPEX | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Beginning total cash | $ 1,193,579 $250,000 | 1,138,819 | 816,728 | 474,681 | 202,435 | 137,193 | 359,948 | 874,541 | 1,262,763 | 1,522,300 | 1,583,455 | 1,433,287 | 1,193,579 |
| Plus/(minus) - receivables collected | | | | | | | | | | | | | |
| Plus/(minus) OP. CF minus PLANNED CAPEX | (304,761) | (322,091) | (342,047) | (272,246) | (65,242) | 222,754 | 514,593 | 388,222 | 259,537 | 61,154 | (150,168) | (265,216) | (275,509) |
| Plus/(minus) Periodic reserve draw down | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending total cash | 1,138,819 | 816,728 | 474,681 | 202,435 | 137,193 | 359,948 | 874,541 | 1,262,763 | 1,522,300 | 1,583,455 | 1,433,287 | 1,168,071 | 1,168,071 |
| Excess cash for debt repayment | | 796,728 | 454,681 | 182,435 | 117,193 | 339,948 | 854,541 | 1,242,763 | 1,502,300 | 1,563,455 | 1,413,287 | 1,148,071 | 1,148,071 |

*Down case (full capex improvement)*

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL REVENUE | 393,288 | 375,758 | 349,637 | 463,179 | 749,173 | 1,236,792 | 1,659,113 | 1,448,114 | 1,279,413 | 907,401 | 599,027 | 436,313 | 9,897,208 |
| TOTAL VARIABLE COST OF REVENUES | 255,150 | 254,697 | 248,278 | 291,763 | 370,496 | 569,861 | 700,084 | 615,195 | 574,918 | 401,026 | 303,711 | 255,780 | 4,840,959 |
| GROSS MARGIN | 138,138 | 121,061 | 101,359 | 171,416 | 378,677 | 666,931 | 959,029 | 832,919 | 704,495 | 506,375 | 295,316 | 180,533 | 5,056,249 |
| TOTAL FIXED OPERATING EXPENSES | 354,304 | 354,304 | 354,304 | 354,304 | 354,304 | 354,304 | 354,304 | 354,304 | 354,304 | 354,304 | 354,304 | 354,304 | 4,251,650 |
| GROSS EXPENSES | 609,454 | 609,001 | 602,582 | 646,067 | 724,800 | 924,165 | 1,054,388 | 969,500 | 929,223 | 755,330 | 658,015 | 610,084 | 9,092,609 |
| **EBITDA** | | | | | | | | | | | | | |
| OPERATING EBITDA | (216,166) | (233,243) | (252,945) | (182,888) | 24,373 | 312,627 | 604,725 | 478,614 | 350,190 | 152,071 | (58,988) | (173,771) | 804,599 |
| EBITDA ENHANCEMENT PAYMENT/(REDUCTION) | (25,383) | (25,383) | (25,383) | (25,383) | (25,383) | (25,383) | (25,383) | (25,383) | (25,383) | (25,383) | (25,383) | (25,383) | (304,599) |
| TOTAL EBITDA | (241,549) | (258,626) | (278,328) | (208,271) | (1,010) | 287,244 | 579,342 | 453,231 | 324,807 | 126,688 | (84,371) | (199,154) | 500,000 |
| INTEREST EXPENSE | 63,211 | 63,464 | 63,719 | 63,975 | 64,231 | 64,489 | 64,748 | 65,009 | 65,270 | 65,533 | 65,797 | 66,062 | 775,509 |
| OPERATING CASH FLOW | (304,761) | (322,091) | (342,047) | (272,246) | (65,242) | 222,754 | 514,593 | 388,222 | 259,537 | 61,154 | (150,168) | (265,216) | (275,509) |
| OP. CASH | (304,761) | (626,851) | (968,899) | (1,241,145) | (1,306,386) | (1,083,632) | (569,038) | (180,816) | 259,537 | 320,691 | 170,523 | (94,693) | (275,509) |
| PLANNED CAPEX | | | | | | | | | | | | | |
| Re-metering Project | | | | | | | 100,000 | | 100,000 | | | | 200,000 |
| Inlet Air Cooling | | | | | | | 140,000 | | 140,000 | | | | 280,000 |
| Power Bus Improvements | | | | | | | 45,000 | | 45,000 | | | | 90,000 |
| System Consumable Rebalancing | | | | | | | 125,000 | 125,000 | | | | | 250,000 |
| Total planned CAPEX | 0 | 0 | 0 | 0 | 0 | 0 | 410,000 | 125,000 | 285,000 | 0 | 0 | 0 | 820,000 |
| Beginning total cash | $ 1,193,579 $250,000 | 1,138,819 | 816,728 | 474,681 | 202,435 | 137,193 | 359,948 | 464,541 | 727,763 | 702,300 | 763,455 | 613,287 | 1,193,579 |
| Plus/(minus) - receivables collected | | | | | | | | | | | | | |
| Plus/(minus) OP. CF minus PLANNED CAPEX | (304,761) | (322,091) | (342,047) | (272,246) | (65,242) | 222,754 | 104,593 | 263,222 | (25,463) | 61,154 | (150,168) | (265,216) | (1,095,509) |
| Plus/(minus) Periodic reserve draw down | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending total cash | 1,138,819 | 816,728 | 474,681 | 202,435 | 137,193 | 359,948 | 464,541 | 727,763 | 702,300 | 763,455 | 613,287 | 348,071 | 348,071 |
| Excess cash for debt repayment | | 796,728 | 454,681 | 182,435 | 117,193 | 339,948 | 444,541 | 707,763 | 682,300 | 743,455 | 593,287 | 328,071 | 328,071 |

Collateral valuation

As noted above, the purchase price for the Ashley plant was not the result of an arms-length negotiated sales process, but rather is determined by a simple arithmetic formula in the 2012 Service Agreement.  As a result, the difference between that contract price and a market valuation creates substantial implicit equity at closing.

In 1992 Thermal North America, Inc. acquired the Ashley Power Plant for an undisclosed price and subsequently invested an additional $13.5 million to install new combustion turbines and back-pressure steam turbines.  In 2007, the Seller purchased the plant from Thermal North America for approximately $14.5 million, representing a forward EBITDA multiple of nearly 9.5x.  The Borrower will be purchasing the plant (inclusive of the option price) for $6.29 million, representing transaction multiples of approximately 0.6x revenue and 6.3x Management base case EBITDA.

Since 2012 in excess of $750 million of acquisitions have occurred in the district energy field.  The substantial increase in interest (and corresponding values) in district energy businesses has been driven by a number of factors, including the emergence of a number of aggressive strategic buyers, such as NRG Yield, which now owns nine legacy district energy systems, and Corix Infrastructure, which was recently acquired by British Columbia Investment Management Corp.  Veolia, DTE Energy and Energenic all also remain active in the acquisition market.  A number of strategic financial buyers have also emerged, including Brookfield Asset Management and I Squared Capital Advisors.  The former has acquired district energy systems in Toronto, Texas and Louisiana, while the latter co-invested in the Cambridge and Boston district energy systems.  Paired with the relative scarcity of district energy/thermal energy businesses available for purchase, a value premium has been created in the current market.

Accordingly, recent acquisitions reflect transaction multiples that support a margin of safety with regards to Arena's cumulative expected investment basis.  For example, in 2013, Omaha's district energy system was acquired by NRG Yield from Capstan Corp. for $120 million. Based on discussions with the investment group that brokered the transaction, the price implied a value at approximately 5x revenue and 13x EBITDA.

Similarly, in 2015, Corix acquired the Cleveland district energy system, a coal-fired plant, with plans to convert it to a natural-gas fired system similar to the Ashley Power Plant.  On a pro forma basis, the Cleveland acquisition implied a value of 3.5x revenue and 11.5x EBITDA.

Using an average of the three known EBITDA data points (Veolia's stated target acquisition multiple of 9.5x, the Omaha transaction (13x) and the Cleveland transaction (11.5x)) yields an implied fair market value of $11.4 million for the Ashley Power Plant on a pro forma basis were it to be sold at an arms-length, negotiated price as opposed to the contractually driven forced sale price obtained by Power Investments.

Other recent transactions in the district energy field are as follows:

- Hartford, Conn. – In 2008, the State of Connecticut purchased (in a forced sale as part of litigation settlement) the district energy facility from TEN Companies for approx. $15 million.  The facility serviced 18 buildings and was appraised at $14 million. Four years later, in April 2012, the Hartford Steam Co. was sold to Energenic, a joint venture between DCO Energy and South Jersey Industries (SJI), for $50 million.

- Toronto, Ont. – In October 2012, Enwave Energy Corp. was sold by the city of Toronto and the Ontario Municipal Employees Retirement System to Toronto-based Brookfield Asset Management for nearly $500

million.  The Toronto system was composed of three central plants, interconnected by 40 km of steam pipes, servicing approximately 150 buildings.

- Houston, Texas/New Orleans, La. - In November 2013, Entergy Corp. divested its district energy systems in Houston and New Orleans to Brookfield for $130 million. At the time of the sale, Entergy disclosed that the systems had a net book value of approximately $100 million.

- Vancouver, B.C. – In November 2013, Creative Energy Canada acquired Central Heat of Vancouver for approximately $30 million.

- Boston, Mass. – In December 2013, Veolia Energy North America and I Squared Capital Advisors announced they were jointly acquiring the Kendall Cogeneration Station in Cambridge from NRG Energy for an undisclosed price. The plant serviced 74 buildings, producing 1 million lbs/hr of steam.


**Industry and Regulatory Analysis**

As noted above, district energy systems produce and deliver steam, hot water or chilled water through underground piping networks to buildings in a given area, such as a college campus or downtown city centers. By combining individual user thermal loads, district energy systems can potentially deliver energy services in a more efficient, economic, and environmentally friendly manner. Currently, 82GW of installed CHP generation capacity - the equivalent of more than 130 coal plants on average, or 9 percent of the nation's total energy-generation capacity - is in use. Though district energy systems aggregate thermal loads of multiple customers, they generally cannot provide electricity to end-use customers because of utility franchise laws.

As a result, APP is restricted from selling electricity to end-users, and as a result, is directed to sales on the wholesale electric grid. Under Subchapters II and III of the Federal Power Act (the "FPA"), 60 the Federal Energy Regulatory Commission ("FERC") regulates (i) the sale at wholesale of electric energy in interstate commerce; (ii) the transmission of electric energy in interstate commerce; (iii) all facilities for such sale or transmission; and (iv) any person or entity (other than federal, state or local governments, or subdivisions, or their subdivisions, units or agencies, and cooperatives financed by the Rural Utilities Service) that owns or operates such facilities, who are "public utilities" under the FPA.  Electric power is in interstate commerce if the facilities for its sale or transmission are interconnected with the interstate electric grid, which means essentially all electric power in the lower 48 states, excluding most of Texas.  In addition, the generation, sale and transmission of thermal energy, and facilities for such generations, sale and transmissions, are not regulated under the FPA or otherwise by the FERC.  This means that the non-public owner or operator of a DES that is generating power and interconnected, directly or indirectly, with the interstate grid and makes sales of power at wholesale, such as to the electric utility with which it is interconnected or into a FERC-regulated regional transmission organization market such as MISO, or that transmits power, is a public utility under the FPA and subject to FERC regulation. Primarily, FERC has exclusive jurisdiction to regulate the rates and terms and conditions for such sales at wholesale and transmission, and operation of the facilities used for them, to ensure that they are just and reasonable and not unduly discriminatory.

Although all such public utilities were historically heavily regulated by FERC, including detailed cost-based review and approval of rates for jurisdictional sales and transmission of power, FERC has developed a regime for pre-authorizing public utilities to charge negotiated, market-based rates ("MBR") for such sales and transmission upon showing the absence of market power in relevant markets. A district energy system is

19

expected to qualify for MBR authorization, which avoids the most onerous forms of FERC regulation (such as pre-approval of rates and issuance of securities). The Ashley Power Plant has historically held MBR approval.

On February 3, 2017 (as amended by application dated March 16, 2017), the Buyer filed an application with FERC for market-based rate authority with an accompanying tariff. The proposed market-based rate tariff provides for the sale of energy, capacity, and ancillary services at market-based rates, and Buyer requested waivers commonly granted to similar market-based rate applicants. On May 12, 2017, FERC approved Buyer's application and granted Buyer market based rate approval to operate. That Order was subsequently finalized on June 12, 2017 when thirty days passed without challenge from any third party.

The Ashley Plant is also subject to a number of environmental regulations, including those involving air emissions and water quality. Accordingly, Seller holds a Part 70 Air Operating Permit No. OP2011-049 which will transfer at closing with the submission of a letter request to the Missouri Department of Natural Resources, NPDES Individual Wastewater Discharge Permit No. MO-0000345, which will also transfer upon request at closing and MSD Sewer Discharge Permit No. 1030608700-2, which will similarly transfer to Ashley Energy at closing. Similarly, Hazardous Waste generator number # 001383 issued by Missouri Department of Natural Resources and Hazardous Waste generator number # MOD 00080549 issued by the United States Environmental Protection Agency will transfer to Buyer post-closing.

## Management

To date the principals of Power Investments and SLEC have invested approximately $[743,500] which was expended to secure purchase of the City's option and associated costs obtaining governmental approval of the new Service Agreement (such as lobbying and related political-activity expenses), conducting due diligence and retaining Dan Dennis to coordinate planning and transition services, and negotiating the terms of the asset purchase with Veolia. Assuming that, at close, PI and SLEC will have invested [$743,500], Arena will own on a post-conversion, pre-promote basis 54.01% of Ashley Energy; the balance of ownership will be split 50/50 between SLEC and PI, who will collectively compensated from their investment in APP only through any recoveries on their investment. The primary management personnel for the operations of Ashley Energy upon closing will be as follows:

- Daniel C. Dennis, P.E.: General Manager, Ashley Energy. Mr. Dennis has been involved in the thermal energy business for 30+ years, having worked for Monsanto, Kaiser Aluminum, Thermal Energy Corp., and Veolia North America at various locations. From 1997 to 2005, Mr. Dennis was the Vice President and General Manager of the Ashley Power Plant, overseeing the design and implementation of the natural-gas fired co-generation system still used today. From 2005 to 2010, Mr. Dennis was Vice President of Operations for Thermal Energy Corp. in Houston, Texas, where he managed and designed the expansion of the Houston district energy system by 45MW, including installation of a 32,000 ton chilled water unit. The Houston district energy system was sold three years later for $130 million as described above. From 2010 to 2013, Mr. Dennis was Vice President of Veolia North America, where he was in charge of the Ashley Power Plant and Kansas City district energy system after their purchase from Thermal North America, and in three years the combined EBITDA of the two systems had improved by $1.2 million. Since 2013, Mr. Dennis has operated a private consulting firm and has worked on district energy projects in Houston, Kansas City, as well as provided consulting services to the City of St. Louis. Mr. Dennis holds a B.S. from University of Missouri-Rolla.

- Steven N. Hutchinson: Chairman, Ashley Energy. Steven N. Hutchinson has 35 years of experience as a venture capital and private equity investor, investment banker, strategic and financing consultant,

and entrepreneur. During his career he has been responsible for investments in approximately 50 companies and participated in the investment process for over 100 investments. For five years, Mr. Hutchinson was a co-head of the Private Equity Group at the investment management firm of Weiss Peck & Greer in New York City. He shared responsibility for raising two middle market investment partnerships aggregating $400 million. Prior to that, Mr. Hutchinson spent 17 years at The Hillman Company, a large, privately-owned investment company in Pittsburgh, where he was a Vice President and Director. He specialized in making private equity investments. During this period, The Hillman Company was the one of the largest and most successful private equity investors in the country. Prior to joining The Hillman Company, Mr. Hutchinson spent two years at the investment banking firm of White Weld & Co which was acquired by Merrill Lynch. Over the last ten years Mr. Hutchinson has been a consultant and entrepreneur. He attended Duke University, received an AB degree from Vassar College and an MBA degree from Harvard University.

- <u>Michael F. Becker, Business Manager, Ashley Energy</u>. Mr. Becker is a St. Louis resident involved with government procurement, business and political matters in the City of St. Louis.  Mr. Becker has been a member and chairperson of the City of St. Louis Government Affairs Committee since 2001, was a Missouri state representative in 2004 and was appointed by Governor Matt Blunt to the Missouri Department of Revenue in 2005. Mr. Becker has been involved with the development of a number of public-private businesses in the City of St. Louis, including developing a new student housing facility in conjunction with the expansion of St. Louis University. He is also closely involved with local City of St. Louis politics, being related to the Mayor of the City of St. Louis by marriage. As business manager, Mr. Becker will be responsible for the acquisition of additional customers for the district energy system and governmental relations, including current efforts to secure favorable legislation awarding tax incentives for new buildings agreeing to utilize heat from the district energy system.

- <u>Mason L. Miller: Manager, Power Investments</u>.  Mr. Miller has been involved in the energy business since 2001. He is the managing partner of the law firm Miller + Wells, PLLC, with offices in Kentucky, Indiana and Missouri.  Since 2001, he has been involved in approximately $500 million of energy-related acquisitions and similar transactions, primarily in the coal industry. Between 2006 and 2009, he negotiated and structured a series of transactions with Peabody Energy, Inc. and others which resulted in the acquisition of the majority of Peabody's holdings in Kentucky for a collective price of over $350 million, the subsequent refinancing of entire portfolio of coal operations after the opening of six mines in a single credit facility comprised of a fixed term note and asset-based revolving loan, and finally the registration and sale of approximately $200 million of publicly-traded bonds upon maturity of the aforementioned note.  On behalf of Power Investments, Mr. Miller has been responsible for the negotiation of the new Service Agreement with the City of St. Louis and corresponding financial and operational guarantees, the acquisition of the purchase option from SLEC, and the purchase of the Ashley Power Plant from Veolia North America.  Mr. Miller holds a B.S. from Northwestern University and a J.D. from Washington & Lee University.

**Transaction**

<u>Overview</u>

As noted above, in 2012 the City of St. Louis and Seller entered into a Service Agreement which provided the City of St. Louis an assignable purchase option for the Ashley Power Plant at a pre-determined price, equal to the net book value of the assets (inclusive of depreciation), less all liabilities, including non-cash liabilities.  SLEC, owned by Mike Becker (biography above), negotiated for and obtained the right to the assignment of that purchase option from the City of St. Louis in 2015.  Subsequently, in 2016, Power Investments, owned by Messrs. Steve Hutchinson and Mason Miller (biographies above), obtained the right to the purchase option from SLEC in exchange for a cash

payment at closing in the amount of approximately $1 million[18] (assuming the book value of the assets do not change) and 50% of the non-Arena equity of Ashley Energy, a subsidiary of Power Investments formed for the sole purpose of purchasing the Ashley Power Plant from Veolia North America.  The remaining 50% of the non-Arena equity of Ashley Energy will be owned by Power Investments.

The total purchase price for the aforementioned option and the purchase of the Ashley Power Plant is $6.29 million,[19] and contemplated sources and uses both at closing and on a go-forward basis are as follows:

| Uses | | | Sources |
|---|---|---|---|
| | total $ invested | total $ invested | |
| PI investment - DD + initial option purchase (funded) | ($210,727) | $5,995,340 | First lien (close) |
| SLEC investment - DD (funded) | ($525,000) | $1,498,835 | Second lien (close) |
| MM investment - guarantee reserve (funded) | ($115,261) | | |
| Purchase investment - plant + option (close) | ($6,542,990) | $999,223 | Equity (Arena) (reserve) (close) |
| Closing fees/expenses (close) | ($756,828) | $850,988 | Equity (Sponsors) (funded) |
| CAPEX/OPEX - reserve | ($1,193,579) | | |
| | ($9,344,386) | $9,344,386 | |

Due diligence

As described above, Power Investment conducted significant bilateral due diligence with Veolia North America and has fully negotiated an Asset Purchase Agreement to be executed by the parties at closing, a copy of which is attached as Exhibit 4.

In order to verify the credibility of Power Investment's assumptions and general feasibility of the operating plan and valuation assumptions, Arena engaged DAI Management Consultants, Inc., based out of Carnegie, PA ("DAI"), based on two independent recommendations from lenders to the power and energy space.  DAI has over 25 years of experience with similar district energy systems across North America. DAI has provided engineering, valuation and market studies in support of cogeneration, steam and electric energy systems, and their work has been used by owners, lenders, investors and regulatory agencies. Please see Exhibit [ ] for a copy of DAI's analysis and conclusions and brochure and further credentials. Arena will engage DAI on a go-forward basis to act as our independent monitoring agent with regards to all plant operational activity and progress on various top- and bottom-line optimizing initiatives.  The cost of such engagement shall be borne entirely by the Borrower.

DAI's analyses primarily focused on "fatal flaws/landmines" and valuation. DAI found the following:

- The steam operations of plant are stable and reliable with an experienced staff. Corrective maintenance efforts to restore both combustion turbine-generator units, including the backpressure turbines, to full operability will need to be a priority to achieve projected electric sales projections.
- Based on the Project Financial Model and including additional revenues from proposed upgrades to the Asset, the estimated value of the Asset supports Arena's cumulative expected Investment basis and, to that end, under their sensitivity analysis (which haircuts management's base case as previously

---

[18] The price for the cash component of the consideration paid to SLEC was negotiated based on SLEC's representations the majority of the cash would be utilized to pay to the City and other parties for outstanding obligations incurred in acquiring the option from the City.

[19] Although the exact allocation of the purchase price between the option and the Ashley Power Plant fluctuates depending on the closing date and final balance sheet setting the net book value of the assets, Power Investments negotiated for a fixed price with SLEC such that collectively the price for the option and plant is set at $6.29 million.  In the event the asset purchase price decreases due to successful negotiations with Veolia, the option price paid to SLEC decreases; conversely, if the asset purchase price increases, the option price paid to SLEC decreases.  Power Investments made the decision that fixing the total purchase price using the sliding components described in the preceding sentence provided stability to transaction pricing that would make obtaining financing manageable given the timeframe involved.

described), the "no improvements/do nothing" valuation which only takes into consideration the pricing improvements from the new contract and the most basic level of operational execution (the core operation) to be between $9.2 and $10.5 million (Arena used a $9 million value assumption in stratifying the Transaction's capitalization described herein).  Assuming some incremental benefit to cash flow under DAI's sensitivity case, total value ranges from $10.5 million to $11.9 million.  Assuming Management's base case, total value ranges from $14.5 million to $17.7 million.

- Large changes to natural gas prices are expected to result in a change of less than 20% to the Asset's EBITDA due to the pass-through mechanism in the steam sales.

- The performance and debt service guarantees in the City's new service agreement (discussed below) are "unusual elements" for a steam supply contract in that they transfer some of the operating risk to the off-taker (e.g. the City). They have the effect of lowering the risks of default by the Borrower to its lender and the overall uncertainty of projected operating cash flows from the Asset.

- Some of the Asset's current steam customers could potentially benefit from switching to self-generated steam over a long-term horizon. However, the majority of customers are unlikely to do so since the economics do not make sense and/or there are physical/engineering challenges to switching to self-generation.

From a documentation and legal standpoint, Arena has engaged Dentons which not only has St. Louis operations, but also is ranked fourth among all law firms in terms of its practice in conventional power (according to www.legal500.com) and, to that end, included on its team evaluating APP the partner who has historically covered Veolia. Denton's evaluation found the following:

- Due to Ashley Energy's "qualifying facility" status[20], Power Investment's capitalization and acquisition of Ashley Energy (and Arena's related ownership therein) does not require FERC approvals beyond those already obtained.  Ashley Energy will file with FERC an updated QF self-certification, and has represented and warranted through the credit agreement as to such QF status.

- Denton's basis for this perspective is a legacy Chevron FERC case. FERC held in Chevron that a QF with market-based rate authority (which Ashley is) is exempt from FPA Section 203 pursuant to 292.601(c) of FERC's regulations.

- Section 203(a)(1)(A) provides that without FERC's prior approval, Ashley could not "sell, lease, or otherwise dispose of the whole of its facilities subject to the jurisdiction of the Commission, or any part thereof of a value in excess of $10,000,000."Because Ashley is selling only a part of its equity and because the portion being sold has a value less than $10 million, the $10 million threshold applies to a transfer of less than all of the voting securities in a public utility, and therefore FERC approval is not required.  See FERC Order No. 708, PP 24, 27 (holding, that with respect to a partial transfer of equity in a public utility, "We also clarify that, consistent with the statute, it applies only to section 203(a)(1)(A)

---

[20] Explanation of QFs: under the Public Utility Regulatory Policies Act of 1978 (PURPA) new class of generating facilities was established to receive special rate and regulatory treatment. Generating facilities in this group are known as QFs, and fall into two categories: qualifying small power production facilities and qualifying cogeneration facilities.

A small power production facility is a generating facility of 80 MW or less whose primary energy source is renewable (hydro, wind or solar), biomass, waste, or geothermal resources. There are some limited exceptions to the 80 MW size limit that apply to certain facilities certified prior to 1995 and designated under section 3(17)(E) of the Federal Power Act (16 U.S.C. § 796(17)(E), which have no size limitation. In order to be considered a qualifying small power production facility, a facility must meet all of the requirements of 18 C.F.R. §§ 292.203(a), 292.203(c) 292.204 for size and fuel use, and be certified as a QF pursuant to 18 C.F.R. § 292.207.

A cogeneration facility is a generating facility that sequentially produces electricity and another form of useful thermal energy (such as heat or steam) in a way that is more efficient than the separate production of both forms of energy. For example, in addition to the production of electricity, large cogeneration facilities might provide steam for industrial uses in facilities such as paper mills, refineries, or factories, or for HVAC applications in commercial or residential buildings. Smaller cogeneration facilities might provide hot water for domestic heating or other useful applications. In order to be considered a qualifying cogeneration facility, a facility must meet all of the requirements of 18 C.F.R. §§ 292.203(b) External Link and 292.205 External Link for operation, efficiency and use of energy output, and be certified as a QF pursuant to 18 C.F.R. § 292.207 External Link. There is no size limitation for qualifying cogeneration facilities.

transfers of securities of a value in excess of $10 million" notwithstanding the fact the transfer represented a transfer of control").

- Independently, FERC regulations also provide an exemption from Section 203 for the two types of QFs, an exemption in which Ashley Energy falls.  That QF exemption has the peculiar characteristic of applying to the facility itself and not specifically to the owner or operator of the facility.  Accordingly, a public utility that owns and operates a QF that is exempt from jurisdiction under section 203 (i.e., Ashley Energy) does not need authorization under section 203 for a transaction involving a change of control with respect to its market-based rate tariff or other non-QF jurisdictional facility.

<u>Key Investment terms</u>

*The Facilities*
- Maximum amount available:
  - First lien: $5.9mm
  - Second lien: $1.5mm
- Term: 1,095th day following the date of issuance (3 years)
- Coupon:
  - First lien:
    - Original issue discount of 1.0%
    - Cash coupon of L + 900 (with a LIBOR floor of 1%), payable monthly; and
    - A paid-in-kind coupon of 3.75% per annum, which shall accrue on a monthly basis.
  - Second lien:
    - Original issue discount of 2.0%
    - Cash coupon of L + 900 (with a LIBOR floor of 1%), payable monthly; and
    - A paid-in-kind coupon of 8.0% per annum, which shall accrue on a monthly basis.
- Yield maintenance:
  - The First Lien Loan shall be callable at any time subject to 6 months of interest yield maintenance.
  - The Second Lien Loan shall be callable at any time subject to 12 months of interest yield maintenance. In the event that the Arena's ROIC at the Yield Maintenance Date is greater than the Minimum ROIC, then no such Yield Maintenance Payment shall be due and payable.
- Required prepayments.
  - 100% of Excess Levered Cash Flow shall be applied to the First Lien Loan on a monthly basis (Excess Levered Cash Flow shall be any residual cash flow after appropriate reserves for scheduled maintenance CAPEX, taxes, insurance, and debt service)
  - a liquidity event, assets sales or issuance of debt or equity securities (aforementioned events to be defined).
  - a Change of Control shall constitute an offer to repurchase 100% of the Term Loan.

    Such prepayments shall be subject to the Yield Maintenance provisions set forth in the preceding paragraph.
- First security interest, mortgage, and blanket UCC filing against all assets of Borrower on all assets of Borrower and the proceeds thereof;
  - A first and second priority pledge of all equity interests in the Company;
  - A first and second priority pledge of all equity interest in direct and indirect subsidiaries of the Company;
  - An unlimited, unconditional guarantee by the Company and all direct and indirect subsidiaries of the Company.
- "Project finance"-style cash flow controls:
  - [Daily sweeps on existing bank accounts and/or establishment of new bank accounts controlled/opened by Arena]

- o   Controls on drawdowns for opex, capex
  - ▪ payment of which shall be subject to a waterfall
  - ▪ Release of non-maintenance capex release subject to lender approval and review of lender-designated monitor
- o   Cash flow reserve accounts (e.g. debt service and maintenance reserves)
- Representations and warranties, events of default, and covenants mutually agreed.  Quarterly financial and operating covenants will include, but not be limited to, minimum EBITDA/Fixed Charge ratio, maximum Net Debt/EBITDA – CAPEX ratio, and minimum liquidity and consolidated tangible net worth thresholds.
- Valuation expenses: $25,000 annually.
- Third-party collateral manager shall be engaged prior to closing and as needed thereafter at Borrower's expense.
- Governing law: The Facility will be governed under the laws of New York.

*The Pref*

- $999,223 Preferred Stock, funded at close.
- Distributions: upon a liquidity event or dividend payment, all distributions to Preferred Stock shall be *pari passu* with the Company's Common Stock.
- Voting: shall vote with the common stock on an as-converted basis, and not as a separate class,  except (i) the Preferred Stock as a class shall be entitled to elect one (1) member of the Board (the "Investor Directors"), (ii) as provided under "Protective Provisions" below, or (iii) as required by law. The Company's Certificate of Incorporation will provide that the number of authorized shares of Common Stock may be increased or decreased with the approval of a majority of the Preferred and Common Stock, voting together as a single class, and without a separate class vote by the Common Stock.
- Dividends: 12% annual, cumulative, compounded monthly, dividend, payable upon a liquidation or redemption.  The Common Stock shall be entitled to a dividend identical to the Preferred Stock.  The Preferred Stock shall participate in any dividend or distribution declared or paid on the Common Stock based on the number of shares of Common into which the Preferred Stock is convertible on the appropriate record date.
- Conversion right:  The Preferred Stock will have the right at any time to convert into Common Stock. The percentage of total shares of Common Stock into which the Preferred Stock may converted will be determined by dividing (i) the Cumulative Principal Amount then funded plus any accrued but unpaid dividends (the "Preferred Stock Funded Balance") by (ii) the sum of (a) the Preferred Stock Funded Balance and (b) Cumulative Principal Amount then funded plus any accrued but unpaid dividends of the Common Stock (the "Common Stock Funded Balance"). Pro forma for any Preferred Stock conversion, PI shall own 20% of the Preferred Stock ownership of Common Stock.  For purposes of illustration:
  - o   Preferred Stock Funded Balance = x
  - o   Common Stock Funded Balance = y
  - o   Post-conversion Preferred Stock ownership of Common Stock = x/(x + y), of which:
    - ▪ PI shall own 20%
    - ▪ Arena shall own 80%
- Protective provisions:  So long as any of the issued shares of Preferred Stock remain outstanding, the Company will not, without the written consent of the holders of a majority of the Company's Preferred Stock, either directly or by amendment, merger, consolidation, or otherwise: (i) liquidate, dissolve or wind-up the affairs of the Company, or effect any Deemed Liquidation Event (as defined below); (ii) amend, alter, or repeal any provision of the Certificate of Incorporation or Bylaws; (iii) create or authorize the creation of or issue any other security convertible into or exercisable for any equity security, having rights, preferences or privileges senior to or on parity with the Preferred Stock, or increase the authorized number

of shares of Common Stock or Preferred Stock; (iv) purchase or redeem or pay any dividend on any capital stock prior to the Preferred Stock, other than stock repurchased from former employees or consultants in connection with the cessation of their employment/services, at the lower of fair market value or cost; (v) create or authorize the creation of any debt security, other than equipment leases that do not exceed, individually or in the aggregate, $[ ], unless such debt security has received the prior approval of the Board of Directors, including the approval of at least a majority of the Investor Directors; (vi) increase or decrease the size of the Board of Directors; (vii) make any loan or advance to, or own any stock or other securities of, any subsidiary or other entity unless it is wholly owned by the Company; (viii) make any loan or advance to any individual or entity, including any employee or director of the Company or any subsidiary, except advances and similar expenditures in the ordinary course of business or under the terms of an equity incentive plan approved by the Board of Directors; (ix) guarantee, directly or indirectly any indebtedness except for the Credit Facilities and trade accounts of the Company arising in the ordinary course of business; (x) increase the number of shares authorized for issuance to officers, directors, employees, consultants and advisors pursuant to equity incentive plans or arrangements; or (xi) create, or hold capital stock in, any subsidiary that is not wholly owned by the Company, or sell, transfer or otherwise dispose of any capital stock of any direct or indirect subsidiary of the Company, or permit any direct or indirect subsidiary to sell, lease, transfer, exclusively license or otherwise dispose of all or substantially all of the assets of such subsidiary.

- Tag-Along/Drag-Along: Arena will have customary tag-along rights on all other classes of capital stock, subject to customary exceptions for spouses, children and similar estate planning matter, and shall not be required to enter into any non-competition or non-solicitation agreements in connection with any such sale. If a majority of the Common Stock desires to sell the Company to an unaffiliated third party, the remaining Common and/or Preferred stockholders, as applicable, will participate in and vote to approve the applicable transaction; provided however, that (i) Arena shall be required to give only customary representations and warranties as to its ownership of the Preferred Stock and shall be liable only for several indemnification on a pro-rata basis (in any event capped at the cash proceeds received) and (ii) Arena shall not be required to enter into any non-competition or non-solicitation agreements in connection with any such sale.

- Arena will have a redemption right (the "Preferred Put"), exercisable at its sole option, on its Preferred Stock 4 years after the Closing Date, at a value equal to the Preferred Stock's post-conversion ownership of Fair Market Value ("FMV"), in which FMV shall equal:

E * 11 – D – WC – O, where

E = trailing twelve month EBITDA, as determined by Company's auditors, measured from the month ending prior to redemption;
D = all secured debt outstanding at the time of redemption;
WC = adjusted working capital, as determined by the Company's auditors;
O = other material, on-balance sheet Company obligations, measured for the month ending prior to redemption

Further, if the Company fails to redeem the Preferred Stock as required, the Investor may at its option cause the Company to retain an investment bank of its choosing to effect a sale of the Company or its assets, with the remaining stockholders participating in and voting to approve the transaction.

- PI will have a redemption right (the "Common Call"), exercisable at its sole option, on Arena's Preferred Stock 4 years after the Closing Date, at a value equal to the Preferred Stock's post-conversion ownership FMV.

Asset purchase agreement

On May 15, 2017, Ashley Energy and Veolia entered into a definitive Asset Purchase Agreement for the Ashley Power Plant which is currently scheduled to close on July 31, 2017, a copy of which is attached hereto as Exhibit [ ].  In connection with the Asset Purchase Agreement, Veolia acknowledged that Seller's parallel operating agreement with Ameren Services Company (or its successor), as designated agent for Union Electric Company and Central Illinois Public Service Company (collectively, "Ameren") referenced twenty (20) megawatts of power, and the generating capacity of the Ashley Power Plant is greater than twenty (20) megawatts of power, and accordingly agreed to be responsible for resolving such inconsistencies by entering into a new generator interconnection agreement, obtaining MISO approval for the same, and obtaining FERC approval of the new generator interconnection agreement.  FERC has subsequently approved that new agreement, subject only to the expiration of the public comment period no later than July 14, 2017. Veolia has also agreed to be responsible for the payment of all liabilities, costs expenses or penalties arising out of or relating to the resolution of the foregoing issues as set forth above, and indemnify and hold Buyer harmless in respect of any such liabilities, costs, expenses or penalties.

The Asset Purchase Agreement also provided that Buyer has the right to continue to use the "Trigen" name for the purpose of access to Seller's "Portal" and "CP Node" with MISO and, to the extent necessary, to comply with applicable MISO and FERC rules and regulations through the earlier of: (i) September 1, 2017, or (ii) MISO accepts Buyer's registration as a Market Participant or Buyer's designated representative that has Market Participant status and MISO updates the asset owner and contact person for the Ashley Power Plant "Portal" and "CP Node".  Ashley Energy timely submitted a MISO change of ownership filing for the facility's CP Node (and asset owner) from Trigen to Ashley Energy, and that change of ownership of the CP Node and associated account became effective July 1, 2017.

As previously noted, prior to the execution of the Asset Purchase Agreement, Veolia, instead of entering into a bilateral contract for the sale of excess capacity from June 2017-May 2018 (as the plant has always done every year since it began selling electric capacity through MISO), elected to sell the capacity at auction with a reserve price of only $1.50/MW-day – a very deep discount to the market price. The true market price has been at least 50 times greater, having sold last year for $74/MW-day.  Current market sales pricing for the June 2018-May 2019 period are already $90.41/MW-day (according to EDF, the Plant's MISO market agent).

New contract and guarantees

Concurrent with the negotiation of a purchase agreement with Seller, Power Investments also negotiated a new Service Agreement with the City of St. Louis to be executed at closing.  The new Service Agreement establishes new, higher rates for the sale of steam, and those higher prices have been incorporated into the pro forma financials described herein.  Burns & McDonnell reviewed those sales models at the proposed new rates and confirmed they were reasonable and accurate as set forth in the pro forma financials.  The Service Agreement, together with underlying individual customer sales agreements, provides that Ashley Energy's steam production costs – including the cost of natural gas and other materials – are passed through and marked up on a percentage basis, thus making Ashley Energy immune from changes in commodity pricing, much like any utility.  The following chart shows Henry Hub natural gas prices over the past 10 years:



The chart below shows Henry Hub natural gas historical settlement prices contrasted with average the futures curve as of July 12, 2017:



In addition to higher steam pricing, the new Service Agreement requires the City of St. Louis to provide financial guarantees with respect to Ashley Energy's EBITDA targets as well at its debt service requirements.  A copy of the new Service Agreement is attached as Exhibit [8] and a description of those guarantees is as follows:

-   EBITDA Enhancement Payments:  In order to assure that the City of St. Louis had a vested interest in not just the survivability of the Ashley Power Plant as an ongoing concern, but also its profitability so as to warrant an investment, Power Investments requested that the City of St. Louis guarantee, in part, that the plant will reach certain EBITDA targets on an annual basis for the first ten years of the Service Agreement.  Accordingly, the City of St. Louis retained Burns & McDonnell to analyse and opine on the reasonability of those EBITDA targets, and after receiving such confirmation from Burns & McDonnell, the City of St. Louis has agreed to provide such support.

Specifically, if Ashley Energy's EBITDA falls below the "Baseline Operating Status" set forth below, then the City of St. Louis has agreed to pay an additional surcharge to Ashley Energy up to the amount set forth in the column "Maximum Annual Operating Surcharge." Such amounts shall be paid as an additional surcharge for steam and related services to the City of St. Louis. The Baseline Operating Status for any given year is inclusive of a minimum $350k maintenance reserve (which escalates every year).

| Year | Baseline Operating Status[21] | Maximum Annual Operating Surcharge | Percentage of Baseline Operating Status |
|------|------|------|------|
| 1 | $773,492 | $202,360 | 26% |
| 2 | $1,391,843 | $51,638 | 4% |
| 3 | $1,571,172 | $155,330 | 10% |
| 4 | $1,681,237 | $207,652 | 12% |
| 5 | $1,794,730 | $261,122 | 15% |
| 6 | $1,866,698 | $270,383 | 14% |
| 7 | $1,958,139 | $296,427 | 15% |
| 8 | $2,051,409 | $321,504 | 16% |
| 9 | $2,146,544 | $345,444 | 16% |
| 10 | $2,243,582 | $368,178 | 16% |

By way of example, if in year 1 Ashley Energy's EBITDA is only $600,000, then the City will pay an additional surcharge for steam in the amount of $173,492 (i.e. $773,492 - $600,000). Alternatively, if in year 1 the EBITDA exceeds $773,492, then the City will not pay any surcharges in year 1. Conversely, if EBITDA is less than $571,132 in year 1, the City will only be obligated to pay a surcharge of $202,360.

- Debt Service Support Guarantee: Second, the City of St. Louis has also agreed to be responsible for the payment of up to $250,000 of debt service shortfall per year ($62,500 per quarter), with a maximum total exposure of $750,000 (i.e., it will expire if triggered for three years up to the full annual amount of $250,000 in those years). This obligation will be subordinate to, and triggered after the Power Investments deferment (discussed below) has been triggered, and any debt service shortfall paid by the City of St. Louis will be recorded as a prepayment to the credit to the City of St. Louis for steam and related services.

The City of St. Louis' obligation to make debt service support payments is contingent upon Power Investments' agreement to guarantee the first $250,000 per year of debt service owed to Lender should Ashley Power be unable to make such payments. The total $250,000 of Power Investment guarantee funds shall be escrowed, in cash, at close and every 12 month period thereafter. If such payments are made, any amounts paid by Power Investments will be treated as a loan to Ashley Energy but expressly subordinated to any amounts owed to Lender.

---

[21] The Baseline Operating Status shall be equal to the total of Ashley Energy's total revenue from operations, less all variable expenses and fixed expenses (including, without limitation, a reserve for maintenance CAPEX and any management fees necessary to provide the services rendered hereunder and the other costs identified as Variable Expenses and Fixed Expenses by Burns & McDonnell).

For example, if Ashley Energy is unable to meet its debt service obligations in year 1 in the amount of $325,000 (i.e. $325,000 in principal or interest was owed but not paid), then Power Investments will pay $250,000 pursuant to its guarantee and the City of St. Louis will pay the remaining $75,000 pursuant to its guarantee.  Taken together with the EBITDA Enhancement Payments, the City of St. Louis and Power Investments are collectively providing guarantees in the collective amounts as follows per year:

| Year | Est. annual EBITDA pro forma for only pricing changes [A]** | Arena annual debt service* | Maximum City surcharge/performance guarantee | Post-performance guarantee min-EBITDA to make debt service | Power Investments debt service guarantee | Post-Power Investments guarantee min-EBITDA to make debt service | City payment guarantee | Post-City guarantee min-EBITDA to make debt service | Total Maximum Guarantees and Enhancement Payments | % of Arena annual debt service | % of Arena annual EBITDA (% of A) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 804,599 | $768,419 | $202,360 | $566,059 | $250,000 | $316,059 | $250,000 | $66,059 | $702,360 | 91.4% | 87.3% |
| 2 | 1,024,308 | $782,350 | $51,638 | $730,712 | $250,000 | $480,712 | $250,000 | $230,712 | $551,638 | 70.5% | 53.9% |
| 3 | 1,004,599 | $782,350 | $155,330 | $627,020 | $250,000 | $377,020 | $250,000 | $127,020 | $655,330 | 83.8% | 65.2% |
| 4 | 1,004,599 | $782,350 | $207,652 | $574,698 | $250,000 | $324,698 | $250,000 | $74,698 | $707,652 | 90.5% | 70.4% |
| 5 | 1,004,599 | $782,350 | $261,122 | $521,228 | $250,000 | $271,228 | $250,000 | $21,228 | $761,122 | 97.3% | 75.8% |
| 6 | 1,004,599 | $782,350 | $270,383 | $511,967 | $250,000 | $261,967 | $250,000 | $11,967 | $770,383 | 98.5% | 76.7% |
| 7 | 1,004,599 | $782,350 | $296,427 | $485,923 | $250,000 | $235,923 | $250,000 | ($14,077) | $796,427 | 101.8% | 79.3% |
| 8 | 1,004,599 | $782,350 | $321,504 | $460,846 | $250,000 | $210,846 | $250,000 | ($39,154) | $821,504 | 105.0% | 81.8% |
| 9 | 1,004,599 | $782,350 | $345,444 | $436,906 | $250,000 | $186,906 | $250,000 | ($63,094) | $845,444 | 108.1% | 84.2% |
| 10 | 1,004,599 | $782,350 | $368,178 | $414,172 | $250,000 | $164,172 | $250,000 | ($85,828) | $868,178 | 111.0% | 86.4% |

*+Year 1 reflects Arena operating model, subsequent years assume last three months of first 12 months interest expense annualized

**Year 1 reflects first year of DAI conservative case; subsequent years reflect average of year 1 and year 2 of DAI conservative case

The annual cash debt service owed to Lender is approximately $768k exclusive of PIK interest and other amounts that may be owed at maturity or the time of repayment.

The City of St. Louis has been willing to provide such financial support and guarantees because ultimately the City cannot permit the Ashley Power Plant to default or cease operations.  There is no alternative source of steam for the approximate 75 buildings on the steam loop.  As a result of the monopolistic control of heat steam to the central business district of St. Louis, the City has no choice but to make sure it is in constant operation.  Accordingly, in the event of a loan default, the City has requested the right to purchase the plant in exchange for repayment of all amounts owed to Lender.

The City of St. Louis is rated Baa1/A+/A- by Moody's, S&P, and Fitch, respectively, with "Stable" outlooks across all. The City's recently issued (November 25, 2016) municipal bonds maturing July 1, 2019 (the closest duration proxy for the structure contemplated herein) currently bear a coupon of 5.5% and a YTW of 1.35% (according to CapitalIQ; as of July 12, 2017).

Reporting and monitoring

Ashley Energy will provide financial statements on a monthly and quarterly basis, and audited financial statements annually. Power Investments will have access to all business records on a real-time basis (sales reports, operating data, etc.).

Projected Economics

The following tables show loan- and equity-level unit economics and assumes that Arena funds the entire facility which remains fully-drawn until exit in month 36.  While the First Lien Facility (and, to a lesser degree, the Second Lien Facility) is priced, sized, and structured for an early takeout, the base case projections presented herein do not reflect such a scenario, which Arena perceives as more of an upside outcome from an IRR perspective.  The equity assumes Arena owns 51% of the Company at closing and, on a post-promote basis after incremental draws during the first year are made, 41%.

The first table summarizes IRRs and ROIC across each component of the capital stack and on a blended basis "down" the cap stack:

| Cap stack - label | $ gross invested | Cap stack - $ - cumulative | Cap stack - % of stack | $ gross distributed | ROIC | Blended ROIC - Arena | IRR | Blended IRR - Arena |
|---|---|---|---|---|---|---|---|---|
| First lien debt | $5,995,340 | $5,995,340 | 64.2% | $8,739,784 | 1.46x | 1.46x | 15.3% | 15.3% |
| Second lien debt | $1,498,835 | $7,494,175 | 80.2% | $2,475,843 | 1.65x | 1.50x | 20.8% | 16.4% |
| **Equity (Arena)** | **$999,223** | **$8,493,398** | **90.9%** | **$2,154,086** | **2.16x** | **1.57x** | **29.1%** | **18.3%** |
| Equity (Sponsors) | $850,988 | $9,344,386 | 100.0% | $2,324,051 | 2.73x | | | |
| | | | | | | | | |
| | | | | | | | | |
| Total | $9,344,386 | | | $15,693,764 | | | | |

*All*

| UNLEVERED RETURNS/P&L | |
|---|---|
| Cash out | $ (8,493,398) |
| Cash in | $ 13,369,713 |
| Deal profit | $ 4,876,315 |
| IRR (compounded) | 18.3% |
| WAL | 2.7 |
| Equity multiple | 1.57x |

*First Lien Facility*

| UNLEVERED RETURNS/P&L | |
|---|---|
| Cash out | $ (5,995,340) |
| Cash in | $ 8,739,784 |
| Deal profit | $ 2,744,444 |
| IRR (compounded) | 15.3% |
| WAL | 2.7 |
| ROIC | 1.46x |

| SUMMARY CASH FLOWS | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 7/28/2017 | 31-Aug-17 | 30-Sep-17 | 31-Oct-17 | 30-Nov-17 | 31-Dec-17 | 31-Jan-18 | 28-Feb-18 | 31-Mar-18 | 30-Apr-18 | 31-Jul-20 |
| Month | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 36 |
| | | | | | | | | | | | |
| *Deal level* | | | | | | | | | | | |
| | | | | | | | | | | | |
| Beginning - claim | | $ 6,055,899 | $ 6,075,787 | $ 6,095,741 | $ 6,115,760 | $ 6,135,845 | $ 6,155,996 | $ 6,176,213 | $ 6,196,497 | $ 6,216,847 | $ 6,792,299 |
| Interest accrued | | 70,354 | 70,585 | 70,817 | 71,050 | 71,283 | 71,517 | 71,752 | 71,988 | 72,224 | 78,909 |
| Interest paid | | $ 50,466 | $ 50,632 | $ 50,798 | $ 50,965 | $ 51,132 | $ 51,300 | $ 51,468 | $ 51,637 | $ 51,807 | $ 56,602 |
| Principal paid | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | |
| Protective advances | | | | | | | | | | | |
| Paydowns - non principal | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Paydowns - terminal | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 6,814,606 |
| Extension/amend/monitor fees - paid | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Exit fees - paid | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | |
| Ending - claim | | $ 6,075,787 | $ 6,095,741 | $ 6,115,760 | $ 6,135,845 | $ 6,155,996 | $ 6,176,213 | $ 6,196,497 | $ 6,216,847 | $ 6,237,264 | $ - |
| Payoff - as % of claim | | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| | | | | | | | | | | | |
| Purchase/funding price | $ 5,995,340 | | | | | | | | | | |
| | | | | | | | | | | | |
| Cash flow to Arena Venture | $ (5,995,340) | $ 50,466 | $ 50,632 | $ 50,798 | $ 50,965 | $ 51,132 | $ 51,300 | $ 51,468 | $ 51,637 | $ 51,807 | $ 6,871,208 |
| Remaining $ basis | | $ 5,944,874 | $ 5,894,242 | $ 5,843,445 | $ 5,792,480 | $ 5,741,348 | $ 5,690,048 | $ 5,638,579 | $ 5,586,942 | $ 5,535,135 | $ 4,070,162 |
| % remaining basis | | 99.2% | 98.3% | 97.5% | 96.6% | 95.8% | 94.9% | 94.0% | 93.2% | 92.3% | 67.9% |
| % LTV | | 64.6% | 64.1% | 63.5% | 63.0% | 62.4% | 61.8% | 61.3% | 60.7% | 60.2% | 44.2% |

*Second Lien Facility*

| UNLEVERED RETURNS/P&L | |
|---|---|
| Cash out | $ (1,498,835) |
| Cash in | $ 2,475,843 |
| Deal profit | $ 977,008 |
| IRR (compounded) | 20.8% |
| WAL | 2.7 |
| ROIC | 1.65x |

**SUMMARY CASH FLOWS**

| Month | 7/28/2017 0 | 31-Aug-17 1 | 30-Sep-17 2 | 31-Oct-17 3 | 31-Nov-17 4 | 31-Dec-17 5 | 31-Jan-18 6 | 28-Feb-18 7 | 31-Mar-18 8 | 30-Apr-18 9 | 31-May-18 10 | 30-Jun-18 11 | 31-Jul-20 36 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Deal level* | | | | | | | | | | | | | |
| Beginning - claim | | $ 1,529,423 | $ 1,539,938 | $ 1,550,525 | $ 1,561,185 | $ 1,571,918 | $ 1,582,725 | $ 1,593,606 | $ 1,604,562 | $ 1,615,594 | $ 1,626,701 | $ 1,637,885 | $ 1,943,893 |
| Interest accrued | | 23,260 | 23,420 | 23,581 | 23,743 | 23,906 | 24,071 | 24,236 | 24,403 | 24,570 | 24,739 | 24,909 | 29,563 |
| Interest paid | | 12,745 | 12,833 | 12,921 | 13,010 | 13,099 | 13,189 | 13,280 | 13,371 | 13,463 | 13,556 | 13,649 | 16,199 |
| Principal paid | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Protective advances | | | | | | | | | | | | | |
| Paydowns - non principal | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Paydowns - terminal | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,957,257 |
| Extension/amend/monitor fees - paid | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Exit fees - paid | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Ending - claim | | 1,539,938 | 1,550,525 | 1,561,185 | 1,571,918 | 1,582,725 | 1,593,606 | 1,604,562 | 1,615,594 | 1,626,701 | 1,637,885 | 1,649,145 | 0 |
| Payoff - as % of claim | | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| | | | | | | | | | | | | | |
| Purchase/funding price | $ 1,498,835 | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| **Cash flow to Arena Venture** | (1,498,835) | $ 12,745 | $ 12,833 | $ 12,921 | $ 13,010 | $ 13,099 | $ 13,189 | $ 13,280 | $ 13,371 | $ 13,463 | $ 13,556 | $ 13,649 | $ 1,973,456 |
| Remaining $ basis | | 1,486,090 | 1,473,257 | 1,460,336 | 1,447,326 | 1,434,227 | 1,421,037 | 1,407,757 | 1,394,386 | 1,380,923 | 1,367,367 | 1,353,718 | 980,249 |
| % remaining basis | | 99.1% | 98.3% | 97.4% | 96.6% | 95.7% | 94.8% | 93.9% | 93.0% | 92.1% | 91.2% | 90.3% | 65.4% |

*Equity (post-promote)*

| UNLEVERED RETURNS/P&L | |
|---|---|
| Cash out | $ (999,223) |
| Cash in | $ 2,154,086 |
| Deal profit | $ 1,154,863 |
| IRR (compounded) | 29.1% |
| WAL | 3.0 |
| Equity multiple | 2.16x |

**SUMMARY CASH FLOWS**

| Month | 7/28/2017 0 | 31-Aug-17 1 | 30-Sep-17 2 | 31-Oct-17 3 | 31-Nov-17 4 | 31-Dec-17 5 | 31-Jan-18 6 | 28-Feb-18 7 | 31-Mar-18 8 | 30-Apr-18 9 | 31-May-18 10 | 30-Jun-18 11 | 31-Jul-20 36 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Deal level* | | | | | | | | | | | | | |
| Beginning - balance | | $ 999,223 | $ 1,009,354 | $ 1,019,588 | $ 1,029,926 | $ 1,040,368 | $ 1,050,916 | $ 1,061,571 | $ 1,072,334 | $ 1,083,207 | $ 1,094,189 | $ 1,105,283 | $ 1,422,331 |
| Pref accrued | | $ 10,131 | 10,234 | 10,337 | 10,442 | 10,548 | 10,655 | 10,763 | 10,872 | 10,983 | 11,094 | 11,206 | 14,421 |
| Pref paid | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Additional advances | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Paydowns - non principal | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Paydowns - terminal | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,436,752 |
| | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Exit fees - paid | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 717,334 |
| Ending - balance | | 1,009,354 | 1,019,588 | 1,029,926 | 1,040,368 | 1,050,916 | 1,061,571 | 1,072,334 | 1,083,207 | 1,094,189 | 1,105,283 | 1,116,489 | 0 |
| Payoff - as % of claim | | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| | | | | | | | | | | | | | |
| Purchase/funding price | $ 999,223 | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| **Cash flow to Arena Venture** | $ (999,223) | | | | | | | | | | | | $ 2,154,086 |
| Remaining $ basis | | $ 999,223 | $ 999,223 | $ 999,223 | $ 999,223 | $ 999,223 | $ 999,223 | $ 999,223 | $ 999,223 | $ 999,223 | $ 999,223 | $ 999,223 | $ 999,223 |

The following returns assume that the first lien is refinanced after 18 months:

| UNLEVERED RETURNS/P&L | |
|---|---|
| Cash out | $ (8,493,398) |
| Cash in | $ 12,156,916 |
| Deal profit | $ 3,663,518 |
| IRR (compounded) | 20.5% |
| WAL | 2.0 |
| Equity multiple | 1.43x |

| Cap stack - label | $ gross invested | Cap stack - $ - cumulative | Cap stack - % of stack | $ gross distributed | ROIC | Blended ROIC - Arena | IRR | Blended IRR - Arena |
|---|---|---|---|---|---|---|---|---|
| First lien debt | $5,995,340 | $5,995,340 | 64.2% | $7,358,254 | 1.23x | 1.23x | 15.7% | 15.7% |
| Second lien debt | $1,498,835 | $7,494,175 | 80.2% | $2,475,843 | 1.65x | 1.31x | 20.8% | 17.3% |
| Equity (Arena) | $999,223 | $8,493,398 | 90.9% | $2,322,820 | 2.32x | 1.43x | 32.3% | 20.5% |
| Equity (Sponsors) | $850,988 | $9,344,386 | 100.0% | $2,545,862 | 2.99x | | | |
| | | | | | | | | |
| Total | $9,344,386 | | | $14,702,778 | | | | |

*Pro forma* organizational structure

All of the operating assets acquired at closing from Seller will be owned by Ashley Energy, LLC. Ashley Energy, LLC will be owned 50% by SLEC, LLC (which is owned by Michael Becker) and 50% by Power Investments (which is owned by Messrs. Hutchinson and Miller).  Lender will have a first priority lien on all of the assets of Ashley Energy, LLC, as well as a pledge of the equity of Ashley Energy.

Transaction Rationale

This transaction presents a compelling opportunity for Arena to earn an attractive risk-adjusted return to provide financing on a fully-secured, hard-asset backed basis.  Arena's basis reflects the fact that St. Louis is forcing Veolia to sell APP pursuant to a non-market process, resulting in transaction value at a material discount to intrinsic value. Not only is Arena's investment implicitly supported by the intrinsic equity beneath our basis, but is explicitly supported by the City of St. Louis itself through numerous debt service and performance guarantees.  Arena is aligned with the City's interests insofar as APP provides 100% of the power to the City's buildings within the steam loop (which powers all of downtown St. Louis).  As the City is the plant's largest customer, without a viable plant, the City would not only be without power, but would face the greater logistical and cost challenge of disintermediating its primary power source for the past [80+] years, the cost of which (excluding opportunity/disruption costs) is estimated to be over five times the cost to ensure that APP remains profitable, viable, and under the operation of a City-approved enterprise.  To that end, the repayment of Arena's loan would not only be implicitly supported by the plant's intrinsic value and the City's motivation to maintain a viable plant, but also explicitly supported by both numerous payment and performance guarantees which, across the first two years would, alone (i.e. excluding any impact excess cash flow amortization), contractually cover approximately 84% of the Facility's estimated interest payments.

Next steps

Complete legal due diligence and final documentation.

**Exhibits**

1. **APP customer list**
2. **B&M report – November 2015**
3. **B&M report – August 2016**
4. **Asset Purchase Agreement**
5. **Indicative PACE term sheets**
6. **DAI credentials and field examination report**
7. **Executed term sheet**
8. **Draft new service agreement**
9. **Player's list**

**Ex 1.       APP customer list**

**Ex. 2 :B&M report – November 2015**

**Ex. 3: B&M report – August 2016**

**Ex. 4: Asset Purchase Agreement**

**Ex. 5: Indicative PACE term sheets**

Ex. 6.    **DAI credentials and field examination report**

**Ex. 7.** **Executed term sheet**

**Ex. 8.      Draft new service agreement**

**Ex. 9.**       **Player's List**