UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

POWER INVESTMENTS, LLC,    )
    )
      Plaintiff,    )
    )
vs.    )    Case No. 4:21-cv-01022-SEP
    )
CARDINALS PREFERRED, LLC,    )
    )
      Defendant.    )
    )

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

FACTS ............................................................................................................................................ 3

LEGAL STANDARD .................................................................................................................... 6

ARGUMENT .................................................................................................................................. 8

I.      Power's Call Option Exercise Created a Binding and Enforceable Bilateral
        Contract That Irrevocably Obligated Cardinals to Transfer the Preferred
        Units to Power ................................................................................................................... 8

        A.      The Exercise of the Call Option Created a Binding Bilateral
                Contract ................................................................................................................. 8

        B.      Cardinals' Attempt to Convert After the Call Option Was Exercised
                Fails Because It Was Extinguished by the Call Exercise and a Party
                to a Contract Cannot Render Its Own Performance Impossible ...................... 11

II.     Cardinals' Proposed Interpretation of the Call Option Renders Numerous
        Terms of the Agreement Meaningless and Nonfunctional .......................................... 13

        A.      Cardinals' Interpretation Renders the Phrase "Shall Be
                Consummated" Meaningless ............................................................................. 14

        B.      Cardinals' Interpretation Renders the Phrase "Call Option"
                Meaningless and Results in an Invalid Illusory Agreement ............................ 15

III.    The Rights of Preferred Unitholders Should Be Strictly Construed, and
        Only Express, Clear, and Direct Rights Can Be Recognized ..................................... 17

        A.      A Preferred Shareholder's Right to Convert After a Call Option Has
                Been Exercised Must Be Clear, Express, and Uncontroverted ....................... 18

        B.      The Phrase "At Any Time or From Time to Time" Does Not Create
                a Clear, Direct, and Express Right to Moot the Call Option ........................... 19

IV.     There Are Express Restrictions on Cardinals' Purported Right to Convert
        the Preferred Units "At Any Time or From Time to Time." ....................................... 21

V.      Even If the Conversion Right Could "Moot" The Exercised Call Option,
        Once the Call Option Was Exercised Cardinals No Longer Had Authority
        to Invoke the Conversion as Cardinals Was No Longer the Holder of the
        Preferred Units ................................................................................................................ 24

VI.     In the Alternative, to the Extent the Court Finds Ambiguity, the Parties'

Intent Reflects a First-Exercised Call Option Was Intended to Trump the Conversion Right. ........................................................................................... 26

CERTIFICATE OF SERVICE ............................................................................. 29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*276 163rd L.P. v. Henry Ventures, L.P.*,
  Case No. 16-021859 .................................................................................11, 12

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ..............................................................................................6

*Baker v. Bristol Care, Inc.*,
  450 S.W.3d 770 (Mo. 2014) .................................................................................16

*Bernstein v. Canet*,
  1996 WL 342096 (Del. Ch. June 11, 1996) .........................................................19

*BJC Health Sys. v. Columbia Cas. Co.*,
  478 F.3d 908 (8th Cir. 2007) ...............................................................................23

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).........................................................................................6, 7

*City of St. Joseph v. Lake Contrary Sewer District*,
  251 S.W.3d 362 (Mo. App. 2008) .......................................................................23

*CNR Healthcare Network, Inc. v. 86 Lefferts Corp.*,
  59 A.D.3d 486 (N.Y. App. Div. 2009) .................................................................22

*Cohn v. Arnheiter*,
  195 N.Y.S. 100 (App. Term 1922) .......................................................................15

*Collins-Myers v. Triangle Trucking, Inc.*,
  2020 WL 1455743 (E.D. Mo. Mar. 25, 2020) .......................................................7

*Discover Growth Fund v. 6D Glob. Techs. Inc.*,
  2015 WL 6619971 (S.D.N.Y. Oct. 30, 2015) .......................................................14

*Dunn Indus. Grp., Inc. v. City of Sugar Creek*,
  112 S.W.3d 421 (Mo. 2003) .................................................................................21

*Elliott Assocs., L.P. v. Avatex Corp.*,
  715 A.2d 843 (Del. 1998) .....................................................................................18

*In re Estate of Schulze*,
  105 S.W.3d 548 (Mo. App. 2003) ....................................................................8, 10

*Fanchon & Marco Enters. v. Dysart*,
189 S.W.2d 291 (Mo. 1945) ........................................................................22

*Fed Cetera, LLC v. Nat'l Credit Servs., Inc.*,
938 F.3d 466 (3d Cir. 2019).......................................................................14

*Feldman v. Brodsky*,
147 N.Y.S.2d 312 (N.Y. 1955) ...................................................................22

*Freeman v. Fabiniak*,
1985 WL 11583 (Del. Ch. Aug. 15, 1985) .................................................25

*Golden Rule Estates Owners Ass'n v. City of Crosslake*,
2005 WL 1514436 (Minn. Ct. App. June 28, 2005)....................................22

*Hansen v. Johnston*,
249 N.E.2d 133 (Ill. App. Ct. 1969) ..........................................................12

*J.H. Berra Constr. Co. v. City of Washington*,
510 S.W.3d 871 (Mo. App. 2017) ..............................................................27

*Jag Trading, L.L.C. v. LSB Industries, Inc.*,
2012 WL 12861138 (W.D. Okla. Dec. 27, 2012)...............................18, 19

*K&V Sci. Co. v. Bayerische Motoren Werke Aktiengesellschaft ("BMW")*,
314 F.3d 494 (10th Cir. 2002) ...................................................................21

*Laclede Power Co. v. Stillwell*,
71 S.W. 380 (Mo. App. 1902) .....................................................................12

*Len v. Fuller*,
1997 WL 305833 (Del. Ch. May 30, 1997) ..........................................24, 25

*M&G Polymers USA, LLC v. Tackett*,
574 U.S. 427 (2015)....................................................................................17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)......................................................................................6

*McGuire v. Lindsay*,
496 S.W.3d 599 (Mo. App. 2016) ..............................................................14

*Meyer v. Gen. Motors Corp.*,
937 F. Supp. 861 (E.D. Mo. 1996)............................................................6, 7

*In re Millenium Super Stop II, LLC*,
569 B.R. 331 (W.D. Mo. Bnkr. 2017) .....................................................8, 16

*Monarch Fire Protection Dist. of St. Louis County, Mo. v. Freedom Consulting &*
  *Auditing Servs., Inc.*,
  678 F. Supp. 2d 927 (E.D. Mo. 2009)..................................................................7

*Northgate Lincoln-Mercury Inc. v. Ford Motor Co.*,
  507 F. Supp. 3d 940 (S.D. Ohio 2020) ...............................................................17

*Parker v. Pulitzer Pub. Co.*,
  882 S.W.2d 245 (Mo. App. 1994) .......................................................................17

*Rikard v. U.S. Auto Protection, LLC*,
  2013 WL 5421966 (E.D. Mo. Sept. 26, 2013).....................................................6

*Rothschild Int'l Corp. v. Liggett Grp. Inc.*,
  474 A.2d 133 (Del. 1984) ...................................................................................18

*In re Ryckman Creek Resources, LLC*,
  2018 WL 4178692 (D. Del. Bnkr. Aug. 29, 2018) .............................................10

*Schnuck Markets, Inc. v. First Data Merchant Servs. Corp.*,
  852 F.3d 732 (8th Cir. 2017) .........................................................................7, 20

*Storey v. RGIS Inventory Specialists, LLC*,
  466 S.W.3d 650 (Mo. App. 2015) ......................................................................14

*Sunray Oil Co. v. Lewis*,
  434 S.W.2d 777 (Mo. App. 1968) ......................................................................16

*Swift v. C.I.R.*,
  20 B.T.A. 1099 (1930), *aff'd sub nom. Comm'r of Internal Revenue v. Swift*,
  54 F.2d 746 (9th Cir. 1932) ...............................................................................15

*TCV VI, L.P. v. TradingScreen Inc.*,
  2015 WL 1598045 (Del. Ch. Feb. 26, 2015) ......................................................22

*Torgerson v. City of Rochester*,
  643 F.3d 1031 (8th Cir. 2011) .............................................................................7

*United States v. Farmers Co-op. Co.*,
  708 F.2d 352 (8th Cir. 1983) ...............................................................................6

*Util. Workers Union of Am., Local 118 v. Ohio Edison Co.*,
  1998 WL 869941 (6th Cir. Dec. 3, 1998) ...........................................................21

*Waggoner v. Laster*,
  581 A.2d 1127 (Del. 1990) .................................................................................18

*Weinstein v. KLT Telecom, Inc.*,
    225 S.W.3d 413 (Mo. 2007) .................................................................................................8, 9

**Other Authorities**

Fed. R. Civ. P. 56(a) ..................................................................................................................6

Fed. R. Civ. P. 56(c) ..................................................................................................................6

In 2017, Power Investments, LLC ("**Power**") and Cardinals Preferred, LLC ("**Cardinals**") entered into the Ashley Energy LLC Amended and Restated Limited Liability Company Agreement (the "**Agreement**"), as the sole members of Ashley Energy LLC (the "**Company**"). The Agreement contains a Call Option that provided the majority common share owner—Power— with the right to buy the Company's preferred shares on or after August 9, 2021 from Cardinals. On August 9, 2021, Power exercised the Call Option by sending notice to Cardinals.  Cardinals, however, outright refused to honor its contractual obligation to sell the preferred shares.  Worse yet, in a belated, bad-faith attempt to evade its binding obligation to sell, Cardinals is purporting to exercise a separate right under the Agreement to convert all of its preferred shares to common shares *after* Power's Call exercise and claims that this purported conversion "moots" Power's Call.

**The issue for the Court to decide here is straightforward and limited:** as a matter of law, did the exercise of the Call Option by Power create a binding and enforceable bilateral agreement that obligates Cardinals to sell the Company's 999,222 Preferred Units to Power, which Cardinals cannot avoid by virtue of its purported exercise of a conversion right, or otherwise?

**Under black-letter contract law in Missouri and other jurisdictions, the answer is a resounding yes.**  Power's exercise of the Call Option created a binding and enforceable contract that irreversibly obligated Cardinals to sell all the Preferred Units.  The very nature of any option—like the Call Option here—is a conscious gamble between sophisticated parties to try to capitalize on a change in value in the future.  This is precisely what the parties bargained for in 2017 when they signed the Agreement, and Cardinals is bound by that bargain.

Contrary to the plain language of the Agreement and the legal authorities governing option contracts specifically and contract interpretation generally, Cardinals contends that the § 10.5 Call Option is not an option at all, but rather simply an offer to sell that was always subject to Cardinals'

continuing consent.  According to Cardinals, Power did not *exercise* the Call Option, but merely "noticed an intent" to exercise it that Cardinals could choose to reject at its sole option.  In Cardinals' view, the § 4.1 Conversion Right is an all-powerful trump card that transcends all other rights in the Agreement.[1]

Cardinals' argument should be rejected for a host of reasons.  **First**, Cardinals is subject to a binding bilateral contract to sell the Preferred Units to Power; taking action to render its performance impossible is a breach of that contract.  **Second**, Cardinals' interpretation of the Agreement renders multiple provisions meaningless and nonfunctional—in particular, the Call Option (§ 10.5) and Further Action (§ 15.12) provisions.  *Conversely, Power's interpretation gives meaning to all of the relevant terms—including Cardinals' trumpeted Conversion Right.*  **Third**, contrary to Cardinals' suggestion otherwise during the TRO hearing, under well-established corporate law, the rights of preferred shareholders like Cardinals are strictly construed, and only express, clear, and direct rights can be recognized—none of which exist in the Agreement here to support Cardinals' position.  **Fourth**, there are a number of express restrictions in the Agreement on Cardinals' purportedly unlimited right to convert the Preferred Units.  **Fifth**, once the Call Option was exercised, Cardinals was no longer the "holder" of the Preferred Units and therefore lacked the authority under the Agreement to convert the Preferred Units.  **Lastly**, although the Agreement is unambiguous and this motion should be granted on that basis, to the extent the Court finds ambiguity, the extrinsic evidence supports Power's position on the Call Option and rejects Cardinals'; further, the Agreement was drafted by Cardinals' counsel and should therefore be construed against Cardinals.

---

[1] Cardinals' Brief in Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. 13) *passim*.

Power's interpretation of the Agreement is substantiated by a wealth of highly relevant case law and other legal authority; Cardinals' interpretation is not, and essentially depends on a single Florida trial court decision—a case that actually favors *Power's* position. *Cardinals cannot point to any instance of a court validating its interpretation under the fact pattern present here.* Not only has Power carried its burden to show the lack of any genuine dispute on the legal issue here, but there is a complete absence of evidence supporting Cardinals' position.

## FACTS

The relevant facts are simple, straightforward, and cannot be controverted.

Power and Cardinals are members of the Company.  Plaintiff's Statement of Uncontroverted Material Facts ("**SUMF**") ¶¶ 1-2.  On August 9, 2017, the Company, Cardinals, and Power entered into the Agreement.  *Id.* ¶ 3.  Under the Agreement, Power is the sole owner of the Company's Class A Common Units and owns 850,988 such units.  *Id.* ¶¶ 4-5.  Under the Agreement, Cardinals is the sole owner of the Company's Preferred Units and owns 999,222 such units.  *Id.* ¶¶ 6-7.

Section 10.5 of the Agreement sets forth a Call Option, which provides: "At any time on or following August 9, 2021, a majority of Class A Common Units shall have the right to purchase a portion or all of the Preferred Units pursuant to this Section 10.5(b) (the 'Call').  The Call shall be consummated within the same time period and at the same price described in Section 10.5(a) above."  *Id.* ¶¶ 8-10.  Therefore, at any time on or after August 9, 2021, Power—the majority Class A Unitholder—was entitled to exercise its rights under the Call and thereby purchase all or a portion of the Company's Preferred Units.  *Id.*

Also pursuant to § 10.5(b), the Call, once exercised by the majority Class A Unitholder, must be consummated within the timing specified by § 10.5(a) governing the Put Option, which provides that the put shall be consummated within six months after the exercise of the put.  *Id.* ¶

3

11.  Therefore, the Call, once exercised by Power—the majority Class A Unitholder—must be consummated within six months after the delivery of notice that Power has exercised the Call.  *Id.* ¶¶ 8-11.

The parties specifically agreed that they would cooperate so as to ensure the purposes of the Agreement are achieved: "The Parties agree to execute and deliver all documents, provide all information and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement."  *Id.* ¶¶ 12-13.  The parties further agreed that specific performance and injunctive relief would be available as potential remedies for breach of any provision of the Agreement.  *Id.* ¶¶ 14-15.

On and effective August 9, 2021, Power exercised the § 10.5 Call Option and thereby proceeded with purchasing all 999,222 of the Company's Preferred Units from Cardinals.  *Id.* ¶ 16.  That same day, Power properly delivered the required written notice to Cardinals of Power's Call Option exercise and resulting purchase of all of the Preferred Units.  *Id.* ¶ 17, 19.  As indicated in Power's Notice, Power sought to consummate the transaction immediately.  *Id.* ¶¶ 17-18.

Section 4.1(a) of the Agreement provides a mechanism by which the Preferred Unitholder may convert Preferred Units it owns into Class A Common Units.  *Id.* ¶¶ 20-21.  The Conversion Right expressed in § 4.1(a) contains the phrase "at any time or from time to time."  *Id.* ¶ 21.  Section 4.1(b) addresses the timing of termination of the Conversion Right in the event of a liquidation, dissolution, or winding up of the Company, and functions in tandem with Section 5.1 and Article XIII of the Agreement.  *Id.* ¶¶ 22-27.

On Sunday, August 15, 2021, at 8:15 p.m. EDT—six days after receiving Power's Notice of Call Option Exercise—Cardinals sent letters to Mr. Mason Miller in his capacity as manager of Power and board member of the Company.  *Id.* ¶¶ 28-35.  In the letters, Cardinals confirmed it had

received Power's Notice.  *Id.* ¶¶ 29, 34-35.  Cardinals purported to reject Power's exercise of the Call Option on the basis that it lacked sufficient information (despite having not requested any additional information to this day) and informed Power that Cardinals was attempting to convert all of its 999,222 Preferred Units to Class A Common Units under § 4.1(a) in an effort to "moot" Power's Call.  *Id.* ¶¶ 30-35.

Dentons US LLP, Cardinals' counsel, drafted the Agreement.  *Id.* ¶¶ 50-51.  Leading up to the Agreement's execution in 2017, Mr. Miller and representatives of Cardinals exchanged a series of emails and documents.  *Id.* ¶ 36.  On August 9, 2017—the same day the Agreement was executed—Cardinals also authored an internal Investment Memorandum regarding Power and Cardinals' purchase of the Company and the Agreement.  *Id.* ¶ 37.  In none of those documents did any party state, suggest, or express any intent that:

- The Preferred Unitholder's conversion right could be used as a means to eliminate or moot an exercised call option;
- The Preferred Unitholder's conversion right would trump the Common Unitholder's rights under an exercised call option;
- Upon the Common Unitholder's exercise of the call option, the Preferred Unitholder would then have the option to either sell the Preferred Units subject to the exercised call option or convert its Preferred Units to Class A Common Units; or
- The Common Unitholder's ability to exercise, consummate, or close on the call option would be at the sole discretion of the Preferred Unitholder.

*Id.* ¶¶ 36-45.  Instead, they demonstrate that the parties' intent was that the Preferred Unitholder's rights would be *in pari passu* (on equal footing) with the rights of the Common Unitholder.  *Id.* ¶ 46.  They demonstrate that Cardinals proposed the clause "at any time" as part of the Preferred Unitholder's conversion right before the parties included a call option in the term sheet for the Agreement.  *Id.* ¶¶ 47-48.  The documents also prove that the parties' intent was that the call option would be exercisable by Power in its sole discretion and not subject to Cardinals' approval.  *Id.* ¶¶ 48-49.

## LEGAL STANDARD

Summary judgment is proper when the pleadings and other record materials show there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A party may move for summary judgment on a part of its claims and/or defenses.  Fed. R. Civ. P. 56(a).  This includes moving on a discrete issue as a matter of law.  *See, e.g.*, *Rikard v. U.S. Auto Protection, LLC*, 2013 WL 5421966, at *1-2 (E.D. Mo. Sept. 26, 2013) (granting partial summary judgment on discrete legal issue).

Material facts are those that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Once the movant establishes the lack of any genuine issue of material fact, "the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on that issue." *Meyer v. Gen. Motors Corp.*, 937 F. Supp. 861, 863 (E.D. Mo. 1996) (citing *Anderson*, 477 U.S. at 249).  Where the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be no genuine issue as to any material fact . . . ."  *Celotex*, 477 U.S. at 322-23.

**The non-moving party must show more than "metaphysical doubt" and must show that a *reasonable* factfinder could find for it; otherwise, any dispute is not "genuine."** *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Meyer*, 937 F. Supp. at 863.  If the evidence adduced by the non-movant is "merely colorable" or "is not significantly probative," summary judgment is proper.   *Anderson*, 477 U.S. at 249-50. Additionally, a party seeking to defeat a summary judgment motion by asserting an affirmative defense must prove the existence of material facts specifically supporting the affirmative defense. *United States v. Farmers Co-op. Co.*, 708 F.2d 352, 353 (8th Cir. 1983).

6

Additionally, "[t]he Court may grant summary judgment where the party bearing the burden to establish the claim has no evidence to support its claim.  'The burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Collins-Myers v. Triangle Trucking, Inc.*, 2020 WL 1455743, at *3 (E.D. Mo. Mar. 25, 2020) (quoting *Celotex*, 477 U.S. at 325).

Summary judgment is "an integral part of the federal rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).  Summary judgment can achieve this overarching goal by "' . . . removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those cases that really do raise genuine issues of material fact.'" *Meyer*, 937 F. Supp. at 863 (quoting *City of Mount Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988)). Summary judgment is not disfavored and is, in fact, designed for every action.  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011).  "[S]ummary judgment is 'not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.'" *Collins-Myers*, 2020 WL 1455743, at *3 (quoting *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007)).

"The interpretation of an unambiguous contract is a question of law suitable for a determination on summary judgment, as is the threshold issue of whether the contract is ambiguous." *Monarch Fire Protection Dist. of St. Louis County, Mo. v. Freedom Consulting & Auditing Servs., Inc.*, 678 F. Supp. 2d 927, 935 (E.D. Mo. 2009); *Schnuck Markets, Inc. v. First Data Merchant Servs. Corp.*, 852 F.3d 732, 738 (8th Cir. 2017).  Cardinals has admitted that the Agreement is unambiguous.[2]  Therefore, it is appropriate for the Court to enter summary judgment

---

[2] Dkt. 13 at p.13.

on the issue presented here.

## ARGUMENT

I. **Power's Call Option Exercise Created a Binding and Enforceable Bilateral Contract That Irrevocably Obligated Cardinals to Transfer the Preferred Units to Power.**

### A.    The Exercise of the Call Option Created a Binding Bilateral Contract.

Section 10.5's Call Option is a binding option contract.  Unlike a standard offer, an option contract is an offer that cannot be revoked before acceptance.  Missouri law makes this concept clear: "An option coupled with consideration is a continuing and irrevocable offer to sell that the seller cannot withdraw during a stated period. . . . The option vests the buyer with a power of acceptance."  *In re Estate of Schulze*, 105 S.W.3d 548, 550 (Mo. App. 2003).  An option gives the optionee the power to purchase the property in question at a stipulated price ***whether or not the owner wishes to sell***.  *Id.*  "Once the buyer accepts the offer in the prescribed manner, the option is considered exercised so as to create a binding bilateral contract. . . . The bilateral contract is specifically enforceable."  *Id.*; *see In re Millenium Super Stop II, LLC*, 569 B.R. 331, 337-38 (W.D. Mo. Bnkr. 2017) ("An exercised option contract may be enforced by specific performance.").

Missouri law expressly extends this rule to put and call options involving the sale of company stock.  As Judge Limbaugh explained in such a context, "upon exercise of the option, the underlying unilateral option contract ripens into a bilateral contract in which both parties must fulfill their respective obligations as set out in the option contract itself.  There are no new terms in the so-called separate contract—it is wholly dependent on the terms of the underlying option contract."  *Weinstein v. KLT Telecom, Inc.*, 225 S.W.3d 413, 416 (Mo. 2007).  Indeed, the very nature of a put/call option in the context of corporate stock is one which, by definition, will result in one party profiting and the other party sacrificing economic value, a bargained-for benefit that two sophisticated parties willingly negotiate and accept at the time the put/call is entered into.  As

Judge Limbaugh continued to explain in *Weinstein*, where the Missouri Supreme Court upheld the enforceability of the exercise of a put option where one of the contracting parties lost *all* the value of the stock:

> Given the nature of the Put Option Agreement—that it was simply a gamble, a lawful wager made between sophisticated parties as part of an arms-length transaction—consideration must be measured at the time the agreement was executed. The bargain was for Weinstein to sell and KLTT to buy the remaining shares at a minimum of $15M, whatever their actual value, and KLTT implicitly took the risk that the shares might lose value or even lose all their value. . . . [O]ption contracts, by their very nature, are wagers, in which the parties risk that the value of the consideration may fall or may be lost altogether before performance is due.

*Id.* at 415-17.

Tellingly, the Delaware Chancery Court has also addressed the issue of call option contracts in the precise context of corporate/LLC share purchases. In *Walsh v. White House Post Productions, LLC,* the court held that call options in the corporate buyout/share purchase context are binding option contracts that the optionor cannot revoke, whose acceptance is solely within the power of the optionee, and that become binding bilateral contracts upon the optionee's acceptance. 2020 WL 1492543, at *5-6 (Del. Ch. Mar. 25, 2020). The court explained: "once the option is exercised and the offer accepted . . . the underlying agreement becomes a valid and enforceable bilateral contract . . . . The notice of acceptance binds the acceptor (option holder) irrevocably." *Id*. at *6 (internal quotation marks omitted).[3] In so holding, the Chancery Court approvingly cited

---

[3] Cardinals' argument that it disagrees with the proposed purchase price and/or lacks sufficient information to evaluate the purchase price (*see* **Ex. 2** at p.1) does not invalidate that a binding bilateral contract was formed when the Call Option was exercised. Notably, multiple Delaware decisions have made clear that disputes over the purchase price for an exercised corporate buyout call option, or how that purchase price is arrived at, are not grounds for allowing withdrawal from the binding option contract or declining to accept the notice of exercise of the call option. In *Walsh*, the defendants were dissatisfied with the purchase price being generated by multiple appraisals of the company and contended they had the right to withdraw from the option. 2020

another Delaware decision, *Ryckman Creek*.  There, in response to a minority member's suit to enforce a similar call option, the majority member tried to withdraw from the option on the ground that there was no enforceable agreement and the call option exercise notice was just an offer, not an acceptance of an open offer.  2018 WL 4178692, at *9.  The court rejected this position, reasoning that the call option was the offer, the call option notice of exercise was the acceptance, and the offeror (majority member) was not permitted to withdraw from the option contract once exercised by the optionee.  *Id*.[4]

The § 10.5 Call Option constitutes a continuing and irrevocable offer by Cardinals to Power from which Cardinals could not legally withdraw.  It was solely Power's right to determine whether to exercise the Call, and when it exercised the Call it accepted the Option.  Once Power accepted the offer in the manner specified in the Call Option, the Option was exercised so as to create a binding bilateral contract that is specifically enforceable by Power against Cardinals.  Power's notice of exercise of the Call Option bound the parties irrevocably to proceed with the Call and fulfill bilateral obligations.  *Schulze*, 105 S.W.3d at 550; *Walsh*, 2020 WL 1492543, at *6.  The Preferred Units are, therefore, the subject of a binding contract, whereby Cardinals must consummate the transaction initiated by the Call Option exercise.  Cardinals has no ability to convert these shares because they are under contract to be sold pursuant to the Agreement.

---

WL 1492543, at *1.  The court rejected this position, holding that the call option became a binding bilateral contract upon the optionee plaintiffs' acceptance, from which the defendants could not withdraw.  *Id*. at *5-6.  The *Ryckman Creek* decision is of accord.  *In re Ryckman Creek Resources, LLC*, 2018 WL 4178692, at *9 (D. Del. Bnkr. Aug. 29, 2018).

[4] A lengthy discussion and analysis of the *Walsh* and *Ryckman Creek* decisions and the application to the facts of this case was included in Plaintiffs' Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. 3 at pp. 6-9) and is incorporated herein by reference.

**B.** **Cardinals' Attempt to Convert After the Call Option Was Exercised Fails Because It Was Extinguished by the Call Exercise and a Party to a Contract Cannot Render Its Own Performance Impossible.**

Cardinals insists that the § 4.1(a) "at any time" language means that it may exercise its conversion right over an exercised Call Option, in the absence of any other language restricting the exercise of the conversion right. In doing so, Cardinals relies on a single case, *276 163rd L.P. v. Henry Ventures, L.P.*, Case No. 16-021859 CACE (Fla. 17th Cir. Ct. Oct. 13, 2017), attached as **Exhibit 18**, for the proposition that competing conversion rights and call option rights may exist in a single contract, and because the conversion option is "preferred," it therefore operates to trump the earlier-exercised call option.[5] However, that very case supports the *opposite* conclusion: the exercise of the call option prior to the purported attempt to convert the preferred units eliminates the right to convert those units.

In *Henry Ventures*, the preferred shareholder (similar to Cardinals) had a right to convert its preferred shares to common shares, and the common shareholder (similar to Power) had the right to exercise a call to purchase the preferred shares. *Id.* at pp.2-5. Notably, just like Cardinals here, the preferred shareholder in *Henry Ventures* placed great reliance on the language of the conversion provision, which permitted the conversion "at any time." *Id.* at pp.3-4. However, unlike the case here, in *Henry Ventures* the conversion right was exercised **before** the call option was exercised. Ultimately, the timing of which right was exercised first controlled which party prevailed, not the alleged unlimited language of the conversion provision or the purported absence of any restrictions on the timing of its exercise. *Id.* at p.5.

In fact, when asked by the court in *Henry Ventures*, the preferred shareholder exercising the conversion right admitted that had the call option been exercised first, it would have eliminated

---

[5] Dkt. 13 at pp.9-10.

the right of the preferred shareholder to convert, to wit:[6]

> THE COURT: So then the way you're describing this is, in its most simplest terms is if your client makes a demand to evoke [sic] 10.01 [the conversion right] before a call option is ever exercised, then 10.01 always will trump.

> MR. MENA [COUNSEL FOR PREFERRED STOCKHOLDER]: Absolutely.

> THE COURT: When, if ever, would 10.03 [the call option] apply under those circumstances? **If they, for instance, hypothetically, had sent a letter exercising the call option prior to your making this demand would 10.03 [the conversion right] be evoked [sic]?**

> MR. MENA: **Yes.  We wouldn't be here.**

> THE COURT: **So your whole case is predicated upon timing?**

> MR. MENA: **Absolutely.  We both had rights** . . . **the same logic would apply, Your Honor.  If they exercise their call option first, let's reverse the facts here, they exercised it first . . . . There would no longer be class A shares to be converted . . . . And that's the key here.**

Indeed, Missouri law is clear that where a party takes action to dispossess itself of an asset that is already subject to a binding and enforceable contract, such conduct is invalid and constitutes a breach of that contract.  In fact, the leading case in Missouri involves this very same power plant.  *See Laclede Power Co. v. Stillwell*, 71 S.W. 380, 382 (Mo. App. 1902) (holding that party, "[b]y making the assignment and dispossessing itself of all of its assets . . . rendered itself unable to comply with the contract, and thereby committed a breach of it").  Put differently, Cardinals cannot render its own performance of the Call Option impossible by converting the Preferred Units to Common Units *after* the Call Option is exercised.  *See, e.g., Hansen v. Johnston*, 249 N.E.2d 133, 136 (Ill. App. Ct. 1969) ("It is clear that when performance of an agreement is rendered impossible by the willful acts of one of the contracting parties, the agreement to pay becomes absolute").

---

[6] *See Transcript* of Hearing on Motions for Summary Judgment in *276 163rd L.P. v. Henry Ventures, L.P.*, Case No. 16-021859 CACE (Fla. 17th Cir. Ct. Oct. 13, 2017), at 40:25-42:7, attached as **Exhibit 19**.

Simply put, it is the operation of law itself that serves as an express limit on the purported limitless right to convert; because a party cannot frustrate its own performance, once a bilateral contract is formed with the exercise of the Call Option, that contract itself becomes an express limit on any purported subsequent right to convert.

## II.    Cardinals' Proposed Interpretation of the Call Option Renders Numerous Terms of the Agreement Meaningless and Nonfunctional.

Cardinals contends that the exercise of the Call Option was not pursuant to an option at all (despite being expressly referred to as such), and therefore did not create an enforceable bilateral contract.  Instead, Cardinals' tortured interpretation is that the exercise of the Call Option simply served as a trigger that forced Cardinals to determine within six months whether, in its sole discretion, it wanted to sell the Preferred Units to Power or alternatively convert them to Common Units.[7]  As an initial matter, this interpretation makes no logical sense against the backdrop of Cardinals' eleventh-hour, rushed attempted conversion on a Sunday night after Power's exercise: if Cardinals had six full months to consider whether to "accept" Power's Call, why try to convert so hurriedly?  Cardinals' conduct demonstrates that they themselves do not really believe the "six-month shot clock in response to Power's exercise" is the correct interpretation.

Beyond that, the only support for their interpretation relies upon the provision in the Call Option that it "shall be consummated within six (6) months after the delivery of notice."[8]  However, Cardinals' interpretation focuses solely on the timeframe (six months) and ignores the meaning of the words "shall" and "consummated."  Cardinals' interpretation renders the terms

---

[7] Dkt. 13 at pp.7, 13.

[8] If Cardinals had wanted the Call Option to function as solely a notice provision and trigger to start a "six month shot clock" on Cardinals' right to convert, it could have simply drafted the Agreement to read as such.  Instead, the Call Option is expressly identified as an option contract, and Cardinals' purported view of how it operates arises solely from implied constructions of various provisions.

"call option" and "shall be consummated" meaningless, leaving nothing more than an invalid illusory contract that makes no sense because it is a pointless right to "notice an intent" (Cardinals' own words).[9]

In determining the meaning of a contract, interpretations that render provisions meaningless, nonfunctional, or nonsensical must be avoided. *Storey v. RGIS Inventory Specialists, LLC*, 466 S.W.3d 650, 655 (Mo. App. 2015); *see McGuire v. Lindsay*, 496 S.W.3d 599, 607 (Mo. App. 2016).

### A. Cardinals' Interpretation Renders the Phrase "Shall Be Consummated" Meaningless.

The term "consummated," in connection with an agreement of sale (here, of Preferred Units), means "'to achieve' or 'to perfect.'" *Fed Cetera, LLC v. Nat'l Credit Servs., Inc.*, 938 F.3d 466, 472 (3d Cir. 2019) (citing Black's law dictionary in defining the term "consummate"); *see, e.g.*, *Discover Growth Fund v. 6D Glob. Techs. Inc.*, 2015 WL 6619971, at *9, *9 n.10 (S.D.N.Y. Oct. 30, 2015) (explaining that "the definition of 'consummation' is 'the act of completing'" (citing Webster's dictionary)). That is important, as the Third Circuit Court of Appeals explained, because "[t]o "achieve" a contract suggests that a contract has formed" already. *Fed Cetera*, 938 F.3d at 472. Put differently, the act of consummating the Call Option is simply the point at which formal record title passes (i.e., the agreement is "perfected"), and in order to do so, by definition a binding bilateral agreement must have already been created. As one court explained, "a sale, even where the subject of a contract, is incomplete and imperfect until title passes. . . . The passing of

---

[9] To be clear, although Cardinals continually refers to Power's notice as simply a "notice of intention to exercise its call option" in the future, *e.g.*, Dkt. 13 at p.8, it was nothing of the sort. The notice was a "notice of exercise," to wit: "Power Investments, LLC is the sole owner of Class A Common Units and is hereby delivering notice to you that ***it is irrevocably electing to exercise the Call*** with respect to all of the Preferred Units." **Exhibit 2** (August 9, 2021 Notice of Exercise of Call Option) at p.1 (emphasis added).

title irrevocably and finally changes the rights of the parties to a sale.   A sale is then 'consummated.'"   *Swift v. C.I.R.*, 20 B.T.A. 1099, 1104-05 (1930), *aff'd sub nom. Comm'r of Internal Revenue v. Swift*, 54 F.2d 746 (9th Cir. 1932).

In contrast, Cardinals contends that the exercise of the Call Option did not create a binding bilateral agreement at the time of exercise, but instead simply gave Cardinals six months to decide what it wanted to do.   However, in order for the Call Option to be "consummated within six (6) months after the delivery of notice," a contract must have already been created and preexist the date of such consummation, because the "consummation" is simply the act of perfecting the contract and transferring record title of the Preferred Units to Power.   Cardinals' interpretation expressly rejects the creation of a bilateral agreement at the time of the Call Option exercise, and thereby renders meaningless the term "consummated."

Moreover, the consummation of the agreement created by the exercise of the Call Option is mandatory, as evidenced by the use of the term "shall": the Call Option "**shall** be consummated within six (6) months after the delivery of notice." **Ex. 1** § 10.5(b) (emphasis added).   Under the term "shall," Cardinals' obligation to convey the Preferred Units to Power was not optional or avoidable; nor could it be mooted.  *See Cohn v. Arnheiter*, 195 N.Y.S. 100, 101 (App. Term 1922) (use of the phrase "shall be consummated" in connection with obtaining landlord consent to a lease created a binding obligation that was "required").   Cardinals' interpretation that it has the discretion to "moot" the Call Option renders the mandatory nature of the phrase "shall be consummated" meaningless and nonfunctional.   Cardinals' interpretation must therefore be rejected.

**B.**   **Cardinals' Interpretation Renders the Phrase "Call Option" Meaningless and Results in an Invalid Illusory Agreement.**

Section 10.5 expressly and clearly identifies Power's right as a "Call Option."   In Missouri,

the meaning of that term is clear: an "option" is something that "grants an exclusive privilege to accept or reject a continuing offer within a specified time." *Sunray Oil Co. v. Lewis*, 434 S.W.2d 777, 780 (Mo. App. 1968); *see also* Williston on Contracts § 5:16 (4th ed. 2021) (explaining that an "option" is "by definition binding as a contract").

Cardinals' interpretation is that § 10.5(b), which is titled "Call Option," is not an option at all, because Cardinals' alleged right to convert the Preferred Units to Common Units "at any time" pursuant to § 4.1(a) means that the exercise of the Call Option by Power simply gives Cardinals the right to either "allow a redemption and transfer of its Preferred Units—like Power requests—or it can exercise its Conversion Rights." *See* Memorandum and Order (Dkt. 15), at p.4. In other words, the "Call Option" is not an option held by Power at all, but simply a provision that allows Power to "notice an intent" and request something of Cardinals that will always require Cardinals' consent. That cannot be the correct interpretation of the Agreement, as it renders the phrase "Call Option" meaningless and nonfunctional.

Moreover, Cardinals' interpretation renders the entirety of § 10.5 an illusory and invalid agreement. An agreement is illusory "when one party retains the unilateral right to amend the agreement and avoid its obligations." *Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 776 (Mo. 2014). Put differently, "[a] contract is 'illusory' where a party has it in his power to keep his promise yet escape performance of anything detrimental to himself." *Millennium Super Stop*, 569 B.R. at 337. Yet that is precisely the interpretation Cardinals has asked this Court to embrace. As the Court noted during the TRO hearing, the only time the Call Option would be exercised by Power is when it was economically rational to do so (i.e., it was "in the money"), and in every such case, it would therefore also be economically rational for Cardinals to try to exercise its conversion right and render it moot. Cardinals' interpretation reads into the Agreement a unilateral

right to avoid its Call Option obligations at its own whim.  However, it is well established that "[c]ourts do not favor the destruction of agreements," thus the Court must "construe each term of a contract to avoid an effect which renders other terms meaningless or illusory." *Parker v. Pulitzer Pub. Co*., 882 S.W.2d 245, 250 (Mo. App. 1994) (quotation marks omitted).  As the Supreme Court explained, the illusory promises doctrine "instructs courts to avoid constructions of contracts that would render promises illusory because such promises cannot serve as consideration for a contract." *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 440 (2015); *see also Northgate Lincoln-Mercury Inc. v. Ford Motor Co.,* 507 F. Supp. 3d 940, 947 (S.D. Ohio 2020) ("[C]ourts disfavor interpretations that render contracts illusory or unenforceable, and prefer a meaning, which gives the contract vitality." (quotation marks omitted)).  As a result, Cardinals' interpretation must be rejected.

## III.   The Rights of Preferred Unitholders Should Be Strictly Construed, and Only Express, Clear, and Direct Rights Can Be Recognized.

Cardinals argues that simply because its units were identified as "Preferred Units," they carry with them some type of implicit "preferential" rights as compared to the Class A Common Units that permit the tardy exercise of the conversion right to "moot" the bilateral contract formed when the Call Option was exercised.[10]  In fact, the opposite is true: because the concept of preferred stock violates the basic tenants of common law with respect to the equal treatment of all stockholders, rights afforded to preferred holders are strictly construed, and in the absence of clear, express, and uncontradictable contractual language granting such specific rights, no such rights or privileges can be found to exist.

As the Delaware Supreme Court has explained, "[p]referential rights are contractual in

---

[10] Dkt. 13 *passim*.

nature and therefore are governed by the express provisions of a company's certificate of incorporation.  Stock preferences must also be clearly expressed and will not be presumed." *Rothschild Int'l Corp. v. Liggett Grp. Inc.*, 474 A.2d 133, 136 (Del. 1984).  The reason for such strict construction is because "stock preferences are in derogation of the common law." *Waggoner v. Laster*, 581 A.2d 1127, 1134 (Del. 1990).  As a result, "[a]ny rights, preferences and limitations of preferred stock that distinguish that stock from common stock must be expressly and clearly stated, as provided by statute." *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 852 (Del. 1998).  Therefore, the rights of preferred stock "***will not be presumed or implied***." *Id.* at 852-53 (emphasis added).  Therefore, Cardinals' suggestion that they have extracontractual rights not expressed in the Agreement must be rejected.

## A.  A Preferred Shareholder's Right to Convert After a Call Option Has Been Exercised Must Be Clear, Express, and Uncontroverted.

At least one court has considered the rule of strict construction of preferred shareholder rights in the context of a call option that was exercised prior to the preferred shareholder attempting to convert preferred shares to common shares, and not surprisingly, once again, the court found in favor of the party exercising the call option.  In *Jag Trading, L.L.C. v. LSB Industries, Inc.,* 2012 WL 12861138, at *2 (W.D. Okla. Dec. 27, 2012), the preferred shareholder sought to enforce a conversion of the preferred stock to common stock after receiving notice that the common shareholder had exercised its right to call and redeem the preferred stock.  In doing so, the preferred stockholder argued that there was an "implicit . . . obligation that [defendant] would give [plaintiff] notice and an opportunity to convert its Convertible Preferred prior to redemption of the stock." *Id.* at *3.  The court rejected the preferred shareholder's argument because: "At common law all shares of stock stand on equal footing.  Preferences granted to one class of shares or group of shareholders, because they are in derogation of this common law rule, must be strictly construed.

. . . Nothing is to be *presumed* in favor of preferences attached to stock, but rather they *must be expressed in clear language . . .*" *Id.* (citation and internal quotation marks omitted).  Since such alleged implied preferences for Convertible Preferred shares were nonexistent in the governing contract, the court held against the party attempting to enforce a conversion after the other side's validly exercised call, stating that "plaintiff has no right under the contract to notice and an opportunity to convert." *Id.*

Here, in the absence of a specific provision directly and expressly stating that the exercise of the Call Option does not obligate Cardinals to the Call and instead implicitly operates solely as a trigger to start a "six month shot clock" on Cardinals' decision to convert, no such interpretation can be presumed or inferred.  "[U]nless [Cardinals] can point to a[] . . . provision which directly requires" the Company to effectuate the conversion after the Call Option has already been exercised, "then the preferred shareholders have no such right." *Bernstein v. Canet*, 1996 WL 342096, at *3 (Del. Ch. June 11, 1996).  There is no such provision in the Agreement here, and Cardinals may not imply it into the Agreement.

### B.   The Phrase "At Any Time or From Time to Time" Does Not Create a Clear, Direct, and Express Right to Moot the Call Option.

Cardinals places great emphasis on the statement in § 4.1(a) that "Preferred Units shall be convertible at any time or from time to time," interpreting the "at any time" language as affording it preferred rights that at all times and under all circumstances supersede the rights of Common Units—in effect, super-contractual rights.  However, such reliance is misplaced.  That provision should not be interpreted to eviscerate the Call Option and render it illusory, but instead should be interpreted in the context of the corresponding put/call options in § 10.5, such that *it refers to when those rights first arose.*

Specifically, § 10.5(a) provides that Cardinals' right to require Ashley Energy to redeem

the Preferred Units (the Put Option) does not first arise until "**at any time** on or following August 9, 2021," whereas the § 4.1(a) conversion right arises "at any time" without reference to a future date.  Both clauses define the time at which Cardinals can *first* exercise its rights to dispose of the Preferred Units: at any time on or after August 9, 2021 if by Put Option redemption, or at any time after execution of the Operating Agreement if by conversion.  Just the same as the § 10.5(a) Put Option, the § 10.5(b) Call Option allows Power to exercise the Call at any time on or after August 9, 2021.  Section 4.1(a)'s "at any time" language does not give Cardinals the right to convert at any time whatsoever irrespective of what has transpired with other rights and events under the Agreement, such as the Call Option.  Rather—as is demonstrated by the contrast with § 10.5's "[a]t any time on or following August 9, 2021" language, it simply clarifies that the conversion right was exercisable from Day One of the Agreement's existence, and did not (like the put/call options) require the passage of four years (to August 9, 2021) to be exercised.  Further, the purpose of § 4.1(a)'s "from time to time" language is to convey that the conversion right could be exercised multiple times on multiple portions of Cardinals' Preferred Units, if applicable—not, again, as Cardinals wants the Court to believe, to convey that Cardinals may exercise it whenever it wants, irrespective of other events impacting the Preferred Units.

Furthermore, to the extent the Court finds ambiguity in the Agreement and proceeds to review extrinsic evidence (*see infra* § 6), the parties' communications prior to the execution of the Agreement facially disprove Cardinals' Frankenstein-esque interpretation of the meaning of the phrase "at any time."  Cardinals contends that language was specifically included for the purpose of giving Cardinals a mechanism to moot the Call Option after it was exercised.[11]  By definition, that cannot be the case, *because the phase "at any time" was included by Cardinals before the*

---

[11] Dkt. 13 at pp.6-9.

*existence of a call option in the documents*.  SUMF ¶¶ 47-48.  As a result, it is incorrect to now contend that the "at any time" language was included in order to provide a mechanism to moot the call option.

In contrast, Power's interpretation gives meaning to the clause on which Cardinals relies, but does so in a manner that does not render other terms of the Agreement meaningless or nonfunctional.  Power's interpretation allows both the Conversion Right and Call Option to make sense and have meaning.  "A construction that attributes a reasonable meaning to all the provisions of the agreement is preferred to one that leaves some of the provisions without function or sense." *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. 2003).  In contrast, Cardinals' interpretation only allows the Conversion Right to have meaning: under Cardinals' interpretation, the Conversion Right is always exercisable no matter what, but the Call Option is never exercisable unless Cardinals agrees to it on the back end.

## IV.   There Are Express Restrictions on Cardinals' Purported Right to Convert the Preferred Units "At Any Time or From Time to Time."

Cardinals argues that the *only* restriction on its right to convert the Preferred Units is found in § 4.1(b), which provides that "[i]n the event of a liquidation, dissolution or winding up of the LLC, the Conversion Rights shall terminate."[12]  However, that provision is non-exclusive and does not state those are the *only* limitations, despite Cardinals' attempt to insert the word "only" where it does not appear.  *See, e.g.*, *K&V Sci. Co. v. Bayerische Motoren Werke Aktiengesellschaft ("BMW")*, 314 F.3d 494, 500 (10th Cir. 2002) (no use of the terms "exclusive," "sole," or "only" meant provision was non-exclusive); *Util. Workers Union of Am., Local 118 v. Ohio Edison Co.*, 1998 WL 869941, at *3 (6th Cir. Dec. 3, 1998) (refusing to find exclusivity where clause "lacks

---

[12] Dkt. 13 at p.6.

any limiting language—like the word 'only'"); *Golden Rule Estates Owners Ass'n v. City of Crosslake*, 2005 WL 1514436, at *6 (Minn. Ct. App. June 28, 2005) (holding provision lacking use of term "only" was not limiting).

Here, Cardinals' Conversion Right is expressly restricted by common law in conjunction with other provisions of the Agreement.  It is indisputable that preferred stock remains subject to the statutory and common law limitations that apply to equity generally.  *TCV VI, L.P. v. TradingScreen Inc*., 2015 WL 1598045, at *6 (Del. Ch. Feb. 26, 2015).  First, pursuant to § 15.3, Power Investments is permitted to seek "specific performance . . . in order to enforce . . . the provisions of this Agreement," including the Call Option, which, by definition, limits the ability of Cardinals to convert the Preferred Units, for if conversion took place the Preferred Units would no longer exist and be capable of delivery by specific performance.  *See Feldman v. Brodsky*, 147 N.Y.S.2d 312, 313 (N.Y. 1955) (specific performance recognized as restriction on "selling, transferring or hypothecating" stock); *Fanchon & Marco Enters. v. Dysart*, 189 S.W.2d 291, 292-93 (Mo. 1945) (recognizing specific performance for purchase of preferred stock of closely held corporation).  Second, § 15.12 requires that Cardinals "execute and deliver all documents, provide all information and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement."  Such a further cooperation clause obligates Cardinals to honor the Call Option and refrain from taking action that would frustrate its consummation.  *See, e.g., CNR Healthcare Network, Inc. v. 86 Lefferts Corp.*, 59 A.D.3d 486, 489-90 (N.Y. App. Div. 2009) (holding that option holder had right to specific performance of option and restraint of competing rights by virtue of further cooperation clause in contract).

Finally, but perhaps most importantly, the binding bilateral contract created by the exercise of the Call Option restricts the exercise of any other rights by Cardinals—including the right to

22

convert—as exercise of such rights would constitute a breach of the preexisting bilateral contract. Missouri law makes clear that where a contract vests a party with a discretionary right such as Cardinals' alleged right to convert the Preferred Units without limitation, exercising that right in a manner that obviates or moots other contractual rights is prohibited.  As the court explained in *City of St. Joseph v. Lake Contrary Sewer District*, 251 S.W.3d 362, 370 (Mo. App. 2008), "[w]hen a contract provides a single party with discretion, that discretion is not unlimited; it must not be exercised to deprive the other party of the benefit of the contractual relationship or evade the spirit of the bargain."  That is even more true in this case, where Cardinals has stated its purpose in attempting to exercise the conversion was to try to "moot" the Call Option and scuttle its consummation, SUMF ¶¶ 33-35.  *See BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 915 (8th Cir. 2007) ("It would not, however, be permissible for Columbia to exercise its discretion in a manner designed to scuttle the deal, . . . however much in Columbia's best financial interest it might have been . . ." (internal citation and quotation marks omitted)).  Here, Cardinals' other contractual obligations restrict its ability to convert the Preferred Units "at any time or from time to time" by the operation of common law.

Once again, in contrast to Cardinals, Power's interpretation gives meaning to the phrase "[i]n the event of a liquidation, dissolution or winding up of the LLC, the Conversion Rights shall terminate."  The reason that language is present in the Agreement has nothing to do with frustrating a binding call option contract.  Instead, that  provision, by its plain terms, is intended to fix the status of a Unitholder (as Preferred or Common) at a moment in time immediately prior to distributions that result from a liquidation, dissolution, or winding up, in order for the Board to be able to make distributions in accordance with § 5.1.  *See* SUMF ¶¶ 23-27.  Section 5.1(b)[13]—which

---

[13] Section 5.1(b) governs distributions in the event of a liquidation under Article XIII of the

governs distributions that result from a liquidation, dissolution, or winding up—mandates that Preferred Unitholders receive the first distribution followed by the Common Unitholders who take "ratably among such holders based upon the number of Common Units held by each such holder *immediately prior to such Distribution*." **Ex. 1** § 5.1(b)(i)-(ii) (emphasis added).  Section 4.1(b), in turn, requires a Preferred Unitholder to decide by the close of business on the date preceding such a distribution whether it intends to participate in the distribution as a Preferred Unitholder or a Common Unitholder.  *Id.* § 4.1(b).  This permits the Board (in charge of distributions following a liquidating event pursuant to Article XIII) to know the status of unitholders immediately prior to making distributions.

V.    **Even If the Conversion Right Could "Moot" The Exercised Call Option, Once the Call Option Was Exercised Cardinals No Longer Had Authority to Invoke the Conversion as Cardinals Was No Longer the Holder of the Preferred Units.**

The right to convert the Preferred Units to Common Units can only be exercised by the "holder of such Preferred Units" pursuant to the express terms of § 4.1(a).  Even assuming, *arguendo*, that the conversion right could "moot" the exercised Call Option, Cardinals was no longer the "holder of such Preferred Units" and therefore lacked the authority to invoke the conversion provision.

The phrase "holder of the Preferred Units" is not defined in the Agreement.  Unlike the recordholder, which refers to the party named on a stock certificate, the "holder" of stock or units is a much broader term.  Once Power exercised the Call Option it became the "holder" of the Preferred Units as the real party in interest.  Once again, case law from the Delaware Chancery Court is instructive.  In *Len v. Fuller*, 1997 WL 305833, at *2 (Del. Ch. May 30, 1997), Fuller exercised a call option to purchase Len's stock.  Len disputed the effectiveness of the call option,

---

Agreement.  SUMF ¶¶ 23-26.  Article XIII mandates that the Board must promptly "determine the amounts to be distributed to each Unitholder in accordance with <u>Section 5.1</u>."  *Id.* ¶ 27.

and instead attempted to modify the board and exercise other shareholder powers, *id.* at *2-3, identical to Cardinals here which has disputed the effectiveness of the Call Option and then purported to exercise its right as holder of the Preferred Units to convert.  Just as is the case here, in *Fuller*, "there ha[d] been no determination of a price to be paid for Mr. Len's shares pursuant to a procedure set forth in the Shareholders Agreement, no cancellation of the certificates, and no change on the company's stock ledger."  *Id*. at *2.

The question before the *Fuller* court was the same as here: because "[i]t is undisputed that on the company's books, Mr. Len is the registered owner of outstanding common stock," could he "otherwise exercise corporate rights associated with stock ownership"?  *Id*. at *3.  The *Fuller* court expressly answered "no."  Once the call option was exercised, the court held that the seller of stock loses the equitable interest since a specifically enforceable contract of sale has formed.  *Id.* at *3-4.  The court continued, explaining: "It is the binding nature of this contract and its specific enforceability under the law that gives to the 'buyer' the *present* equitable right as it may be deemed to have, such as the right . . . to have its vote counted . . . ."  *Id.* at *3 (emphasis in original).  As the *Fuller* court explained, **in cases where "option contracts did not expressly address the powers of the seller/optionor to exercise shareholder rights after notice of exercise but before closing,"** the holding is that "**the registered owner of stock [is] to be equitably disabled, following notice of exercise, to exercise shareholder power.**"  *Id.* at *5 (emphasis added); *see, e.g.*, *Freeman v. Fabiniak*, 1985 WL 11583, at *7 (Del. Ch. Aug. 15, 1985) ("[I]t would be inequitable to allow a holder of record who holds mere legal title to stock to act by consent in a manner contrary to the wishes of the true owner.").  Here, the same holds true.  Once Power exercised the Call Option, Cardinals was no longer the "holder of the Preferred Units" and lacked the authority to invoke the conversion power as shareholder.

**VI.     In the Alternative, to the Extent the Court Finds Ambiguity, the Parties' Intent Reflects a First-Exercised Call Option Was Intended to Trump the Conversion Right.**

The Agreement unambiguously favors Power's position over Cardinals', and is not subject to construction based on extrinsic evidence.  Summary judgment should be granted to Power on the issue here on that basis.  However, in the alternative, even if the Court were to find the Agreement ambiguous in any relevant respect, the parties' intent reflects that an exercise of the Call Option was intended to be superior to any later-exercised conversion right.

First, the documents exchanged between the parties leading up to the August 9, 2017 execution of the Agreement, as well as an internal document prepared by Cardinals on the day of execution, show that there was never any discussion, let alone suggestion, of any of the points Cardinals now wants the Court to believe about the alleged unlimited power of the Conversion Right and inherent superiority of Preferred to Common Units in all respects.  These documents support Power's position and provide no support to Cardinals'.  In none of these documents did any party state, suggest, or express any intent that the conversion right would trump, or could be used to eliminate or moot, an exercised call option; that upon exercise of the call option, the Preferred Unitholder would then enjoy a right to decide whether to "accept" the call option or to convert its Preferred Units; or that the Common Unitholder's ability to exercise, consummate, or close on the call option would be at the Preferred Unitholder's sole discretion.  SUMF ¶¶ 36-45.  Further, the documents affirmatively support Power's position and reject Cardinals'.  They demonstrate that the parties' intent was that the Preferred Unitholder's rights would be in *pari passu* (on equal footing) with the rights of the Common Unitholder, *id.* ¶ 46—*not*, as Cardinals contends, that the Preferred Units would be inherently superior and hold veto power over the Common Units.  They demonstrate that Cardinals proposed the clause "at any time" as part of the Preferred Unitholder's conversion right *before* the parties included a call option in the term sheet

26

for the Agreement, *id.* ¶¶ 47-48; thus, the parties cannot possibly have intended this clause to serve as a mechanism to "moot" the Call Option once exercised.  The documents also prove that the parties' intent was that the call option would be exercisable by Power in its sole discretion and not subject to Cardinals' approval.  *Id.* ¶¶ 48-49.

Notably, the Agreement was drafted by Dentons, counsel for Cardinals.  SUMF ¶¶ 50-51. As such, in the event extrinsic evidence is considered, any remaining ambiguities must be construed in favor of Power.  *See J.H. Berra Constr. Co. v. City of Washington*, 510 S.W.3d 871, 874 (Mo. App. 2017) ("If there is no evidence of the parties' intent, we construe any ambiguous language in a contract in the light most favorable to the party that did not draft it.").  If Cardinals had wanted to include a provision stating that the Conversion Right trumps the Call Option in every circumstance, or that the Call Option is only exercisable by Power at Cardinals' sole discretion, it could have done so.  It did not, and the Agreement must be construed in Power's favor.

WHEREFORE, for the reasons stated herein and in the attached Motion, Statement of Uncontroverted Material Facts, and Exhibits, and in support of all of its claims against Defendant Cardinals Preferred, LLC, Plaintiff Power Investments, LLC respectfully requests the Court to enter partial summary judgment in its favor and against Defendant Cardinals Preferred, LLC and accordingly find that as a matter of law, the exercise of the Call Option by Power created a binding and enforceable bilateral agreement that obligates Cardinals to sell the Company's 999,222 Preferred Units to Power, which Cardinals cannot avoid by virtue of its purported exercise of the Conversion Right, or otherwise; and such other and further relief as the Court deems just and proper.

Dated:  September 13, 2021     ARMSTRONG TEASDALE LLP


By: */s/ Christopher R. LaRose*
   Christopher R. LaRose  #59612MO
   Daniel R. O'Brien   #69258MO
   Armstrong Teasdale LLP
   7700 Forsyth Blvd., Suite 1800
   St. Louis, Missouri 63105
   Telephone:  314.621.5070
   Fax:  314.621.5065
   clarose@atllp.com
   dobrien@atllp.com

   ATTORNEYS FOR PLAINTIFF POWER
   INVESTMENTS, LLC

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this 13th day of September, 2021, the foregoing and all attachments were electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of the same to all counsel of record.

*/s/ Christopher R. LaRose*