UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| POWER INVESTMENTS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 4:21-cv-01022-SEP |
| vs. | ) | |
| | ) | |
| CARDINALS PREFERRED, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF MASON L. MILLER

I, the undersigned, Mason L. Miller, pursuant to 28 U.S.C. § 1746, declare that:

1.      I am over 18 years of age and have personal knowledge of the facts contained in this declaration, and I am of sound mind and competent to testify as a witness to those facts.

2.      I am a member and manager of Plaintiff Power Investments, LLC ("**Power**"), and by reason of my position am authorized and qualified to make this declaration.

3.      I am also a member of the Board of Managers of Ashley Energy, LLC (the "**Board**").  Pursuant to Section 6.4(a) of Ashley Energy's Operating Agreement (the "**Operating Agreement**"), I was appointed Chief Executive Officer, President, and Secretary of Ashley Energy.   *See* Doc. 1-1, § 6.4.

4.      In addition to appointing me to those officer positions, Section 6.4 delegated to me those duties normally associated with those offices, as well as any additional authority specifically delegated to me by the Board.

> The Board may (but need not), from time to time, designate and appoint one or more persons as an Officer of the LLC… Any Officers so designated shall have such authority and perform such duties as the Board may, from time to time, delegate to them. **The Board may assign titles to particular Officers. Unless the Board otherwise decides, if the title is one commonly used for**

> **officers of a business corporation formed under the New York Business Corporation Law, the assignment of such title shall constitute the delegation to such Officer of the authority and duties that are normally associated with that office,** and any specific delegation of authority and duties made to such Officer by the Board.

*Id*. (emphasis added).

5.     The Regions Bank loan agreement, which has been in continuous effect since 2018 (the "**Loan Agreement**"), required that Ashley Energy vest me with the ability to exercise day-to-day control over the operations and affairs of Ashley Energy.  A true and accurate copy of the Loan Agreement is attached hereto as **Exhibit A**.

6.     Specifically, the definition section of the Loan Agreement defines change of control where "Miller ceases to exercise day-to-day control over the operations and affairs of the Borrower."  Ex. A at p. 6.

7.     A change of control, in turn, constitutes a default under the Loan Agreement.  Ex. A at p. 62 (listing a Change of Control as an Event of Default).

8.     As a result, if I cease to exercise day-to-day control over the operations and affairs of the Ashley Energy, it would be an event of default under the Loan Agreement, which would put Ashley Energy's loan with Regions Bank at risk.

9.     The Board—including Mr. Disque and Mr. Dupont—unanimously approved the credit agreement containing these provisions in February 2018. A true and accurate copy of the February 2018 Board Resolution (the "**2018 Resolution**") is attached hereto as **Exhibit B**.

10.     In the 2018 Resolution, the Board also unanimously decided to vest me with the continuing authority to amend the terms of the loan documents as I might see fit in my sole discretion as President and CEO and appointed me as an Authorized Person for those purposes. Specifically, 2018 Resolution provides:

2

> **Mason L. Miller, as the President and Chief Executive Officer,** and Daniel C. Dennis, the Chief Operating Officer, and any person that the foregoing may designate (collectively, the "Authorized Persons") **be, and they hereby are,** acting individually or jointly, **authorized, empowered and directed, in the name and on behalf of the Company, to execute and deliver the Loan Documents, <u>with such changes in terms and conditions as either such Authorized Persons shall, in such Authorized Person's sole discretion, approve,</u>** the execution and delivery thereof to be conclusive evidence of such approval.

Ex. B at 1-2 (emphasis added).

11.     The Board further decided to vest me with the authority to enter into new agreements with Regions Bank:

> The Company is hereby authorized… to transact any and all such other business with the Lender **as at any time may be deemed appropriate or advisable by each Authorized Person**, acting jointly or alone transacting the same.
>
> FURTHER RESOLVED, that… each Authorized Person, acting jointly or alone is authorized to make agreements limiting the rights of the Company while any such loans remain unpaid or any such credit arrangements are in existence.

*Id*. at 2 (emphasis added).

12.     Finally, this delegation of authority continues until revoked in writing by delivery of a certificate to Regions Bank evidencing the same:

> FURTHER RESOLVED, **the Lender is permitted to rely on these Resolutions until it receives notice from an Authorized Person that these resolutions have been revoked or modified until written notice of revocation**, in the form of a certificate signed by and on behalf of the Company by an Authorized Person has been given to the Lender and its receipt obtained therefor.

*Id*. at 3. (emphasis added).

13.     The 2018 Resolution was reviewed and approved by Cardinal's legal counsel at Dentons prior to execution by Mr. Dupont and Mr. Disque, along with all the other relevant loan

documents.  A true and accurate the email chain reflecting Dentons' approval is attached hereto as **Exhibit C**.

14.     Between February 2018 and November 2021, seven amendments to the Loan Agreement were executed.  In every case, the language of the amendments was negotiated on behalf of Ashley Energy solely by me working directly with Regions Bank, with no involvement of the Board in such discussions.

15.     At no point prior to the exercise of the Call Option by Power Investments on August 9, 2021, did either Mr. Dupont or Mr. Disque express any interest in being involved in the substantive discussions with Regions Bank concerning those amendments.

16.     Amendment Nos. 1–5 contained resolutions signed by the Board, but Regions Bank did not request a similar board resolution be executed in connection with Amendment Nos. 6 or 7, because I had already been vested with the authority to amend the terms of the loan documents and enter into new agreements and related matters as President and CEO, pursuant to the 2018 Resolution.

17.     As a result, on September 23, 2021, I executed Amendment No. 6 on behalf of Ashley Energy.  Amendment No. 6 did three things: (a) it extended the bank loan to November 30, 2021; (b) it secured the bank's permission to use restricted cash that the bank was previously holding as collateral to pay off the line of credit, thus increasing Ashley Energy's available unrestricted cash; and (c) it secured the bank's permission to use restricted cash that the bank was previously holding as collateral to pay off approximately $1.6 million of high-interest debt owed to Caterpillar Finance.  If there were any remaining restricted funds available after completing the plant reconstruction, those funds would be used to pay off some of the existing Regions Bank loan.  A true and accurate copy of Amendment No. 6 is attached as **Exhibit D**.

18.     However, after I executed Amendment No. 6 on behalf of Ashley Energy, on September 29, 2021, Mr. Disque for the first time demanded to be provided updates concerning the status of discussions concerning the Regions Bank loan.

19.     As a result, approximately a week later, on October 7, 2021, I briefed the Board on the status of the Regions Bank loan and upcoming plans for potential additional changes.  The meeting was recorded with the knowledge and consent of all present.

20.     Specifically, I advised the Board of Managers verbally and in writing that, pursuant to Amendment No. 6, the maturity date for the line of credit had been extended to November 30, 2021 and paid off in full with the permission of Regions Bank using cash that was previously restricted from use and held as collateral by Regions Bank, thus resulting in more unrestricted cash available to Ashley Energy.

21.     I also advised the Board of Managers that pursuant to Amendment No. 6, Regions Bank had agreed to allow Ashley Energy to use some of the proceeds that were previously restricted to pay off the high-interest loan owed to Caterpillar Finance, pay off the line of credit, and complete the reconstruction work at the plant.

22.     Finally, I advised the Board of Managers that if at the end of the reconstruction project there was any remaining cash available, it would be used to pay down the Regions Bank debt and not to make a distribution to unitholders.

23.     Mr. Disque and Mr. Dupont expressed no objection to any of the above changes to the Loan Agreement or uses of cash.  In fact, the meeting was recorded and Mr. Disque nodded affirmatively as each item was discussed and stated verbally, "right, right."

24.     I explained to the Board that the reason for the changes described above was to improve our balance sheet, which would allow us to get the best terms for refinancing from

Regions Bank or other competing banks, as well as reduce our insurance costs, all of which would increase the ultimate amount of cash available for distribution.

25.     Not only did Mr. Dupont not express any concern or objection to me handling the negotiations with Regions Bank and others, or the execution of Amendment No. 6, he affirmatively stated that he wanted me to simply "make sure that we have the, if there was a term sheet going back and forth, and if there was an extension or an amendment to effectuate the extension, that we have those documents just for our records."

26.     Mr. Dupont also acknowledged that the above use of proceeds would allow the company to do a "recap[italization] from the new debt [i.e., refinancing] that will allow us to take a dividend," then stated that he "got it, got it, got it" and stated that he understood that "the notion would be that we show a better balance sheet to prospective lenders and insurers, lock in our better insurance, divided recap[iptalization] with presumably, hopefully . . . better terms from maybe a different bank, maybe Regions."

27.     In light of the above discussion, following the October 7, 2021 board meeting, I did not receive any communications from Mr. Disque or Mr. Dupont objecting to Amendment No. 6 or the planned use of proceeds that was outlined above.

28.     Instead, at the close of the October 7 board meeting, Mr. Disque simply stated that "in between meetings, we would appreciate. . . . updates on anything that is significant, like the Regions extension for example."

29.     As a result, on November 22, 2021, I executed Amendment No. 7 to the Regions Bank loan.  Once again, Regions Bank did not request any resolutions be signed by the Board of Managers because I had already been vested with that unilateral authority to amend the loan

agreement, as reflected in the 2018 Resolution.  A true and accurate copy of Amendment No. 7 is attached hereto as **Exhibit E**.

30.     Amendment No. 7 did two minor things: (a) it extended the term of the Regions Bank loan to January 31, 2022; and (b) secured the bank's permission to use the restricted funds previously held by the bank as cash collateral (and unavailable for use by Ashley Energy) for working capital needs.

31.     On December 3, Jeff Ferris, an employee of Cardinals/Arena, emailed and asked if the Regions Bank loan had been extended "another two months," to which I immediately responded "yes, it was extended to 1/31 to tie well to a potential refinancing," consistent with the plan discussed at the October 7, 2021 meeting, and once a fully executed copy of amendment was obtained, it was provided to the Board of Managers in advance of the most recent board meeting.  A true and accurate copy of that email is attached as **Exhibit F**.

32.     On December 8, Mr. Disque, for the first time, accused me of improper conduct related to the Regions Bank loan. The following morning he threatened to take action with Mr. Dupont, including contacting the company's lenders, if I didn't respond by close of business.

33.     I promptly responded with a detailed email, and I asked him a number of questions on behalf of Ashley Energy, including requesting he identify any provision of the operating agreement or board resolution that prohibited me from discussing matters with Regions Bank and others, and executing Amendment Nos. 6 and 7, in light of the provisions of the Regions loan agreement and the actions taken by the board in February 2018.  A true and accurate copy of those email exchanges are attached as **Exhibit G**.

34.     To this date I have never received a response from Mr. Disque to this email or any of the requested information.

7

35.     The case involving SL EC, LLC ("**SLEC**") was originally filed in late 2017. When it was filed, I briefed the Board on the case and allegations made, and at a board meeting on November 15, 2017, the Board unanimously (including Mr. Dupont and Mr. Disque) approved engaging Armstrong Teasdale and Miller Edwards Rambicure ("**MER**") to represent all of the parties.  A true and accurate copy of those meeting minutes are attached hereto as **Exhibit H**.

36.     Whenever substantively important rulings were issued, such as dispositive motions being granted, I would update the Board as to the general status of the case.  That occurred, for example, when SLEC voluntarily dismissed the case in May 2018 (before filing it again in August 2018), and also when the Court granted substantially all of Ashley Energy's Motion for Summary Judgment and entered sanctions against the SLEC/plaintiff parties in September 2021, as discussed in detail below.

37.     The Board was also involved with the SLEC litigation, as was Cardinals' counsel at Dentons, during the discovery phase.  In April 2020, Cardinals itself was served with subpoenas and became active participants in the litigation, as Dentons served objections to the subpoenas that were prepared by Dentons, who requested the assistance of Armstrong Teasdale. A true and accurate copy of the email string evidencing the involvement of Dentons and Cardinals in the discovery process is attached hereto as **Exhibit I**.

38.     Later in May 2020, Cardinals management, including Mr. Lawrence Cutler, the authorized signor for Cardinals, received the subpoena in the SL EC litigation by separate service of process, and Mr. Dupont acknowledged that Cardinals was "handling" the matter with its legal counsel (Dentons).  A true and accurate copy of that email is attached as **Exhibit J**.

39.     Just a few months before the Call Option was exercised on August 9, 2021, Cardinals was once again actively involved in the discovery process in the SLEC litigation.  In March 2021, a separate and new subpoena was sent to Cardinals' consultant, DAI Management, which was then forwarded to Mr. Dupont who contacted me by email.  A true and accurate copy of that email is attached as **Exhibit K**.  Mr. Dupont was briefed on the status of the litigation and presumably he addressed the subpoena that had been issued, as he had no further questions for me concerning the litigation.

40.     The amount of legal fees that the company was incurring was reflected on the financial information provided on a monthly basis to Cardinals, and is also specifically addressed in Ashley Energy's audited financial statements each year, which have been unanimously approved by the Board each year.

41.     I do not understand how Cardinals can claim to have just learned in August 2021 that the SLEC litigation was still pending and that Armstrong Teasdale was representing Ashley Energy, as Cardinals' representatives had been involved in the litigation just a few months earlier, had been involved in the discovery process on multiple occasions, had approved the engagement of Armstrong Teasdale to represent all of the parties, and had received both monthly financial information and audited financial statements reflecting legal expenses being incurred.

42.     Moreover, all of the pleadings are publicly available online through the PACER system, and presumably Cardinals' counsel at Dentons—the same lawyers Mr. Dupont said were "handling" the subpoena and that served discovery objections—were monitoring the case and keeping their client informed.

43.     On September 21, 2021, Judge Ross granted summary judgment to the Defendants (including Ashley Energy) on almost all of the claims asserted against them in the

SLEC litigation. At the same time, Judge Ross dismissed other claims brought by certain of the SLEC parties as a terminating sanction for numerous improper and sanctionable conduct by those parties during the course of the case.  A copy of the opinions are attached as **Exhibit L**.

44.     As a result, a few weeks later at the October 7, 2021 meeting of the Board, I provided an update to the Board of Managers concerning the SLEC litigation.  That meeting was recorded with the knowledge and consent of all involved.

45.     Mr. Disque is incorrect in his statement that I represented that "Ashley Energy had been dismissed from the action." I did not make that representation.  Instead, the recording confirms that I specifically advised Mr. Disque that the claims against Ashley Energy had been dismissed, which is accurate.  Judge Ross's summary judgment opinion preserved for trial only a single claim brought by the SLEC parties: that being a claim for breach of contract against Power Investments, the remedy for which is being sought is the imposition of a constructive trust.  *See* Ex. L.

46.     Mr. Disque's mistaken belief that Ashley Energy was "dismissed from the action" is also confusing to me, as he is aware the Ashley Energy has a multi-million dollar counterclaim against the SLEC parties that is set for trial in April 2021.

47.     On November 12, 2021, I received an email requesting to schedule a special meeting of the board from David Disque. A true and accurate copy of that email exchange is attached as **Exhibit M.**

48.     Mr. Disque refused to communicate with Power Investments about the reason for the meeting despite having been elected to the board in part by Power Investments.  A true and accurate copy of that email exchange is attached as **Exhibit N**.

49.     The purpose was to discuss their belief that Armstrong Teasdale could no longer represent Ashley Energy in unrelated litigation because AT was now representing Power against the other Ashley member.  Following the meeting, Mr. Disque prepared minutes by email that I corrected.  A true and accurate copy of that email exchange is attached as **Exhibit O**.

50.     Out of the blue on December 2, 2021, I received an already signed resolution  of the Board of Manager of Ashley Energy from Mr. Disque that went beyond what was discussed at the special meeting, and was unnecessary given that a motion had already been passed at the meeting.  A true and accurate copy of that email exchange is attached as **Exhibit P**.

51.     Mr. Disque initially refused to disclose who prepared the resolution.  However, at the board meeting of Ashley Energy on December 16, 2021, which was recorded with the knowledge and consent of all present, Mr. Disque admitted that Cardinals' lawyer had prepared the legal document for Ashley Energy, despite being adverse to Ashley Energy concerning various matters in this litigation.

52.     When I inquired as to how Cardinals' counsel, who was adverse to Ashley Energy having already served a subpoena on Ashley Energy, could now be preparing legal documents for a party they are adverse to, Mr. Dupont took the position that a resolution of a board of managers was not a "legal document."

53.     Until this point in time, as President and CEO of Ashley Energy, I had always been responsible and vested with the authority to select and engage legal counsel on behalf of Ashley Energy. In fact, I had engaged legal counsel on at least six separate occasions for Ashley Energy for various matters.

54.     In this instance, I suggested the names of three separate, qualified lawyers who could serve as special counsel and had no prior relationship with Ashley Energy or Power

11

Investments.  However, rather than interview any potential counsel at all, Mr. Disque advised me that he and Mr. Dupont had unilaterally (and to my exclusion) contacted Andrew Ruben at the Sandberg Phoenix firm and had engaged him.

55.     I later learned in the recorded December 16, 2021 board meeting that Mr. Ruben was not independent at all, having been recommended by Cardinals' counsel at Dentons, and having had separate, ex parte communications with Mr. Disque.

56.     I nonetheless, as the CEO and President of Ashley Energy, scheduled interviews with Mr. Ruben, as well as Mark Hinderks at Stinson, and Brian Lamping at Thompson Coburn, so that each potential lawyer could be interviewed and assessed for their qualifications and independence.

57.     Mr. Ruben failed to appear for his interview earlier today, and Mr. Disque and Mr. Dupont have refused to participate in any interviews.  Needless to say, the independence of special counsel is important, as the special counsel will be tasked with reviewing not only the alleged conflict of interest raised by Mr. Disque, but also the conflict of interest posed by Mr. Disque and Mr. Dupont with respect to their attempts to unilaterally control the day to day affairs of Ashley Energy.

58.     On December 16, Mr. Disque, with only his signature, purported to engage Mr. Ruben to represent Ashley Energy. A copy of the letter is attached hereto as **Exhibit Q**.

59.     Mr. Disque then unilaterally directly contacted Ashley Energy accounting employees, and instructed them to immediately wire funds to Mr. Ruben's firm from an Ashley Energy bank account to which Mr. Disque has no access or authority.  A true and accurate copy of that email exchange is attached as **Exhibit R**.

60.     Perhaps worse, on December 10, 2021, Cardinals served a subpoena on Ashley Energy seeking the production of tens of thousands of pages of records in this case.  A true and accurate copy of that subpoena is attached as **Exhibit S**.

61.     I retained Amy Fehr with Capes Sokol to represent Ashley Energy in responding to the subpoena from Cardinals, as she and her firm had no prior relationship with any of the parties.

62.     On December 16, 2021, Mrs. Fehr served her objections on behalf of Ashley Energy to the subpoena that Cardinals' counsel at Dentons had served.  A true and accurate copy of that objection letter is attached as **Exhibit T**.

63.     On December 20, 2021, Mrs. Fehr forwarded me a letter she had received from Mr. Disque and Mr. Dupont.  The letter had been created on fake Ashley Energy letterhead which they had created using a logo they had downloaded from the internet.  In the letter, they claimed to be acting on behalf of Ashley Energy, and demanded Mrs. Fehr turn over all of her privileged attorney-client information related to the subpoena they—Cardinals—had served on Ashley Energy.  A true and accurate copy of that letter is attached as **Exhibit U**.

64.     At no time prior to the exercise of the call option on September 9, 2021, had any members of the board of managers been involved in the selection and engagement of counsel for Ashley Energy.   Since September 9, Cardinals has attempted to unilaterally engage special counsel for Ashley Energy that was recommended by their lawyers at Dentons, and with whom they have had ex parte communications, without interviewing any others, and has now attempted to serve a subpoena on Ashley Energy and then control the selection of counsel who shall be responding to the subpoena they served, going so far as to falsify letterhead and demand Ashley Energy's counsel surrender privileged communications related to that subpoena they served.  All

of the foregoing is substantially different than the manner in which the business was operated prior to September 9, 2021.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 21st day of December, 2021.

Mason L. Miller