**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| POWER INVESTMENTS, LLC, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| vs. | )    Case No. 4:21-cv-01022 |
| | ) |
| CARDINALS PREFERRED, LLC, | ) |
| | ) |
| *Defendant.* | ) |

**NOTICE OF INTENT TO SERVE A SUBPOENA TO PRODUCE DOCUMENTS OR**
**THINGS FOR DISCOVERY PURSUANT TO RULE 45**

PLEASE TAKE NOTICE that, pursuant to Federal Rules of Civil Procedure 45, Defendant

Cardinals Preferred, LLC ("Cardinals") will be serving a document subpoena on Regions Financial

Corporation, through its Registered Agent, CSC-Lawyers Incorporating Service Company, located

at 251 Little Falls Drive, Wilmington, DE 19808. A copy of the subpoena is attached as **Exhibit**

**1**.

Dated: January 28, 2022                         Respectfully submitted,

                                                By:_____/s/ Wayne C. Stansfield_____

                                                REED SMITH LLP
                                                Joseph J. Tuso
                                                Wayne C. Stansfield
                                                Nicholas R. Rodriguez
                                                Three Logan Square
                                                1717 Arch Street, Suite 3100
                                                Philadelphia, Pennsylvania 19103
                                                Telephone: (215) 851-8100
                                                Facsimile: (215) 851-1420
                                                jtuso@reedsmith.com
                                                wstansfield@reedsmith.com
                                                nrodriguez@reedsmith.com
                                                (*admitted pro hac vice*)

                                                *Attorneys for Cardinals Preferred, LLC*

## **CERTIFICATE OF SERVICE**

I, Wayne C. Stansfield, certify that a true and correct copy of Defendant Cardinals Preferred, LLC's Notice of Intent to Serve a Subpoena to Produce Documents or Things for Discovery Pursuant to Rule 45, was served on today's date by email upon all counsel of record.

/s/ *Wayne C. Stansfield*
Wayne C. Stansfield

Dated:  January 28, 2022

# <u>EXHIBIT 1</u>

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

### Eastern District of Missouri

| | |
|---|---|
| Power Investments, LLC, Plaintiff/Counterdefendant | ) |
| *Plaintiff* | ) |
| v. | )     Civil Action No.   4:21-cv-01022-SEP |
| Cardinals Preferred, LLC, | ) |
| Defendant/Counterclaimant | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                         Regions Financial Corporation

*(Name of person to whom this subpoena is directed)*

    ✔ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Schedule A.

| | |
|---|---|
|         Reed Smith LLP - Chicago, 110 S. Wacker Drive,<br>        Suite 4000, Chicago, IL 60606; or | |
| Place:  Reed Smith LLP - Delaware, 1201 N. Market Street<br>        Suite 1500, Wilmington, DE 19801; or<br>        wstansfield @reedsmith.com | Date and Time:<br><br>      02/11/2022 9:00 am |

    ❒ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| | |
|---|---|
| Place: | Date and Time: |
| | |

    The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    01/28/2022

         *CLERK OF COURT*

                                     OR

| | |
|---|---|
|       *Signature of Clerk or Deputy Clerk* |      /s/ Wayne C. Stansfield<br>       *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____

Carinals Preferred, LLC, Defendant/Counterclaimant          , who issues or requests this subpoena, are:

Wayne C. Stansfield, Reed Smith LLP, 1717 Arch Street, Suite 3100, Philadelphia, PA 19103; (215) 851-8100

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  4:21-cv-01022-SEP

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $      0.00      .

I declare under penalty of perjury that this information is true.

Date: _____               _____
                                                              *Server's signature*

                                          _____
                                                              *Printed name and title*

                                          _____
                                                              *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

### SCHEDULE A
### of
### Subpoena issued to Regions Financial Corporation ("Regions")

Notwithstanding any definition set forth below, each word, term or phrase used in these Requests is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure.

### DEFINITIONS

1.      "Request" is defined to mean each of the enumerated items in the list of "Documents to Be Produced" below.

2.      "Regions", "Regions Bank", "you", "your", or "yourself" is defined to mean Regions Financial Corporation including its parents, subsidiaries, affiliates, attorneys, agents, representatives, contractors, and any other person or entity acting or purporting to act on Regions' behalf.

3.      "Plaintiff" or "Power" is defined to mean Plaintiff Power Investments, LLC, including its agents, attorneys, representatives, and any other person or entity acting or purporting to act on Power's behalf.

4.      "Cardinals" is defined to mean Defendant Cardinals Preferred, LLC, including its agents, attorneys, representatives, and any other person or entity acting or any other person or entity purporting to act on Cardinals' behalf.

5.      "Ashley" is defined to mean Ashley Energy, LLC, including its agents, attorneys, representatives, and any other person or entity acting or purporting to act on Ashley's behalf.

6.      "Armanino" is defined to mean Armanino LLP and/or Brown Smith Wallace, including their parents, subsidiaries, affiliates, agents, attorneys, representatives, and any other person or entity acting or any other person or entity purporting to act on their behalf.

7.     "Beene Garter" is defined to mean Beene Garter LLP, including its agents, attorneys, representatives, and any other person or entity acting or any other person or entity purporting to act on Beene Garter's behalf

8.     The "Litigation" is defined to mean the civil lawsuit, filed in the United States District Court – Eastern District of Missouri, captioned *Power Investments, LLC v. Cardinals Preferred, LLC*, Case No. 4:21-cv-01022.

9.     "Ashley's Litigation" is defined to mean the civil lawsuit, filed in the United States District Court – Eastern District of Missouri, captioned *SL EC, LLC, et al., v. Ashley Energy, LLC, et al.*, Case No. 4:18-cv-01377-JAR.

10.    "Complaint" is defined as Power's most recently filed complaint in the Litigation. As of the date of service of this Subpoena, the most recently filed complaint in the Litigation is Power's Verified Complaint, filed on August 16, 2021, a copy of which is attached hereto as **Exhibit 1**.

11.    "Answer" is defined as Defendant's most recently filed answer in the Litigation. As of the date of service of these Requests, the most recently filed answer in the Litigation is Defendant's Answer to Complaint and Counterclaims, filed on September 24, 2021, a copy of which is attached hereto as **Exhibit 2**.

12.    The "Plant" is defined to mean Ashley's Power Plant located in the business district of the City of St. Louis.

13.    "LLC Agreement" is defined as the Ashley Energy LLC Amended and Restated Limited Liability Company Agreement, and all provisions contained within, executed on August 9, 2017, a copy of which is attached to the Complaint. *See* Compl. (Ex. 1)*.*

14.     "Call Option" is defined as the ability of Power to give notice of its intent to purchase a portion or all of the Preferred Units of Ashley pursuant to Section 10.5 of the LLC Agreement, on or after August 9, 2021.

15.     "Conversion Right" is defined to mean the right for Cardinals to convert its Preferred Units of Ashley into Class A Common Units of Ashley "at any time" pursuant to Section 4.1 of the LLC Agreement.

16.     "Water Intrusion Event" is defined as the events occurring on or about June 1, 2019, as more fully described in paragraphs 21-25 of the Answer's Counterclaims, whereby the Plant suffered a massive water intrusion event. *See* Answer (Ex. 2).

17.     "Loan Agreement" is defined as any agreement between Regions and Ashley, including for distribution of funds, amendments thereto and any other ancillary agreements resulting therefrom.

18.     "Person" is defined as any individual, corporation, limited liability company, partnership, joint venture, firm, association, proprietorship, agency, board, authority, commission or other such entity.

19.     "Communicate" and "Communication" are defined as (1) every manner or means of disclosure, transfer, or exchange of information, and (2) every disclosure, transfer or exchange of information, whether made or accomplished orally or by document, whether face-to-face, by telephone, mail, telex, facsimile, personal delivery, electronic mail (e-mail) or otherwise.

20.     "Document" means any tangible object or electronic data in any form or format whatsoever from which intelligence can be perceived, including the original, and every copy of the original or copy which any way was derived from any copy of the original, of, every writing or recording of every kind or description, whether handwritten, typed, drawn, sketched, printed or

recorded by any physical, mechanical, electronic or electrical means, including, without limitation, books, records, papers, pamphlets, brochures, catalogs, manuals, circulars, advertisements, specifications, blueprints, maps, plats, surveys, drawings, sketches, graphs, charts, plans, laboratory or engineering reports, correspondence, electronic mails (e-mail), communications, telegrams, telexes, memoranda, analyses, summaries, abstracts, tariffs, tax returns, financial statements, profit and loss statements, cash flow statements, books of account, balance sheets, reviews, annual or other periodic reports, estimates, prospectuses, registration solicitations, minutes, stock ledgers, stock certificates, licenses, permits, calendars, drafts, work papers, projections, studies, transcriptions, notations of meeting, notations of telephone conversations, computer tapes, computer data storage material (including disks and CD-ROM), printouts, transaction tapes, microfilm, microfiche, magnetic tape, discs, data cells, appointment book agenda diaries, telephone bills and toll call records, expense reports, checkbooks, cancelled checks, bills, bank statements, confirmations, receipts, invoices, contracts, agreements, directives, bulletins, instruments, assignments, applications, offers, acceptance, proposals, financing statements, documents of title, appraisals, purchase orders, bills of lading, shipping orders, freight bills, delivery tickets, way bills, manifest lists, written memorials of oral communications, forecasts, photographs, photographic slides or negatives, video tapes, films, or filmstrips.

21.     "Relate to", "relating to", and "regarding" mean having any possible connection within the broadest sense of those terms.

22.     "Affiliated with" means any relationship between an individual and business entity, including but not limited to relationships in which the individual is employed by or acting as an agent, contractor, or independent contract and purportedly on behalf of the business entity.

23.     "And" means and/or and "or" means and/or.

24.     "Including" is defined as "including but not limited to."

25.     "State," "identify" and "detail" mean to describe fully and with specificity each and every item of information and reasoning which explains the answer to be given including, but not limited to, identification of all documents and persons relating to or referring thereto; and identification of all communications and dates on the subject; and a statement of the dates and substance of all acts or events relating in any way to the subject matter of the Request or Interrogatory.

26.     Every reference to a company and/or business encompasses the officers, directors, agents, servants, employees, attorneys, or representative of the company.

## INSTRUCTIONS

1.     Unless otherwise agreed in writing, all Documents are to be produced to the attention of Wayne C. Stansfield, Esq., at the offices of Reed Smith LLP – Chicago located at 110 S. Wacker Drive, Suite 4000, Chicago, IL 60606, or the offices of Reed Smith LLP – Delaware located at 1201 N. Market Street Suite 1500, Wilmington, DE 19801, or by email at wstansfield@reedsmith.com.

2.     In answering these Requests, furnish all information that is available to you or subject to your reasonable inquiry, access, or control, including but not limited to all information in the actual or constructive possession of you, your attorneys, investigators, experts, and all others acting on your behalf.

3.     Unless otherwise stated, the Requests are limited in temporal scope from **December 1, 2016** to the present.

4.     If you object to any part of a Request, set forth the basis for the objection and respond to all non-objectionable parts of the request.

- 8 -

5.      If there are no responsive Documents to any Request or category thereof, so state in writing.

6.      If you maintain that any Document or record was previously but is now no longer in existence, in your possession, or subject to your control, state whether it: (i) is missing or lost; (ii) has been destroyed; (iii) has been transferred, voluntarily or involuntarily to others; or (iv) has been otherwise disposed of.  In each instance, set forth the contents of the Document and the location of any copies of the Document, and describe the circumstances surrounding its disposition, stating the date of its disposition, any authorization therefor, the person(s) responsible for such disposition, and the policy, rule, order or other authority by which such disposition was made.

7.      If you cannot answer a Request in whole or in part, answer to the extent possible, specifying: (i) the reason(s) for your inability to answer the remainder of the Request; (ii) whatever information or knowledge in your possession concerning the unanswered portion; (iii) your efforts to secure the unknown information; and (iv) the name, business address, residential address, and occupation of any person consulted by in an effort to answer the Request.

8.      In responding to these Requests, produce all responsive Documents in the custody, control, or possession of you, your agents, affiliates investigators, attorneys, accountants, financial advisors, or other representatives associated with you, your predecessors, successors, agents, or affiliates.

9.      Responsive Documents include all attachments and enclosures.  If any part of a Document is responsive to a Request, produce the entire document, including all attachments, enclosures, notes, and any other matter physically or electronically attached to the document. Documents, including all attachments thereto, should be produced as they are kept in their ordinary

course.   Documents constituting routing slips, transmittal memoranda, letters, cover sheets, comments, evaluations, and similar materials shall be produced.

10.     Exact copies of all original Documents shall be produced, as well as copies of any Documents or drafts of those original Documents bearing any mark or notation which is not present on the original Document.

11.     Otherwise non-responsive Documents shall be produced if such documents mention, discuss, refer to, or explain the Documents called for by these requests.

12.     These Requests shall be interpreted to be inclusive rather than exclusive:

    a.   The singular form of a noun or pronoun includes the plural form, and the plural form includes the singular.

    b.   The word "including" shall be construed always to introduce a non-exhaustive whether or not so specified.

    c.   The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of a request all information that might otherwise be construed to be outside its scope.

    d.   The scope of a Request shall not be construed narrowly based on any inferences drawn from the phrasing of any other Request.

13.     If you withhold any information, including any document or communication, sought by any discovery request on the basis of a claim of privilege, work product, or any reason: (i) state the nature of the privilege claimed or the basis for withholding the information requested and as to the specific information withheld, (ii) identify the attorney with respect to whom the privilege is claimed; (iii) identify each person who read, received, or possessed the document or a

copy of the document; and (iv) identify any portion of the document or communication that is not privileged.

## **DOCUMENTS TO BE PRODUCED**

1. All Documents and Communications relating to or concerning the negotiation, drafting, or execution of Loan Agreements or any amendments thereto.

2. All Documents and Communications related to actions taken by Ashley requiring Regions prior approval.

3. All Document and Communications discussing Ashley's ongoing compliance requirements, including financial reporting requirements.

4. All Documents and Communications relating to potential Events of Default occurring or having occurred under the Loan Agreement.

5. All Documents and Communications relating to Your request for a third-party and/or new auditor of Ashley.

6. All Documents and Communications with Beene Garter relating to Ashley.

7. All Documents and Communications with Armanino relating to Ashley.

8. All Communications between you and Mason Miller related to Ashley, Cardinals, or Power.

9. All Documents and Communications relating to the calculation, whether formal or informal, of Ashley's value, including, but not limited to, Ashley's Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA").

# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| POWER INVESTMENTS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. |
| CARDINALS PREFERRED, LLC, | ) | |
| | ) | |
| Serve at: 405 Lexington Ave., 59th Floor | ) | |
| New York, NY 10174 | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### VERIFIED COMPLAINT

Plaintiff Power Investments, LLC, for its Verified Complaint against Defendant

Cardinals Preferred, LLC, states as follows:

### Parties

1.      Plaintiff Power Investments, LLC ("**Power**" or the "**Class A Unitholder**") is a

limited liability company organized and existing under the laws of the State of Nevada.  Its

members are citizens of Kentucky, Nebraska, and New York.  Power is therefore a citizen of

Kentucky, Nebraska, and New York.

2.      Defendant Cardinals Preferred, LLC ("**Cardinals**" or the "**Preferred**

**Unitholder**") is a limited liability company organized and existing under the laws of the State of

Delaware.

3.      Based on information and belief, Cardinals has four members.  The names of its

members are highly confidential business information, but information concerning the specific

names of the members is available for *in camera* review by this Court.  For the purposes of this

Complaint, in order to preserve sensitive and confidential business information, the members

shall be referred to as "Member 1," "Member 2," etc., and are described as follows:

a. Member 1 is a limited liability company organized and existing under the laws of the State of Delaware. The sole member of Member 1 is a Canadian corporation organized under the laws of Canada, with its principal place of business in Ontario, Canada. Member 1 is therefore a citizen of Canada.

b. Member 2 is a limited liability company organized and existing under the laws of the State of Delaware. The sole member of Member 2 is the same Canadian corporation organized under the laws of Canada, with its principal place of business in Ontario, Canada. Member 2 is therefore a citizen of Canada.

c. Member 3 is a limited liability company organized and existing under the laws of the Cayman Islands. The sole member of Member 3 is the same Canadian corporation organized under the laws of Canada, with its principal place of business in Ontario, Canada. Member 3 is therefore a citizen of Canada.

d. Member 4 is a limited liability company organized and existing under the laws of the State of Delaware. The sole member of Member 4 is a C-Corporation organized under the laws of the State of Delaware, with its principal place of business in Ontario, Canada. Member 4 is therefore a citizen of Canada and Delaware.

4. Cardinals is therefore a citizen of Delaware and Canada.

## Jurisdiction and Venue

5. This Court has jurisdiction over this case under 28 U.S.C. § 1332, as there is complete diversity of citizenship among the parties and the amount in controversy exceeds the sum or value of $75,000.00.

6. The amount in controversy is satisfied for various reasons, including without limitation that: (a) the value of Ashley Energy LLC, the company a substantial part of whose ownership and shares are at issue in this dispute, far exceeds $75,000.00; and (b) the 999,222 Preferred Units whose status is at issue in this dispute were initially purchased for $999,222 and have a market value that far exceeds $75,000.00.

2

7. This Court has personal jurisdiction over Defendant in that Defendant has expressly consented to the jurisdiction of this Court. Ex. 1 (Agreement) § 15.8.

8. This Court has personal jurisdiction over Defendant notwithstanding Defendant's contractual assent. Defendant has been a part owner of the Company, a Missouri limited liability company with its operations located exclusively in Missouri, since 2017. Through its ownership interest in the Company and its conduct complained of below directly affecting the ownership status and structure of the Company, Defendant has purposefully availed itself of the forum, and—in light of its ownership interest and conduct—it was reasonably foreseeable that Defendant could be sued in Missouri. Further, the claims herein concern the ownership status and structure of the Company, a Missouri company with only Missouri operations, and therefore arise at least in part from Defendant's contacts with Missouri. Finally, Missouri has a substantial interest in hearing this dispute since it concerns the ownership status and structure of a Missouri company with only Missouri operations, and any burden or logistical inconvenience to Defendant of having this dispute decided in Missouri is insignificant.

9. Venue is proper in this Court because all parties have expressly consented to jurisdiction and venue in this Court for the present dispute. Ex. 1 § 15.8.

10. Venue is likewise proper in this Court under 28 U.S.C. § 1391(b)(2) and (b)(3).

11. A substantial part of the events or omissions giving rise to Power's claim occurred in this District. Specifically, and as further described below, this dispute concerns the ownership and shares of Ashley Energy LLC, a Missouri limited liability company with its operations located exclusively within this District.

12. Additionally, venue is proper in this Court because Cardinals is subject to this Court's personal jurisdiction with respect to this action, as described above.

**Facts**

13.     Power is a member of Ashley Energy, LLC (the "**Company**" or the "**LLC**").

14.     Cardinals is also a member of the Company.

15.     Power and Cardinals are also each referred to under the Agreement as a "**Unitholder**." Ex. 1 *passim*.

16.     The Company's ownership structure is set forth in that certain *Ashley Energy LLC Amended and Restated Limited Liability Company Agreement* (the "**Agreement**"). A true and accurate copy of the Agreement is attached as Exhibit 1.

17.     In 2017, Power and Cardinals partnered to purchase 100% of the Company.

18.     Specifically, on August 8, 2017, the Company's Original Member, Michael Becker, transferred 100% of the Company's equity interests to Power, also known under the Agreement as the "Class A Unitholder." Ex. 1 at 1.

19.     Also on August 8, 2017, Cardinals, also known under the Agreement as the "Preferred Unitholder," purchased 999,222 Preferred Units of the Company in exchange for an investment of $999,222.00. *Id.*

20.     Power is the sole owner of the Company's Class A Common Units and owns 850,988 such units. *Id.* at Schedule I.

21.     Cardinals is the sole owner of the Company's Preferred Units and owns 999,222 such units. *Id.*

22.     Section 10.5 of the Agreement sets forth a Call Option. *Id.* § 10.5(b).

23.     The Call Option provides: "At any time on or following August 9, 2021, a majority of Class A Common Units shall have the right to purchase a portion or all of the

Preferred Units pursuant to this <u>Section 10.5(b)</u> (the "<u>Call</u>"). The Call shall be consummated within the same time period and at the same price described in Section 10.5(a) above." *Id.*

24. Therefore, at any time on or after August 9, 2021, Power—the majority Class A Unitholder—was entitled to exercise its rights under the Call and thereby purchase all or a portion of the Company's Preferred Units. *Id.*

25. Pursuant to Section 10.5(b), the Call shall be consummated at the price described in Section 10.5(a), which specifies the pricing of the Put as follows:

> The price for Preferred Units sold to the LLC in accordance with this <u>Section 10.5(a)</u> shall be equal to the greater of (x) the sum of (1) the Preferred Unitholder's Unreturned Capital and (2) the Preferred Unitholder's Unpaid Return, in each case as of the date of such redemption or (y) the price of the Preferred Units calculated in accordance with the following formula:
>
> $$E * 11 - D - WC - O$$
>
> E = trailing twelve month EBITDA, as determined by LLC's auditors, measured from the month ending prior to redemption;
> D = all secured debt outstanding at the time of redemption;
> WC = adjusted working capital, as determined by the LLC's auditors;
> O = other material, on-balance sheet LLC obligations, measured for the month ending prior to redemption

*Id.* § 10.5.

26. Therefore, the Call, once exercised by Power—the majority Class A Unitholder— must be consummated at the price described in Section 10.5(a). *Id.*

27. The price formulas set by Section 10.5 applicable to the Put Option and Call Option are to be calculated as of the time of exercise by the purchasing party. *Id.*

28. Therefore, the purchase price for Power's purchase of the Preferred Units pursuant to the Call Option is to be calculated as of August 9, 2021, when Power exercised its Call. *Id.*

29.     Also pursuant to Section 10.5(b), the Call, once exercised by the majority Class A Unitholder, shall be consummated within the timing specified by Section 10.5(a) governing the Put, which provides that the Put shall be consummated within six months after the delivery of notice of exercise: "The Put shall be consummated within six (6) months after the delivery of notice that the Preferred Unitholder has exercised the Put (such date of consummation, the "Put Closing").  If the Put Closing does not take place in accordance with Section 10.5(a) or to the extent that the LLC may not, as of the Put Closing legally redeem the Preferred Units, such redemption will take place as soon as legally permitted." *Id.*

30.     Therefore, the Call, once exercised by Power—the majority Class A Unitholder—must be consummated within six months after the delivery of notice that Power has exercised the Call. *Id.*

31.     The parties specifically agreed that they would cooperate so as to ensure the purposes of the Agreement are achieved: "The Parties agree to execute and deliver all documents, provide all information and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement." *Id.* § 15.12.

32.     The parties further agreed that specific performance and injunctive relief would be available as potential remedies for breach of any provision of the Agreement: "The Parties agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that the LLC and each Unitholder may in its sole discretion apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive relief (without posting a bond or other security) in order to enforce or prevent any violation of the provisions of this Agreement." *Id.* § 15.3.

33.     On and effective August 9, 2021, Power exercised the Call as set forth in the Call

Option (Agreement § 10.5) and thereby proceeded with purchasing all of the Company's

Preferred Units.

34.     On August 9, 2021, Power delivered written notice to Cardinals of Power's Call

exercise and resulting purchase of the Preferred Units, as well as the Call purchase price in

accordance with the Section 10.5(a) price formula, namely: $1,610,971.77.  A true and accurate

copy of Power's Call Notice is attached as <u>Exhibit 2</u>.  Power sought to consummate the

transaction immediately.  *Id*.

35.     The Call Notice was delivered to Cardinals' office located at 405 Lexington Ave.,

59th Floor, New York, NY 10174 via courier, facsimile, and mail on August 9.  *Id*.

36.     The purchase price amount includes a total return of $611,749.77 over the life of

Cardinals' 4-year investment, or 61%, on its original $999,220.00 investment.

37.     Since receiving the Call Notice, Cardinals has informed Powers that it is

unwilling to comply with its obligations under the Agreement to consummate and close the Call.

38.     On an August 12, 2021 phone call, representatives of Cardinals made all of this

clear to Mason Miller, Power's representative, despite also admitting to Mr. Miller that Section

10.5 of the Agreement is "very clear" in providing Power with the Call Option it exercised.  On

that phone call, the Cardinals' representatives even asked Power to retract its exercise of the Call

(which Power declined to do).  Cardinals also refused to permit Power to consummate the call

and refused to provide payment/wire instructions.

39.     Further, after receiving Power's notice, Cardinals began taking steps to prevent

the consummation and closing of the Call, including attempting to convert its Preferred Units—

all of which Cardinals was already obligated to sell to Power by virtue of the Call exercise.

7

40.     Section 4.1(a) provides a mechanism by which the Preferred Unitholder may convert Preferred Units it owns into Class A Common Units.  Ex. 1 § 4.1(a).

41.     Almost a week after receiving the Call Notice, Cardinals informed Power that Cardinals was attempting to convert all of its 999,222 Preferred Units to Class A Common Units under Section 4.1(a) in an effort to "moot" Power's Call.

42.     Specifically, shortly after 7:00 p.m. Central on Sunday, August 15, 2021—six days after receiving Power's notice—Cardinals faxed Mr. Miller a letter purporting to provide notice that Cardinals is converting all of its Preferred Units into Class A Common Units pursuant to Section 4.1(a).  A true and accurate copy of the August 15 Letter to Mr. Miller is attached as Exhibit 3.

43.     Cardinals sent a second letter at that same time to Mr. Miller, as a board member of Ashley Energy, giving the board the same notice.  A true and accurate copy of the August 15 Letter to the Board is attached as Exhibit 4.

44.     Section 4.2(a) of the Agreement provides that the effective time of conversion of Preferred Units under Section 4.1(a) is "[t]he close of business on the date of receipt by the LLC of such notice [of conversion]."  Ex. 1 § 4.2(a).

45.     Thus, notwithstanding the fact that Cardinals' purported conversion attempts to convert all of the very shares that Power has already begun purchasing through its Call, the earliest Cardinals' attempted conversion could even become effective is the close of business on Monday, August 16, 2021—after the filing of this Complaint.  *Id.*

46.     Cardinals' August 15, 2021 letters further purported to reject Power's exercise of its Call Option, despite admitting that Cardinals had received Power's August 9, 2021 notice of its Call exercise.  Ex. 3 at p.1; Ex. 4 at p.1.  These attempts to convert the Preferred Units so as to

"moot" Power's Call constitutes immediate and irreparable harm to Cardinals, as it purports to prevent Power from purchasing and owing the Preferred Units, as bargained for in the Agreement.

47.     Further, after receiving Power's notice, Cardinals has threatened to take additional steps to frustrate and/or prevent the consummation and closing of the Call pursuant to the Agreement.

48.     Specifically, in a separate August 12, 2021 phone call, a Cardinals representative communicated to Mr. Miller that Cardinals believed it has the power to delay the closing of Power's Call at least six months, and to take steps to significantly increase the Call's purchase price by forcing cash distributions from the Company, and prematurely settling an as-yet-unlitigated and unliquidated subrogation claim by the Company against the Metropolitan St. Louis Sewer District and forcing those proceeds to be distributed as well.  The representative also expressed that he had no intention of selling the Preferred Units at the price contemplated by section 10.5 of the Agreement.

49.     These threats were made despite, earlier in the day on August 12, 2021, a Cardinals representative admitting by email that the Agreement requires consummation of the Call purchase within six months of Power's notice and in the same email chain admitting that the price mechanics for the Call Option are the same as for the Put Option under the Agreement. August 12 email chain at pp. 1-3, a true and accurate copy of which is attached as Exhibit 5.

50.     In an email the following day, on August 13, the Cardinals' representative further acknowledged that the Board of the Company, including Cardinals' two Board members, had unanimously approved the form and methodology of the calculation of the price set forth in the

Call exercise.  August 13 email at p.1, a true and accurate copy of which email chain is attached as Exhibit 6.

51.     The closing delay threatened by Cardinals represents an attempt to delay the closing indefinitely so as to make execution of the Call purchase impossible, which again constitutes irreparable harm to Power.

52.     The delay and/or refusal to consummate the Call threatened by Cardinals represent an attempt to raise the purchase price for Power's Call significantly, under a scenario where the purchase price is calculated as of the date of closing.

53.     The Agreement does not provide for the Call purchase price to be calculated as of the date of closing; on the contrary, it requires the purchase price to be calculated as of the date of Power's exercise of the call.  Ex. 1 § 10.5.

54.     Beyond Cardinals' wholesale refusal to comply with its obligations to consummate and close the Call and its attempt to subvert Power's Call through conversion, Cardinals' taking the additional threatened steps would render impossible the consummation and closing of Power's Call pursuant to the Agreement because it would delay the start of the closing process (which involves a number of events that must happen in sequence over a period of months) and would improperly burden Power with a higher purchase price that it is not obligated to pay.

55.     Power exercised its Call Option, including delivering the required notice, before Cardinals informed Power of its refusal to comply with its contractual obligations with respect to the Call, its attempted conversion of all of the Preferred Units, and its threat to take additional subversive actions.

56.     The parties agreed that they would have all rights and remedies available to them under any law, including the Agreement: "Each Unitholder shall have all rights and remedies set forth in this Agreement and all rights and remedies which such person has been granted at any time under any other agreement or contract and all of the rights which such Person has under any law." Ex. 1 § 15.3.

57.     The parties further agreed that Missouri law would govern this dispute and this Court would be an appropriate venue: "This Agreement and any dispute hereunder shall be governed by, and construed in accordance with, the laws of the State of Missouri, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Missouri or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Missouri.  Any dispute relating to this Agreement shall be heard in the state or federal courts of Missouri, and the Parties agree to jurisdiction and venue therein." Id. § 15.8.

## COUNT I – DECLARATORY RELIEF

58.     Plaintiff restates and re-alleges paragraphs 1 through 57 as if fully set forth herein.

59.     The Declaratory Judgment Act ("the Act") provides in relevant part that: "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  The Act further provides: "Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." Id.

60.     To state a claim under the Act, the plaintiff must meet the "case or controversy" requirements of Article III of the Constitution and have standing to sue under the relevant state law. Cooper Indus., LLC v. Spectrum Brands, Inc., 2017 WL 1078045, at *1-2 (E.D. Mo. Mar. 22, 2017).  Under Missouri law, a party must be a party to a contract or third-party beneficiary

11

thereof in order to have standing to obtain a declaration of rights, status, and legal relationship under that contract. *Id.*

61.     An actual and justiciable controversy exists between Power and Cardinals, and this Court is vested with the power to declare the rights and other legal relations of the parties with respect to the Agreement and the Call Option set forth therein.

62.     An actual and justiciable controversy exists because Power, pursuant to the Agreement, has exercised its Call Option rights in order to purchase all of the Company's Preferred Units, and delivered notice of same and of Power's intent to consummate and close the Call, and Cardinals, after receiving Power's notice, has informed Powers that it intends not to comply with its obligations under the Agreement to consummate and close the Call, and is threatening to take steps to frustrate and/or prevent the consummation and closing of the Call pursuant to the Agreement, including delaying the closing to try to impose on Power an unauthorized and falsely inflated purchase price.

63.     An actual and justiciable controversy further exists because after receiving Power's notice, Cardinals has taken steps to try to prevent the consummation and closing of the Call.  Specifically, Cardinals is attempting to convert all of its 999,222 Preferred Units—all of which Power had already begun purchasing through its Call exercise—into Class A Common Units under Section 4.1(a).

64.     An actual and justiciable controversy further exists because the parties expressly agreed in Section 15.12 of the Agreement that they would "take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement," but Cardinals has informed Power that it is refusing to take or refrain from taking actions necessary and appropriate to achieve the purposes of the Agreement, in that it is refusing to cooperate with

the consummation and closing of Power's Call pursuant to Section 10.5 of the Agreement, and intends to take actions to frustrate and/or prevent the consummation and closing of Power's Call through delay and financial manipulation to try to alter the purchase price. Further, Cardinals is attempting to convert all of the shares subject to Power's previous Call exercise.

65.     An actual and justiciable controversy further exists because Cardinals has claimed entitlement to delay the closing of Power's Call and to avoid taking necessary and appropriate steps to consummate and close the Call within six months of Power's notice, but nothing in the Agreement so entitles them, and in fact, the Agreement is expressly to the contrary.

66.     An actual and justiciable controversy further exists because Cardinals has claimed entitlement to take financial steps to manipulate Power's purchase price upward after receiving notice of Power's exercise, but nothing in the Agreement so entitles them, and in fact, the Agreement is expressly to the contrary.

67.     An actual and justiciable controversy further exists because Cardinals contends that the purchase price for Power's Call is to be calculated as of the date of closing, but the Agreement provides that it is to be calculated as of the date of Power's exercise of the Call.

68.     Power validly exercised its Call Option, including delivering the required notice, before Cardinals informed Power of its refusal to comply with its contractual obligations with respect to the Call, its attempted conversion of all of the Preferred Units, and its threat to take additional subversive actions.

69.     The Call Option constitutes a continuing and irrevocable offer by Cardinals to Power that Cardinals cannot legally withdraw. Once Power accepted the offer in the manner specified in the Call Option, the Call Option was exercised so as to create a binding bilateral contract that is specifically enforceable by Power against Cardinals. *In re Estate of Schulze*, 105

S.W.3d 548, 550 (Mo. App. 2003); *Walsh v. White House Post Productions, LLC*, 2020 WL 1492543, at *5-6 (Del. Ch. Ct. Mar. 25, 2020).

70.     Conversion of Cardinals' Preferred Units into Class A Common Units constitutes an attempt to nullify and make impossible the consummation and closing of Power's Call by making all Preferred Units unavailable to be purchased by Power.

71.     Therefore, Cardinals' refusal to comply with its obligations to consummate and close the Call and its threatened subversive actions constitute anticipatory breach, and its attempted conversion of the Preferred Units constitutes actual breach, of Cardinals' obligations under Sections 10.5 and 15.12 of the Agreement.

72.     Moreover, there is implied in every contract a covenant of good faith and fair dealing.  Cardinals, therefore, owed duties of good faith and fair dealing to Power under the Agreement.

73.     Cardinals' conduct in refusing to honor and perform its contractual obligations in connection with Power's Call under Section 10.5, in attempting to convert its Preferred Units after being notified that Power had exercised its Call Option and had begun purchasing the Preferred Units, and in threatening to take additional steps to frustrate and/or prevent the consummation and closing of Power's Call through unauthorized financial manipulation of the purchase price, bespeaks a conscious effort to frustrate, prevent, and subvert the fulfillment of the exercised Call Option and therefore deprive Power of the benefits it is rightly owed under the Agreement.

74.     Thus, not only did Cardinals breach the Agreement, it also breached its duties of good faith and fair dealing.

75.     The subject matter over which Power seeks declaratory relief—the rights and other legal relations of the parties with respect to the Agreement and the Call Option set forth therein—is a matter within the subject matter jurisdiction of this Court.

76.     Power has standing under Missouri law to obtain declaratory relief under the Agreement in this Court because Power is a party to the Agreement.

77.     Power further has standing to seek declaratory relief in this Court because the parties agreed that such relief was available as a potential remedy in the event of a breach of the Agreement by the other party.  Ex. 1 § 15.3.

78.     The Agreement is a valid and enforceable contract.

WHEREFORE, Plaintiff Power Investments, LLC requests that this Court enter declaratory judgment in favor of Plaintiff Power Investments, LLC and against Defendant Cardinals Preferred, LLC, including: (1) a declaration by this Court that the Agreement is a valid and enforceable contract; (2) a declaration by this Court that the Agreement's Call Option, set forth in Section 10.5, constitutes a continuing and irrevocable offer by Cardinals to Power that Cardinals cannot legally withdraw; (3) a declaration by this Court that once Power accepted the offer in the manner specified in the Call Option, the Call Option was exercised so as to create a binding bilateral contract that is specifically enforceable by Power against Cardinals; (4) a declaration by this Court that under Sections 10.5 and 15.12 of the Agreement, Cardinals is obligated to take all steps necessary and appropriate to cooperate with the consummation and closing of Power's Call within six months of August 9, 2021, and at the purchase price of $1,610,971.77; (5) a declaration by this Court that Cardinals' refusal to consummate and close Power's Call constitutes breaches of Sections 10.5 and 15.12 of the Agreement, as well as the implied covenant of good faith and fair dealing; (6) a declaration by this Court that Cardinals'

attempted conversion of its Preferred Units constitutes a breach of Sections 10.5 and 15.12 of the Agreement, as well as the implied covenant of good faith and fair dealing; (7) a declaration by this Court that Cardinals' attempted conversion of its Preferred Units under Section 4.1(a) is invalid and ineffectual and must yield to Power's exercised Call Option rights under Section 10.5; (8) a declaration by this Court that Cardinals' threatened actions, including delaying the consummation and closing of the Call and upward financial manipulation of the purchase price after Power's notice of exercise, constitute breaches of Sections 10.5 and 15.12 of the Agreement, as well as the implied covenant of good faith and fair dealing; (9) a declaration by this Court that the Agreement does not entitle Cardinals to delay the consummation and closing of Power's Call or to avoid taking necessary and appropriate steps to consummate and close the Call within six months of Power's notice; (10) a declaration by this Court that the Agreement does not entitle Cardinals to manipulate the Call purchase price upward, including without limitation through cash infusions into the Company after Power's notice, or to impose on Power a purchase price other than the purchase price communicated by Power to Cardinals in its notice on August 9, 2021; (11) a declaration by this Court that the Agreement provides that the Call purchase price is to be calculated as of the date of Power's exercise, not the date of closing; (12) a declaration by this Court that the purchase price for Power's Call, in accordance with Section 10.5, is $1,610,971.77; and (13) such other or different declaratory relief as the Court deems just and proper.

## **COUNT II – SPECIFIC PERFORMANCE**

79.     Plaintiff restates and re-alleges paragraphs 1 through 78 as if fully set forth herein.

80.     The Call Option provides that on or after August 9, 2021, Power—the majority Class A Unitholder—was entitled to exercise the Call and thereby purchase all or a portion of the Company's Preferred Units.  Ex. 1 § 10.5(b).

81.     The Call, once exercised by Power—the majority Class A Unitholder—must be consummated within six months after the delivery of notice that Power has exercised the Call, at the price described in Section 10.5(a).  *Id.* § 10.5.

82.     On August 9, 2021, Power delivered written notice to Cardinals that Power was exercising the Call and was thereby proceeding with purchasing all of the Preferred Units, as well as the Call purchase price in accordance with the Section 10.5(a) price formula, namely: $1,610,971.77.

83.     The Call Option constitutes a continuing and irrevocable offer by Cardinals to Power that Cardinals cannot legally withdraw.  Once Power accepted the offer in the manner specified in the Call Option, the Call Option was exercised so as to create a binding bilateral contract that is specifically enforceable by Power against Cardinals.  *In re Estate of Schulze*, 105 S.W.3d 548, 550 (Mo. App. 2003); *Walsh v. White House Post Productions, LLC*, 2020 WL 1492543, at *5-6 (Del. Ch. Ct. Mar. 25, 2020).

84.     Thus, once Power accepted the Call Option offer, Cardinals became obligated to take affirmative steps to consummate and close Power's purchase of the Preferred Units in the manner prescribed by Section 10.5, including within six months of Power's notice of exercise and at the $1,610,971.77 price communicated by Power.  Ex. 1 § 10.5.

85.     Since receiving Power's notice, Cardinals has failed to take such steps and has indicated to Power that it is refusing to comply with its obligations to consummate and close the Call as required by Section 10.5, and instead is threatening to take steps to frustrate and/or prevent the consummation and closing of the Call.

86.     Specifically, Cardinals has threatened to delay the closing and to manipulate the purchase price upward through, at minimum, cash infusions into the Company after Power's August 9, 2021 notice in an effort to impose an unauthorized inflated purchase price on Power.

87.     Accordingly, Cardinals has anticipatorily breached Section 10.5.

88.     Cardinals, further, has taken affirmative steps to try to prevent and nullify the consummation and closing of Power's Call and associated purchase of all of the Preferred Units.

89.     Specifically, after receiving Power's notice, Cardinals has attempted to convert all of its Preferred Units to Class A Common Units under Section 4.1(a) of the Agreement.

90.     Conversion of Cardinals' Preferred Units into Class A Common Units constitutes an attempt to nullify and make impossible the consummation and closing of Power's Call by making all Preferred Units unavailable to be purchased by Power.

91.     Accordingly, Cardinals is in actual breach of Section 10.5.

92.     Further, the parties are obligated to "take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of the Agreement," i.e., to cooperate as necessary and appropriate to achieve the Agreement's purposes. *Id.* § 15.12.

93.     One of the Agreement's purposes is to provide Power with the right to exercise the Call Option and thereby purchase some or all of the Company's Preferred Units in the manner prescribed by Section 10.5, and to have that purchase consummated and closed in the manner prescribed by Section 10.5, including within six months of delivery of Power's notice and at the price set by Section 10.5(a)'s formula at the time of exercise. *Id.* § 10.5.

94.     The Agreement therefore imposes on Cardinals an obligation to take or refrain from taking such actions as may be necessary or appropriate to allow Power's purchase of Preferred Units to be consummated and closed in the manner prescribed by Section 10.5,

including within six months of delivery of Power's notice and at the price set by Section 10.5(a)'s formula at the time of exercise. *Id.* §§ 10.5, 15.12.

95.     Cardinals has informed Power that it will not take such actions as may be necessary or appropriate to allow Power's purchase of Preferred Units to be consummated and closed in the manner prescribed by Section 10.5, including within six months of Power's notice and at the price of $1,610,971.77.

96.     Specifically, Cardinals has informed Power that it is refusing to cooperate with the consummation and closing of Power's Call and associated purchase of Preferred Units as prescribed by Section 10.5.

97.     Cardinals has further informed Power that it will not refrain from taking such actions as may be necessary or appropriate to allow Power's purchase of Preferred Units to be consummated and closed in the manner prescribed by Section 10.5, including within six months of Power's notice and at the price of $1,610,971.77.

98.     Specifically, Cardinals is threatening to take steps to frustrate and/or prevent the consummation and closing of the Call, namely, through improper delay and financial manipulation in an effort to alter the purchase price.

99.     Accordingly, Cardinals has anticipatorily breached Section 15.12.

100.    Further, Cardinals is in actual breach of Section 15.12 because of its attempted conversion of the Preferred Units, which constitutes a failure to refrain from conduct as may be necessary or appropriate to cooperate in the consummation and closing of Power's Call.

101.    Power validly exercised its Call Option, including delivering the required notice, before Cardinals informed Power of its refusal to comply with its contractual obligations with

respect to the Call, its attempted conversion of all of the Preferred Units, and its threat to take additional subversive actions.

102.    Moreover, there is implied in every contract a covenant of good faith and fair dealing.  Cardinals, therefore, owed duties of good faith and fair dealing to Power under the Agreement.

103.    Cardinals' conduct in refusing to honor and perform its contractual obligations in connection with Power's Call under Section 10.5, in attempting to convert its Preferred Units after being notified that Power had exercised its Call Option and had begun purchasing the Preferred Units, and in threatening to take additional steps to frustrate and/or prevent the consummation and closing of Power's Call through unauthorized financial manipulation of the purchase price, bespeaks a conscious effort to frustrate, prevent, and subvert the fulfillment of the exercised Call Option and therefore deprive Power of the benefits it is rightly owed under the Agreement.

104.    Thus, not only did Cardinals breach the Agreement, it also breached its duties of good faith and fair dealing.

105.    As a direct and proximate result of Cardinals' breaches, Power has been damaged, and will continue to be damaged.

106.    In light of Power's consideration paid to enter into the Agreement, Power's purposes for entering into the Agreement, and Power's settled expectations regarding the Agreement's benefits, the damages caused by Cardinals' breaches are uniquely catastrophic and can only be fully cured by the remedy of specific performance.

107.    Specific performance is also authorized and warranted because the parties expressly consented to specific performance and injunctive relief as potential remedies for any breaches of the Agreement.  Ex. 1 § 15.3.

108.    The Agreement is a valid and enforceable contract.

109.    Power has performed, and continues to perform, all of its obligations under the Agreement, and stands ready, willing, and able to continue performing any and all such obligations.

WHEREFORE, Plaintiff Power Investments, LLC requests that this Court enter judgment in favor of Plaintiff Power Investments, LLC and against Defendant Cardinals Preferred, LLC, ordering Defendant Cardinals Preferred, LLC to perform its obligations under Sections 10.5 and 15.12 of the Agreement and accordingly take any and all steps necessary and appropriate to consummate and close Power's Call and associated purchase of all of the Preferred Units within six months of August 9, 2021 and at the purchase price of $1,610,971.77, and immediately enjoin Cardinals' attempted conversion of its Preferred Units to Class A Common Units and any and all steps Cardinals has taken or plans to take to prevent and/or frustrate the consummation and closing of the Call, including without limitation delaying the closing process and affecting Company finances in an effort to manipulate the purchase price upward; or such other relief as may otherwise be determined and proven at trial; and such other and further relief as is just and appropriate.

## COUNT III – BREACH OF CONTRACT AND BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

110.    Plaintiff restates and re-alleges paragraphs 1 through 109 as if fully set forth herein.

111.    Plaintiff brings this claim in the alternative to Count II, and seeks the relief set forth in this Count III only in the event the Court does not grant the relief sought in Count II.

112.    The Call Option provides that on or after August 9, 2021, Power—the majority Class A Unitholder—was entitled to exercise the Call and thereby purchase all or a portion of the Company's Preferred Units.  Ex. 1 § 10.5(b).

113.    The Call, once exercised by Power—the majority Class A Unitholder—must be consummated within six months after the delivery of notice that Power has exercised the Call, at the price described in Section 10.5(a).  *Id.* § 10.5.

114.    On August 9, 2021, Power delivered written notice to Cardinals that Power was exercising the Call and was thereby proceeding with purchasing all of the Preferred Units, as well as the Call purchase price in accordance with the Section 10.5(a) price formula, namely: $1,610,971.77.

115.    The Call Option constitutes a continuing and irrevocable offer by Cardinals to Power that Cardinals cannot legally withdraw.  Once Power accepted the offer in the manner specified in the Call Option, the Call Option was exercised so as to create a binding bilateral contract that is specifically enforceable by Power against Cardinals.  *In re Estate of Schulze*, 105 S.W.3d 548, 550 (Mo. App. 2003); *Walsh v. White House Post Productions, LLC*, 2020 WL 1492543, at *5-6 (Del. Ch. Ct. Mar. 25, 2020).

116.    Thus, once Power accepted the Call Option offer, Cardinals became obligated to take affirmative steps to consummate and close Power's purchase of the Preferred Units in the manner prescribed by Section 10.5, including within six months of Power's notice of exercise and at the $1,610,971.77 price communicated by Power.  Ex. 1 § 10.5.

117.    Since receiving Power's notice, Cardinals has failed to take such steps and has indicated to Power that it is refusing to comply with its obligations to consummate and close the Call as required by Section 10.5, and instead is threatening to take steps to frustrate and/or prevent the consummation and closing of the Call.

118.    Specifically, Cardinals has threatened to delay the closing and to manipulate the purchase price upward through, at minimum, cash infusions into the Company after Power's August 9, 2021 notice in an effort to impose an unauthorized inflated purchase price on Power.

119.    Accordingly, Cardinals has anticipatorily breached Section 10.5.

120.    Cardinals, further, has taken affirmative steps to try to prevent and nullify the consummation and closing of Power's Call and associated purchase of all of the Preferred Units.

121.    Specifically, after receiving Power's notice, Cardinals has attempted to convert all of its Preferred Units to Class A Common Units under Section 4.1(a) of the Agreement.

122.    Conversion of Cardinals' Preferred Units into Class A Common Units constitutes an attempt to nullify and make impossible the consummation and closing of Power's Call by making all Preferred Units unavailable to be purchased by Power.

123.    Accordingly, Cardinals is in actual breach of Section 10.5.

124.    Further, the parties are obligated to "take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of the Agreement," i.e., to cooperate as necessary and appropriate to achieve the Agreement's purposes. *Id.* § 15.12.

125.    One of the Agreement's purposes is to provide Power with the right to exercise the Call Option and thereby purchase some or all of the Company's Preferred Units in the manner prescribed by Section 10.5, and to have that purchase consummated and closed in the

manner prescribed by Section 10.5, including within six months of delivery of Power's notice and at the price set by Section 10.5(a)'s formula at the time of exercise. *Id.* § 10.5.

126. The Agreement therefore imposes on Cardinals an obligation to take or refrain from taking such actions as may be necessary or appropriate to allow Power's purchase of Preferred Units to be consummated and closed in the manner prescribed by Section 10.5, including within six months of delivery of Power's notice and at the price set by Section 10.5(a)'s formula at the time of exercise. *Id.* §§ 10.5, 15.12.

127. Cardinals has informed Power that it will not take such actions as may be necessary or appropriate to allow Power's purchase of Preferred Units to be consummated and closed in the manner prescribed by Section 10.5, including within six months of Power's notice and at the price of $1,610,971.77.

128. Specifically, Cardinals has informed Power that it is refusing to cooperate with the consummation and closing of Power's Call and associated purchase of Preferred Units as prescribed by Section 10.5.

129. Cardinals has further informed Power that it will not refrain from taking such actions as may be necessary or appropriate to allow Power's purchase of Preferred Units to be consummated and closed in the manner prescribed by Section 10.5, including within six months of Power's notice and at the price of $1,610,971.77.

130. Specifically, Cardinals is threatening to take steps to frustrate and/or prevent the consummation and closing of the Call, namely, through improper delay and financial manipulation in an effort to alter the purchase price.

131. Accordingly, Cardinals has anticipatorily breached Section 15.12.

132.     Further, Cardinals is in actual breach of Section 15.12 because of its attempted conversion of the Preferred Units, which constitutes a failure to refrain from conduct as may be necessary or appropriate to cooperate in the consummation and closing of Power's Call.

133.     Power validly exercised its Call Option, including delivering the required notice, before Cardinals informed Power of its refusal to comply with its contractual obligations with respect to the Call, its attempted conversion of all of the Preferred Units, and its threat to take additional subversive actions.

134.     Moreover, there is implied in every contract a covenant of good faith and fair dealing.  Cardinals, therefore, owed duties of good faith and fair dealing to Power under the Agreement.

135.     Cardinals' conduct in refusing to honor and perform its contractual obligations in connection with Power's Call under Section 10.5, in attempting to convert its Preferred Units after being notified that Power had exercised its Call Option and had begun purchasing the Preferred Units, and in threatening to take additional steps to frustrate and/or prevent the consummation and closing of Power's Call through unauthorized financial manipulation of the purchase price, bespeaks a conscious effort to frustrate, prevent, and subvert the fulfillment of the exercised Call Option and therefore deprive Power of the benefits it is rightly owed under the Agreement.

136.     Thus, not only did Cardinals breach the Agreement, it also breached its duties of good faith and fair dealing.

137.     As a direct and proximate result of Cardinals' breaches, Power has been damaged, and will continue to be damaged, in an amount that exceeds $75,000.

138.     The Agreement is a valid and enforceable contract.

139.    Power has performed, and continues to perform, all of its obligations under the Agreement, and stands ready, willing, and able to continue performing any and all such obligations.

WHEREFORE, Plaintiff Power Investments, LLC requests that this Court enter judgment in favor of Plaintiff Power Investments, LLC and against Defendant Cardinals Preferred, LLC, for an amount that exceeds $75,000 or as may otherwise be determined and proven at trial, plus prejudgment interest, and for such other and further relief as is just and appropriate.

Dated:  August 16, 2021                    ARMSTRONG TEASDALE LLP


By:  */s/ Christopher R. LaRose*
        Christopher R. LaRose          #59612MO
        Daniel R. O'Brien              #69258MO
        Armstrong Teasdale LLP
        7700 Forsyth Blvd., Suite 1800
        St. Louis, Missouri 63105
        Telephone:  314.621.5070
        Fax:  314.621.5065
        clarose@atllp.com
        dobrien@atllp.com

        ATTORNEYS FOR PLAINTIFF POWER
        INVESTMENTS, LLC

**VERIFICATION**

I, Mason L. Miller, being of lawful age, hereby declare under penalty of perjury, as follows:

1.     I am the manger and member of Plaintiff Power Investments, LLC.

2.     I am a board member of Ashley Energy LLC.

3.     The facts alleged in the Verified Complaint are based upon matters known personally to me and/or on information provided to me by others, and are true and correct to the best of my knowledge, information, and belief.


Executed within the United States of America on this 16th day of August, 2021.

_____
Mason L. Miller, Manager and Member

# EXHIBIT 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| POWER INVESTMENTS, LLC, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Case No. 4:21-cv-01022 |
| vs. | ) | |
| | ) | |
| CARDINALS PREFERRED, LLC, | ) | |
| | ) | |
| *Defendant.* | ) | |

## <u>CARDINALS PREFERRED, LLC'S ANSWER TO<br>THE COMPLAINT AND COUNTERCLAIMS</u>

Defendant Cardinals Preferred, LLC ("Cardinals"), by and through its undersigned counsel, hereby answers Plaintiff Power Investment, LLC's ("Power") Complaint (the "Complaint") and states as follows:

### <u>Parties</u>[1]

1.      Plaintiff Power Investments, LLC ("**Power**" or the "**Class A Unitholder**") is a limited liability company organized and existing under the laws of the State of Nevada. Its members are citizens of Kentucky, Nebraska, and New York. Power is therefore a citizen of Kentucky, Nebraska, and New York.

**ANSWER:** Cardinals is without adequate knowledge or information to admit or deny the allegations in this paragraph, and therefore the allegations in this paragraph are denied.

2.      Defendant Cardinals Preferred, LLC ("**Cardinals**" or the "**Preferred Unitholder**") is a limited liability company organized and existing under the laws of the State of Delaware.

---

[1] References to headings from the Complaint are meant solely for the Court's ease of reference and in no way constitute admissions of the facts, allegations, or conclusions stated in those headings.  Any allegation below not explicitly admitted by Cardinals is denied.

**ANSWER:** Cardinals admits that it is a limited liability company organized and existing under the laws of the State of Delaware but denies that it is currently a Preferred Unitholder because Cardinals converted its Preferred Units into Class A Common Units on August 16, 2021 and, as such, is currently a Class A Common Unitholder.

3.      Based on information and belief, Cardinals has four members. The names of its members are highly confidential business information, but information concerning the specific names of the members is available for *in camera* review by this Court. For the purposes of this Complaint, in order to preserve sensitive and confidential business information, the members shall be referred to as "Member 1," "Member 2," etc., and are described as follows:

  a. Member 1 is a limited liability company organized and existing under the laws of the State of Delaware. The sole member of Member 1 is a Canadian corporation organized under the laws of Canada, with its principal place of business in Ontario, Canada. Member 1 is therefore a citizen of Canada.

  b. Member 2 is a limited liability company organized and existing under the laws of the State of Delaware. The sole member of Member 2 is the same Canadian corporation organized under the laws of Canada, with its principal place of business in Ontario, Canada. Member 2 is therefore a citizen of Canada.

  c. Member 3 is a limited liability company organized and existing under the laws of the Cayman Islands. The sole member of Member 3 is the same Canadian corporation organized under the laws of Canada, with its principal place of business in Ontario, Canada. Member 3 is therefore a citizen of Canada.

  d. Member 4 is a limited liability company organized and existing under the laws of the State of Delaware. The sole member of Member 4 is a C-Corporation organized under the laws of the State of Delaware, with its principal place of business in Ontario, Canada. Member 4 is therefore a citizen of Canada and Delaware.

**ANSWER:** Cardinals denies the allegations in this paragraph, including its subparts. By way of further response, Cardinals is a limited liability company organized and existing under the laws of the State of Delaware and is wholly owned by Lexington Finance Designated Activity Corporation ("LFDAC"), an Irish company with limited liability and having a place of business in New York.

LFDAC has two members, which are both limited liability companies. Above those two entities are dozens of persons and entities and, for jurisdictional purposes, at least eighteen (18) members and/or ultimate beneficial owners are individuals with New York citizenship and residency.

4.      Cardinals is therefore a citizen of Delaware and Canada.

**ANSWER:** It is admitted only that Cardinals is a limited liability company organized and existing under the laws of the State of Delaware. As a limited liability company, Cardinals denies that it is a citizen of Delaware since its state of formation is not determinative of its citizenship. By way of further response, Cardinals is wholly owned by LFDAC, an Irish company with limited liability and having a place of business in New York. LFDAC has two members, which are both limited liability companies. At least eighteen (18) members and/or ultimate beneficial owners are individuals with New York citizenship and residency.

## Jurisdiction and Venue

5.      This Court has jurisdiction over this case under 28 U.S.C. § 1332, as there is complete diversity of citizenship among the parties and the amount in controversy exceeds the sum or value of $75,000.00.

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required. To the extent a response is required, Cardinals admits only that the amount in controversy exceeds $75,000.00.

6.      The amount in controversy is satisfied for various reasons, including without limitation that: (a) the value of Ashley Energy LLC, the company a substantial part of whose ownership and shares are at issue in this dispute, far exceeds $75,000.00; and (b) the 999,222 Preferred Units whose status is at issue in this dispute were initially purchased for $999,222 and have a market value that far exceeds $75,000.00.

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required. To the extent a response is required, Cardinals admits only that the amount in controversy exceeds $75,000.00.

7. This Court has personal jurisdiction over Defendant in that Defendant has expressly consented to the jurisdiction of this Court. <u>Ex. 1</u> (Agreement) § 15.8.

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required. By way of further response, the allegations in this paragraph refer to a document that speaks for itself and Cardinals refers the Court to that document for its true and correct content.

8. This Court has personal jurisdiction over Defendant notwithstanding Defendant's contractual assent. Defendant has been a part owner of the Company, a Missouri limited liability company with its operations located exclusively in Missouri, since 2017. Through its ownership interest in the Company and its conduct complained of below directly affecting the ownership status and structure of the Company, Defendant has purposefully availed itself of the forum, and—in light of its ownership interest and conduct—it was reasonably foreseeable that Defendant could be sued in Missouri. Further, the claims herein concern the ownership status and structure of the Company, a Missouri company with only Missouri operations, and therefore arise at least in part from Defendant's contacts with Missouri. Finally, Missouri has a substantial interest in hearing this dispute since it concerns the ownership status and structure of a Missouri company with only Missouri operations, and any burden or logistical inconvenience to Defendant of having this dispute decided in Missouri is insignificant.

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required.

9. Venue is proper in this Court because all parties have expressly consented to jurisdiction and venue in this Court for the present dispute. <u>Ex. 1</u> § 15.8.

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required. To the extent a response is required, the allegations in this paragraph are admitted. By way of further response, the allegations in this paragraph refer to a document that speaks for itself and Cardinals refers the Court to that document for its true and correct content.

10. Venue is likewise proper in this Court under 28 U.S.C. § 1391(b)(2) and (b)(3).

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required. To the extent a response is required, the allegations in this paragraph are denied.

11. A substantial part of the events or omissions giving rise to Power's claim occurred in this District. Specifically, and as further described below, this dispute concerns the ownership and shares of Ashley Energy LLC, a Missouri limited liability company with its operations located exclusively within this District.

**ANSWER:** Cardinals denies that a substantial part of the events or omissions giving rise to this case occurred in this District since Power's wrongful actions were committed by Power in Kentucky and directed to Cardinals in New York.

12. Additionally, venue is proper in this Court because Cardinals is subject to this Court's personal jurisdiction with respect to this action, as described above.

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required. To the extent a response is required, the allegations in this paragraph are denied.

### Facts

13. Power is a member of Ashley Energy, LLC (the "**Company**" or the "**LLC**").

**ANSWER:** Cardinals admits the allegations in this paragraph.

14. Cardinals is also a member of the Company.

**ANSWER:** Cardinals admits the allegations in this paragraph. .

15.     Power and Cardinals are also each referred to under the Agreement as a "**Unitholder**." Ex. 1 *passim*.

**ANSWER:**  Cardinals admits that Power and Cardinals are each referred to as a "Unitholder" under the Agreement.  By way of further response, the allegations in this paragraph refer to a document that speaks for itself and Cardinals refers the Court to that document for its true and correct content, including specifically Cardinals' former status as a Preferred Unitholder.

16.     The Company's ownership structure is set forth in that certain *Ashley Energy LLC Amended and Restated Limited Liability Company Agreement* (the "**Agreement**"). A true and accurate copy of the Agreement is attached as Exhibit 1.

**ANSWER:**  Cardinals admits that Exhibit 1 is a true and correct copy of the Company's Amended and Restated Limited Liability Company Agreement.  By way of further response, the allegations in this paragraph refer to a document that speaks for itself and Cardinals refers the Court to that document for its true and correct content.

17.     In 2017, Power and Cardinals partnered to purchase 100% of the Company.

**ANSWER:**  Cardinals admits that Power and Cardinals purchased 100% of the Company in 2017 and that Cardinals purchased a majority stake in the Company as a Preferred Unitholder.

18.     Specifically, on August 8, 2017, the Company's Original Member, Michael Becker, transferred 100% of the Company's equity interests to Power, also known under the Agreement as the "Class A Unitholder." Ex. 1 at 1.

**ANSWER:**  Cardinals admits that Michael Becker allegedly transferred 100% of the Company's equity interest to Power.  By way of further response, Cardinals recently learned that Mr. Becker sued Power and Miller (among other parties) in this Court claiming that Power and Miller (among others) defrauded Mr. Becker in connection with the transaction referenced in paragraph 18 of the

Complaint. That matter is ongoing under the caption, *SL EC, LLC, et al. v. Ashley Energy, LLC, et al.*, Case No. 4:18-CV-01377-JAR (E.D. Mo.).

19.     Also on August 8, 2017, Cardinals, also known under the Agreement as the "Preferred Unitholder," purchased 999,222 Preferred Units of the Company in exchange for an investment of $999,222.00. *Id.*

**ANSWER:** Cardinals admits that Cardinals was the sole "Preferred Unitholder" under the Agreement and, on August 8, 2017, acquired 999,222 Preferred Units of the Company, making it the majority owner of the Company, but otherwise denies the allegations in this paragraph.

20.     Power is the sole owner of the Company's Class A Common Units and owns 850,988 such units. *Id.* at Schedule I.

**ANSWER:** Cardinals denies that Power is currently the sole owner of the Company's Class A Common Units. On August 16, 2021, Cardinals converted its 999,222 Preferred Units of the Company into 999,222 Class A Common Units, effective on that date, pursuant to Section 4.1 of the Agreement.

21.     Cardinals is the sole owner of the Company's Preferred Units and owns 999,222 such units. *Id.*

**ANSWER:** Cardinals denies that Cardinals is currently the owner of the Company's Preferred Units. On August 16, 2021, Cardinals converted its 999,222 Preferred Units of the Company into 999,222 Class A Common Units, effective on that date, pursuant to Section 4.1 of the Agreement.

22.     Section 10.5 of the Agreement sets forth a Call Option. *Id.* § 10.5(b).

**ANSWER:** The allegations in this paragraph refer to a document that speaks for itself and Cardinals refers the Court to that document for its true and correct content.

23.     The Call Option provides: "At any time on or following August 9, 2021, a majority of Class A Common Units shall have the right to purchase a portion or all of the Preferred Units

pursuant to this <u>Section 10.5(b)</u> (the "<u>Call</u>"). The Call shall be consummated within the same time period and at the same price described in Section 10.5(a) above." *Id.*

**ANSWER:** The allegations in this paragraph refer to a document that speaks for itself and Cardinals refers the Court to that document for its true and correct content.

24. Therefore, at any time on or after August 9, 2021, Power—the majority Class A Unitholder—was entitled to exercise its rights under the Call and thereby purchase all or a portion of the Company's Preferred Units. *Id.*

**ANSWER:** Cardinals denies that Power was entitled to purchase all or a portion of the Company's Preferred Units. The Call Option in Section 10.4 was subject to, among other things, Cardinals' right to convert its Preferred Units into Class A Common Units under Section 4.1 (the "Conversion Right"), which Cardinals exercised on August 16, 2021.

25. Pursuant to Section 10.5(b), the Call shall be consummated at the price described in Section 10.5(a), which specifies the pricing of the Put as follows:

> The price for Preferred Units sold to the LLC in accordance with this <u>Section 10.5(a)</u> shall be equal to the greater of (x) the sum of (1) the Preferred Unitholder's Unreturned Capital and (2) the Preferred Unitholder's Unpaid Return, in each case as of the date of such redemption or (y) the price of the Preferred Units calculated in accordance with the following formula:
> $$E * 11 - D - WC - O$$
> E = trailing twelve month EBITDA, as determined by LLC's auditors, measured from the month ending prior to redemption;
> D = all secured debt outstanding at the time of redemption;
> WC = adjusted working capital, as determined by the LLC's auditors;
> O = other material, on-balance sheet LLC obligations, measured for the month ending prior to redemption

*Id.* § 10.5.

**ANSWER:** Cardinals denies that the Call "shall be consummated" at the price described in Section 10.5(a) where, as here, Cardinals converted its Preferred Units to Class A Common Units

upon receiving notice of the Call.  Once Cardinals converted its Preferred Units into Class A Common Units on August 16, 2021, Power no longer had any Call rights.

26.     Therefore, the Call, once exercised by Power—the majority Class A Unitholder— must be consummated at the price described in Section 10.5(a). *Id.*

**ANSWER:**  Cardinals denies that the Call once exercised by Power must be consummated at the price in Section 10.5(a).  The Call Option in Section 10.4 was subject to, among other things, Cardinals' right to convert its Preferred Units into Class A Common Units under Section 4.1, which Cardinals exercised on August 16, 2021.

27.     The price formulas set by Section 10.5 applicable to the Put Option and Call Option are to be calculated as of the time of exercise by the purchasing party. *Id.*

**ANSWER:**  Cardinals denies that the price formulas in Section 10.5 are to be calculated as of the time of exercise by the purchasing party.  To the extent Cardinals had not converted its Preferred Units into Class A Common Units as it did here, Cardinals would be entitled to a purchase price calculated as of the time of the closing of the Call which is the time of redemption.

28.     Therefore, the purchase price for Power's purchase of the Preferred Units pursuant to the Call Option is to be calculated as of August 9, 2021, when Power exercised its Call. *Id.*

**ANSWER:** Cardinals denies that the purchase price for Power to purchase the Preferred Units pursuant to the Call Option is to be calculated as of August 9, 2021.  To the extent Cardinals had not converted its Preferred Units into Class A Common Units as it did here, Cardinals would be entitled to a purchase price calculated as of the time of the closing of the Call which is the time of redemption.

29.     Also pursuant to Section 10.5(b), the Call, once exercised by the majority Class A Unitholder, shall be consummated within the timing specified by Section 10.5(a) governing the Put, which provides that the Put shall be consummated within six months after the delivery of

notice of exercise: "The Put shall be consummated within six (6) months after the delivery of notice that the Preferred Unitholder has exercised the Put (such date of consummation, the "<u>Put Closing</u>"). If the Put Closing does not take place in accordance with Section 10.5(a) or to the extent that the LLC may not, as of the Put Closing legally redeem the Preferred Units, such redemption will take place as soon as legally permitted." *Id.*

**ANSWER:** Cardinals denies that the Call once exercised must be consummated within the timing specified by Section 10.5(a). The Call, at all times, was subject to Cardinal's right to convert its Preferred Units into Class A Common Units "at any time" under Section 4.1.

30.     Therefore, the Call, once exercised by Power—the majority Class A Unitholder— must be consummated within six months after the delivery of notice that Power has exercised the Call. *Id.*

**ANSWER:** Cardinals denies that the Call once exercised by Power must be consummated within six months after the delivery of notice that Power has exercised the Call. The Call, at all times, was subject to Cardinal's right to convert its Preferred Units into Class A Common Units "at any time" under Section 4.1. As discussed herein, Cardinals exercised that right effective August 16, 2021, thereby rendering moot the need for a closing of the Call.

31.     The parties specifically agreed that they would cooperate so as to ensure the purposes of the Agreement are achieved: "The Parties agree to execute and deliver all documents, provide all information and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement." *Id.* § 15.12.

**ANSWER:** Cardinals admits that the parties specifically agreed that they would cooperate so as to ensure the purposes of the Agreement are achieved, but denies any suggestion that Cardinals has not so cooperated. By way of further response, the allegations in this paragraph refer to a

document that speaks for itself and Cardinals refers the Court to that document for its true and correct contents.

32.    The parties further agreed that specific performance and injunctive relief would be available as potential remedies for breach of any provision of the Agreement: "The Parties agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that the LLC and each Unitholder may in its sole discretion apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive relief (without posting a bond or other security) in order to enforce or prevent any violation of the provisions of this Agreement." *Id.* § 15.3.

**ANSWER:** Cardinals admits that the parties agreed that specific performance and injunctive relief would be available as potential remedies for breach of any provision of the Agreement, but denies any suggestion that Cardinals has breached any provision of the Agreement.  By way of further response, the allegations in this paragraph refer to a document that speaks for itself and Cardinals refers the Court to that document for its true and correct contents.

33.    On and effective August 9, 2021, Power exercised the Call as set forth in the Call Option (Agreement § 10.5) and thereby proceeded with purchasing all of the Company's Preferred Units.

**ANSWER:** Cardinals denies that that Power exercised the Call effective August 9, 2021.  By way of further response, Power purports to have sent Cardinals a notice of its intent to exercise its Call on or about August 9, 2021, which Cardinals did not receive until August 12, 2021.  In response, and as was its right under Section 4.1 of the Agreement, Cardinals converted its Preferred Units into Class A Common Units, effective August 16, 2021, thereby eliminating Power's Call.

34.    On August 9, 2021, Power delivered written notice to Cardinals of Power's Call exercise and resulting purchase of the Preferred Units, as well as the Call purchase price in

accordance with the Section 10.5(a) price formula, namely: $1,610,971.77. A true and accurate copy of Power's Call Notice is attached as <u>Exhibit 2</u>. Power sought to consummate the transaction immediately. *Id.*

**ANSWER:** Cardinals expressly denies the allegations in this paragraph. By way of further response, Power sent a letter to an empty office building via fax on August 9, 2021 purporting to be written notice that Power intended to exercise its Call option, which Cardinals did not receive until August 12, 2021, based on an erroneous calculation of the purchase price set forth in Section 10.5(a). In response, Cardinals exercised its right to convert its Preferred Units into Class A Common Units effective August 16, 2021, thereby rendering the need for a closing of the Call moot.

35. The Call Notice was delivered to Cardinals' office located at 405 Lexington Ave., 59th Floor, New York, NY 10174 via courier, facsimile, and mail on August 9. *Id.*

**ANSWER:** Cardinals admits that a document was faxed to this office, but denies that the document constitutes notice.

36. The purchase price amount includes a total return of $611,749.77 over the life of Cardinals' 4-year investment, or 61%, on its original $999,220.00 investment.

**ANSWER:** Cardinals denies that purchase price includes a total return of 61% on its original investment. The purchase price, even if correct, would only comprise an approximately 15% per annum return on investment.

37. Since receiving the Call Notice, Cardinals has informed Powers that it is unwilling to comply with its obligations under the Agreement to consummate and close the Call.

**ANSWER:** Cardinals denies that it is unwilling to comply with its obligations under the Agreement. To the contrary, Power, not Cardinals, is refusing to recognize Cardinals' right to

convert its Preferred Units to Class A Common Units "at any time" as reflected in Section 4.1 of the Agreement. *See generally* Counterclaims.

38.     On an August 12, 2021 phone call, representatives of Cardinals made all of this clear to Mason Miller, Power's representative, despite also admitting to Mr. Miller that Section 10.5 of the Agreement is "very clear" in providing Power with the Call Option it exercised. On that phone call, the Cardinals' representatives even asked Power to retract its exercise of the Call (which Power declined to do).  Cardinals also refused to permit Power to consummate the call and refused to provide payment/wire instructions.

**ANSWER:** Cardinals denies the allegations in this paragraph.

39.     Further, after receiving Power's notice, Cardinals began taking steps to prevent the consummation and closing of the Call, including attempting to convert its Preferred Units— all of which Cardinals was already obligated to sell to Power by virtue of the Call exercise.

**ANSWER:** Cardinals denies that it was obligated to sell its Preferred Units to Power by virtue of the Call.  As set forth in Section 4.1 of the Agreement, Cardinals was permitted to, and did, convert its Preferred Units into Class A Common Units "at any time," which included, but was not limited to, after Power exercised its Call.  Once Cardinals converted its Preferred Units into Class A Common Units, Power's Call was terminated.

40.     Section 4.1(a) provides a mechanism by which the Preferred Unitholder may convert Preferred Units it owns into Class A Common Units.  Ex. 1 § 4.1(a).

**ANSWER:** Cardinals admits that Section 4.1(a) of the Agreement provides a mechanism for Cardinals to convert its Preferred Units into Class A Common Units "at any time."

41.     Almost a week after receiving the Call Notice, Cardinals informed Power that Cardinals was attempting to convert all of its 999,222 Preferred Units to Class A Common Units under Section 4.1(a) in an effort to "moot" Power's Call.

**ANSWER:** Cardinals denies that Cardinals "was attempting" to convert its Preferred Units into to Class A Common Units almost "a week after receiving" the Call Notice. After receiving Power's Call Notice on August 12, 2021, Cardinals did convert its Preferred Units into Class A Common Units effective August 16, 2012 which rendered Power's Call moot.

42.     Specifically, shortly after 7:00 p.m. Central on Sunday, August 15, 2021—six days after receiving Power's notice—Cardinals faxed Mr. Miller a letter purporting to provide notice that Cardinals is converting all of its Preferred Units into Class A Common Units pursuant to Section 4.1(a). A true and accurate copy of the August 15 Letter to Mr. Miller is attached as Exhibit 3.

**ANSWER:** Cardinals denies that Cardinals sent its notice "six days after receiving Power's notice" or that Cardinals was "purporting" to provide notice of its Conversion Right. Specifically, after receiving Power's Call Notice on August 12, 2021, Cardinals properly exercised its Conversion Right under Section 4.1(a), effective as of the close of business on August 16, 2021, thereby converting its Preferred Units into Class A Common Units and mooting Power's Call. Cardinals admits that Exhibit 3 is a true and accurate copy of the August 15 Letter Cardinals sent properly exercising its Conversion Right.

43.     Cardinals sent a second letter at that same time to Mr. Miller, as a board member of Ashley Energy, giving the board the same notice. A true and accurate copy of the August 15 Letter to the Board is attached as Exhibit 4.

**ANSWER:** Cardinals admits that it also sent the same notice to Mr. Miller as a board member and that Exhibit 4 is a true and correct copy of said notice.

44.     Section 4.2(a) of the Agreement provides that the effective time of conversion of Preferred Units under Section 4.1(a) is "[t]he close of business on the date of receipt by the LLC of such notice [of conversion]." Ex. 1 § 4.2(a).

**ANSWER:** Cardinals admits that Cardinals conversion of its Preferred Units into Class A Common Units was effective as of "[t]he close of business on the date of receipt by the LLC of such notice [of conversion];" namely, the close of business on August 16, 2021.

45. Thus, notwithstanding the fact that Cardinals' purported conversion attempts to convert all of the very shares that Power has already begun purchasing through its Call, the earliest Cardinals' attempted conversion could even become effective is the close of business on Monday, August 16, 2021—after the filing of this Complaint. *Id.*

**ANSWER:** Cardinals denies that Cardinals conversion was "purported" but admits that the effective date of the conversion was the close of business on August 16, 2021. By way of further response, Cardinals was permitted to, and did, convert its Preferred Units into Class A Common Units "at any time" pursuant to Section 4.1 of the Agreement, which included, but was not limited to, after Power exercised its Call. Once Cardinals converted its Preferred Units into Class A Common Units, Power's Call was terminated.

46. Cardinals' August 15, 2021 letters further purported to reject Power's exercise of its Call Option, despite admitting that Cardinals had received Power's August 9, 2021 notice of its Call exercise. Ex. 3 at p.1; Ex. 4 at p.1. These attempts to convert the Preferred Units so as to "moot" Power's Call constitutes immediate and irreparable harm to Cardinals, as it purports to prevent Power from purchasing and owing the Preferred Units, as bargained for in the Agreement.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph. Cardinals was permitted to convert its Preferred Units into Class A Common Units "at any time" under Section 4.1 of the Agreement, which included, but was not limited to, after Power exercised its Call. On August 15, 2021, Cardinals sent Power and the Company notice that it was exercising its Conversion Right effective August 16, 2021. After the close of business on August 16, 2021, Cardinals' Preferred Units were converted into Class A Common Units, and Power's Call was terminated.

47.     Further, after receiving Power's notice, Cardinals has threatened to take additional steps to frustrate and/or prevent the consummation and closing of the Call pursuant to the Agreement.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph.  Cardinals was permitted to convert its Preferred Units into Class A Common Units "at any time" under Section 4.1 of the Agreement, which included, but was not limited to, after Power exercised its Call.  On August 15, 2021, Cardinals sent Power and the Company notice that it was exercising its Conversion Right effective August 16, 2021.  After the close of business on August 16, 2021, Cardinals' Preferred Units were converted into Class A Common Units, and Power's Call was terminated.

48.     Specifically, in a separate August 12, 2021 phone call, a Cardinals representative communicated to Mr. Miller that Cardinals believed it has the power to delay the closing of Power's Call at least six months, and to take steps to significantly increase the Call's purchase price by forcing cash distributions from the Company, and prematurely settling an as-yet-unlitigated and unliquidated subrogation claim by the Company against the Metropolitan St. Louis Sewer District and forcing those proceeds to be distributed as well.  The representative also expressed that he had no intention of selling the Preferred Units at the price contemplated by section 10.5 of the Agreement.

**ANSWER:** Cardinals denies the allegations in this paragraph.

49.     These threats were made despite, earlier in the day on August 12, 2021, a Cardinals representative admitting by email that the Agreement requires consummation of the Call purchase within six months of Power's notice and in the same email chain admitting that the price mechanics for the Call Option are the same as for the Put Option under the Agreement. August 12 email chain at pp. 1-3, a true and accurate copy of which is attached as <u>Exhibit 5</u>.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph. By way of further response, Cardinals was permitted to convert its Preferred Units into Class A Common Units "at any time" under Section 4.1 of the Agreement, which included, but was not limited to, after Power exercised its Call. On August 15, 2021, Cardinals sent Power and the Company notice that it was exercising its Conversion Right effective August 16, 2021. After the close of business on August 16, 2021, Cardinals' Preferred Units were converted into Class A Common Units, and Power's Call was terminated.

50.     In an email the following day, on August 13, the Cardinals' representative further acknowledged that the Board of the Company, including Cardinals' two Board members, had unanimously approved the form and methodology of the calculation of the price set forth in the Call exercise. August 13 email at p.1, a true and accurate copy of which email chain is attached as Exhibit 6.

**ANSWER:** Cardinals admits that an email was sent on August 13 but denies the remainder of the allegations of this paragraph. By way of further response, Miller influenced the Company's auditors to calculate EBITDA at an inappropriately low rate so that Miller could usurp Cardinals' equity position in the Company and receive its distribution.

51.     The closing delay threatened by Cardinals represents an attempt to delay the closing indefinitely so as to make execution of the Call purchase impossible, which again constitutes irreparable harm to Power.

**ANSWER:** Cardinals denies the allegations in this paragraph except that it admits that the closing of the Call is not possible because Cardinals properly converted its Preferred Units into Class A Common Units effective August 16, 2021 thereby terminating Power's Call. By way of further response, the allegations in this paragraph call for a legal conclusion to which no response is required.

52.     The delay and/or refusal to consummate the Call threatened by Cardinals represent an attempt to raise the purchase price for Power's Call significantly, under a scenario where the purchase price is calculated as of the date of closing.

**ANSWER:**  Cardinals denies the allegations in this paragraph except that it admits that, had Cardinals not exercised its Conversion Right, the purchase price under the Call would be as of the date of closing.

53.     The Agreement does not provide for the Call purchase price to be calculated as of the date of closing; on the contrary, it requires the purchase price to be calculated as of the date of Power's exercise of the call.  Ex. 1 § 10.5.

**ANSWER:**  Cardinals expressly denies the allegations in this paragraph and respectfully refers the Court to Section 10.5 of the Agreement for its true and correct content.

54.     Beyond Cardinals' wholesale refusal to comply with its obligations to consummate and close the Call and its attempt to subvert Power's Call through conversion, Cardinals' taking the additional threatened steps would render impossible the consummation and closing of Power's Call pursuant to the Agreement because it would delay the start of the closing process (which involves a number of events that must happen in sequence over a period of months) and would improperly burden Power with a higher purchase price that it is not obligated to pay.

**ANSWER:**  Cardinals denies the allegations in this paragraph except that it admits that the closing of the Call is impossible since Cardinals properly converted its Preferred Units into Class A Common Units effective August 16, 2021 thereby mooting Power's Call.

55.     Power exercised its Call Option, including delivering the required notice, before Cardinals informed Power of its refusal to comply with its contractual obligations with respect to the Call, its attempted conversion of all of the Preferred Units, and its threat to take additional subversive actions.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph. Cardinals properly converted its Preferred Units into Class A Common Units effective August 16, 2021 thereby mooting Power's Call.

56.     The parties agreed that they would have all rights and remedies available to them under any law, including the Agreement: "Each Unitholder shall have all rights and remedies set forth in this Agreement and all rights and remedies which such person has been granted at any time under any other agreement or contract and all of the rights which such Person has under any law." Ex. 1 § 15.3.

**ANSWER:** The allegations in this paragraph refer to a document that speaks for itself and Cardinals refers the Court to that document for its true and correct contents.

57.     The parties further agreed that Missouri law would govern this dispute and this Court would be an appropriate venue: "This Agreement and any dispute hereunder shall be governed by, and construed in accordance with, the laws of the State of Missouri, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Missouri or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Missouri. Any dispute relating to this Agreement shall be heard in the state or federal courts of Missouri, and the Parties agree to jurisdiction and venue therein." *Id.* § 15.8.

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required. To the extent a response is required, the allegations in this paragraph are admitted. By way of further response, the allegations in this paragraph refer to a document that speaks for itself and Cardinals refers the Court to that document for its true and correct contents.

## COUNT I – DECLARATORY RELIEF

58.     Plaintiff restates and re-alleges paragraphs 1 through 57 as if fully set forth herein.

**ANSWER:**  Cardinals incorporates by reference its responses to paragraphs 1 through 57 of the Complaint as if fully set forth herein.

59.     The Declaratory Judgment Act ("the Act") provides in relevant part that: "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Act further provides: "Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." *Id.*

**ANSWER:**  The allegations in this paragraph call for a legal conclusion to which no response is required.  To the extent a response is required, the allegations in this paragraph are admitted.

60.     To state a claim under the Act, the plaintiff must meet the "case or controversy" requirements of Article III of the Constitution and have standing to sue under the relevant state law. *Cooper Indus., LLC v. Spectrum Brands, Inc.*, 2017 WL 1078045, at *1-2 (E.D. Mo. Mar. 22, 2017).  Under Missouri law, a party must be a party to a contract or third-party beneficiary thereof in order to have standing to obtain a declaration of rights, status, and legal relationship under that contract. *Id.*

**ANSWER:**  The allegations in this paragraph call for a legal conclusion to which no response is required.  To the extent a response is required, the allegations in this paragraph are admitted.

61.     An actual and justiciable controversy exists between Power and Cardinals, and this Court is vested with the power to declare the rights and other legal relations of the parties with respect to the Agreement and the Call Option set forth therein.

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required. To the extent a response is required, the allegations in this paragraph are denied.

62. An actual and justiciable controversy exists because Power, pursuant to the Agreement, has exercised its Call Option rights in order to purchase all of the Company's Preferred Units, and delivered notice of same and of Power's intent to consummate and close the Call, and Cardinals, after receiving Power's notice, has informed Powers that it intends not to comply with its obligations under the Agreement to consummate and close the Call, and is threatening to take steps to frustrate and/or prevent the consummation and closing of the Call pursuant to the Agreement, including delaying the closing to try to impose on Power an unauthorized and falsely inflated purchase price.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph. Cardinals properly converted its Preferred Units into Class A Common Units effective August 16, 2021 thereby mooting Power's Call. There is nothing improper with Cardinals exercising its contractual right.

63. An actual and justiciable controversy further exists because after receiving Power's notice, Cardinals has taken steps to try to prevent the consummation and closing of the Call. Specifically, Cardinals is attempting to convert all of its 999,222 Preferred Units—all of which Power had already begun purchasing through its Call exercise—into Class A Common Units under Section 4.1(a).

**ANSWER:** Cardinals expressly denies the allegations in this paragraph. Cardinals properly converted its Preferred Units into Class A Common Units effective August 16, 2021 thereby mooting Power's Call. There is nothing improper with Cardinals exercising its contractual right.

64. An actual and justiciable controversy further exists because the parties expressly agreed in Section 15.12 of the Agreement that they would "take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement," but Cardinals has

informed Power that it is refusing to take or refrain from taking actions necessary and appropriate to achieve the purposes of the Agreement, in that it is refusing to cooperate with the consummation and closing of Power's Call pursuant to Section 10.5 of the Agreement, and intends to take actions to frustrate and/or prevent the consummation and closing of Power's Call through delay and financial manipulation to try to alter the purchase price. Further, Cardinals is attempting to convert all of the shares subject to Power's previous Call exercise.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph. Cardinals properly converted its Preferred Units into Class A Common Units effective August 16, 2021 thereby mooting Power's Call. There is nothing improper with Cardinals exercising its contractual right.

65. An actual and justiciable controversy further exists because Cardinals has claimed entitlement to delay the closing of Power's Call and to avoid taking necessary and appropriate steps to consummate and close the Call within six months of Power's notice, but nothing in the Agreement so entitles them, and in fact, the Agreement is expressly to the contrary.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph. Cardinals properly converted its Preferred Units into Class A Common Units effective August 16, 2021 pursuant to Section 4.1 of the Agreement thereby mooting Power's Call.

66. An actual and justiciable controversy further exists because Cardinals has claimed entitlement to take financial steps to manipulate Power's purchase price upward after receiving notice of Power's exercise, but nothing in the Agreement so entitles them, and in fact, the Agreement is expressly to the contrary.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph. To the extent Cardinals did not exercised its Conversion Right (it did), the purchase price for its Preferred Units would be calculated as of the date of the closing of the Call and would be based on a correct calculation of the Company's EBITDA.

67.     An actual and justiciable controversy further exists because Cardinals contends that the purchase price for Power's Call is to be calculated as of the date of closing, but the Agreement provides that it is to be calculated as of the date of Power's exercise of the Call.

**ANSWER:** Cardinals expressly denies that the Agreement provides that the purchase price is to be calculated as of the date of Power's exercise of the Call.

68.     Power validly exercised its Call Option, including delivering the required notice, before Cardinals informed Power of its refusal to comply with its contractual obligations with respect to the Call, its attempted conversion of all of the Preferred Units, and its threat to take additional subversive actions.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph.  Cardinals properly converted its Preferred Units into Class A Common Units effective August 16, 2021 thereby mooting Power's Call.  There is nothing improper with Cardinals exercising its contractual right.

69.     The Call Option constitutes a continuing and irrevocable offer by Cardinals to Power that Cardinals cannot legally withdraw. Once Power accepted the offer in the manner specified in the Call Option, the Call Option was exercised so as to create a binding bilateral contract that is specifically enforceable by Power against Cardinals.  *In re Estate of Schulze*, 105 S.W.3d 548, 550 (Mo. App. 2003); *Walsh v. White House Post Productions, LLC*, 2020 WL 1492543, at *5-6 (Del. Ch. Ct. Mar. 25, 2020).

**ANSWER:** Cardinals expressly denies the allegations in this paragraph.  The Call Option was subject to other rights in the Agreement, including Cardinals' right to convert its Preferred Units into Class A Common Units, which Cardinals exercised effective August 16, 2021.  By way of further response, the allegations in this paragraph call for a legal conclusion to which no response is required.

70. Conversion of Cardinals' Preferred Units into Class A Common Units constitutes an attempt to nullify and make impossible the consummation and closing of Power's Call by making all Preferred Units unavailable to be purchased by Power.

**ANSWER:** Cardinals admits that it converted its Preferred Units into Class A Common Units and that Power no longer has the ability to exercise the Call, but otherwise denies the allegations in this paragraph.

71. Therefore, Cardinals' refusal to comply with its obligations to consummate and close the Call and its threatened subversive actions constitute anticipatory breach, and its attempted conversion of the Preferred Units constitutes actual breach, of Cardinals' obligations under Sections 10.5 and 15.12 of the Agreement.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph. Cardinals properly converted its Preferred Units into Class A Common Units effective August 16, 2021 thereby mooting Power's Call as Cardinals was permitted to do under Section 4.1 of the Agreement.

72. Moreover, there is implied in every contract a covenant of good faith and fair dealing. Cardinals, therefore, owed duties of good faith and fair dealing to Power under the Agreement.

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required. To the extent a response is required, Cardinals admits that there is covenant of good faith and fair dealing in every Missouri contract but denies the suggestion that Cardinals has breached that covenant.

73. Cardinals' conduct in refusing to honor and perform its contractual obligations in connection with Power's Call under Section 10.5, in attempting to convert its Preferred Units after being notified that Power had exercised its Call Option and had begun purchasing the Preferred Units, and in threatening to take additional steps to frustrate and/or prevent the consummation and

closing of Power's Call through unauthorized financial manipulation of the purchase price, bespeaks a conscious effort to frustrate, prevent, and subvert the fulfillment of the exercised Call Option and therefore deprive Power of the benefits it is rightly owed under the Agreement.

**ANSWER:** Cardinals expressly denies the allegations of this paragraph. Cardinals properly converted its Preferred Units into Class A Common Units effective August 16, 2021 thereby mooting Power's Call as it was permitted to do under Section 4.1 of the Agreement.

74.    Thus, not only did Cardinals breach the Agreement, it also breached its duties of good faith and fair dealing.

**ANSWER:** Cardinals expressly denies the allegations of this paragraph. By way of further response, the allegations in this paragraph call for a legal conclusion to which no response is required

75.    The subject matter over which Power seeks declaratory relief—the rights and other legal relations of the parties with respect to the Agreement and the Call Option set forth therein— is a matter within the subject matter jurisdiction of this Court.

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required. To the extent a response is required, the allegations in this paragraph are admitted.

76.    Power has standing under Missouri law to obtain declaratory relief under the Agreement in this Court because Power is a party to the Agreement.

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required. To the extent a response is required, the allegations in this paragraph are denied.

77.    Power further has standing to seek declaratory relief in this Court because the parties agreed that such relief was available as a potential remedy in the event of a breach of the Agreement by the other party. Ex. 1 § 15.3.

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required. To the extent a response is required, the allegations in this paragraph are denied. By way of further response, the allegations in this paragraph refer to a document that speaks for itself and Cardinals refers the Court to that document for its true and correct contents.

78. The Agreement is a valid and enforceable contract.

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required. To the extent a response is required, the allegations in this paragraph are admitted.

WHEREFORE, Plaintiff Power Investments, LLC requests that this Court enter declaratory judgment in favor of Plaintiff Power Investments, LLC and against Defendant Cardinals Preferred, LLC, including: (1) a declaration by this Court that the Agreement is a valid and enforceable contract; (2) a declaration by this Court that the Agreement's Call Option, set forth in Section 10.5, constitutes a continuing and irrevocable offer by Cardinals to Power that Cardinals cannot legally withdraw; (3) a declaration by this Court that once Power accepted the offer in the manner specified in the Call Option, the Call Option was exercised so as to create a binding bilateral contract that is specifically enforceable by Power against Cardinals; (4) a declaration by this Court that under Sections 10.5 and 15.12 of the Agreement, Cardinals is obligated to take all steps necessary and appropriate to cooperate with the consummation and closing of Power's Call within six months of August 9, 2021, and at the purchase price of $1,610,971.77; (5) a declaration by this Court that Cardinals' refusal to consummate and close Power's Call constitutes breaches of Sections 10.5 and 15.12 of the Agreement, as well as the implied covenant of good faith and fair dealing; (6) a declaration by this Court that Cardinals' attempted conversion of its Preferred Units constitutes a breach of Sections 10.5 and 15.12 of the Agreement, as well as the implied covenant of good faith and fair dealing; (7) a declaration by this Court that Cardinals' attempted conversion of its Preferred Units under Section 4.1(a) is invalid and ineffectual and must yield to

Power's exercised Call Option rights under Section 10.5; (8) a declaration by this Court that Cardinals' threatened actions, including delaying the consummation and closing of the Call and upward financial manipulation of the purchase price after Power's notice of exercise, constitute breaches of Sections 10.5 and 15.12 of the Agreement, as well as the implied covenant of good faith and fair dealing; (9) a declaration by this Court that the Agreement does not entitle Cardinals to delay the consummation and closing of Power's Call or to avoid taking necessary and appropriate steps to consummate and close the Call within six months of Power's notice; (10) a declaration by this Court that the Agreement does not entitle Cardinals to manipulate the Call purchase price upward, including without limitation through cash infusions into the Company after Power's notice, or to impose on Power a purchase price other than the purchase price communicated by Power to Cardinals in its notice on August 9, 2021; (11) a declaration by this Court that the Agreement provides that the Call purchase price is to be calculated as of the date of Power's exercise, not the date of closing; (12) a declaration by this Court that the purchase price for Power's Call, in accordance with Section 10.5, is $1,610,971.77; and (13) such other or different declaratory relief as the Court deems just and proper.

**ANSWER:** Cardinals denies Power is entitled to any of the relief it seeks in this Action.

## **COUNT II – SPECIFIC PERFORMANCE**

79.     Plaintiff restates and re-alleges paragraphs 1 through 78 as if fully set forth herein.

**ANSWER:** Cardinals incorporates by reference its responses to paragraphs 1 through 78 of the Complaint as if fully set forth herein.

80.     The Call Option provides that on or after August 9, 2021, Power—the majority Class A Unitholder—was entitled to exercise the Call and thereby purchase all or a portion of the Company's Preferred Units.  Ex. 1 § 10.5(b).

**ANSWER:** Cardinals denies that Power was entitled to purchase all or a portion of the Company's Preferred Units. The Call Option in Section 10.4 was subject to, among other things, Cardinals' right to convert its Preferred Units into Class A Common Units under Section 4.1, which Cardinals exercised effective August 16, 2021.

81.     The Call, once exercised by Power—the majority Class A Unitholder—must be consummated within six months after the delivery of notice that Power has exercised the Call, at the price described in Section 10.5(a). *Id.* § 10.5.

**ANSWER:** Cardinals denies that Power was entitled to purchase all or a portion of the Company's Preferred Units. The Call Option in Section 10.4 was subject to, among other things, Cardinals' right to convert its Preferred Units into Class A Common Units under Section 4.1, which Cardinals exercised effective August 16, 2021.

82.     On August 9, 2021, Power delivered written notice to Cardinals that Power was exercising the Call and was thereby proceeding with purchasing all of the Preferred Units, as well as the Call purchase price in accordance with the Section 10.5(a) price formula, namely: $1,610,971.77.

**ANSWER:** Cardinals denies the characterization of what Power delivered as "written notice" but admits that Power sent via fax to an empty office building what it alleges is written notice. By way of further response, Cardinals denies that Power was entitled to purchase all or a portion of the Company's Preferred Units. The Call Option in Section 10.4 was subject to, among other things, Cardinals' right to convert its Preferred Units into Class A Common Units under Section 4.1, which Cardinals exercised effective August 16, 2021.

83.     The Call Option constitutes a continuing and irrevocable offer by Cardinals to Power that Cardinals cannot legally withdraw. Once Power accepted the offer in the manner specified in the Call Option, the Call Option was exercised so as to create a binding bilateral

contract that is specifically enforceable by Power against Cardinals. *In re Estate of Schulze*, 105 S.W.3d 548, 550 (Mo. App. 2003); *Walsh v. White House Post Productions, LLC*, 2020 WL 1492543, at *5-6 (Del. Ch. Ct. Mar. 25, 2020).

**ANSWER:** Cardinals expressly denies the allegations in this paragraph. The Call Option was subject to other rights in the Agreement, including Cardinals' right to convert its Preferred Units into Class A Common Units, which Cardinals exercised effective August 16, 2021. By way of further response, the allegations in this paragraph call for a legal conclusion to which no response is required.

84.     Thus, once Power accepted the Call Option offer, Cardinals became obligated to take affirmative steps to consummate and close Power's purchase of the Preferred Units in the manner prescribed by Section 10.5, including within six months of Power's notice of exercise and at the $1,610,971.77 price communicated by Power. Ex. 1 § 10.5.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph. The Call Option was subject to other rights in the Agreement, including Cardinals' right to convert its Preferred Units into Class A Common Units, which Cardinals exercised effective August 16, 2021. By way of further response, the allegations in this paragraph call for a legal conclusion to which no response is required.

85.     Since receiving Power's notice, Cardinals has failed to take such steps and has indicated to Power that it is refusing to comply with its obligations to consummate and close the Call as required by Section 10.5, and instead is threatening to take steps to frustrate and/or prevent the consummation and closing of the Call.

**ANSWER:** Cardinals denies the allegations in this paragraph except that it admits that Cardinals has no obligation to close the Call since Cardinals exercised its Conversion Right.

86.     Specifically, Cardinals has threatened to delay the closing and to manipulate the purchase price upward through, at minimum, cash infusions into the Company after Power's August 9, 2021 notice in an effort to impose an unauthorized inflated purchase price on Power.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph.  The Call Option was subject to other rights in the Agreement, including Cardinals' right to convert its Preferred Units into Class A Common Units, which Cardinals exercised effective August 16, 2021.  In addition, to the extent Cardinals did not exercise its Conversion Right (it did), the purchase price for its Preferred Units would be calculated as of the date of the closing of the Call and would be based on a correct calculation of the Company's EBITDA.

87.     Accordingly, Cardinals has anticipatorily breached Section 10.5.

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required.  To the extent a response is required, the allegations in this paragraph are denied.

88.     Cardinals, further, has taken affirmative steps to try to prevent and nullify the consummation and closing of Power's Call and associated purchase of all of the Preferred Units.

**ANSWER:** Cardinals admits that it converted its Preferred Units into Class A Common Units and that Power no longer has the ability to exercise the Call, but otherwise denies the allegations in this paragraph.

89.     Specifically, after receiving Power's notice, Cardinals has attempted to convert all of its Preferred Units to Class A Common Units under Section 4.1(a) of the Agreement.

**ANSWER:** Cardinals admits that it converted its Preferred Units into Class A Common Units and that Power no longer has the ability to exercise the Call, but otherwise denies the allegations in this paragraph**.**

90.     Conversion of Cardinals' Preferred Units into Class A Common Units constitutes an attempt to nullify and make impossible the consummation and closing of Power's Call by making all Preferred Units unavailable to be purchased by Power.

**ANSWER:** Cardinals admits that it converted its Preferred Units into Class A Common Units and that Power no longer has the ability to exercise the Call, but otherwise denies the allegations in this paragraph.

91.     Accordingly, Cardinals is in actual breach of Section 10.5.

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required.  To the extent a response is required, the allegations in this paragraph are denied.

92.     Further, the parties are obligated to "take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of the Agreement," i.e., to cooperate as necessary and appropriate to achieve the Agreement's purposes.  *Id.* § 15.12.

**ANSWER:** The allegations in this paragraph refer to a document that speaks for itself and Cardinals refers the Court to that document for its true and correct contents.  To the extent a response is required, the allegations in this paragraph are denied.

93.     One of the Agreement's purposes is to provide Power with the right to exercise the Call Option and thereby purchase some or all of the Company's Preferred Units in the manner prescribed by Section 10.5, and to have that purchase consummated and closed in the manner prescribed by Section 10.5, including within six months of delivery of Power's notice and at the price set by Section 10.5(a)'s formula at the time of exercise.  *Id.* § 10.5.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph.  The Call Option was subject to other rights in the Agreement, including Cardinals' right to convert its Preferred Units into Class A Common Units, which Cardinals exercised effective August 16, 2021.  In addition, to the extent Cardinals did not exercise its Conversion Right (it did), the purchase price for its

Preferred Units would be calculated as of the date of the closing of the Call and would be based on a correct calculation of the Company's EBITDA.

94.     The Agreement therefore imposes on Cardinals an obligation to take or refrain from taking such actions as may be necessary or appropriate to allow Power's purchase of Preferred Units to be consummated and closed in the manner prescribed by Section 10.5, including within six months of delivery of Power's notice and at the price set by Section 10.5(a)'s formula at the time of exercise. *Id.* §§ 10.5, 15.12.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph. The Call Option was subject to other rights in the Agreement, including Cardinals' right to convert its Preferred Units into Class A Common Units, which Cardinals exercised effective August 16, 2021. In addition, to the extent Cardinals did not exercise its Conversion Right (it did), the purchase price for its Preferred Units would be calculated as of the date of the closing of the Call and would be based on a correct calculation of the Company's EBITDA.

95.     Cardinals has informed Power that it will not take such actions as may be necessary or appropriate to allow Power's purchase of Preferred Units to be consummated and closed in the manner prescribed by Section 10.5, including within six months of Power's notice and at the price of $1,610,971.77.

**ANSWER:** Cardinals admits that it converted its Preferred Units into Class A Common Units and that Power no longer has the ability to exercise the Call, but otherwise denies the allegations in this paragraph.

96.     Specifically, Cardinals has informed Power that it is refusing to cooperate with the consummation and closing of Power's Call and associated purchase of Preferred Units as prescribed by Section 10.5.

**ANSWER:** Cardinals admits that it converted its Preferred Units into Class A Common Units and that Power no longer has the ability to exercise the Call, but otherwise denies the allegations in this paragraph.

97.     Cardinals has further informed Power that it will not refrain from taking such actions as may be necessary or appropriate to allow Power's purchase of Preferred Units to be consummated and closed in the manner prescribed by Section 10.5, including within six months of Power's notice and at the price of $1,610,971.77.

**ANSWER:** Cardinals admits that it converted its Preferred Units into Class A Common Units and that Power no longer has the ability to exercise the Call, but otherwise denies the allegations in this paragraph..

98.     Specifically, Cardinals is threatening to take steps to frustrate and/or prevent the consummation and closing of the Call, namely, through improper delay and financial manipulation in an effort to alter the purchase price.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph.  The Call Option was subject to other rights in the Agreement, including Cardinals' right to convert its Preferred Units into Class A Common Units, which Cardinals exercised effective August 16, 2021.  In addition, to the extent Cardinals did not exercise its Conversion Right (it did), the purchase price for its Preferred Units would be calculated as of the date of the closing of the Call and would be based on a correct calculation of the Company's EBITDA.

99.     Accordingly, Cardinals has anticipatorily breached Section 15.12.

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required.  To the extent a response is required, the allegations in this paragraph are denied.

100. Further, Cardinals is in actual breach of Section 15.12 because of its attempted conversion of the Preferred Units, which constitutes a failure to refrain from conduct as may be necessary or appropriate to cooperate in the consummation and closing of Power's Call.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph. The Call Option was subject to other rights in the Agreement, including Cardinals' right to convert its Preferred Units into Class A Common Units, which Cardinals exercised effective August 16, 2021.

101. Power validly exercised its Call Option, including delivering the required notice, before Cardinals informed Power of its refusal to comply with its contractual obligations with respect to the Call, its attempted conversion of all of the Preferred Units, and its threat to take additional subversive actions.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph. The Call Option was subject to other rights in the Agreement, including Cardinals' right to convert its Preferred Units into Class A Common Units, which Cardinals exercised effective August 16, 2021. .

102. Moreover, there is implied in every contract a covenant of good faith and fair dealing. Cardinals, therefore, owed duties of good faith and fair dealing to Power under the Agreement.

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required. To the extent a response is required, Cardinals admits that there is covenant of good faith and fair dealing in every Missouri contract but denies the suggestion that Cardinals has breached that covenant.

103. Cardinals' conduct in refusing to honor and perform its contractual obligations in connection with Power's Call under Section 10.5, in attempting to convert its Preferred Units after being notified that Power had exercised its Call Option and had begun purchasing the Preferred Units, and in threatening to take additional steps to frustrate and/or prevent the consummation and

closing of Power's Call through unauthorized financial manipulation of the purchase price, bespeaks a conscious effort to frustrate, prevent, and subvert the fulfillment of the exercised Call Option and therefore deprive Power of the benefits it is rightly owed under the Agreement.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph. Cardinals properly converted its Preferred Units into Class A Common Units effective August 16, 2021 thereby mooting Power's Call. There is nothing improper with Cardinals exercising its contractual right. In addition, to the extent Cardinals did not exercise its Conversion Right (it did), the purchase price for its Preferred Units would be calculated as of the date of the closing of the Call and would be based on a correct calculation of the Company's EBITDA.

104. Thus, not only did Cardinals breach the Agreement, it also breached its duties of good faith and fair dealing.

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required. To the extent a response is required, the allegations in this paragraph are denied.

105. As a direct and proximate result of Cardinals' breaches, Power has been damaged, and will continue to be damaged.

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required. To the extent a response is required, the allegations in this paragraph are denied.

106. In light of Power's consideration paid to enter into the Agreement, Power's purposes for entering into the Agreement, and Power's settled expectations regarding the Agreement's benefits, the damages caused by Cardinals' breaches are uniquely catastrophic and can only be fully cured by the remedy of specific performance.

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required. To the extent a response is required, the allegations in this paragraph are denied.

107.    Specific performance is also authorized and warranted because the parties expressly consented to specific performance and injunctive relief as potential remedies for any breaches of the Agreement. Ex. 1 § 15.3.

**ANSWER:** The allegations in this paragraph refer to a document that speaks for itself and Cardinals refers the Court to that document for its true and correct contents. By way of further response, the allegations in this paragraph call for a legal conclusion to which no response is required. To the extent a response is required, the allegations in this paragraph are denied except that it is admitted that the Parties consented to specific performance and injunctive relief as potential remedies for any breach of the Agreement.

108.    The Agreement is a valid and enforceable contract.

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required. To the extent a response is required, the allegations in this paragraph are admitted.

109.    Power has performed, and continues to perform, all of its obligations under the Agreement, and stands ready, willing, and able to continue performing any and all such obligations.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph and respectfully refers the Court to Cardinals' Counterclaims herein.

WHEREFORE, Plaintiff Power Investments, LLC requests that this Court enter judgment in favor of Plaintiff Power Investments, LLC and against Defendant Cardinals Preferred, LLC, ordering Defendant Cardinals Preferred, LLC to perform its obligations under Sections 10.5 and 15.12 of the Agreement and accordingly take any and all steps necessary and appropriate to consummate and close Power's Call and associated purchase of all of the Preferred Units within six months of August 9, 2021 and at the purchase price of $1,610,971.77, and immediately enjoin Cardinals' attempted conversion of its Preferred Units to Class A Common Units and any and all

steps Cardinals has taken or plans to take to prevent and/or frustrate the consummation and closing

of the Call, including without limitation delaying the closing process and affecting Company

finances in an effort to manipulate the purchase price upward; or such other relief as may otherwise

be determined and proven at trial; and such other and further relief as is just and appropriate.

**ANSWER:** Cardinals denies Power is entitled to any of the relief it seeks in this Action.

## COUNT III – BREACH OF CONTRACT AND BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

110.     Plaintiff restates and re-alleges paragraphs 1 through 109 as if fully set forth herein.

**ANSWER:** Cardinals incorporates by reference its responses to paragraphs 1 through 109 of the

Complaint as if fully set forth herein.

111.     Plaintiff brings this claim in the alternative to Count II, and seeks the relief set forth

in this Count III only in the event the Court does not grant the relief sought in Count II.

**ANSWER:** Cardinals is without adequate knowledge or information to admit or deny the

allegations in this paragraph, and therefore the allegations in this paragraph are denied.

112.     The Call Option provides that on or after August 9, 2021, Power—the majority

Class A Unitholder—was entitled to exercise the Call and thereby purchase all or a portion of the

Company's Preferred Units.  Ex. 1 § 10.5(b).

**ANSWER:** Cardinals denies that Power was entitled to purchase all or a portion of the Company's

Preferred Units.  The Call Option in Section 10.4 was subject to, among other things, Cardinals'

right to convert its Preferred Units into Class A Common Units under Section 4.1, which Cardinals

exercised on August 16, 2021.

113.     The Call, once exercised by Power—the majority Class A Unitholder—must be

consummated within six months after the delivery of notice that Power has exercised the Call, at

the price described in Section 10.5(a).  *Id.* § 10.5.

**ANSWER:** Cardinals denies that Power was entitled to purchase all or a portion of the Company's Preferred Units. The Call Option in Section 10.4 was subject to, among other things, Cardinals' right to convert its Preferred Units into Class A Common Units under Section 4.1, which Cardinals exercised on August 16, 2021.

114. On August 9, 2021, Power delivered written notice to Cardinals that Power was exercising the Call and was thereby proceeding with purchasing all of the Preferred Units, as well as the Call purchase price in accordance with the Section 10.5(a) price formula, namely: $1,610,971.77.

**ANSWER:** Cardinals denies the characterization of what Power delivered as "written notice" but admits that Power sent via fax to an empty office building what it contends is written notice. By way of further response, Cardinals denies that Power was entitled to purchase all or a portion of the Company's Preferred Units. The Call Option in Section 10.4 was subject to, among other things, Cardinals' right to convert its Preferred Units into Class A Common Units under Section 4.1, which Cardinals exercised on August 16, 2021.

115. The Call Option constitutes a continuing and irrevocable offer by Cardinals to Power that Cardinals cannot legally withdraw. Once Power accepted the offer in the manner specified in the Call Option, the Call Option was exercised so as to create a binding bilateral contract that is specifically enforceable by Power against Cardinals. *In re Estate of Schulze*, 105 S.W.3d 548, 550 (Mo. App. 2003); *Walsh v. White House Post Productions, LLC*, 2020 WL 1492543, at *5-6 (Del. Ch. Ct. Mar. 25, 2020).

**ANSWER:** Cardinals expressly denies the allegations in this paragraph. The Call Option was subject to other rights in the Agreement, including Cardinals' right to convert its Preferred Units into Class A Common Units, which Cardinals exercised effective August 16, 2021. By way of

further response, the allegations in this paragraph call for a legal conclusion to which no response is required.

116.    Thus, once Power accepted the Call Option offer, Cardinals became obligated to take affirmative steps to consummate and close Power's purchase of the Preferred Units in the manner prescribed by Section 10.5, including within six months of Power's notice of exercise and at the $1,610,971.77 price communicated by Power.  Ex. 1 § 10.5.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph.  The Call Option was subject to other rights in the Agreement, including Cardinals' right to convert its Preferred Units into Class A Common Units, which Cardinals exercised effective August 16, 2021.  By way of further response, the allegations in this paragraph call for a legal conclusion to which no response is required.

117.    Since receiving Power's notice, Cardinals has failed to take such steps and has indicated to Power that it is refusing to comply with its obligations to consummate and close the Call as required by Section 10.5, and instead is threatening to take steps to frustrate and/or prevent the consummation and closing of the Call.

**ANSWER:** Cardinals denies the allegations in this paragraph except that it admits that Cardinals has no obligation to close the Call since it exercised its Conversion Right.

118.    Specifically, Cardinals has threatened to delay the closing and to manipulate the purchase price upward through, at minimum, cash infusions into the Company after Power's August 9, 2021 notice in an effort to impose an unauthorized inflated purchase price on Power.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph.  The Call Option was subject to other rights in the Agreement, including Cardinals' right to convert its Preferred Units into Class A Common Units, which Cardinals exercised effective August 16, 2021.  In addition, to the extent Cardinals did not exercise its Conversion Right (it did), the purchase price for its

Preferred Units would be calculated as of the date of the closing of the Call and would be based on a correct calculation of the Company's EBITDA.

119.    Accordingly, Cardinals has anticipatorily breached Section 10.5.

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required.  To the extent a response is required, the allegations in this paragraph are denied.

120.    Cardinals, further, has taken affirmative steps to try to prevent and nullify the consummation and closing of Power's Call and associated purchase of all of the Preferred Units.

**ANSWER:** Cardinals admits that it converted its Preferred Units into Class A Common Units and that Power no longer has the ability to exercise the Call, but otherwise denies the allegations in this paragraph.

121.    Specifically, after receiving Power's notice, Cardinals has attempted to convert all of its Preferred Units to Class A Common Units under Section 4.1(a) of the Agreement.

**ANSWER:**  Cardinals admits that it converted its Preferred Units into Class A Common Units and that Power no longer has the ability to exercise the Call, but otherwise denies the allegations in this paragraph.

122.    Conversion of Cardinals' Preferred Units into Class A Common Units constitutes an attempt to nullify and make impossible the consummation and closing of Power's Call by making all Preferred Units unavailable to be purchased by Power.

**ANSWER:** Cardinals admits that it converted its Preferred Units into Class A Common Units and that Power no longer has the ability to exercise the Call, but otherwise denies the allegations in this paragraph.

123.    Accordingly, Cardinals is in actual breach of Section 10.5.

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required.  To the extent a response is required, the allegations in this paragraph are denied.

124.    Further, the parties are obligated to "take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of the Agreement," i.e., to cooperate as necessary and appropriate to achieve the Agreement's purposes. *Id.* § 15.12.

**ANSWER:** The allegations in this paragraph refer to a document that speaks for itself and Cardinals refers the Court to that document for its true and correct contents. To the extent a response is required, the allegations in this paragraph are denied.

125.    One of the Agreement's purposes is to provide Power with the right to exercise the Call Option and thereby purchase some or all of the Company's Preferred Units in the manner prescribed by Section 10.5, and to have that purchase consummated and closed in the manner prescribed by Section 10.5, including within six months of delivery of Power's notice and at the price set by Section 10.5(a)'s formula at the time of exercise. *Id.* § 10.5.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph. The Call Option was subject to other rights in the Agreement, including Cardinals' right to convert its Preferred Units into Class A Common Units, which Cardinals exercised effective August 16, 2021. In addition, to the extent Cardinals did not exercise its Conversion Right (it did), the purchase price for its Preferred Units would be calculated as of the date of the closing of the Call and would be based on a correct calculation of the Company's EBITDA.

126.    The Agreement therefore imposes on Cardinals an obligation to take or refrain from taking such actions as may be necessary or appropriate to allow Power's purchase of Preferred Units to be consummated and closed in the manner prescribed by Section 10.5, including within six months of delivery of Power's notice and at the price set by Section 10.5(a)'s formula at the time of exercise. *Id.* §§ 10.5, 15.12.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph. The Call Option was subject to other rights in the Agreement, including Cardinals' right to convert its Preferred Units

into Class A Common Units, which Cardinals exercised effective August 16, 2021. In addition, to the extent Cardinals did not exercise its Conversion Right (it did), the purchase price for its Preferred Units would be calculated as of the date of the closing of the Call and would be based on a correct calculation of the Company's EBITDA.

127. Cardinals has informed Power that it will not take such actions as may be necessary or appropriate to allow Power's purchase of Preferred Units to be consummated and closed in the manner prescribed by Section 10.5, including within six months of Power's notice and at the price of $1,610,971.77.

**ANSWER:** Cardinals admits that it converted its Preferred Units into Class A Common Units and that Power no longer has the ability to exercise the Call, but otherwise denies the allegations in this paragraph.

128. Specifically, Cardinals has informed Power that it is refusing to cooperate with the consummation and closing of Power's Call and associated purchase of Preferred Units as prescribed by Section 10.5.

**ANSWER:** Cardinals admits that it converted its Preferred Units into Class A Common Units and that Power no longer has the ability to exercise the Call, but otherwise denies the allegations in this paragraph.

129. Cardinals has further informed Power that it will not refrain from taking such actions as may be necessary or appropriate to allow Power's purchase of Preferred Units to be consummated and closed in the manner prescribed by Section 10.5, including within six months of Power's notice and at the price of $1,610,971.77.

**ANSWER:** Cardinals admits that it converted its Preferred Units into Class A Common Units and that Power no longer has the ability to exercise the Call, but otherwise denies the allegations in this paragraph.

130.    Specifically, Cardinals is threatening to take steps to frustrate and/or prevent the consummation and closing of the Call, namely, through improper delay and financial manipulation in an effort to alter the purchase price.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph.  The Call Option was subject to other rights in the Agreement, including Cardinals' right to convert its Preferred Units into Class A Common Units, which Cardinals exercised effective August 16, 2021.  In addition, to the extent Cardinals did not exercise its Conversion Right (it did), the purchase price for its Preferred Units would be calculated as of the date of the closing of the Call and would be based on a correct calculation of the Company's EBITDA.

131.    Accordingly, Cardinals has anticipatorily breached Section 15.12.

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required.  To the extent a response is required, the allegations in this paragraph are denied

132.    Further, Cardinals is in actual breach of Section 15.12 because of its attempted conversion of the Preferred Units, which constitutes a failure to refrain from conduct as may be necessary or appropriate to cooperate in the consummation and closing of Power's Call.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph.  The Call Option was subject to other rights in the Agreement, including Cardinals' right to convert its Preferred Units into Class A Common Units, which Cardinals exercised effective August 16, 2021

133.    Power validly exercised its Call Option, including delivering the required notice, before Cardinals informed Power of its refusal to comply with its contractual obligations with respect to the Call, its attempted conversion of all of the Preferred Units, and its threat to take additional subversive actions.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph. The Call Option was subject to other rights in the Agreement, including Cardinals' right to convert its Preferred Units into Class A Common Units, which Cardinals exercised effective August 16, 2021.

134. Moreover, there is implied in every contract a covenant of good faith and fair dealing. Cardinals, therefore, owed duties of good faith and fair dealing to Power under the Agreement.

**ANSWER:** The allegations in this paragraph call for a legal conclusion to which no response is required. To the extent a response is required, Cardinals admits that there is covenant of good faith and fair dealing in every Missouri contract but denies the suggestion that Cardinals has breached that covenant.

135. Cardinals' conduct in refusing to honor and perform its contractual obligations in connection with Power's Call under Section 10.5, in attempting to convert its Preferred Units after being notified that Power had exercised its Call Option and had begun purchasing the Preferred Units, and in threatening to take additional steps to frustrate and/or prevent the consummation and closing of Power's Call through unauthorized financial manipulation of the purchase price, bespeaks a conscious effort to frustrate, prevent, and subvert the fulfillment of the exercised Call Option and therefore deprive Power of the benefits it is rightly owed under the Agreement.

**ANSWER:** Cardinals expressly denies the allegations in this paragraph. Cardinals properly converted its Preferred Units into Class A Common Units effective August 16, 2021 thereby mooting Power's Call. There is nothing improper with Cardinals exercising its contractual right. In addition, to the extent Cardinals did not exercise its Conversion Right (it did), the purchase price for its Preferred Units would be calculated as of the date of the closing of the Call and would be based on a correct calculation of the Company's EBITDA.

136.     Thus, not only did Cardinals breach the Agreement, it also breached its duties of good faith and fair dealing.

**ANSWER:**  The allegations in this paragraph call for a legal conclusion to which no response is required.  To the extent a response is required, the allegations in this paragraph are denied.

137.     As a direct and proximate result of Cardinals' breaches, Power has been damaged, and will continue to be damaged, in an amount that exceeds $75,000.

**ANSWER:**  The allegations in this paragraph call for a legal conclusion to which no response is required. To the extent a response is required, the allegations in this paragraph are denied.

138.     The Agreement is a valid and enforceable contract.

**ANSWER:**  The allegations in this paragraph call for a legal conclusion to which no response is required.  To the extent a response is required, the allegations in this paragraph are admitted.

139.     Power has performed, and continues to perform, all of its obligations under the Agreement, and stands ready, willing, and able to continue performing any and all such obligations.

**ANSWER:**  Cardinals expressly denies the allegations in this paragraph and respectfully refers the Court to Cardinals' Counterclaims herein.

WHEREFORE, Plaintiff Power Investments, LLC requests that this Court enter judgment in favor of Plaintiff Power Investments, LLC and against Defendant Cardinals Preferred, LLC, for an amount that exceeds $75,000 or as may otherwise be determined and proven at trial, plus prejudgment interest, and for such other and further relief as is just and appropriate.

**ANSWER:** Cardinals denies Power is entitled to any of the relief it seeks in this Action.

## **AFFIRMATIVE DEFENSES**

Cardinals avers the following defenses, which apply to each and every cause of action asserted in the Complaint to which such defense is or may be applicable.  By asserting these

defenses, Cardinals does not assume any burden of proof, persuasion or production not otherwise legally assigned to it. Cardinals expressly reserves the right to assert additional affirmative defenses, based upon further investigation and discovery, when and if they become appropriate during this action.

### FIRST DEFENSE

The Complaint fails to state a claim upon which relief may be granted.

### SECOND DEFENSE

Power's claims are barred, in whole or in part, by the doctrines of estoppel, acquiescence, laches, ratification, and/or waiver.

### THIRD DEFENSE

Power's claims are barred, in whole or in part, by Power's own breaches of the LLC Agreement.

### FOURTH DEFENSE

Power's claims are barred, in whole or in part, by the equitable doctrine of unclean hands.

### FIFTH DEFENSE

Power's claims are barred, in whole or in part, because it has not suffered any harm or damages.

### SIXTH DEFENSE

Cardinals' actions were taken in good faith, and Cardinals has reasonable grounds for believing that its actions were not in violation of applicable law or agreements.

# COUNTERCLAIMS

Defendant/Counterclaim Plaintiff Cardinals Preferred, LLC ("Cardinals" or "Counterclaim Plaintiff"), by and through its counsel, in support of its Counterclaims against Plaintiff/Counterclaim Defendant Power Investment, LLC ("Power" or "Counterclaim Defendant," and, with Cardinals, the "Parties"), states as follows:

## NATURE OF THE ACTION

1.      Unhappy with the agreement that Power and its owner, Mason Miller ("Miller"), made, Power is attempting to rewrite the Parties' agreement through litigation in order to improperly take advantage of a catastrophic water intrusion event at the Company's power plant which has prevented the Company from operating and caused its present value to appear suppressed.

2.      After receiving over $35 million in insurance proceeds, which resulted in over $4 million in excess cash that Cardinals and Power had already agreed would be imminently distributed to the owners of the Company, Power is attempting to improperly usurp nearly the entire value of the Company from its business partner and obtain a windfall that Power and Miller know full-well they are not entitled to under the Parties' Agreement (defined herein).

3.      Specifically, Power wants to ignore (and wants this Court to believe it should ignore) Cardinals' bargained-for priority rights under the Agreement in order to force Cardinals to sell its 54% interest in the Company for $1.6 million so that Power may obtain all of the equity in a company that is valued at over $75 million.

4.      For the reasons more fully described herein, Cardinals respectfully requests that this Court enter an order against Power and in favor of Cardinals: (i) requiring Power to stop interfering with Cardinals' Class A Common Units in the Company; (ii) enjoining Power from continuing to attempt to exercise its Call; (iii) awarding actual, compensatory, and consequential

damages; (iv) pre- and post-judgment interest as provided by law; and (v) such other and further relief as the Court deems just and proper.

## PARTIES, JURISDICTION, AND VENUE

5.     Counterclaim Plaintiff Cardinals is a limited liability company organized and existing under the laws of the State of Delaware and is wholly owned by Lexington Finance Designated Activity Corporation ("LFDAC"), an Irish company with limited liability and having a place of business in New York.  LFDAC has two members, which are both limited liability companies.  At least eighteen (18) members and/or ultimate beneficial owners are individuals with New York citizenship and residency.

6.     Counterclaim Defendant Power is a limited liability company organized and existing under the laws of the State of Nevada.  Its members are citizens of Kentucky, Nebraska, and New York.  Power is therefore a citizen of Kentucky, Nebraska, and New York.

7.      Counterclaim Defendant Power brought the underlying action in this Court on the basis of complete diversity.  If the Court determines that it has jurisdiction over Counterclaim Defendant Power's claims, this Court has jurisdiction over this Counterclaim on the basis of diversity of citizenship among the parties and the amount in controversy exceeds the sum or value of $75,000.00.

8.     Venue is proper in this Court because all parties have consented to venue in the state or federal courts of Missouri for the present dispute.  *See* Power's Compl., Ex. 1, § 15.8.

9.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and (b)(3).  A substantial part of the events or omissions giving rise to Cardinals' Counterclaim occurred in this District.  Specifically, the dispute concerns the ownership and shares of Ashley Energy LLC, a Missouri limited liability company with its operations located exclusively within this District.

## FACTUAL BACKGROUND

### A.    The Purchase of the Ashley Power Plant

10.    Since 1904, Ashley Power Plant (the "Plant") has produced and supplied steam to the business district of the City of St. Louis and, more recently, supplied steam to roughly 70 buildings, hotels, sports venues and businesses in downtown St. Louis.

11.    Although many of these businesses rely exclusively on steam to heat their properties, the Plant experienced a significant decline in revenue between 2015 and 2016 due to a confluence of factors including, among other things, out of service steam turbines and erroneous gas turbine maintenance estimates.

12.    Thus, in or around December 2016, Power approached the owners of Cardinals requesting approximately $8.5 million to acquire the Plant and for working capital to operate the Plant. In exchange, Power agreed to give Cardinals a majority and preferred equity position in Ashley Energy LLC ("Ashley" or the "Company"), the entity that would own the Plant.

13.    After several months of due diligence and negotiations, the Company purchased the Plant. The purchase was made through a series of transactions, but ultimately resulted in Power acquiring 850,988 shares of the Company's Class A Common Units for $850,988 (i.e., a 45.99% interest in Ashley) and Cardinals acquiring 999,222 Preferred Units for $999,222 (i.e., a 54.01% interest).

### B.    The Ashley LLC Agreement

14.    Given the additional consideration Cardinals paid for its interest in the Company and the significant capital it invested in a very risky (and, at that time, failing) business, Cardinals negotiated for and was given preferential rights over Power with respect to its units and its ownership of the Company as set forth in the Company's Amended and Restated Limited Liability Company Agreement (the "Agreement").

15.    Specifically, Cardinals, as the "Preferred Unitholder," was given, among other things, priority to unreturned capital in the event of liquidation, the right to exercise a put option, a veto right to increase or decrease the number of members on the Company's Board of Managers, and entitlement to certain additional financial information.

16.    In addition, Cardinals was granted the ability to convert its Preferred Units into Class A Common Units "at any time."  That right is set forth under Section 4.1(a) of the Agreement and provides:

> Preferred Units shall be convertible **at any time** or from time to time by a holder of such Preferred Units giving written notice to the LLC of the exercise of conversion rights contemplated by this Article IV (the "Conversion Rights"), without the payment of additional consideration by any holder thereof, into such number of fully paid and non-assessable Class A Common Units as is determined by dividing the Original Issue Price by the Conversion Price (as defined below) in effect at the time of conversion, and shall automatically so convert as provided in Section 5.1(b)(i).

*Id.* § 4.1(a) (emphasis added).

17.    Under the Agreement, the conversion would automatically occur at "[t]he close of business on the date of receipt by the [Company] of such notice…."  *Id.* at § 4.1(b).

18.    The only limitation on Cardinals' right to convert its Preferred Units into Class A Common Units is set forth in Section 4.1(b).

19.    Section 4.1(b) provides that Cardinals' right to convert its Preferred Units into Class A Common Units only ceases "[i]n the event of a liquidation, dissolution or winding up of the LLC…."

20.    In other words, absent liquidation, dissolution, or winding up of the Company, Cardinals holds the right to convert its Preferred Units into Class A Common Units "at any time."

### C.     __The Water Intrusion Event__

21.      In the years following the execution of the Agreement, the Company was improving due in large part to the cash infusion provided by Cardinals. All signs pointed to a rebound for the Plant with a significant increase in revenue.

22.      However, while the Company was on its path to growth, in 2019, the Plant suffered a massive water intrusion event (the "Water Intrusion Event"), which adversely impacted operations and revenue.

23.      On or about, June 1, 2019, the Plant was filled with water after the St. Louis Metro Sewer District's ("MSD") main pump house failed.

24.      Fortunately, the damage caused by the Water Intrusion Event was covered by a variety of insurance policies.

25.      In total, the Company was paid over $35 million in 2020 and 2021 in insurance proceeds and were assigned subrogation rights held by the insurance carriers against third parties, which the Company estimated to be valued at $15 to $20 million of additional anticipated proceeds.

### D.     __Power's Breaches__

26.      As a result of the various insurance payments, which exceeded the cost of physical repairs to the Plant, the Company maintained over $4 million in excess capital beginning in February 2021.

27.      Thus, in the winter of 2020 and spring of 2021, the Parties discussed making a distribution of that excess capital to Cardinals and Power. Based on the excess capital that the Company had at that time, Cardinals would receive a distribution of more than $2 million and Power would receive a distribution of slightly less than $2 million.

28.      It is clear now, however, that Power was seeking to wrongfully usurp not only the entire $4 million, but the additional $15 to $20 million of potential subrogation claims proceeds and the entire Company (~$75 million of value), for itself.

29.      Thus, shortly thereafter, Power, through Miller, began taking steps to delay the distribution as part of its scheme to claim that it could buy out Cardinals' Preferred Units for even less than the amount Cardinals would receive from the pending distribution which the board had already approved and agreed upon.

30.      Power's scheme was premised upon an erroneous reading of the Agreement. Specifically, under the Agreement, Power was given a call option, which permitted Power to give notice of an intent to purchase a portion or all of the Company's Preferred Units at some point in the following six (6) months from that notice, using a formula based on EBITDA, on or after August 9, 2021.

31.      Power believes that, if it purposefully caused a few month delay, it could then take the position that Power could purchase Cardinals' Preferred Units for just $1.6 million and keep Cardinals' 54% of the $4 million distribution and the additional $15 to $20 million of subrogation claims proceeds, which the Company is expected to be receive.

32.      Thus, despite the fact that the Company's board agreed at the June 1, 2021 board meeting that the distribution of excess capital should be made immediately, Miller told Cardinals' representatives that the Company "should wait" to make the distribution until the fall of 2021 under the guise that it would allow more time for the Company to rebuild and because the Company needed bank approval for the distribution.  This, of course, was a pretext for Power to usurp the distribution owed to Cardinals.

33.      In addition, around the same time, Miller hired a new auditor for the Company that he, upon information and belief, believed he could influence in calculating the Company's

EBITDA so that Power could attempt to further his "buy out" scheme and improperly obtain Cardinals Preferred Units at an incredible discount.

34.     Contrary to Power position in this matter, Miller and Cardinals expressly negotiated and agreed that Cardinals had "preferred" rights, including a conversion right in the event that Powers sought to call the Preferred Units.  Indeed, Cardinals negotiated a variety of rights in the Agreement to protect itself, including the right to convert its Preferred Units into Class A Common Units at any time and thwart any attempt by Power to exploit its business partner with a "call" notice under circumstances such as here.

35.     Notably, Miller himself stated during the negotiations of the Agreement that there may be circumstances where one partner in the investment could financially hurt the other in a scenario as exists here, specifically stating "we shouldn't be able to call your equity at a value of 2X at closing and keep the spread for ourselves."

36.     Accordingly, when Power's principal, Miller, purportedly sent notice to Cardinals at its office on August 9, 2021[2] expressing Power's intent to exercise its Call and purchase the Preferred Units, Cardinals responded by exercising its preferred conversion right and, effective, August 16, 2021, converted its Preferred Units to Class A Common Units at the close of business on that day.

37.     Frustrated by the fact that he was not going to be able to usurp the Company from Cardinals for himself, Power resorted to this litigation.

---

[2] Cardinals' offices largely remain empty due to COVID-related restriction and thus Cardinals did not receive the notice until August 12, 2021.

## COUNT I

### DECLARATORY JUDGMENT

38.     Cardinals incorporates the allegations in paragraphs 1 through 37 of its Counterclaim as if set forth fully herein.

39.     Cardinals seeks a declaratory judgment, pursuant to 28 U.S.C. § 2201, of the respective rights and obligations of Cardinals and Power under the Agreement.

40.     An actual and justiciable controversy exists between Cardinals and Power. Namely, there is a dispute among Cardinals and Power regarding Cardinals' exercise of the Conversion Rights under the Agreement as well as Power's alleged exercise of its Call.

41.     An actual and justiciable controversy exists because Power seeks to avoid its obligations and ignore Cardinals' rights under the Agreement by attempting to halt Cardinals' rightful exercise of its Conversion Rights under the Agreement.

42.      An actual and justiciable controversy likewise exists because Power seeks to ignore provisions of the Agreement and terminate Cardinals' Conversion Rights when no triggering mechanism has occurred that would allow for the termination of the Conversion Rights.

43.      An actual and justiciable controversy likewise exists because Power refuses to acknowledge that its Call Option under Section 10.5 of the Agreement is only consummated at closing—which could take up to six months—whereas for Cardinals' Conversion Right the consummation occurs merely by written notice and it takes effect at the close of business on the same day.

44.     An actual and justiciable controversy also exists because, even if Power and Miller had the right to call the Preferred Units, Power and Miller have taken steps to artificially decrease the purchase price of the Company in bad faith.

45.     A declaratory judgment determining that Cardinals has exercised its Conversion Right is necessary and appropriate at this time so that Cardinals may receive the benefit of its rights under the Agreement.

46.     Counterclaim plaintiff Cardinals therefore seeks an order from this Court entering declaratory judgment in favor of Cardinals and against Counterclaim Defendant Power including: (a) a declaration by this Court that Cardinals exercised its Conversion Rights under Section 4.1 of the Agreement; (b) a declaration by this Court that Cardinals is a Class A Common Unitholder with all the rights of a Class A Common Unitholder; (c) a declaration by this Court that Power's attempt to exercise its Call Option under Section 10.5 of the Agreement is null, void and moot in light of Cardinals conversion under Section 4.1 of the Agreement; and (d) a declaration by this Court that Power and Miller have acted in bad faith by attempting to manipulate the books and records of the Company to artificially lower its value.

**COUNT II**

**SPECIFIC PERFORMANCE**

47.     Cardinals incorporates the allegations in paragraphs 1 through 46 of its Counterclaim as if set forth fully herein.

48.     Under the Agreement, Cardinals' holds certain preferential rights as a Preferred Unitholder.  One such preferred right was the ability to convert its Preferred Units into Class A Common Units "at any time."  Agreement, Section 4.1(a).

49.     Under the Agreement, the time of the conversion would be"[t]he close of business on the date of receipt by the [Company] of such notice…."  *Id.* at § 4.1(b).

50.     Power and Cardinals agreed that there would be <u>only</u> three instances when Cardinals' right to convert its Preferred Units into Class A Common Units would terminate. Specifically, Section 4.1(b) provides "[i]n the event of a liquidation, dissolution or winding up of

the LLC, the Conversion Rights shall terminate at the close of business on the last full day preceding the date fixed for the payment of any such amounts distributable on such event to the Preferred Unitholder."

51.    It is undisputed that the Company is not in liquidation, dissolving or winding up.

52.    Cardinals delivered to the Company written notice that it was converting its Preferred Units into Class A Common Units on August 15, 2021 (effective August 16, 2021). Thus, Cardinals is currently a Class A Common Unitholder effective as of August 16, 2021.

53.    Instead of honoring the agreement Power made, Power refused to recognize Cardinals' exercise of its Conversion Right and, instead, filed the instant litigation seeking to prevent Cardinals from doing so.  Such actions constitute a breached the Agreement.

54.    As a direct and proximate result of Power's breach, Cardinals has been damaged and continues to be damaged.

55.    Power's decision to obstruct Cardinals' rightful exercise of its Conversion Rights by instituting litigation necessitates specific performance as Power's breach can only be rectified by allowing Cardinals to exercise its Conversion Right.

56.    Additionally, Section 15.3 of the Agreement authorizes Cardinals to pursue specific performance as a remedy for Power's breach of the Agreement.

57.    Cardinals has performed and continues to perform its obligations under the Agreement.

58.    Therefore, Cardinals seeks an entry of an order from this Court in favor of Cardinals and against Power ordering Power to perform its obligations under Section 4.1 of the Agreement and take any and all steps necessary and appropriate to allow Cardinals' Conversion Right to take effect and such other and further relief as is deemed just and appropriate by this Court.

## COUNT III

### BREACH OF CONTRACT

59.     Cardinals incorporates the allegations in paragraphs 1 through 58 of its Counterclaim as if set forth fully herein.

60.     Cardinals and Power entered into a valid and enforceable contract, the Agreement, which governs the rights, duties, and obligations of the parties.

61.      Section 4.1 of the Agreement allows Cardinals to exercise its Conversion Rights at any time, and taking effect at the close of business on the day Cardinals provides notice of its decision to exercise the Conversion Rights.  *See* Agreement, §§ 4.1(a), 4.2(a).

62.     The only limitation on the Conversion Rights is set forth in Section 4.1(b) and provides that Cardinals' Conversion Rights shall terminate if and only if one of the three events occurred: "a liquidation, dissolution or winding up of the LLC."  Agreement, §§ 4.1(b).

63.     It is undisputed that none of those events have occurred.

64.     Cardinals delivered to the Company written notice that it was converting its Preferred Units into Class A Common Units after the close of business on August 15, 2021 (effective August 16, 2021).  Thus, as of the close of business on August 16, 2021, Cardinals was a Class A Common Unitholder.

65.     Power breached its obligations under the Agreement by refusing to recognize the proper exercise of Cardinals' Conversion Rights and instead seeking to enjoin Cardinals from exercising its rights under the Agreement.

66.     Cardinals has fulfilled all of its obligations under the Agreement.

67.     Cardinals has suffered damages as a direct and proximate result of Power's breaches in an amount to be proven at trial.

## COUNT IV

## BREACH OF IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING

68.     Cardinals incorporates the allegations in paragraphs 1 through 67 of its Counterclaim as if set forth fully herein.

69.     Missouri law imposes an implied covenant of good faith and fair dealing in all contracts. *Koger v. Hartford Life Ins. Co.*, 28 S.W.3d 405, 412 (Mo. App. W.D. 2000). "The implied duty of one party to cooperate with the other party to a contract to enable performance and achievement of the expected benefits is an enforceable contract right." *Id.*

70.     "A party breaches the covenant of good faith and fair dealing if it exercises a judgment conferred by the express terms of the agreement in a manner that evades the spirit of the agreement and denies the other party the expected benefit of the agreement." *Glenn v. HealthLink HMO, Inc.,* 360 S.W.3d 866, 877 (Mo. App. E.D. 2012).

71.     Power breached this covenant, by among other things, delaying the $4 million distribution, attempting to exercise Power's Call and buyout Cardinals' Preferred Units for an artificially suppressed price that they know to be unfair, and refusing to recognize Cardinals' conversion of its Preferred Units to Class A Common Units as Cardinals was permitted to do under the Agreement.

72.     Furthermore, when Cardinals exercised its express rights under the Agreement, Power acted in bad faith to avoid its contractual obligations and sought to proceed with the Call which had been mooted by virtue of Cardinals' conversion right.

73.     As a result of Power's and Miller's conduct described herein, Cardinals has suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Cardinals respectfully requests that the Court issue the following relief:

A.  An order in favor of Cardinals and against Power requiring Power to specifically perform their contractual duties and recognize rights and obligations of Cardinals as holder of Common Units in the Company;

B.  An order enjoining Power from exercising the Call;

C.  Actual, compensatory, and consequential damages;

D.  Pre- and post-judgment interest as provided by law; and

E.  Such other and further relief as the Court deems just and proper.

Respectfully submitted,

DENTONS US LLP

By: */s/ Stephen J. O'Brien*
Stephen J. O'Brien, #43977MO
One Metropolitan Square, Suite 3000
St. Louis, Missouri 63102
Telephone: (314) 241-1800
Facsimile: (314) 259-5959
stephen.obrien@dentons.com

REED SMITH LLP
Joseph J. Tuso
Wayne C. Stansfield
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
215-851-8100
jtuso@reedsmith.com
wstansfield@reedsmith.com
(*admitted pro hac vice*)

*Attorneys for Counter-Plaintiff Cardinals*
*Preferred, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 24, 2021, the foregoing was electronically filed with the Clerk of the Court using the Court's CM/ECF system which will send notification of such filing to all counsel of record.

_____*/s/ Stephen J. O'Brien*_____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

POWER INVESTMENTS, LLC,            )
                                   )
        Plaintiff/Counterclaim     )
        Defendant,                 )
                                   )      Case No. 4:21-cv-01022-SEP
vs.                                )
                                   )
CARDINALS PREFERRED, LLC,          )
                                   )
        Defendant/Counterclaim     )
        Plaintiff.                 )
                                   )

**STIPULATED PROTECTIVE ORDER**

Plaintiff/Counterclaim Defendant Power Investments, LLC and Defendant/Counterclaim Plaintiff Cardinals Preferred, LLC (collectively, the "parties") seek to prevent the unauthorized disclosure of confidential, sensitive, or proprietary information or documents produced during the course of pre-trial discovery in the above-captioned action.

Now, therefore, it is hereby stipulated and agreed as follows:

1.      Any party to this litigation may designate any document which it reasonably believes to be confidential and which it produces during the course of pre-trial discovery in the above-captioned action as "Confidential" or a similar confidential designation subject to the provisions of this Stipulated Protective Order.  It shall be necessary for the designating party to stamp, designate, or otherwise describe specific documents as "CONFIDENTIAL" in order for the documents to be afforded the protections set forth in this Stipulated Protective Order.

2.      Any party to this litigation may designate any document it produces during the course of pre-trial discovery in the above-captioned action as "Attorney' Eyes Only." "Attorneys' Eyes Only" information means information, documents, and things within the scope

**EXHIBIT A**

of Rule 26(c)(l)(G) that the producer believes in good faith is not generally known to others and

has significant competitive value such that unrestricted disclosure to others would create a

substantial risk of serious injury, and which the producer (i) would not normally reveal to third

parties except in confidence or has undertaken with others to maintain in confidence, or (ii)

believes in good faith is significantly sensitive and protected by a right to privacy under federal

or state law or any other applicable privilege or right related to confidentiality or privacy.  The

designation is reserved for information that constitutes proprietary financial or technical or

commercially sensitive personal, business, or competitive information that the producer

maintains as highly confidential in its business, including documents that would reveal trade

secrets, the disclosure of which is likely to cause harm to the competitive position of the

producer.  It shall be necessary for the designating party to stamp, designate, or otherwise

describe specific documents as "Attorneys' Eyes Only" in order for the documents to be afforded

the protections set forth in this Stipulated Protective Order.

     3.     All documents designated "CONFIDENTIAL" ("Confidential Material") shall be

used by the parties hereto, other than the party or parties by whom production of the particular

material is first made, only for the prosecution or defense of claims made in connection with the

above-captioned action.  Confidential Material, or any portion or recitation thereof, shall not be

given or communicated to anyone, except the following persons:

     a.     The parties, the parties' counsel, and counsel's staff, including but not

          limited to paralegal and necessary clerical staff;

     b.     Experts with whom the parties or their counsel consult; however, nothing

          stated herein shall override or take precedence over the normal rules of

          discovery with respect to experts, and no document provided to an expert

that would normally be discoverable shall be withheld from an opposing

party solely on the basis that it constitutes Confidential Material;

Confidential Material provided to an expert shall be handled in accordance

with the terms of this order, and each expert shall sign Exhibit A and agree

to be bound by the terms of this order;

c.     Any person believed to be a potential witness who authored or received

Confidential Materials;

d.     The Court, court reporters, and court personnel;

e.     Other persons as designated by the Court or as agreed in writing by the

parties hereto.

4.     All documents designated "ATTORNEYS' EYES ONLY" ("AEO Material")

shall be used by the parties hereto, other than the party or parties by whom production of the

particular material is first made, only for the prosecution or defense of claims made in

connection with the above-captioned action.  AEO Material, or any portion or recitation thereof,

shall not be given or communicated to anyone, except the following persons:

a.     Counsel who represent the parties in the above-captioned action and

counsel's staff, including but not limited to paralegal and necessary

clerical staff;

b.     Experts with whom the parties or their counsel consult; however, nothing

stated herein shall override or take precedence over the normal rules of

discovery with respect to experts, and no document provided to an expert

that would normally be discoverable shall be withheld from an opposing

party solely on the basis that it constitutes AEO Material; AEO Material

**EXHIBIT A**

provided to an expert shall be handled in accordance with the terms of this
order, and each expert shall sign Exhibit A and agree to be bound by the
terms of this order;

    c.      Any person believed to be a potential witness who authored or received
AEO Materials;

    d.      The Court, court reporters, and court personnel;

    e.      Other persons as designated by the Court or as agreed in writing by the
parties hereto.

    5.      Any persons entitled to receive Confidential Material and/or AEO Material by
virtue of Paragraphs 3 or 4 shall first be advised of the existence and content of this Stipulated
Protective Order and shall agree to be bound by the provisions thereof.

    6.      Each person referred to in subparagraphs 3(b), 3(c), 3(e), 4(b), 4(c), and 4(e), who
has been shown or given access to Confidential Material and/or AEO Material, or information
derived therefrom, shall sign an undertaking in the form attached as Exhibit A to this Order,
stating that he or she has read a copy of this Order and agrees to be bound by its provisions.
Signed undertakings shall be retained by counsel for the party who provides such material or
information to such person and shall upon request be provided to counsel for the opposing party.

    7.      All copies, excerpts, summaries, notes, charts, or the like that contain information
from a document designated as "Confidential," "AEO," or a similar confidential designation
shall also be treated as Confidential Material and/or AEO Material, respectively.

    8.      Documents that may be designated "Confidential," "AEO," or a similar
confidential designation include, but are not limited to, discovery responses and deposition
transcripts in this action, or portions thereof. Confidentiality designations for depositions shall

EXHIBIT A

be made either on the record or by written notice to the other party within 14 days of receipt of the final transcript. All depositions shall be treated as "Confidential" until 14 days after receipt of the final transcript. The portion of any deposition of any witness that includes Confidential Material and/or AEO Material shall be taken only in the presence of persons who are otherwise qualified to have access to such information under the terms of this order.

9.      Third parties producing documents in the course of this action may also designate documents as "Confidential," "AEO," or a similar confidential designation, subject to the same protections and constraints as the parties to this action. A copy of the Protective Order shall be served along with any subpoena served in connection with this action. All documents produced by such third parties, even if not designated by such third parties as "Confidential" or a similar confidential designation, shall be treated by the parties to this action as Confidential Material for a period of 15 days from the date of their production. During that 15-day period, any party may designate such documents as "Confidential," "AEO," or a similar confidential designation pursuant to the terms of the Protective Order.

10.     In the event of depositions of third-party witnesses during which Confidential Material and/or AEO Material is shown or revealed to the deponent, the party seeking to use such materials shall request that said deponent agree to be bound by this Order and execute an undertaking in the form attached as Exhibit A hereto. Counsel for the parties agree to, in good faith, make an effort to enforce this provision. If the deponent refuses to be bound or execute Exhibit A, Confidential Material and/or AEO Material may be disclosed to the deponent without violating this Order only during the course of the deposition. If the refusing deponent elects to read and sign his or her deposition transcript, counsel for the parties may only provide those

EXHIBIT A

exhibits containing Confidential Material and/or AEO Material at counsel's office and must, thereafter, retain all copies of the Confidential Material and/or AEO Material.

11.    If another court or an administrative agency subpoenas or orders production of Confidential Material and/or AEO Material which a party or its counsel has obtained under the terms of this Order, such party or its counsel shall promptly notify the party or other person who designated the document(s) as Confidential Material and/or AEO Material of the pendency of such subpoena or order unless such subpoena or order prohibits such notification.

12.    Any party who inadvertently fails to identify documents as "Confidential," "AEO," or a similar confidential designation shall have 10 days from the discovery of its oversight to correct its failure.  Such failure shall be corrected by providing written notice of the error and substituting copies of the inadvertently produced documents bearing appropriate confidentiality designations.  Any party receiving such inadvertently unmarked documents shall make reasonable efforts to retrieve documents distributed to persons not entitled to receive documents with the corrected designation.

13.    If a party intends to file a document containing "Confidential," "AEO," or similarly designated information with the Court, the party must file a motion seeking leave to file such information under seal and must otherwise comply with the procedures of L.R. 83-13.05. The Court will then determine whether the information should be filed under seal or permitted to be filed in the public record.  Prior to disclosure at trial or a hearing of materials or information designated "Confidential," "AEO," or a similar confidential designation, the parties may seek further protections against public disclosure from the Court.

14.    Any party may request a change in the designation of any information designated "Confidential," "AEO," or a similar confidential designation.  Any such document shall be

**EXHIBIT A**

treated as designated until the change is completed. If the requested change in designation is not agreed to, the dispute shall be resolved in accordance with L.R. 37-3.04 and this Court's Requirements. The moving party shall have the burden of proof in any such change in designation.

15.     Except as provided herein, this Stipulated Protective Order shall remain in effect after this litigation has been concluded by way of settlement, judgment, or otherwise, including the exhaustion of any and all appeals. No person, including the parties hereto, having received Confidential Material and/or AEO Material, shall distribute or communicate that Confidential Material and/or AEO Material to anyone after the conclusion of the litigation. Nothing in this Stipulated Protective Order shall prohibit any party or parties who first produce Confidential Material and/or AEO Material from using or distributing that Confidential Material and/or AEO Material in other business matters unrelated to this litigation.

16.     No party shall be obligated to challenge the propriety or status of any document as Confidential Material and/or AEO Material, and a failure to make such a challenge shall not preclude a subsequent challenge to that status by any party.

17.     Nothing contained in this Stipulated Protective Order shall bar or otherwise restrict any attorney from rendering advice to his client in this matter and, in the course thereof, from generally referring to or relying upon his examination of Confidential Material and/or AEO Material; provided, however, that such attorney shall use good faith efforts to avoid disclosure of AEO Material to any persons not entitled to such information pursuant to Paragraph 4.

18.     Neither the provisions of this Stipulated Protective Order nor any disclosure by any party pursuant hereto shall constitute a waiver of any attorney-client, work product, or joint defense/common interest privilege, including the protections afforded by any applicable Rules of

EXHIBIT A

Civil Procedure or by common law. The terms and provisions of this Stipulated Protective Order shall not be deemed or interpreted to require the disclosure or production by any party hereto of any documents or information otherwise subject to a valid claim of attorney-client, work product, or other privilege or protection against disclosure in discovery. In the event any party or person inadvertently or unintentionally produces or discloses any document or information protected by the attorney-client privilege, joint defense/common interest privilege, or the work product doctrine, including but not limited to the protections afforded by any applicable Rules of Civil Procedure or by common law, the party or person who receives such document or information shall, upon written request by the party or person who produced such document or information, immediately return it and all copies of it to the party or person who produced or disclosed such document or information, and make no further use of it or copies of it thereafter.

19.     Any party may seek a modification or termination of this Stipulated Protective Order by first attempting to obtain the consent of the other party to the proposed modification and, absent concurrence, upon application to the Court.

20.     This Stipulated Protective Order shall not and does not constitute authority or authorization for any person not a party hereto to insist upon access to or inspection of any information or documents to which that person would not, in the absence of the entry of this Stipulated Protective Order, be otherwise entitled under law.

21.     At the conclusion of this action, all parties shall either within sixty (60) days of conclusion (a) return to the producing party all Confidential Material and/or AEO Material produced by that other party in their possession or in the possession of their agents, including any copies thereof, or (b) certify that all Confidential Material and/or AEO Material produced by other parties has been destroyed.

**EXHIBIT A**

22.     In the event the non-designating party wishes to challenge the propriety or status of any document as Confidential Material and/or AEO Material, the dispute shall be resolved in accordance with L.R. 37-3.04 and this Court's Requirements.

23.     This Court shall have jurisdiction over the parties hereto with respect to any dispute concerning the enforcement or interpretation of this Stipulated Protective Order and the use of the Stipulated Protective Order.

24.     The parties agree to cooperate fully and in good faith with each other in attempting to resolve any disputes that may arise as to the terms and effect of this Stipulated Protective Order so that recourse of the Court may be kept at a minimum.  This Order shall survive the termination of this action and continue in full force and effect unless waived by the written consent of the producer.

DATED this __13th____ day of ___December____, 2021.


_____

THE HONORABLE SARAH E. PITLYK

**EXHIBIT A**

**APPROVED AS TO FORM AND CONTENT**

DENTONS US LLP

ARMSTRONG TEASDALE LLP

By: _/s/ Stephen J. O'Brien (w/ consent)_
    Stephen J. O'Brien, #43977MO
    One Metropolitan Square, Suite 3000
    St. Louis, Missouri 63102
    Telephone: (314) 241-1800
    Fax: (314) 259-5959
    stephen.obrien@dentons.com

By: _/s/ Christopher R. LaRose_
    Christopher R. LaRose, #59612MO
    Daniel R. O'Brien, #69258MO
    7700 Forsyth Blvd., Suite 1800
    St. Louis, Missouri 63105
    Telephone: 314.621.5070
    Fax: 314.621.5065
    clarose@atllp.com
    dobrien@atllp.com

REED SMITH LLP

ATTORNEYS FOR
PLAINTIFF/COUNTERCLAIM
DEFENDANT POWER INVESTMENTS,
LLC

By: _/s/ Wayne C. Stansfield (w/ consent)_
    Joseph J. Tuso (pro hac vice)
    Wayne C. Stansfield (pro hac vice)
    Three Logan Square
    1717 Arch Street, Suite 3100
    Philadelphia, PA 19103
    215-851-8100
    jtuso@reedsmith.com
    wstansfield@reedsmith.com

ATTORNEYS FOR
DEFENDANT/COUNTERCLAIM
PLAINTIFF CARDINALS PREFERRED,
LLC

EXHIBIT A

**EXHIBIT A**

**UNDERTAKING**

   The undersigned has read the annexed Protective Order, understands its contents, and hereby undertakes to make no disclosures of any Confidential Material and/or AEO Material, as those terms are defined in the annexed Protective Order, to any person who is not permitted to have access to such Confidential Material and/or AEO Material by the Protective Order. In addition, the undersigned agrees not to use such Confidential Material and/or AEO Material for any purpose whatsoever other than in connection with this action. The undersigned agrees to either (a) return all Confidential Material and/or AEO Material supplied by any party, directly or indirectly, and all copies thereof and all notes or other transcriptions made therefrom, to the party producing the Confidential Material and/or AEO Material, within thirty (30) days of the conclusion of this action and any appeals thereof, or (b) certify that the Confidential Material and/or AEO Material has been destroyed. The undersigned understands that a violation of this undertaking is punishable as contempt of court.

DATE: _____    NAME: _____
                  (print or type)

                SIGNATURE: _____

EXHIBIT A