# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| POWER INVESTMENTS, LLC, | ) |
| | ) |
| Plaintiff/Counterclaim-Defendant, | ) |
| | ) |
| | ) Case No. 4:21-cv-01022 |
| vs. | ) |
| | ) |
| CARDINALS PREFERRED, LLC, | ) |
| | ) |
| Defendant/Counterclaim-Plaintiff. | ) |

## CARDINALS PREFERRED, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Defendant/Counterclaim-Plaintiff Cardinals Preferred, LLC ("Cardinals") submits this Memorandum of Law in Support of its Motion for a Temporary Restraining Order (and thereafter a preliminary injunction) pursuant to Rule 65 of the Federal Rules of Civil Procedure (the "Motion").

## PRELIMINARY STATEMENT[1]

This Motion is the unfortunate result of Plaintiff/Counterclaim-Defendant Power Investments, LLC's ("Power") complete disregard of this Court's prior ruling and order as well as its own counsel's representations that the Parties, who are the two owners of Ashley Energy LLC ("Ashley" or the "Company"), should maintain the status quo regarding Ashley's governance until such time as the Court has the opportunity to rule on the substantive merits of this case. Despite this clear directive, Power and its principal, Mason Miller, have engaged in a pattern of conduct to undermine and frustrate Cardinals' rights as a Unitholder of Ashley and to seize complete control

---

[1] Capitalized terms not otherwise defined herein have the same meaning as that in Cardinals' Counterclaims.

of the Company to further their efforts to purchase Cardinals' units and shut down an investigation into a serious conflict of interest issue resulting from Power's counsel's representation of Ashley. The Court must put an end to Power's wrongful conduct and it is entitled to do so since Cardinals can easily establish each of the *Dataphase* factors.

First, Cardinals can establish, not only that it has a "fair chance of prevailing," but that it is likely to succeed on the merits of its claims. Indeed, this Court has already held that both Parties' positions are compelling, including specifically Cardinals' argument that its conversion mooted Power's attempt to exercise its Call Option. In addition, Cardinals is likely to succeed on its additional claims that Power has breached a variety of other sections of the Operating Agreement, which mandate that the management of Ashley's business and affairs rests exclusively with the Company's Board of Managers and that officers of the Company only have that authority which is expressly delegated to them by the Board. Power, though Miller, has breached these provisions by usurping and refusing to recognize the Board's authority (including unanimous decisions), claiming repeatedly that the Board has no authority to vote on matters concerning the Company, stating that Power has the sole control and voting power over Ashley, and agreeing to material changes to Ashley's loan agreements without consulting with or obtaining the authority to do so from the Board.

Second, Power's actions have created a threat of irreparable harm. Leaving aside that the Parties expressly agreed that any breaches of the Operating Agreement would entitle the non-breaching party to injunctive relief, Power's actions cannot be remedied by money damages as they directly infringe on Cardinals' and its Board appointees' right to vote and manage the affairs of the Company. As Power previously represented to this Court, Cardinals being "wrongly

stripped of its right to participate in the governance of the Ashley . . . would . . . constitute irreparable harm."

Third, while the harm to Cardinals will be great without an injunction, the harm to Power will be de minimis if an injunction is enter against it. Cardinals is only requesting that this Court issue an order that preserves the status quo and prevents Power from taking steps to further its Call Option or undermine or frustrate the Parties' governance structure which was in place immediately preceding the Call Option. Indeed, the fact that Cardinals even needs to request this type of relief is shocking given that the Court was very clear in its previous decision that the Parties should preserve the status quo until such time as the Court has had the opportunity to consider the substantive merits of the claim. Accordingly, this *Dataphase* factor likewise favors issuing an injunction.

Finally, the public interest favors an injunction. Specifically, the public interest favors enforcing valid contracts and it also favors Board oversight of manager-managed limited liability companies. Particularly given Mr. Miller's acts to date, oversight is necessary to ensure that Mr. Miller is managing the "day-to-day" affairs of the Company, which owns and operates a Power Plant, properly.

In short, Cardinals is unequivocally entitled to temporary restraining order to preserve the status quo until such time as the Court fully determines this matter. Accordingly, the Court should grant Cardinals' Motion and put an end to Power's gamesmanship.

## **STATEMENT OF FACTS**

As the Court is aware, this action arises out of a dispute over Power's attempt to exercise a Call Option, and Cardinals' exercise of its Conversion Right with respect to their ownership interests in Ashley. The background facts leading up to this dispute are set forth in Cardinals'

Counterclaims. The relevant facts for purposes of this Motion and the exigent circumstances necessitating the emergency relief requested are as follows.

A.      **The Ownership and Operation of Ashley Energy LLC.**

Cardinals and Power are co-owners of Ashley, which owns and operates a steam power plant (the "Plant") in St. Louis. *See* Counterclaims ¶¶ 10-13. Prior to Cardinals' conversion, Cardinals was the Preferred Unitholder owning fifty-four (54%) of the total Units of Ashley and Power was the Common Unitholder owning forty-six (46%) of the total Units of Ashley. *Id.* ¶ 13.

Ashley's Amended and Restated Limited Liability Agreement (the "Operating Agreement") sets forth very clearly how Ashley is governed, as well as the rights, duties, and obligations of its Unitholders.[2] *See* Compl. Ex. 1. Like all manager-managed limited liability companies, Ashley is managed <u>exclusively</u> by its Board of Managers, as set forth in Section 6.1 of the Operating Agreement, which provides:

> **Management by the Board of Managers**. Except for situations in which the approval of the Members or any specific Member is expressly required by the terms of this Agreement or by nonwaivable provisions of applicable law, (i) **the Board shall conduct, direct and exercise full control over all activities of the LLC**, including the issuance of Equity Securities and the voting and sale of and the exercise of other rights with respect to, the equity securities of the LLC's Subsidiaries and any other Person in which the LLC directly or indirectly holds an equity interest, (ii) **all management powers over the business and affairs of the LLC shall be exclusively vested in the Board** and (iii) the Board shall have the power to bind or take any action on behalf of the LLC or to exercise in its good faith discretion any rights and powers (including the rights and powers to take certain actions, give or withhold certain consents or approvals, or make certain determinations, opinions, judgments, or other decisions) granted to the LLC under this Agreement, or any other agreement, instrument, or other document to which the LLC is a party, or by virtue of its holding the equity interests of any Subsidiary thereof or any other Person.

---

[2] "The duties and obligations of members and managers derive both from Missouri statutes and the LLC's operating agreement and articles of organization, and duties and liabilities may be expanded or restricted by provision in the operating agreement." *Imperial Zinc Corp. v. Engineered Prods. Indus., L.L.C.*, No. 4:16 CV 551 RWS, at *6 n.2 (E.D. Mo. Nov. 9, 2016) (citing *Hibbs v. Berger*, 430 S.W.3d 296, 316 (Mo. Ct. App. 2014)).

- 4 -

*Id.* § 6.1 (emphasis added).

Ashley's Board of Managers consists of three (3) Managers. *Id.* § 6.2(a). One Manager is designated by Power, one Manager is designated by Cardinals, and the third is designated by the majority of the Common Units and Preferred Units voting together. *Id.* § 6.2(b); *see* Decl. of Wayne C. Stansfield ("Stansfield Decl.") Ex. 1 (TRO Hearing Tr.) at 34:4-6 (Mr. LaRose: "both shareholders get to elect a third [Board Manager]."). Under the Operating Agreement, each Manager has one (1) vote and, "except as otherwise provided in this Agreement, the act of Managers possessing a majority of the votes held by the Managers present at a meeting of the Board at which a quorum is present shall be the act of the Board." *Id.* § 6.3(a). At present, the three (3) Managers of Ashley are: (i) Mason Miller ("Miller"), (ii) Victor DuPont ("DuPont"), and (iii) David Disque ("Disque"). *See* Declaration of David Disque ("Disque Decl.") ¶ 4.

The Board also has the power, but not the obligation, to designate and appoint one or more persons as "Officers" of the Company. *See* Compl. Ex. 1 § 6.4(a). Under the Operating Agreement, the authority of the Officers and the duties delegated to them are solely determined by the Board and "[a]ny such delegation may be revoked at any time by the Board in its sole discretion." *Id.* § 6.4(a). In this regard, Mason Miller was appointed to serve as Chief Executive Officer and President of Ashley. *Id.*

In addition, Cardinals and Power have certain rights with respect to their equity interests in the Company. Relevant here are the rights set forth in Sections 4.1 and 10.5 of the Operating Agreement. Section 4.1(a) unequivocally provides:

> Preferred Units shall be convertible **at any time** or from time to time by a holder of such Preferred Units giving written notice to the LLC of the exercise of conversion rights contemplated by this Article IV (the "Conversion Rights"), without the payment of additional consideration by any holder thereof, into such number of fully paid and non-assessable Class A Common Units as is determined by dividing the Original Issue Price by the Conversion Price (as defined below) in

effect at the time of conversion, and shall automatically so convert as provided in Section 5.1(b)(i).

*Id.* § 4.1(a) (emphasis added). Under the Operating Agreement, the conversion would automatically occur at "[t]he close of business on the date of receipt by the [Company] of such notice…." *Id.* § 4.1(b). The only limitation on Cardinals' right to convert its Preferred Units into Common Units (*i.e.*, the only time that Cardinals is divested of its conversion right) is set forth in Section 4.1(b), which provides that Cardinals' right to convert its Preferred Units into Common Units only ceases "[i]n the event of a liquidation, dissolution or winding up of the LLC…." *Id.* In other words, absent liquidation, dissolution, or winding up of the Company, Cardinals holds the right to convert its Preferred Units into Common Units "at any time." *Id.*

Section 10.5 of the Operating Agreement provides Power with a Call Option pursuant to which Power could provide notice to Cardinals that Power sought to purchase the Preferred Units, subject to the limitations in the Operating Agreement. Specifically, Section 10.5 states:

> At any time on or following August 9, 2021, at majority of Class A Common Units shall have the right to purchase a portion or all of the Preferred Units pursuant to this Section 10.5(b) (the "Call"). The Call shall be consummated within the same period and at the same price described in Section 10.5(a) above.

*Id.* § 10.5(b). The Operating Agreement prescribes a specific formula for calculating the purchase price of the Preferred Units. *Id.* § 10.5(a)(i). But, unlike Cardinals' Conversion Right, which is effective as of the close of business on the date the notice is received, Section 10.5(a)(ii) provides for a time period of up to six months in which the Call Option may be consummated. *Id.* § 10.5(a)(ii).

### B. Cardinals Converts its Preferred Units into Common Units and Power Files this Action Against Cardinals.

On August 9, 2021, Miller, on behalf of Power, sent Cardinals a notice expressing Power's desire to exercise its Call Option and purchase the Preferred Units.[3]  Three days after actually receiving that notice, on August 15, 2021, Cardinals exercised its Conversion Right by sending notice to Power, thus converting its Preferred Units into Common Units effective at the close of business on August 16, 2021.

On August 16, 2021, Power filed a Complaint in this Court alleging three counts based on Cardinals allegedly breaching Sections 10.5 and 15.12 of the Agreement and allegedly breaching the implied covenant of good faith and fair dealing.  Contemporaneously therewith, Power also sought a temporary restraining order ("TRO") seeking to prevent Cardinals from acting upon its Conversion Rights.  "**According to Power, such relief would simply preserve the status quo**." TRO Op. Doc. [15] at 3 (citing Doc. [3] at 15) (emphasis added).

The Court held oral argument on the TRO on August 19, 2021.  At the hearing, counsel for Power repeatedly claimed that, by filing the TRO, Power was merely trying to preserve the status quo so that the Parties could operate in the fashion they had been until the Court could determine the substantive merits of the claims.  *See* Stansfield Decl. Ex. 1 (TRO Hearing Tr.) at 6:23-25 (Mr. Larose: "Delaying the consummation of the Call. So what we're trying to do is simply preserve the status quo."); 11:4-7 ("The only way to buy the unique asset is if the conversion is stopped or the status quo as of our Call, right, is preserved…").  Power also argued that Mr. Miller could face "irreparable harm" based upon his fear that he would lose a board seat and voting rights should

---

[3] Cardinals' offices largely remain empty due to COVID-related restriction and thus Cardinals did not receive the notice until August 12, 2021.

Cardinals choose to remove him following its conversion of its Preferred Units to Common Units. *Id.* at 7:10-8:10.

The next day, this Court issued its Memorandum and Order. Although the Court granted, in part, Power's TRO, the Court explicitly "decline[d] to hold that Power is more likely than not to prevail." Doc. [15] (TRO Op.) at 5. Instead, the Court held that, "[a]t this very early stage in the litigation, both parties have presented compelling arguments supporting their interpretation of the contractual text, and neither has effectively countered the other's position with either legal authority or evidence," and that Power's argument regarding its exercise of the Call Option "give it a 'fair chance of prevailing' on the merits." *Id.* Thus, the Court agreed to enter the TRO "to **preserve the status quo** while the parties brief and argue their respective substantive position." *Id.* at 7 (emphasis added).

The Court then scheduled a hearing on Power's request for a preliminary injunction. To avoid the need for a hearing based on Power's representations that it sought only to preserve the status quo,[4] as well as the Court's statements in its Order that it wanted to "preserve the status quo," Cardinals agreed to a Consent Order which it believed preserved the status quo until the Parties could complete discovery and this Court could render a decision on the Parties' substantive position. *See* Doc. [18]. The Court entered the Consent Order on September 2, 2021. *See* Doc. [22].

---

[4] Indeed, in an email to Mr. LaRose on August 31, 2021, counsel for Cardinals specifically asked what would stop "[Miller] from reneging on your representations that Power will wait for a judicial determination?" *See* Stansfield Decl. Ex. 23. In response, Mr. LaRose specifically stated that he wanted only to "keep the status quo" and that "the order clearly says that the parties agree that neither the TRO or this extension of the TRO constitutes a decision on the merits or would entitle Power to specific performance…." *Id.*

**C.  Cardinals and its Board Appointees Learn that Power's Counsel at Armstrong Teasdale LLP is Concurrently Representing Ashley and Power in Litigation in this Court Regarding the Same Underlying Transaction.**

After the Consent Order was entered, Cardinals and its two representatives on Ashley's Board of Managers, Disque and Dupont (the "Cardinals Managers"), learned that counsel for Power in this litigation, Christopher R. LaRose, Esq. of Armstrong Teasdale LLP, is simultaneously representing Power and Ashley in a separate, but related action, in this Court.[5] *See* Disque Decl. ¶ 5. Specifically, on July 30, 2018, Plaintiffs SL EC, LLC, Michael Becker, and Davis & Garvin, LLC filed an action against Ashley, Miller Wells, PLLC, Power, and Miller for breach of contract, fraudulent conveyance, imposition of a constructive trust, and piercing the corporate veil related to Power's acquisition of SL EC, LLC/Becker's equity interest in Ashley (the "SL EC Litigation"). *See SL EC, LLC, et al. v. Ashley Energy, LLC, et al.*, Case No. 4:18-CV-01377-JAR (E.D. Mo.); Disque Decl. ¶ 6. The SL EC Litigation concerns the transaction referenced in Power's Complaint in this Action in Paragraphs 17 and 18. *See* Compl. Doc. [1] ¶¶ 17-18.

Although the Board of Managers had previously been aware of the SL EC Litigation (as Cardinals had been served third-party subpoenas in that case approximately two (2) years ago)[6], the Cardinals Managers believed that Ashley was no longer a defendant in that action based on Mr. Miller's infrequent updates about the SL EC Litigation and his representations that Ashley had been dismissed.[7] Disque Decl. ¶ 7. However, Cardinals Managers recently learned Mr. Millers' representations were untrue and that Ashley is not only still a party to that action, but a

---

[5] Cardinals has since learned that Armstrong has represented Ashley in a number of other matters, including the drafting and negotiation of the Regions Bank loan agreements. Disque Decl. ¶ 8.

[6] Notably, Christopher R. LaRose, Esq. of Armstrong Teasdale LLP, drafted objections and responses on behalf of Cardinals to those subpoenas. *See* Stansfield Decl. Ex. 2.

[7] While this action was commenced years ago, Mr. Miller reaffirmed to the Board that Ashley was no longer a party to this dispute as recently as October 2021. Disque Decl. ¶ 7.

constructive trust is sought against Ashley in that case. *See SL EC, LLC v. Ashley Energy, LLC*, No. 4:18-CV-01377-JAR, 2021 U.S. Dist. LEXIS 179170 (E.D. Mo. Sep. 21, 2021).

On September 21, 2021, Judge Ross granted, in part, and denied, in part, Ashley's Motion for Summary Judgment. *Id.* at *46. The Court held that the Plaintiffs' claim for breach of contract related to a $1.1 million contingent payment due and owing to them could not be decided on summary judgment and that the remedy in Count VIII, "that the Court discover that the membership interest in Ashley belonging to [Power] become the subject of a constructive trust for the benefit of [Plaintiffs]," should remain against Ashley. *Id.*; *see SL EC, LLC v. Ashley Energy, LLC*, Case No. 4:18-CV-01377-JAR Doc. [90]. Contrary to Mr. Miller's representations (who is himself a practicing attorney), Judge Ross did not dismiss Ashley but instead specifically found that Power's Units in Ashley could become the subject of a constructive trust for the benefit of the Plaintiffs in the SL EC Litigation.[8] *See SL EC, LLC*, 2021 U.S. Dist. LEXIS 179170.

### D. Cardinals and the Cardinals Managers Request Information about the SL EC Litigation and Updated Information About Ashley.

Because Mr. LaRose and Armstrong Teasdale were serving as counsel for Ashley while at the same time representing Ashley's minority Unitholder in litigation against its majority Unitholder over their interests in Ashley, Cardinals and the Cardinals Managers, as members of the Board of Managers of Ashley, were extremely concerned by what could likely be an

---

[8] It is unclear why counsel for Power did not mark this Action related to the SL EC Litigation when Power filed its Complaint or, at the very least, inform the Court of this other action given that it concerns the same underlying transaction and unquestionably has implications as to whether Power will remain an interested party in Ashley and, thus, will impact this case. However, not informing this Court of the related action is par for the course for Mr. Miller and his counsel. Judge Ross has critically noted Mr. Miller's "gamesmanship" and litigation tactics in the prior pending case. *See, e.g, SL EC, LLC v. Ashley Energy, LLC,* No. 4:18-cv-01377-JAR, 2019 U.S. Dist. LEXIS 220880, at **13-14 (E.D. Mo. Dec. 26, 2019*)* ("[T]he Court is somewhat unsympathetic because it believes that the risk is the result of Defendants' gamesmanship in filing the Kentucky Action while on notice of, and only two days before, Plaintiffs' stated intent to bring suit in Missouri."); *Id.* at **15-16 ("The Court finds that alternative unacceptable for the same reasons discussed above: the Kentucky Action is the result of what appears to this Court to be gamesmanship and is the less-convenient forum."); *Id.* at *34 ("[T]he Court believes that complexity is the result of Defendants' gamesmanship and will not punish Plaintiffs.").

unwaivable conflict of interest.[9]  *See* Disque Decl. ¶ 9; *Morris v Morris*, 306 A.D.2d 449, 763 NYS2d 622, 624-25 (2d Dept 2003) ("It is accepted that '[o]ne who has served as an attorney for a corporation may not represent an individual shareholder in a case in which his interests are adverse to other shareholders.'"); *Fincanna Capital Corp. v. Cultivation Techs.*, No. G058931, 2021 Cal. App. Unpub. LEXIS 4234, at *5 (June 28, 2021) (upholding trial court's conclusion that "disqualification was warranted because 'corporate counsel' professional duties run to the corporation, [and] counsel must refrain from taking part in any controversies or factional differences among shareholders as to control of the corporation.").[10]

Accordingly, Cardinals and the Cardinals Managers sought additional information from Ashley and Armstrong Teasdale regarding Armstrong's representation of Ashley.  Because Mr. Miller had been repeatedly ignoring requests for information, Cardinals and the Cardinals Managers sent Ashley a formal demand for books and records on October 14, 2021 seeking, among other things, information related to the SL EC Litigation.  *See* Stansfield Decl. Ex. 4 (Letter on October 14, 2021 to Mr. Miller).  In addition, since a "corporate manager is a 'client' for the purposes of privilege," *State ex rel. Polytech, Inc. v. Voorhees*, 895 S.W.2d 13, 14 (Mo. 1995), the

---

[9] In fact, Armstrong Teasdale, itself, appeared to agree that this could create a conflict.  In a letter dated October 22, 2021 to the Cardinals Managers in response to their request as Board members for Ashley's client files, Mr. La Rose stated:  "In responding to your request for the client files, we also must comply with Rule 4-1.13, which requires this law firm to act in the best interest of Ashley Energy, *as opposed to any individual managers or unitholders of Ashley Energy*."  *See* Stansfield Decl. Ex. 3 (Letter on October 22, 2021 from Mr. LaRose) (emphasis added).

[10] *See also Barmash v. Perlman*, 2013 N.Y. Misc. LEXIS 4626 *; 2013 NY Slip Op 32460(U) ** (Oct. 3, 2013 N.Y. Supr. Ct.) ("Where a law firm has served as corporate counsel to an entity, it cannot then represent one shareholder against another with regard to underlying corporate transactions concerning that self-same corporate entity."); *Metro-Goldwyn-Mayer, Inc. v. Tracinda Corp.*, 36 Cal. App. 4th 1832 (1995) (disqualifying corporate counsel from representing former Board members, commenting "corporate counsel should of course, refrain from taking part in any controversies or factional differences among shareholders as to control of the corporation, so that he or she can advise the corporation without bias or prejudice"); *Woods v. Superior Court*, 149 Cal.App.3d 931 (1983) (California appellate court held an attorney who represented a family corporation for years cannot "take sides in a serious dispute between its owners" and represent one spouse against another when the family corporation is the primary focus of the dispute).

Cardinals Managers, as corporate representatives of Ashley, also sent a letter to Mr. LaRose on October 14, 2021, requesting that Armstrong provide them with Ashley's client files as well as an update on all matters for which Armstrong is currently representing Ashley. *See* Stansfield Decl. Ex. 5.

In response to the letter to Ashley, Mr. Miller, purportedly on behalf of Ashley, stated that, despite the fact that a manager's entitlement to information is "essentially unfettered,"[11] Mr. Miller was limiting the Cardinals Managers' access to only certain information and claimed that he believed that the requests were being made for an improper purpose. *See* Stansfield Decl. Ex. 6 (Letter from Mr. Miller dated October 22, 2021). Furthermore, Mr. Miller repeatedly and wrongfully stated (again, purportedly on behalf of *Ashley*) that "as of August 9, 2021, Power Investments, LLC, the owner of 100% of the common units, also became the holder of the Preferred Units of Ashley, concurrent therewith vesting Power Investments with the voting authority with respect to all units" and that Cardinals was a "former unitholder." *Id.* at 2; *see also id.* at 1 ("[A]s of August 9, 2021, Power Investments became the sole beneficial owner of all of the units, common and preferred."); *id.* at 7 ("As noted above, as of August 9, 2021, Power Investments, LLC, the owner of 100% of the common units, also became the holder of the Preferred Units of Ashley."); *id.* at 8 ("[I]t is Ashley's understanding that as of August 9, 2021, Cardinals had only record title to the Preferred Units and could not exercise any unitholder rights, as those now reside with the beneficial owner.").

Although Mr. Miller ultimately agreed to give certain information to the Cardinals Managers, he refused to give most of the information requested and claimed that the Cardinals

---

[11] *State ex rel. Kennedy v. Continental Boiler Works, Inc.*, 807 S.W.2d 164, 166 (Mo. Ct. App. 1991) (A manager's "right to examine the books and records is 'unqualified.'"); *Obeid v. Gemini Real Estate Advisors, LLC*, No. 2017-0510-JTL, 2018 Del. Ch. LEXIS 186, at *9 (Del. Ch. June 5, 2018) (holding that manager's right to books and records of the Company was "essentially unfettered in nature").

Managers could not share any of the information they received with Cardinals. *Id.* Mr. Miller made this false statement despite the fact that it is well-established that "[w]hen a director serves as the designee of a stockholder on the board, and when it is understood that the director acts as the stockholder's representative, then the stockholder is generally entitled to the same information as the director." *Kalisman v. Friedman*, No. 8447-VCL, 2013 Del. Ch. LEXIS 100, at \*17 (Ch. Apr. 17, 2013); *see also Moore Business Forms, Inc. v. Cordant Holdings Corp.*, 1996 Del. Ch. LEXIS 56, 1996 WL 307444, at \*4 (Del. Ch. June 4, 1996); *KLM v. Checchi*, 1997 Del. Ch. LEXIS 125, 1997 WL 525861, at \*2-3 (Del. Ch. July 23, 1997); *AOC Ltd. P'ship v. Horsham Corp.*, 1992 Del. Ch. LEXIS 110, 1992 WL 97220, at \*1 (Del. Ch. May 4, 1992). This rule extends to privileged information. *See In re CBS Corp. Litig.*, 2018 Del. Ch. LEXIS 231, at \*19-20 (Ch. July 13, 2018) (rejecting the Company's "request that access to any [Company] privileged information that may be provided as a result of this ruling be limited to the [controlling stockholder] Affiliated Directors and not shared with the [controlling stockholder] or their counsel" since weight of precedent supported the opposite conclusion).

Separately, Mr. LaRose responded to the Cardinals Managers' letter claiming that because Mr. Miller (his client) was already in possession of Ashley's client files, he did not need to provide client files to anyone else on the Board. Disque Decl. ¶ 10; Stansfield Decl. Ex. 3. Like Mr. Miller's letter, Mr. LaRose requested that the Cardinals Managers agree not to give to Cardinals (among others) any attorney-client communications between Ashley and Armstrong under the false premise that disseminating information to Cardinals could waive an applicable privilege. *Id.*; Disque Decl. ¶ 10. Again, Mr. LaRose's demand was in direct contradiction of established law and the past practices of Ashley pursuant to which all Board members were free to share

information with their principals, including allegedly privileged information.  *See In re CBS Corp. Litig.*, 2018 Del. Ch. LEXIS 231, at *19-20.

   **E.**     **The Board Agrees to Appoint Special Counsel to Investigate the Conflict Issue.**

   Messrs. Miller and LaRose's demands in their letters were clearly a pretext for avoiding an investigation into these issues.  Nevertheless, to avoid a dispute over the feigned confusion by Messrs. Miller and LaRose as to the capacity in which the Cardinals Managers were requesting the information, a Special Meeting of the Board was properly noticed and called to discuss these issues and to appoint a Special Counsel to investigate the conflict issues resulting from Armstrong's representation of Ashley and Power.  Disque Decl. ¶ 11; Stansfield Decl. Ex. 8.  In addition, because Mr. Miller's own law firm, Miller Edwards Rambicure PLLC ("MER"), had also appeared for Ashley in the SL EC Litigation (which was not disclosed to or approved by the Board of Managers), the Board of Managers believed the Special Counsel should investigate any conflicts associated with MER's representation of Ashley as well.  Disque Decl. ¶ 12.

   Thus, and even though a majority of the Board could act by written consent under the terms of the Operating Agreement, the Cardinals Managers called a Special Meeting of the Board of Managers to discuss the conflict issue as a Board.  *See* Disque Decl. ¶ 13.  Specifically, on November 17, 2021, the Board of Managers held a telephonic meeting at which the Board discussed and ultimately unanimously approved (*i.e.*, including Mr. Miller) the appointment of Special Counsel to investigate the conflicts of interest associated with Ashley's legal representation in the SL EC Litigation.  *See* Disque Decl. ¶ 14.

   This agreement was memorialized in the Board's meeting minutes and was thereafter, in accordance with best practices, formally composed into a written resolution which set forth the specific scope of the work the Special Counsel would engage in. Disque Decl. ¶¶ 15.  Accordingly, on December 2, 2021, the Cardinals Managers sent to Mr. Miller written resolutions reflecting the

appointment of Special Counsel and proposed using Sandberg Phoenix & Von Gontard P.C., with whom neither Ashley nor Cardinals or its affiliates had any previous relationship, to serve as Special Counsel to Ashley.[12]  Stansfield Decl. Ex. 8 (Disque email on December 2, 2021); Disque Decl. ¶ 16.

### F.   Miller Acts Unilaterally, Without Board Approval, and in Violation of the Ashley Operating Agreement to Amend Ashley's Loan Agreement with Regions Bank.

As discussed above, in addition to requesting information about the SL EC Litigation, Cardinals and the Cardinals Managers requested information about Ashley's current loan agreements with its lender, Regions Bank (the "Loan Agreements").  In response, Mr. Miller provided an amendment to the Loan Agreements dated September 30, 2021 ("Amendment 6"), which the Board had not approved and which materially changed the terms of the loan with Regions Bank (the "Regions Loan").  *See* Stansfield Decl. Ex. 10 (Amendment No. 6 to Regions Loan and Security Agreement).  Specifically, in addition to extending the maturity date of the Regions Loan to November 30, 2021, Mr. Miller added, among other things, a mandatory prepayment provision, which obligates Ashley to use excess amounts it has in its reserve account to repay the interest and the principal on the Regions Loan after completion of the rebuilding of the Plant.  *Id.*  Mr. Miller entered into this amendment without first consulting with, or obtaining the approval of, the Board and without any authority to do so as Ashley's CEO.  Disque Decl. ¶ 19.

---

[12] Mr. Miller proposed other law firms to serve as Special Counsel.  *See* Disque Decl. ¶ 17.  The Cardinals Managers considered these candidates but concluded that Sandberg Phoenix's credentials were more impressive and their experience was more relevant to the issues to be investigated.  *Id.*  In addition, the majority of the recommendations made by Mr. Miller were lawyers who appear to have attended law school with Mr. LaRose and the Cardinals Managers believed that any lawyer serving as Special Counsel should have no affiliation with Armstrong, Mr. LaRose, or MER.  *Id.*

Approximately one month later, Mr. Miller again entered into an amendment to the Loan Agreements without consulting with or obtaining the approval of the Board, this time extending the maturity date of the Regions Loan to January 31, 2022 and again further materially changing the terms of the Loan Agreements ("Amendment 7," and, together with "Amendment 6," the "Loan Amendments").  Disque Decl. ¶ 20; *See* Stansfield Decl. Ex. 11 (Amendment No. 7 to Regions Loan and Security Agreement).  Specifically, Mr. Miller agreed, without first consulting with or obtaining the approval of, the Board, that all proceeds received from the insurers as a result of the Water Intrusion Event (*i.e.*, the $35 million) would be directly deposited into a special account and that Regions Bank would have the right to debit the special account to pay the Regions Loan, whether or not any amounts were due and owing at that time and without the approval of Ashley. Disque Decl. ¶ 20; Stansfield Decl. Ex. 11.  These proceeds are the very same funds that are the subject of Cardinals' Counterclaims and that the Board had already agreed would be distributed to the Members of Ashley once the Plant was rebuilt.  *See* Counterclaims ¶ 27; Disque Decl. ¶ 21.

Mr. Miller knew full well that he lacked the authority to negotiate or execute any of the Loan Amendments without Board approval.  *See* Disque Decl. ¶ 22.  To be sure, in every other amendment to the Loan Agreements (including those in February and May of 2021), Mr. Miller specifically sought and obtained the Board's approval to amend the Loan Agreements.  *See id.*; *see also* Stansfield Decl. Exs. 11-15 (Amendments No. 1-5 of Regions Bank Loan and Security Agreements, Exhibit A); *id.* Exs. 16-17 (Ashley's Board of Managers' Resolutions for Amendments No. 4 & 5).  Yet, in the most recent Loan Amendments, Mr. Miller falsely represented to the bank that execution of the Amendments were "duly authorized by all requisite action of [Ashley]" even though Mr. Miller knew the Board did not approve any resolutions or even know of these material changes, and that he lacked the authority to bind the Company to

these agreements without the express approval of the Board of Managers.  *See* Stansfield Decl.

Exs. 9-10.

> **G.     Miller Repeatedly and Falsely Claims that Cardinals is No Longer an Owner of Ashley and He is the Sole Decision Maker for Ashley.**

In light of Mr. Miller's action, the Cardinals Managers wrote to Mr. Miller on December

8, 2021 stating that Mr. Miller's unilateral decision to agree to the Loan Amendments without first

consulting with the Board was both highly improper and unauthorized.  *See* Stansfield Decl. Ex.

18 (Email Exchange between Mr. Disque and Mr. Miller on December 8-9, 2021).  The Cardinals

Managers also reminded Mr. Miller that Ashley was "a manager-managed limited liability

company and, as such, the management of its affairs rests solely with its Board of Managers."  *Id.*

In this regard, and although Mr. Miller was serving as Ashley's CEO, "all decisions regarding

Ashley's credit facilities rest solely with the Board and has never been delegated to any

individual."  *Id.*  Accordingly, the Cardinals Managers made clear that Mr. Miller was "not

authorized to be engaging in discussions with any lenders without the prior consent of the Board

of Managers."  *Id.*

In response, Mr. Miller claimed, among other things, that he was permitted to amend the

Loan Agreement without the Board's consent and further repeated his false claims that the

Cardinals Managers were serving "at the pleasure of Power Investments" and that Power was the

Cardinals Managers' "principal."  *Id.*  Most egregiously, Mr. Miller expressly rejected the very

Operating Agreement that he co-drafted and executed, which states that "the Board shall conduct,

direct and exercise full control over all the activities of the LLC," "all management powers over

the business and affairs of the LLC shall be exclusively vested in the Board," and that the Board

may revoke any delegated authority to an officer "at any time" in "its sole discretion."

Notwithstanding these unambiguous provisions, Mr. Miller fantastically claimed that the Cardinals

Managers "unanimously and irrevocably delegated the power to exercise control over Ashley Energy's affairs" to him and claimed that attempting to revoke that authority would be a breach of numerous agreements.[13] *Id.*

**H.     Power and Miller Attempt to Hinder the Conflicts Investigation By Launching Baseless Accusations and Refusing to Comply with the Board's Directives.**

Apparently finally realizing the gravity of the situation and that Miller's "gamesmanship" (as Judge Ross aptly described it) was beginning to be discovered, Power and Miller began to take steps to thwart the Special Counsel's investigation into Armstrong's and MER's conflicts even though Miller himself had voted in favor of and approved the action.

First, on December 10, 2021, Mr. Miller, purportedly "on behalf of Ashley," threatened to investigate and potentially assert claims against Cardinals on behalf of Ashley. Stansfield Decl. Ex. 19 (Email on December 10, 2021 from Mr. Miller). Miller claimed that Cardinals' exercising its Conversion Rights under the Operating Agreement, which, not only was its contractual right, but also the direct result of Mr. Miller's own actions (*i.e.*, sending notice of an intent to exercise the Call Option), may be a breach of certain unspecified Loan Agreements with Regions Bank. *Id.* Mr. Miller stated that he would self-interestedly be launching "an investigation" into these claims. *Id.*

Second, on December 13, 2021, Mr. Miller, again, purportedly "on behalf of Ashley," threatened additional frivolous investigations, but this time of the Cardinals Managers. Stansfield Decl. Ex. 20 (Email on December 13, 2021 from Mr. Miller). Mr. Miller claimed in his email that

---

[13] Mr. Miller has repeatedly stated that it would be a breach of the Loan Agreements if he did not have the authority to amend it. Leaving aside that those agreements appear to be negotiated and drafted by Armstrong Teasdale, that is simply not true. The Agreement provides that if Mr. Miller ceases to run the "day-to-day" operations of the Company, that would be a Change in Control event. But materially amending a loan agreement with a senior lender is not part of the "day-to-day" operations – it is an action that needs approval of the Board. Indeed, the amendment themselves required such a representation (which Mr. Miller falsified).

he was trying to determine whether the Cardinals Managers may be "breaching their duties of loyalty and good faith and incapable of voting and taking other action on behalf of Ashley" because they had sought information from Ashley which they have the unquestionable right to as Managers under the Operating Agreement. *Id.* According to Mr. Miller, the Cardinals Directors' disclosure of information to Cardinals would also be a breach of their duties even though, as discussed above, Miller's claim was directly contradicted by established law that permits Managers to disclose information, including privilege information, to their principals. *Id.*; *see supra* Section D.

Third, on December 16, 2021, a meeting of the Board of Managers was held. *See* Disque Decl. ¶ 23. During that meeting, Mr. Miller repeatedly claimed that Board of Managers had no authority to manage the affairs of the Company despite the fact that the Operating Agreement expressly states otherwise and they have been doing so for the past four years. *Id.* Mr. Miller stated that he, through Power, controlled and managed the affairs of the Company, including all voting authority, and that the Cardinals Managers had no rights whatsoever to vote on any matters at the Board level. *Id.* These statements are inexplicable for several reasons, not the least of which is that this Court had expressly <u>not held</u> that Power was the owner of Cardinals' Preferred Units. Nevertheless, Mr. Miller repeatedly claimed the very opposite (presumably believing that he knows better than this Court). *Id.*

In addition, with respect to the Special Counsel specifically, Mr. Miller stated at the same meeting that he was the only person at Ashley with the authority to engage counsel, that it was his decision regarding who to engage, and that Mr. Miller would be interviewing and engaging Special Counsel to investigate the conflict of interest issue concerning his own counsel. *Id.* In addition, Mr. Miller stated that he would instruct the Special Counsel to also investigate what he claimed to be the Cardinals Managers' breaches of the implied covenant of good faith and fair dealing,

whether the Cardinals Managers could continue serving on the Board, and whether Cardinals attempt to convert its Preferred Units into Common Units would be a breach of the Regions Bank loan agreements. *Id.* As discussed above, these were frivolous claims having nothing to do with the conflict issue.

Finally, hours after the meeting, counsel for Power sent a letter to counsel for Cardinals taking many of the very same positions that Mr. Miller took at the Board meeting and seeking to shut down the independent investigation of his likely conflicts of interest. Stansfield Decl. Ex. 21 (Letter from December 16, 2021 from Mr. LaRose). Like Mr. Miller, Mr. LaRose claimed that the Cardinals Managers' hiring of Special Counsel to investigate his conflict (which Mr. Miller previously agreed to) and hiring an industry advisor for Ashley was not within the authority of the Board or otherwise inconsistent with how the Company had been managed. *Id.* Mr. LaRose made these false claims without citing any evidence whatsoever supporting this unsupportable assertions. *Id.*

Power also doubled down on its claim that Cardinals was no longer an owner of Ashley. *Id.* Again, presumably believing that they know better than this Court, and despite the fact that this Court had expressly **not held** that Power's Call Option was effective and the entire purpose of TRO and Consent Order was to preserve the status quo to address that issue, Mr. LaRose stated that the Cardinals Managers' actions "violate Power's ownership interest in the Preferred Units" and that Power was the beneficial owner of the Preferred Units. *Id.*

Given the fact that Power and Mr. Miller had repeatedly taken actions to frustrate not only Cardinals' conversion but its majority ownership in Ashley and the status quo order, Cardinals moved for an order in this Court seeking to restrain Power and Miller from engaging in this wrongdoing.

# ARGUMENT

## I.   LEGAL STANDARD.

District courts have broad discretion to make determinations regarding the propriety of injunctive relief. *See Planned Parenthood of Minnesota, Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 866 (8th Cir. 1977) (citations omitted). "Temporary injunctive relief functions to '**preserve the status quo** until, upon a final hearing, a court may grant full, effective relief." *Amdocs, Inc. v. Bar*, 2016 WL 9405679, at *3 (E.D. Mo. May 23, 2016) (quoting *Kansas City S. Trans. Co., Inc. v. Teamsters Local Union #41*, 126 F.3d 1059, 1065 (8th Cir. 1997)) (emphasis added). When deciding whether to issue a temporary restraining order, the Court must consider (1) the threat of irreparable harm to the movant; (2) the balance between that harm and the harm that granting the injunction will inflict on other parties; (3) the probability that the movant will prevail on the merits; and (4) the public interest. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). "While 'no single factor is determinative,' the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (quoting *Dataphase*, 640 F.2d at 113) (internal citations omitted).

## II.   CARDINALS HAS SATISFIED THE *DATAPHASE* FACTORS AND IS ENTITLED TO A TEMPORARY RESTRAINING ORDER.

### A.   Cardinals is Likely to Prevail on the Merits of its Claims.

While Cardinals can prove that it is likely to prevail on the merits of its claims, it has easily established that its arguments "give it a 'fair chance of prevailing' on the merits, which is all that is required to satisfy this *Dataphase* factor." TRO Op. at 5 (citing *Planned Parenthood Minn. v. Rounds*, 530 F.3d 724, 730 (8th Cir. 2008)). The reasons why are multiple.

First, Cardinals can establish that Power has breached Section 4.1(a) of the Operating Agreement. Cardinals had the right to convert its Preferred Units into Common Units "at any

time" and did exercise that right effective on the close of business on August 16, 2021. As the Court is aware, this was one of the central issues briefed by the Parties in connection with the TRO and for which this Court appeared to find Cardinals was likely to prevail on the merits. *See* Doc. [15] (TRO Op.) at 5 (declining "to hold that Power is more likely than not to prevail" on its interpretation of the Agreement). As Cardinals explained then, the Conversion Right did not need to be exercised prior to Power sending a notice of intent to call Cardinals' Preferred Units because Cardinals' Conversion Right expressly trumped Power's Call Option as it is the only interpretation of the Agreement that is supported by its plain text and basic principles of contractual interpretation.[14] Since the Court issued the TRO, Mr. Miller's actions have violated Cardinals' Conversion Rights by not only disregarding Cardinals' ownership interest in Ashley in communications with Cardinals and the Ashley Board of Managers, but to the outside world.

Second, Power has breached numerous other provisions of the Operating Agreement related to the Board having the exclusive authority to manage the affairs of the Company. Sections 6.1, 6.3, and 6.4 provide, in relevant part, that "the Board shall conduct, direct and exercise full control over all activities of the LLC," "all management powers over the business and affairs of the LLC shall be exclusively vested in the Board," "the act of Managers possessing a majority of the votes held by the Managers present at a meeting of the Board at which a quorum is present shall be the act of the Board," and Officers of the Company shall only "have such authority and perform such duties as the Board may, from time to time, delegate to them" and "such delegation may be revoked at any time by the Board in its sole discretion." Compl. Ex. 1 §§ 6.1, 6.3, and 6.4

---

[14] Those include, among other things, the fact that the Preferred Units could be converted "at any time," none of the three events that the Parties agreed would be the only limitations on Cardinals' Conversion Right occurred, an interpretation that added the "Call Option" to the events limiting Cardinals' Conversion Right would contravene the doctrine of *expressio unius,* and Power's argument that the Call Option was an irrevocable offer to sell misses the mark because options, like other contracts, can have conditions subsequent, such as the exercise of a Conversion Right.

Power has, through Mr. Miller, breached these provision by usurping and refusing to recognize the Board's authority (including unanimous decisions), claiming repeatedly that the Board (including the Cardinals Managers) has no authority to vote on matters concerning the Company, and stating that Power has the sole control and voting power over Ashley. Furthermore, Power/Miller have refused to recognize the acts of the majority of the Board, including the retention of Special Counsel at Sandberg Phoenix,[15] and have agreed to the Loan Amendments without being delegated the authority to do so by the Board.

Finally, Power has breached the implied covenant of good faith and fair dealing.[16] A party breaches the implied covenant if it exercises a judgment conferred by the agreement's express terms in a manner that "evades the spirit of the transaction or denies the other party the expected benefit of the contract." *Envtl. Prot., Inspection, & Consulting, Inc. v. City of Kansas City*, 37 S.W.3d 360, 366 (Mo. App. 2000). Here, Power has breached the implied covenant by disregarding almost all of Cardinals rights as a Unitholder of Ashley.

Power will surely repeat the same arguments it has raised with Cardinals in its letters that Mr. Miller has somehow been delegated complete, unfettered and unbounded authority over the Company with no oversight or reporting to the Board of Managers. That is entirely false. As reflected in the attached declaration of Mr. Disque, as well as other supporting documents, Mr. Miller was appointed by the Board to serve as the CEO and President of Ashley to run the day-to-

---

[15] Indeed, as recently as this morning, Mr. Miller falsely represented to an attorney at Sandberg Phoenix that, despite representing the majority of the Board, the Cardinals Managers "do not have the authority to engage legal counsel for Ashley Energy...." Stansfield Decl. Ex. 22 (Email on December 20, 2021 from Miller to Sandberg Phoenix).

[16] Cardinals will also be able to establish that Miller, in his capacity as an Officer of Ashley, has breached his fiduciary duties by taking all of the self-interested steps discussed above to frustrate Cardinals majority ownership in Ashley. Unlike the Managers of Ashley, whose fiduciary duties are waived pursuant to Section 6.6, Mr. Miller, while acting in his capacity **as an officer** of Ashley, owes traditional fiduciary duties to Ashley and all its unitholders and has breached those duties.

day operations of Ashley.[17]  However, Mr. Miller, like all officers of companies, always served at the pleasure of the Board and was only delegated that authority that the Board conferred to him. Mr. Miller has never been delegated "control" over the Company – and most certainly not "irrevocable" or unchecked authority – and Mr. Miller and Power's actions go well-beyond any "day to day" authority that Mr. Miller ever had.  As just one example, Mr. Miller never had the authority to amend the Loan Agreements without the approval of the Board, never had authority to make express representations to a lender from "the Board", and Mr. Miller knew this as evidenced by the fact that Mr. Miller sought the approval of the Board for all prior amendments to the Loan Agreements that occurred before he sent his notice of intent to Call.

In short, Cardinals is likely to succeed on the merits on many, if not all, of its claims. Accordingly, the first *Dataphase* factor for a TRO is met.

**B.      There is a Threat of Irreparable Harm to Cardinals.**

There is also a threat of irreparable harm to Cardinals if the Court were to not issue an injunction.  As an initial matter, the Parties expressly consented to specific performance and injunctive relief as potential remedies for any breaches of the Agreement.  *See* Compl. Ex. 1 § 15.3. That, by itself, supports a finding of irreparable harm.  *See Saint Laurie Ltd. v. Yves Saint Laurent America, Inc.*, 13-CV-6857 (DAB), 2015 WL 12991205, at *5 (S.D.N.Y. Mar. 27, 2015) ("Assuming a breach is proven, '[w]hen specific performance is contemplated by the contract, courts tend to find that irreparable harm would be suffered unless specific performance is granted.'" (citing *Wells Fargo Bank v. Bank of Am.*, No. 11 Civ. 4062, 2013 WL 372149, at *8 (S.D.N.Y. Jan. 31, 2013), citing *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 2009)).

---

[17] "Day to day operations" has a common and easily understood meaning, to wit:  overseeing staff, making routine scheduling for shifts, and reporting to superiors (in this case, the Board of Managers).

But even if there were no such stipulation, the damages caused by Power's and Miller's actions cannot be remedied without an injunction. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Phyllis Schlafly Revocable Tr. v. Cori*, 924 F.3d 1004, 1009 (8th Cir. 2019) (quoting *Gen. Motors Corp. v. Harry Brown's LLC*, 563 F.3d 312, 319 (8th Cir. 2009) (internal citations omitted). Here, that is the case. To be sure, each decision that Mr. Miller makes unilaterally and without Board approval can and is having a material impact on Ashley. For example, Mr. Miller's unauthorized and self-interested agreement with Regions Bank regarding the Loan Agreements are materially changing the potential value of Ashley and how Ashley uses its excess funds to operate the business.

In addition, Power's actions are, in effect, causing Cardinals to lose its interest in the Company, including its voting power and Board seats. This is the quintessential type of harm that cannot be remedied by money damages. Indeed, as one treatise explained,

> shareholders' right to elect directors is the primary, if not exclusive, method by which they may exert some measure of influence upon the conduct and affairs of the entity in which they have invested, and it implicates "the ideological underpinning upon which the legitimacy of directorial power rests." Efforts that thwart that right, whether by design or practical effect, are likely to be deemed irremediable at law.

1 Corp & Commercial Practice in DE Court of Chancery § 14.03 (2021); *see also International Banknote Co. v. Muller*, 713 F. Supp. 612, 623 (S.D.N.Y. 1989) ("Courts have consistently found that corporate management subjects shareholders to irreparable harm by denying them the right to vote their shares or unnecessarily frustrating them in their attempt to obtain representation on the board of directors.") (citations omitted).

There is little doubt that Power's actions (through Miller) are denying Cardinals and the Cardinals Managers right to vote. Indeed, Mr. Miller has repeatedly claimed that Cardinals has no

rights whatsoever and that he has sole control and voting power over Ashley. Furthermore, although Board meetings are held, Power and Miller have refused to recognize the acts of the majority of the Board, including the retention of Special Counsel. Thus, although serving as "Managers," Power's actions render the Cardinals Managers' title meaningless and, at present, equate to Cardinals not having any representation on the Board. As Power itself argued to this Court in its TRO brief, Cardinals being "wrongly stripped of its right to participate in the governance of the Ashley . . . would . . . constitute irreparable harm." Doc. 3 at 12. Accordingly, the Court should grant Cardinals' request for an injunction.

### C. The Harms to Cardinals if a TRO is Not Issued Substantially Outweigh Any Alleged Harm to Power.

As discussed above, the harm to Cardinals will be irreparable if Power is able to continue acting in the manner it has. By contrast, the harm to Power would be de minimis if the Court were to issue the injunction. To be sure, Cardinals is not seeking anything other than an order preserving ***the status quo*** so that this Court has the opportunity to rule on the merits of the litigation rather than Miller making decisions that are contrary to the Court's orders and statements. Specifically, Cardinals is asking this Court to order Power to cease its interference with Ashley continuing to be run as the Parties negotiated, agreed to and have been operating for the past four (4) years, which includes Mr. Miller reporting to and serving at the pleasure of the Board as long as he remains an officer of the company. In addition, Cardinals is asking this Court to order Mr. Miller to cease his misrepresentations to third-parties that he has sole authority over Ashley and to act only with the authority that the Board delegates to him. Such authority does not include, and has never included, the unilateral authority to amend the terms of the Loan Agreement—that has always required and continues to require the express written approval of the Board.

Furthermore, Cardinals is asking that the Court restrain Power from taking any further action seeking to further its Call Option. This includes, among other things, representing or taking action on Mr. Miller's false claim that Cardinals is a "former" owner of the Preferred Units and that Cardinals' only purpose is to now serve his commands. The Court will decide ownership issues at the appropriate time. Until that time, however, Mr. Miller should be enjoined from trying to circumvent the judicial process.

Given that Power had previously stated that it was merely trying to preserve the status quo, Power certainly cannot now claim that maintaining the status quo would cause harm to Power. Accordingly, this *Dataphase* factor likewise favors Cardinals and entry of the TRO.

### D. The Public Interest Favors a TRO.

The public interest also favors entry of the TRO for two reasons. First, the public interest is served by enforcing contractual relationships. *See H&R Block Tax Servs., LLC v. Cardenas*, 2020 U.S. Dist. LEXIS 36307, 2020 WL 1031033, at *4 (W.D. Mo. Mar. 3, 2020). Second, the public interest is served by ensuring proper oversight of Ashley's operations. Ashley is the owner of a Power Plant that provides essential steam heat to the core business district of St. Louis. Over the last few months, Ashley has been suffering financially with Mr. Miller as its CEO. Without proper oversight from an involved Board, the Company will continue down this spiral with the potential for the Plant to close. Accordingly, the public interest is served by ensuring that the Board oversees Mr. Miller as he manages the day-to-day operation of Ashley.

## III. NO BOND IS NECESSARY.

As Power explained in its TRO Brief, the Parties contractually "agreed that remedies including specific performance and/or injunctive relief would be available in response to a party's breach '***without posting a bond or other security***'" and "[e]nforcing the terms of the parties' agreement serves important public policy purposes, including honoring the parties' settled

expectations and the consideration they paid in bargaining for a no-bond requirement." Doc. [3] at 14 (citing Compl. Ex. 1, § 15.3 (emphasis added) and *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1145 (8th Cir. 2007)). Here, for the same reason that the Court did not require Power to post a bond in connection with the TRO, the Court should not require Cardinals to post a bond as the Parties contractually agreed to that no bond is required and Power cannot show any damages if an injunction were granted since it would merely place the Parties back in the status quo.

## **CONCLUSION**

For the foregoing reasons, Cardinals respectfully asks this Court to issue a temporary restraining order and preliminary injunction in the form filed contemporaneously herewith.

Dated: December 20, 2021

Respectfully submitted,

DENTONS US LLP

By:    */s/ Stephen J. O'Brien*
    Stephen J. O'Brian #43977MO
    One Metropolitan Square, Suite 3000
    St. Louis, Missouri 63102
    Telephone: (314) 241-1800
    Facsimile: (314) 259-5959
    stephen.obrien@dentons.com

By:    */s/ Wayne C. Stansfield*
    REED SMITH LLP
    Joseph J. Tuso
    Wayne C. Stansfield
    Nicholas R. Rodriguez
    Three Logan Square
    1717 Arch Street, Suite 3100
    Philadelphia, Pennsylvania 19103
    Telephone: (215) 851-8100
    Facsimile: (215) 851-1420
    jtuso@reedsmith.com
    wstansfield@reedsmith.com
    nrodriguez@reedsmith.com
    (*admitted pro hac vice*)

    *Attorneys for Cardinals Preferred, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing was electronically filed on December 20, 2021 with the United States District Court for the Eastern District of Missouri using the CM/ECF system which will send notification of such filing to all parties requesting electronic notice.

                                             */s/Wayne C. Stansfield*
                                             Wayne C. Stansfield