# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| POWER INVESTMENTS, LLC, | ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 4:21-cv-01022-SEP |
| CARDINALS PREFERRED, LLC, | ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM AND ORDER

Before the Court are Plaintiff Power Investments, LLC, and Defendant Cardinals Preferred, LLC's cross motions for summary judgment, Docs. [144], [147], as well as the parties' joint motions for leave to file under seal, Docs. [188], [189], [190], [191]. For the reasons set forth below, the Court denies Power's motion for summary judgment, grants in part and denies in part Cardinals' motion for summary judgment, and denies the joint motions for leave to file under seal.

### UNDISPUTED MATERIAL FACTS AND BACKGROUND

This is a dispute between the investors in Ashley Energy LLC, a company that runs an energy plant in downtown St. Louis, Missouri. Doc. [164-2] ¶¶ 1-2. In 2017, Power and Cardinals agreed to acquire Ashley Energy and executed the Operating Agreement at issue. *Id.* ¶ 8. The purchase of the plant was accomplished through a series of transactions, ultimately resulting in Power acquiring 850,988 shares of Ashley Energy's common units for $850,988 (a 45.99% interest) and Cardinals acquiring 999,222 preferred units for $999,222 (a 54.01% interest). Doc. [160-2] ¶ 8.

The Agreement provides Power and Cardinals call and put options, respectively. Specifically, the text of the Agreement provides:

> **10.5  Put/Call Option**.
>
> (a)   Put Option:
>
> (i)   At any time on or following August 9, 2021, the Preferred Unitholder shall have the right to cause the LLC to redeem a portion or all of the Preferred Units pursuant to this Section 10.5(a) (the "Put"). The price for Preferred Units sold to the LLC in accordance with this Section 10.5(a) shall be equal to the greater of (x) the sum of (1) the Preferred Unitholder's Unreturned Capital and (2) the Preferred Unitholder's Unpaid Return, in each case as of the date of such

redemption or (y) the price of the Preferred Units calculated in accordance with the following formula:

$$E * 11 - D - WC - O$$

E = trailing twelve month EBITDA, as determined by LLC's auditors, measured from the month ending prior to the redemption;

D = all secured debt outstanding at the time of redemption;

WC = adjusted working capital, as determined by the LLC's auditors;

O = other material, on-balance sheet LLC obligations, measured for the month ending prior to redemption

(ii)     The Put shall be consummated within six (6) months after the delivery of notice that the Preferred Unitholder has exercised the Put (such date of consummation, the "Put Closing"). If the Put Closing does not take place in accordance with Section 10.5(a) or to the extent that the LLC may not, as of the Put Closing legally redeem the Preferred Units, such redemption will take place as soon as legally permitted.

(b)     Call Option.  At any time on or following August 9, 2021, a majority of Class A Common Units shall have the right to purchase a portion or all of the Preferred Units pursuant to this Section 10.5(b) (the "Call"). The Call shall be consummated within the same time period and at the same price described in Section 10.5(a) above.

Doc. [146-3] ¶ 10.5.

The Agreement also allows Cardinals, as the preferred unitholder, to convert its preferred units into common units:

### 4.1     Conversion Right.

(a)     Preferred Units shall be convertible at any time or from time to time by a holder of such Preferred Units giving written notice to the LLC of the exercise of conversion rights contemplated by this Article IV (the "Conversion Rights"), without the payment of additional consideration by any holder thereof, into such number of fully paid and non-assessable Class A Common Units as is determined by dividing the Original Issue Price by the Conversion Price (as defined below) in effect at the time of conversion, and shall automatically so convert as provided in Section 5.1(b)(i). The "Original Issue Price" shall be equal to $1.00. The "Conversion Price" shall initially be equal to $1.00 and shall be subject to adjustments as provided in this Article IV.

(b)     Termination of Conversion Rights.  In the event of a liquidation, dissolution or winding up of the LLC, the Conversion Rights shall terminate at the

2

close of business on the last full day preceding the date fixed for the payment of any such amounts distributable on such event to the Preferred Unitholder.

    **4.2**    <u>**Mechanics of Conversion**</u>.

    (a)    <u>Conversion</u>.  The close of business on the date of receipt by the LLC of such notice shall be the time of conversion (the "<u>Conversion Time</u>").  The LLC shall, as soon as practicable after the Conversion Time issue and deliver to such holder of Preferred Units, or to his, her or its nominees, a notice of issuance of Class A Common Units in accordance with the provisions hereof.

    (b)    <u>Effect of Conversion</u>.  All Preferred Units which shall have been surrendered for conversion as herein provided shall no longer be deemed to be outstanding and all rights with respect to such Units shall immediately cease and terminate at the Conversion Time, except only the right of the holders thereof to receive Class A Common Units in exchange therefore.

*Id.* ¶¶ 4.1-4.2.  The parties agree that there has been no liquidation, dissolution or winding up of Ashley.  Doc. [160-2] ¶ 15.

On August 9, 2021, Power delivered a call notice to Cardinals, stating its intention to "exercise the Call with respect to all of the Preferred Units" and to consummate the call "in a timely manner and . . . as soon as practicable."  Doc. [160-2] ¶ 58; *see* Doc. [1-2].  On August 15, 2021, Cardinals sent Power a conversion notice, which Cardinals believed would take effect at the close of business the same day and moot Power's call.  Doc. [160-2] ¶¶ 61-62; *see* Doc. [1-4].  Power responded by filing this lawsuit the next day, levying claims for a declaratory judgment (Count 1), specific performance (Count 2), as well as breach of contract and breach of the covenant of good faith and fair dealing (Count 3).  Doc. [1].  Cardinals then answered and asserted counterclaims against Power for a declaratory judgment (Count 1), specific performance (Count 2), breach of contract (Count 3), and breach of the implied covenant of good faith and fair dealing (Count 4).  Doc. [30].  Power moves for summary judgment on all counts of its complaint and all of Cardinals' counterclaims.  Doc. [144].  Cardinals moves for summary judgment on Counts 1, 2, and 3 of its counterclaims and all of Power's claims.  Doc. [147].

STANDARD

Under Federal Rule of Civil Procedure 56, a court must grant a motion for summary judgment if it finds, based on the factual record, that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those that "might affect the outcome of the suit under the governing law," and there is a genuine dispute where "a

3

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted). The burden then shifts to the non-movant to "present specific evidence, beyond 'mere denials or allegations [that] . . . raise a genuine issue for trial.'" *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019) (quoting *Wingate v. Gage Cnty. Sch. Dist., No. 34*, 528 F.3d 1074, 1078-79 (8th Cir. 2008)). "In order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy." *Binkley v. Entergy Operations, Inc.*, 602 F.3d 928, 931 (8th Cir. 2010) (quotation marks omitted) (quoting *Godfrey v. Pulitzer Pub. Co.*, 276 F.3d 405, 412 (8th Cir. 2002)).

## DISCUSSION

The parties dispute whether the Agreement permitted Cardinals to exercise its conversion right after Power gave notice of its intent to exercise its call option. The Court, having the power "[i]n a case of actual controversy within its jurisdiction" to "declare the rights and other legal relations of any interested party," 28 U.S.C. § 2201, "interpret[s] an L.L.C.'s operating agreement according to the ordinary rules of contract law." *McGuire v. Lindsay*, 496 S.W.3d 599, 607 (Mo. Ct. App. 2016) (citing *CB3 Enterprises LLC v. Damas*, 415 S.W.3d 163, 166 (Mo Ct. App. 2013)). "The primary rule in interpreting a contract is to ascertain the parties' intent and give effect to that intent." *Id.* (citing *Storey v. RGIS Inventory Specialists, LLC*, 466 S.W.3d 650, 654 (Mo. Ct. App. 2015)). The Court "rel[ies] on the plain and ordinary meaning of the words in the contract and consider[s] the document as a whole." *Id.* "The clauses must be read in the context of the entire contract, and interpretations that render provisions meaningless should be avoided." *Id.* (citing *Storey*, 466 S.W.3d at 654-55).

The parties offer competing interpretations of the Agreement. Power contends that its August 9, 2021, call notice "exercised" its "right to purchase" and that the call "shall be consummated within six (6) months after the delivery of notice. . . ." Doc. [144-1] at 17-18. Power believes that the phrase "shall be consummated within six (6) months after the delivery of

4

notice" means that Cardinals cannot moot Power's call through a later conversion. *Id.* at 18. Power argues that the "use of the term 'shall' means the consummation of the call is mandatory and must be accomplished" and claims that "Section 10.5 does not list any conditions under which consummation can be stopped once notice has been delivered." *Id.* Cardinals, for its part, argues that Section 4.1(a) of the Agreement allows for post-call-notice conversion, as Cardinals' "Preferred Units shall be convertible at any time." Doc. [147-1] at 21.

Considering the plain and ordinary meaning of the disputed terms in the context of the entire contract, the Court finds Power's interpretation of the phrase "shall be consummated" unpersuasive. The term "shall" does not necessarily entail an unyielding mandate. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 114 (2012) ("The meaning of *shall* is not fixed: '[t]hough "shall" generally means "must," legal writers sometimes use, or misuse, "shall" to mean "should," "will," or even "may."'" (quoting *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 432 n.9 (1995))). "Shall" can express an expectation without implying anything about whether that expectation may be thwarted by intervening circumstances. Considered in context, "shall" appears to have that meaning here. In the parallel provision relating to Cardinals' put option—the very provision from which the call option's timing provision derives, *see* Doc. [146-3] ¶ 10.5(a)(ii)—the Agreement provides that the put option "shall be consummated within" six months of delivery of notice of its exercise. *Id.* But then, in the very next sentence, it addresses the possibilities that "the Put Closing does not take place in accordance with" that section—without limiting that possibility to any specific condition or set of circumstances—or "that the LLC may not, as of the Put Closing legally redeem the Preferred Units . . . ." *Id*. The latter sentence plainly contemplates that consummation of an option may be impeded, or may even be legally impermissible, notwithstanding the delivery of notice and the provision that the option "shall be consummated within six (6) months [thereof]." *Id.* Moreover, Section 10.5(b) dictates that a "Call shall be consummated within the same time period . . . described in Section 10.5(a)," undermining any possible argument that the phrase "shall be consummated" in reference to the call option should be interpreted differently than the same phrase in reference to the put option. *Id.* ¶ 10.5(b).

Therefore, the text of Section 10.5 does not support Power's position that notice of exercise of its call option triggered a process that *had to* culminate in consummation and *could not* be impeded by any intervening development. And Power provides the Court with no other

5

basis in the text of the Agreement for interpreting "shall be consummated" as a limitation on Cardinals' conversion right, which is described in detail in the Agreement without mention of any such limitation. *See McGuire*, 496 S.W.3d at 607 ("The clauses must be read in the context of the entire contract.").

At the same time, the Agreement's terms unambiguously allow Cardinals to convert its preferred units "at any time," without any exclusion for the period after a call is noticed and before its consummation. Under Section 4.1(a) of the Agreement, the parties agreed that Cardinals' "Preferred Units shall be convertible *at any time* or from time to time by a holder of such Preferred Units giving written notice to the LLC of the exercise of conversion rights. . . ." Doc. [146-3] ¶ 4.1(a) (emphasis added). Section 4.1(b) further provides that "[i]n the event of a liquidation, dissolution or winding up of the LLC, the Conversion Rights shall terminate at the close of business on the last full day preceding the date fixed for the payment of any such amounts distributable on such event to the Preferred Unitholder." *Id.* ¶ 4.1(b). The parties agree that none of those events occurred. Thus, as long as Cardinals was a "holder" of preferred units, the text of the Agreement gave Cardinals the right to convert those units "at any time." *Id.* ¶ 4.1(a).

Power attempts to persuade the Court not to adopt that straightforward reading of the contract's terms with several arguments, all of which fail.

**(1) Cardinals' interpretation does not add nonexistent terms or render key terms meaningless.**

First, Power claims that Cardinals' interpretation adds nonexistent terms to the Agreement and renders key terms meaningless. Specifically, Power asserts that Cardinals' interpretation imposes an unwritten condition on its "right to purchase" and turns the "right" into a mere request. Doc. [144-1] at 19. But that argument rests on the unstated—and unsupported—premise that Power's "right to purchase" must be an unconditional right. Power "offers no reason why the word 'right' is ambiguous or why the Court should interpret it to refer only to unconditional rights. To do so would be to rewrite the [Agreement]. . . ." *CU\*Answers, Inc. v. G2Link, LLC*, 2019 WL 8163864, at *3 (E.D. Penn. Dec. 5, 2019); *see also id.* (articulating the definition of a "right" as "[s]omething that is due to a person by just claim, legal guarantee, or moral principle," and that a conditional right is one of many varieties of a right (quoting *Black's Law Dictionary* 1517-18 (Bryan Garner ed., 10th ed. 2014))).

6

Power also says Section 10.5's use of the term "has exercised" would not make sense if Cardinals could convert its shares, because the use of the present perfect tense indicates a completed act. Doc. [144-1] at 19-20. But the Agreement uses the term "has exercised" in reference to notice of Cardinals' put option immediately before it notes the possibility that consummation may not take place. *See* Doc. [146-3] ¶ 10.5(a)(ii) ("If the Put Closing does not take place . . . ."). Thus, the tense of "has exercised" does not imply that notice triggers an inexorable process from which consummation must result, and that nothing could interrupt that process or prevent consummation. Even if Power "has exercised" its call option, as that phrase is used in the Agreement, Power acknowledges that its call has not been consummated, *see* Doc. [122], and the Agreement sets a six-month timeframe for bringing the call to completion. There is nothing in the phrase "has exercised" that rules out an impediment to consummation, such as Cardinals' conversion of its shares.

And finally, the Court's interpretation of the phrase "shall be consummated" does not render that phrase itself meaningless. As explained above, "shall be consummated within six (6) months," as used in the Agreement, provides a timeframe for closing the call barring any impediment, which the adjacent text explicitly contemplates. *See* Doc. [146-3] ¶ 10.5(a)(ii). Nothing in Section 10.5 or elsewhere in the Agreement supports interpreting it as a mandate that the call *must* be closed or an implied declaration that nothing may impede that closing. *Id*.

**(2) Cardinals' interpretation does not lead to "illogical results."**

Second, Power claims that Cardinals' interpretation of the phrase "at any time" would invite "illogical results." Doc. [144-1] at 23-24. Power argues that "at any time" identifies only when Cardinals can begin exercising its conversion right and is not an absolute authorization. Doc. [160-1] at 18-19. According to Power, if "at any time" is understood to permit conversion after a call has been exercised, then it must also mean that a later call could moot an earlier put, that a belated call could moot a conversion, and that a call noticed months prior to a conversion would be moot. *Id.* at 19. Power warns that such an interpretation would lead to the "nonsensical result" that each party could repeatedly exercise its rights to thwart the other party's attempts to exercise its own. *Id.*

The Court is unpersuaded by Power's attempted *reductio ad absurdum*. To begin with, it is by no means obvious that giving the phrase "at any time" its plain meaning would have the results Power suggests, given the times laid out in the Agreement for the consummation of the

7

various rights.  For example, the Court fails to see how a "belated call could moot a conversion (if noticed the same day)," Doc. [160-1] at 19, because under the Agreement, the conversion would be completed the same day, long before the call's consummation.  Thus, interpreting the term "at any time" in Section 4.1 of the Agreement to mean that a holder of preferred units may convert those units into common units at any time—irrespective of another party's notice of exercise of a call option—is not tantamount to adopting a rule that *any* later-exercised right under the Agreement moots *any* earlier-exercised right.

The Court acknowledges that giving the phrase "at any time" its plain meaning may make it possible for the possessor of preferred units to thwart another party's call.  But the fact that interpreting a contract in accordance with its plain terms would make an aspect of the contract more advantageous to one party or another is not a reason to deem unambiguous text ambiguous.  *See Jacobson Warehouse Co. v. Schnuck Markets, Inc.*, 13 F.4th 659, 668-69 (8th Cir. 2021) ("A contract is unambiguous when it 'uses plain and unequivocal language,' in which case we enforce it as written." (quoting *Deal v. Consumer Programs, Inc.*, 470 F.3d 1225, 1230 (8th Cir. 2006))).  Nor is it a reason to read into a contract a condition—e.g., "except if conversion would thwart an already-noticed call"—that is not supported by its text on the grounds that to do otherwise would be "illogical."  Doc. [144-1] at 23; *see also Birdsong v. Bydalek*, 953 S.W.2d 103, 118 (Mo. Ct. App. 1997) ("[W]hen parties reduce their agreements to writing it is presumed that the instrument contains their entire contract . . . .  It is not enough to say that the implied [condition] is necessary to make the agreement fair, or that without such [condition] it would be improvident or unwise, or that the contract will operate unjustly[.]" (quoting *Conservative Fed. Sav. & Loan Ass'n v. Warnecke*, 324 S.W.2d 471, 478-79 (Mo. App. 1959))).

Especially where, as here, the parties to a contract are sophisticated entities relying on expert advice, this Court does not sit in judgment of whether the trade-offs they made were wise or fair.  The Court's role is to determine what the parties intended, the best evidence of which is the text of the contract itself.  *See, e.g.*, *In re SRC Holding Corp.*, 545 F.3d 661, 668 (8th Cir. 2008) ("In the absence of contractual ambiguity, whether policy coverage 'makes sense' as a business matter is largely irrelevant; freely contracting actors in the marketplace, particularly sophisticated business entities who rely on experts to advise them, are best suited to determine what makes the most economic sense, and the language they have mutually negotiated and agreed to is the best evidence of what those parties intended."); *Schnuck Markets, Inc. v. First*

8

*Data Merch. Data Servs. Corp.*, 86 F. Supp. 3d 1055, 1064 (E.D. Mo. 2015) ("Where, as here, the parties are sophisticated business entities who rely on experts to advise them, the language they have mutually negotiated and agreed to is the best evidence of what they intended.").

### (3) Power has not shown that call options are "binding bilateral contracts."

Third, Power asserts, without apposite authority, that an interpretation of the Agreement that allows Cardinals to convert after receiving notice of the call fails because call options are "binding bilateral contract[s]." Doc. [144-1] at 20-22. But that argument neither engages the text of the Agreement, which provides for conversion "at any time," nor explains why conversion-after-call procedures seem to take place with some regularity in reported cases. *See* Doc. [164-1] at 21-22 & n.8 (collecting cases). Because Power provides no case concluding that the exercise of a conversion right is "contrary to the definition and function of an option," Doc. [144-1] at 20, the Court rejects that argument.

### (4) Power's argument that the Court must strictly construe the rights of preferred unitholders ignores the Agreement's text and relies on the wrong body of law.

Fourth, Power says that Cardinals' interpretation fails because the rights of preferred unitholders must be expressly given and strictly construed, and Cardinals has no express right to convert following a call notice. Doc. [144-1] at 24-26. Power cites several Delaware cases in support of that proposition. *Id.* Putting aside that the Agreement does expressly grant preferred unitholders the right to convert their shares "at any time," the Delaware cases are inapplicable because they apply the law of corporations and not the law of limited liability companies. In Missouri, the stated purpose of the Limited Liability Company Act is "to give the maximum effect to the principle of freedom of contract and to the enforceability of operating agreements." Mo. Rev. Stat. § 347.081(2). Thus, the Court declines to apply the corporate law principles Power advances and instead interprets the Agreement in accordance with principles of contract law. *See McGuire*, 496 S.W.3d at 607.

### (5) Section 4.1(b) provides no support to Power's interpretation, whether exhaustive or not.

Fifth, Power says that Cardinals misreads Section 4.1(b) as an exclusive list of limitations on its conversion right. Doc. [144-1] at 26-28. Section 4.1(b) provides that "[i]n the event of a liquidation, dissolution or winding up of the LLC, the Conversion Rights shall terminate at the close of business on the last full day preceding the date fixed for the payment of any such amounts distributable on such event to the Preferred Unitholder." Doc. [146-3] ¶ 4.1(b). Power

9

says that this provision, rather than providing an exclusive list of events that terminate the conversion right, instead "simply explains *when* conversion rights will terminate in the event of a dissolution or liquidation, and not that conversion rights will *only* terminate upon dissolution or liquidation."[1]  Doc. [144-1] at 26.  That critique of Cardinals' interpretation of Section 4.1(b) does nothing to vindicate Power's claims.

The Court does not have to decide whether Section 4.1(b)'s list of terminating events is exhaustive to find that the text of Section 4.1 is more consistent with Cardinals' interpretation of the Agreement than it is with Power's.  The section broadly authorizes the exercise of conversion rights "at any time," and then says nothing about any limitation in the context of an exercised-but-not-yet-consummated call, even though the parties evidently recognized the need to explain how the termination of the right would work in other contexts.  That hardly bolsters Power's claim that the exercise of its call option terminated the conversion right under the Agreement, even if the text of Section 4.1 does not dispose of the question altogether by stating explicitly that the three situations described are the *only* events that could terminate the conversion right.

**(6) Because the contract is not ambiguous, the Court considers no extrinsic evidence.**

Finally, Power cites extrinsic evidence that the parties did not intend for conversion to moot an exercised call option.  Doc. [144-1] at 28-32.  The "parol evidence rule bars the use of extrinsic evidence unless the instrument to be interpreted is ambiguous."  *Bracht v. Grushewsky*, 448 F. Supp. 2d 1103, 1109 (E.D. Mo. 2006) (citation omitted).  "A contract is ambiguous only if reasonable people may fairly and honestly differ in their construction of the terms because the terms are susceptible of more than one meaning.  A contract is not ambiguous merely because the parties disagree over its meaning."  *Smith v. Taylor-Morley, Inc.*, 929 S.W.2d 918, 921 (Mo. Ct. App. 1996) (citations omitted).  As set forth above, the Court finds that the Agreement is not ambiguous and thus declines to consider extrinsic evidence of the parties' intent.[2]

---

[1] Power notes that the consummation of its call would also terminate Cardinals' conversion rights, and that is not listed among the termination events; therefore, Power argues, the list cannot be exhaustive. *See* Doc. [160-1] at 20.  Unlike the three listed events, the consummation of a call would not result in the termination of conversion rights altogether but rather in the transfer of conversion rights from the old preferred unitholder to the new preferred unitholder.  Therefore, the Court sees no significance in the fact that the drafters did not include the consummation of a call in the list of terminating events.

[2] The Agreement itself also contains an integration clause providing that "[t]his Agreement, those documents expressly referred to herein and other documents of even date herewith embody the complete agreement and understanding among the Parties . . . ."  Doc. [146-3] ¶ 15.13.  "When a contract contains

**CONCLUSION**

Power's claims rest on an erroneous interpretation of the Agreement. Therefore, the Court denies Power's motion for summary judgment and grants Cardinals' motion for summary judgment on all counts in Power's complaint. Cardinals also moved for summary judgment on Counts I, II, and III of its counterclaims. The Court grants summary judgment in part on the declaratory judgment counterclaim (Count I) and, for the reasons set forth above, declares that Cardinals exercised its conversion rights under Section 4.1 of the Agreement, that Cardinals is a Class A Common Unitholder with all the rights of a Class A Common Unitholder, and that Power's attempt to exercise its call option under Section 10.5 of the Agreement is moot in light of Cardinals' conversion under Section 4.1 of the Agreement. *See* Doc. [30] ¶ 46. The Court denies summary judgment on counterclaim Count I to the extent Cardinals seeks "a declaration by this Court that Power . . . h[as] acted in bad faith by attempting to manipulate the books and records of the Company to artificially lower its value," *id.*, because Cardinals did not adequately brief that issue. The Court likewise denies summary judgment on counterclaim Counts II (specific performance) and III (breach of contract), because Cardinals failed to adequately brief those claims, especially the issue of remedy, and also failed to explain if, and to what extent, it sought partial summary judgment on those claims.

Accordingly,

**IT IS HEREBY ORDERED** that Power Investments, LLC's Motion for Summary Judgment, Doc. [144], is **DENIED**.

**IT IS FURTHER ORDERED** that Cardinals Preferred, LLC's Motion for Summary Judgment, Doc. [147], is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that the Joint Motions for Leave to File Under Seal, Docs. [188], [189], [190], [191], are **DENIED** because the Court has not relied on the materials the parties sought to file under seal. Within fourteen (14) days of the date of this Order, the parties may withdraw the exhibits at issue before they become part of the public record. *See* E.D. Mo. L.R. 13.05(B)(2).

---

an integration clause . . . parol evidence may only be considered if there is an ambiguity which cannot be resolved within the four corners of the contract." *W. Silver Recycling, Inc. v. Nidec Motor Corp.*, 509 F. Supp. 3d 1106, 1111-12 (E.D. Mo. 2020) (citing *Tribus, LLC v. Greater Metro, Inc.*, 589 S.W.3d 679, 702 (Mo. App. 2019)). As already noted, the Court finds no ambiguity in the relevant contract text.

11

**IT IS FINALLY ORDERED** that, **no later than March 17, 2023**, the parties must provide a joint memorandum to the Court explaining whether rulings on the motions to exclude testimony are necessary in light of this Order.

Dated this 22nd day of February, 2023.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE